Barbara A. Rohr SBN 273353
Email: brohr@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885

Richard W. Gonnello (*pro hac vice*)
Email: rgonnello@faruqilaw.com
Katherine M. Lenahan (*pro hac vice*)
Email: klenahan@faruqilaw.com
Megan M. Sullivan (*pro hac vice*)
Email: msullivan@faruqilaw.com
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

*Attorneys for Lead Plaintiffs*
*Royal Wulff Ventures LLC and Robert E. Cook, as*
*Trustee for the Robert E. Cook and Paula J. Brooks*
*Living Trust Under An Agreement Dated 12/30/1988*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATRICK LOFTUS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PRIMERO MINING CORP., JOSEPH F. CONWAY, ERNEST MAST, DAVID BLAIKLOCK, AND WENDY KAUFMAN,<br><br>Defendants. | Case No. 2:16-cv-01034 BRO(RAOx)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

TABLE OF CONTENTS

I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 7

IV. LEGAL AND ACCOUNTING BACKGROUND ..... 10

A. Transfer Pricing & Taxation for Intercompany Cross-Border Transactions ..... 10

B. The OECD Guidelines, Mexican Tax Law, and Advance Pricing Agreements ..... 11

C. International Financial Reporting Standards ..... 14

V. FACTUAL BACKGROUND ..... 18

A. Relevant History of the San Dimas Mine ..... 18

B. Primero's Tax Evasion Scheme ..... 23

1. Corporate Restructuring and Amendment of the Internal SPA ..... 23

2. The Revised Transfer Price Between ST Barbados and PEM Recorded in the Amended Internal SPA Does Not Comply with the Arm's Length Principle ..... 25

3. Primero's APA Application and the Natera Brothers ..... 33

C. Mexican Tax Authorities Uncover Primero's Scheme ..... 39

VI. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..... 42

VII. POST-CLASS PERIOD EVENTS ..... 112

A. Mexican Press Coverage of the SAT's Reason for Filing the Nullification Claim Uncovers the Natera Brothers' Involvement ..... 113

B. Primero Continues To Conceal the Substance of the SAT's Claims ..... 116

VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 121

A. Core Operations ..... 121

B. Magnitude of the Fraud ..... 124

C. Press Coverage of the SAT's Crack Down on Tax Evasion Schemes and Silver Wheaton's Tax Woes Put Defendants on Notice that Primero's Tax Arrangements Were Vulnerable To Challenge ..... 125

D. Financial Motive of the Individual Defendants ..... 126

1. Phantom Share Units ....128
2. Insiders Cash Out ....130

E. Financial Motives of the Company ....132

F. Concealment of the SAT'S Threats, the Initial Filing of the Nullification Claim, and the SAT's Stated Reasons for Seeking to Nullify the APA Ruling ....135

G. The IFRS Imposed a Duty Upon Primero To Record a Tax Liability or To Disclose a Contingent Liability with Respect to the APA Ruling ....137

H. Defendants' Tax Scheme Was Inherently Fraudulent ....140

I. Defendants' Tax Scheme Violated the CFPOA ....141

J. Conway Resigned as CEO ....142

K. Violations of Primero's Code of Business Conduct and Ethics ....143

L. Certain Individual Defendants Swore To the Accuracy of Certain Filings ....145

IX. CLASS ACTION ALLEGATIONS ....149

X. LOSS CAUSATION ....152

XI. CONTROL PERSON LIABILITY ....153

XII. THE FRAUD ON THE MARKET PRESUMPTION ....154

XIII. THE AFFILIATED UTE PRESUMPTION ....156

XIV. NO STATUTORY SAFE HARBOR ....156

XV. CAUSES OF ACTION ....157

XVI. PRAYER FOR RELIEF ....161

XVII. JURY TRIAL DEMAND ....162

The allegations in this Consolidated Amended Class Action Complaint[1] are based on the personal knowledge of Lead Plaintiffs Royal Wulff Ventures LLC and Robert E. Cook, as trustee for the Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988, ("**Plaintiffs**")[2], as to Plaintiffs' own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiffs' information and belief is based upon the investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including as follows: (i) review and analysis of those public filings Primero Mining Corp. ("**Primero**" and the "**Company**") made with the United States Securities and Exchange Commission ("**SEC**") and Canadian securities regulatory authorities referenced herein; (ii) review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Primero, Joseph Conway, David Blaiklock, Wendy Kaufman, and/or Ernest Mast (collectively, the "**Defendants**"); (iii) review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control and/or in the custody and control of the SEC, Mexican courts of law, Mexican government authorities, or Canadian government authorities. Plaintiffs believe that additional evidentiary support for their allegations will emerge after a reasonable opportunity to conduct discovery.

---

[1] All internal citations and quotations are omitted and all emphases are added unless otherwise noted.

[2] For ease of reference, a Table of Defined Terms and Abbreviations is provided as Exhibit A; and a Chronology of Key Events is provided as Exhibit B.

## I. INTRODUCTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased or otherwise acquired the securities of Primero in the United States or on the NYSE at artificially inflated prices between October 5, 2012 to February 3, 2016, inclusive (the "**Class Period**"), and who suffered damages thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the "**Exchange Act**") and SEC Rule 10b-5 promulgated thereunder (the "**Class**").

2. This case involves a tax evasion scheme as well as Defendants' numerous false and misleading statements and omissions concerning the scheme; the impact of the scheme on Primero's financial statements and operations; Defendants' concealment of the fraud even after the Mexican tax authorities began confronting Defendants about the scheme; and Defendants' concealment of the Mexican tax authorities' threats and audits of its tax arrangements.

3. Primero is a Canada-based mining company whose principal asset at the outset of the Class Period was the Company's ownership of the San Dimas mine in Mexico. Although the mine has a large silver reserve which can be mined at a relatively low cost, due to contracts that Primero's predecessor entered into (and which Primero assumed when it purchased the mine), Primero faced an onerous tax obligation to the Mexican government.

4. Primero (like its predecessor) was being taxed by the Mexican government at the spot price (*i.e.*, the market price) ("**Spot Price**") for the majority of the silver it extracted from the San Dimas mine and subsequently sold. However, Primero was only receiving approximately $4.00 per ounce (well below the Spot Price) for the vast majority of the silver it was selling. This unusual situation occurred because Primero had agreed to sell the silver from the San

Dimas mine at that price to another Canadian mining company, Silver Wheaton Corp. ("**SW Purchase Price**"), through a series of transnational contractual arrangements involving Primero, Silver Wheaton, and an assortment of their related party subsidiaries across four nations' jurisdictions—all in an effort to avoid paying taxes in both Mexico and Canada.[3]

5. When the original versions of these agreements were entered into in 2004, silver traded at around $6.47 per ounce, but when Primero assumed the agreements in August 2010, silver traded at about $18.99 per ounce. By the outset of the Class Period, silver traded at $34.53 per ounce. Thus, while Primero was only set to receive approximately $4 for each ounce of silver it sold to Silver Wheaton, Primero was to be taxed at the significantly higher Spot Prices.

6. With the price of silver skyrocketing, Primero's already heavy tax burden became even more crushing and threatened the Company's prospects. In an effort to reduce the Company's tax liability and increase Primero's profitability and cash flow, Primero devised a scheme to evade the taxes it owed to Mexico.

7. First, Primero amended a contract between Primero Empresa Minera, S.A. de C.V. ("**PEM**"), its Mexican subsidiary that owned the San Dimas mine, and Silver Trading (Barbados) Ltd. ("**ST Barbados**"), its Barbadian subsidiary that served as the pass-through for silver sales to Silver Wheaton's Cayman subsidiary. Primero amended the contract so that the transfer price (*i.e.*, the sale price) from PEM to ST Barbados was no longer the significantly higher Spot Price of silver but rather the approximately $4 per ounce SW Purchase Price. *See* Ex. C at 2.

8. There was no basis to make these changes other than as part of Primero's effort to evade Mexican tax laws applicable to transnational asset transfers between a company's related party subsidiaries. The fundamental

[3] A depiction of the contractual arrangements can be found at Exhibit C.

principle governing the taxation of such transfers is known as the "arm's length principle." Under the arm's length principle, as described in Article 179 of Mexico's Income Tax Law, taxpayers dealing with foreign related parties must determine their gross income and allowable tax "deductions by using the prices and consideration that they would have used with independent parties in comparable transactions."

9. Here, no independent party would have agreed to sell silver to a third party at prices that were so substantially below the Spot Price. Indeed, to do so would have been a waste of corporate assets. For that matter, why else would Primero's predecessor not have taken the same simplistic approach and merely paid income taxes to Mexico on the $4 per ounce SW Purchase Price rather than the Spot Price of silver?

10. In order for Primero's scheme to succeed, there was of course more to the story. In Mexico, a taxpayer can seek a ruling on an "advance pricing agreement" ("**APA**") from Mexico's tax authority, the Servicio de Administración Tributaria (the "**SAT**") to confirm the appropriate pricing method for the corporate taxpayer to apply to intercompany sales under the arm's length principle. Recognizing that the amended contract was a transparent attempt to flout Mexican tax law, Primero took steps to ensure that the fix was in at the SAT. That is, Primero hired as its lawyer Christian Natera Niño de Rivera, a lawyer who just so happened to be the brother of Luis Natera Niño de Rivera, the head of the Transfer Pricing Audit Administration at the SAT. The latter Natera brother had Primero's application improperly approved, much to the detriment of the Mexican taxpayer.

11. In fact, when Primero first discussed its plans to seek a new tax treatment, one analyst candidly asked what possible incentive Mexico would have to agree to this, as the country would be the "net loser" if Primero only had to pay taxes on the Spot Price. After Primero submitted its APA application, another

analyst commented that the probability of a positive ruling was "highly unlikely." Of course, neither the analysts nor the public knew the full extent of Primero's scheme.

12. Thus, when Primero announced on October 5, 2012 that it had received a positive ruling on its APA (the "**APA Ruling**"), which covered the years 2010 through 2014, investors were shocked and Primero's stock rose 36% that day, closing at $7.37. One analyst even referred to the development as a "***miracle of life***" for the Company.

13. But the APA Ruling was no miracle. As *Reforma*, a widely read newspaper in Mexico would later report, the positive APA Ruling was the result of the Natera brothers' chicanery.

14. Just two months after Primero received the APA Ruling a new administration came into power in Mexico that began to crack down on tax evasion schemes of multinational corporations. Eventually, and unbeknownst to investors, the SAT began to threaten Primero's APA Ruling and initiated investigations into and tax audits of PEM. The SAT's investigations eventually led to the temporary suspension of PEM from the country's list of importers and exporters. The SAT's actions culminated in the August 2015 filing of a legal claim against PEM which sought to nullify the APA Ruling. Notwithstanding, Primero continued to tout the continued viability of the APA Ruling for the 2010-2014 period and presented the likelihood of its subsequent renewal on the same terms as virtually guaranteed.

15. It was not until February 3, 2016 that the truth began to emerge as Primero announced that PEM ***received*** a legal claim by the SAT which sought to nullify the APA Ruling. In response, Primero's stock plummeted 28% and investors suffered massive losses.

16. Unbeknowst to investors prior thereto, the true facts, which were known and/or recklessly disregarded by Defendants but concealed from the investing public during the Class Period, were as follows:

(a) Primero's accounting for sales of silver by PEM to ST Barbados did not comply with applicable Mexican transfer pricing rules and therefore the Company inappropriately recorded revenue and taxes from sales of silver produced from PEM's sales of silver produced at the San Dimas mine at the SW Purchase Price rather than the Spot Price at all times during the Class Period;

(b) Primero's financial statements did not comply with the applicable accounting standards because Primero failed to recognize and record appropriate tax liabilities in the Company's financial statements, and as a result Primero's net income was materially overstated and its income tax expense was materially understated;

(c) Alternatively, Primero's financial statements did not comply with the applicable accounting standards because the Company failed to disclose in the notes to its financial statements the existence of substantial contingent tax liabilities;

(d) The APA Ruling, which the Company claimed allowed it to pay taxes on the sale of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price, was procured by fraud or misrepresentation and was therefore vulnerable to retroactive nullification;

(e) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's

recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal; and

(f) The SAT was highly unlikely to renew the APA Ruling on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

## II. JURISDICTION AND VENUE

17. This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in this District.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## III. PARTIES

21. Lead Plaintiffs Royal Wulff Ventures LLC and Robert E. Cook, as trustee of The Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988, as set forth in their shareholder certifications (ECF

No. 13-4), acquired Primero securities at artificially inflated prices during the Class Period and were damaged thereby.

22. Primero is a producer of precious metals with operating mines in Canada and Mexico. Primero is headquartered in Toronto, Ontario, Canada and trades on the NYSE under the ticker symbol "PPP."

23. Defendant Joseph F. Conway ("**Conway**") served as the Company's Chief Executive Officer ("**CEO**") from June 2010 until January 31, 2016. On January 31, 2016, Conway became Primero's Executive Vice Chairman.

24. Defendant Ernest Mast ("**Mast**") became Primero's CEO on January 31, 2016. Prior to this date, Mast served as Primero's President and Chief Operating Officer ("**COO**").

25. Defendant David Blaiklock ("**Blaiklock**") served as the Company's Chief Financial Officer ("**CFO**") from the beginning of the Class Period until September 29, 2014.

26. Defendant Wendy Kaufman ("**Kaufman**") became Primero's CFO on September 29, 2014 and served in that position through the end of the Class Period.

27. The defendants referenced above in ¶¶23-26 are sometimes referred to herein as the "**Individual Defendants**."

28. Defendant Primero and the Individual Defendants are referred to herein, collectively, as the "**Defendants**."

29. The Individual Defendants, because of their positions with the Company, possessed the authority to control, correct, and/or update the contents of Primero's public disclosures to the market. Each of the Individual Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the Company's financial results and operations. The Individual Defendants further had the duty to correct and/or

update any previously issued statements that were untrue or became materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful, complete, and accurate information. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the Company's financial results and operations. By virtue of such duties, these officers and directors were required, *inter alia*, to:

a) conduct and supervise the business of Primero in accordance with federal laws;
b) supervise the preparation of Primero's SEC filings and approve any reports concerning Primero's financial reporting and results; and
c) ensure that Primero established and followed adequate internal controls.

30. As officers, directors, and/or controlling persons of a publicly-held company which is registered with the SEC under the federal securities laws and the securities of which were traded on United States' securities exchanges, including the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to (1) promptly disseminate complete, accurate, and truthful information with respect to the Company's financial statements and operations; (2) correct any previously issued statements that were materially misleading or untrue when made so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information; and (3) update any previously-issued forward-looking statements that became materially misleading or untrue so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information.

31. The Individual Defendants are each primarily liable for the misrepresentations and misleading statements alleged herein and are also liable as

controlling persons of Primero. The Individual Defendants are each primarily liable for the scheme which deceived the investing public regarding Primero's tax liability, which caused Plaintiffs and other members of the Class to purchase or acquire Primero securities at artificially inflated prices during the Class Period and suffer damages as a result.

32. Primero is liable for the acts of the Individual Defendants and its employees and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.

33. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Primero under *respondeat superior* and agency principles.

## IV. LEGAL AND ACCOUNTING BACKGROUND

### A. Transfer Pricing & Taxation for Intercompany Cross-Border Transactions

34. A major issue facing governments today involves attempts by multinational corporations to avoid taxes by using intercompany transfer pricing to shift profits to related entities in low tax jurisdictions, like the Cayman Islands and Barbados. *See* Prem Sikka, *Shifting profits across borders*, The Guardian (Feb. 12, 2009), https://www.theguardian.com/commentisfree/2009/feb/11/taxavoidance-tax.

35. "Transfer pricing" refers to the "prices at which an enterprise transfers physical goods and intangible property or provides services to associated enterprises." Organisation for Economic Co-Operation and Development (the "**OECD**"), Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations (July 2010) ("**OECD Guidelines**"), at 11.

36. The OECD has attempted to address this problem by creating international transfer pricing rules, which are set forth in the OECD Guidelines. The guiding standard of the transfer pricing rules is the arm's length principle, which OECD member countries, including Mexico, "have agreed should be used for tax purposes by [multinational enterprise] groups and tax administrations." OECD Guidelines at 1.1.

**B. The OECD Guidelines, Mexican Tax Law, and Advance Pricing Agreements**

37. In 1997, Mexico adopted the OECD's transfer pricing guidelines to construe the transfer pricing provisions set forth in Mexico's Income Tax law (the "**ITL**"). Article 179 of the ITL sets forth the arm's length principle as follows:

> Corporation taxpayers dealing with foreign related parties are required to determine their gross income and allowable deductions by using the prices and consideration that they would have used with independent parties in comparable transactions.

(this principle was previously set forth in Article 215 of the ITL until December 31, 2013); *see also* OECD, *Peer Review of Mexican Transfer Pricing Legislation and Practice*s ("**OECD Peer Review**"), at 25, http://www.oecd.org/tax/transfer-pricing/38665215.pdf.

38. Article 179 of the ITL provides that the OECD Guidelines are applicable to the interpretation of provisions in Mexico's tax law which are devoted to multinational enterprises.

39. Parties are considered to be related "if one participates, directly or indirectly, in the management, control or capital of the other or if one individual or entity, or a group of individuals or entities participates, directly or indirectly, in the management, control or capital of two or more entities or individuals." OECD Peer Review at 7. Failure to follow the arm's length principle is grounds for the Mexican tax authority, the SAT, "to determine the income and allowable

deductions by considering the prices and consideration that *independent parties would have used in comparable transactions*[.]" OECD Peer Review at 7.

40. Transactions, or entities, are found to be "comparable when no differences exist that significantly affect the price, consideration or profit margin to which the transfer pricing methods refer, or, where any such differences do exist, when they can be eliminated through reasonable adjustments." OECD Peer Review at 14. When determining whether a transaction between independent parties is comparable to one between associated entities, the following factors must be considered:

- Characteristics of the transactions;
- Functions or activities, assets used and risks assumed in the operations of each of the parties to the transaction;
- Contractual terms;
- Economic circumstances; and
- Business strategies, including market penetration, permanence and expansion.

OECD Peer Review at 14.

41. Article 76 of Mexico's Federal Fiscal Code (the "**FFC**") allows tax authorities to assess penalties, which can be up to 55-75% of the omitted income tax, if it is determined that an adjustment to the company's transfer pricing is necessary and no transfer pricing documentation supports the company's original determination of its transfer prices.

42. Certain countries allow taxpayers to avoid future disputes over transfer pricing by entering into a prospective agreement regarding the taxpayer's transfer prices, known as an "advance pricing agreement," or APA.

43. The OECD Guidelines define an APA as "an arrangement that determines, in advance of controlled transactions, an appropriate set of criteria . . .

for the determination of the transfer pricing for those transactions over a fixed period of time." OECD Guidelines at 4.123. One advantage of an APA is that it "can stimulate a free flow of information among all parties involved for the purpose of coming to a legally correct and practicably workable result." OECD Guidelines, at 4.143. The OECD Guidelines also stress that "taxpayers in identical situations should not be treated differently" when applying for an APA. *Id.* at 4.163.

44. The regulations governing APAs in Mexico are established under Article 34-A of the FFC. Ernst & Young, *Guide to Advance Pricing Agreements (APA), Mexico,* http://www.ey.com/GL/en/Services/Tax/International-Tax/Guide-to-advance-pricing-agreements--APA----Mexico.

45. In Mexico, APAs are not agreements between the tax administration and the taxpayer. OECD Peer Review, at 59. Rather, they are administrative tax resolutions, or rulings, made by the SAT in response to a specific request by a taxpayer. OECD Peer Review, at 59. APA rulings are issued under Mexico's FFC by the SAT and bind Mexico and the taxpayer with respect to the methodology used to determine the prices or amounts in transactions between related parties under the arm's length principle as defined in ITL Article 179, provided that the taxpayer meets the compliance and documentation requirements. OECD Peer Review at 59-60.

46. Article 34-A of the FFC provides that rulings issued on an APA are valid for five years, spanning the fiscal year in which they are acquired, the immediately preceding year, and the following three fiscal years.

47. Pursuant to Article 36 of the FFC, a favorable APA ruling may only be amended by the Federal Court of Tax and Administrative Justice through a proceeding initiated by the tax authorities, known as a *juicio de lesividad*.

48. According to the OECD Guidelines, APAs "should be subject to cancellation, even retroactively, in the case of fraud or misrepresentation of information during an APA negotiation, or when a taxpayer fails to comply with the terms and conditions of an APA." OECD Guidelines at 4.138. Under the OECD Guidelines, and Mexican law, an APA may be cancelled by the Federal Court of Tax and Administrative Justice if "there was a misrepresentation, mistake or omission that was attributable to the *neglect, carelessness, or willful default of a taxpayer when filing the [] APA request and submission*." OECD Guidelines, Annex to Chapter IV: Advance Pricing Arrangements, at ¶77.

49. Pursuant to Articles 51 and 52 of Mexico's Federal Administrative Litigation Procedure Law, cancellation of an APA Ruling by the Federal Court of Tax and Administrative Justice would result in an annulment of the ruling. In other words, not only would the APA ruling no longer be in effect, it would be void *ab initio*—retroactively annulled as if the APA ruling had never been in effect.

**C. International Financial Reporting Standards**

50. For the fiscal years ended December 31, 2011 through 2015, Primero purported to prepare its financial statements with the SEC in accordance with Internal Financial Reporting Standards ("**IFRS**"). The IFRS are a set of accounting standards developed by the International Accounting Standards Board for the preparation of public company financial statements. *See* What is IFRS?, AICPA IFRS Resources, http://www.ifrs.com/updates/aicpa/ifrs_faq.html#q1. The International Accounting Standards ("**IAS**") are part of the accounting principles included in the IFRS. *See* IFRS.org, *2001 IASB Updates*, http://www.ifrs.org/Updates/IASB-Updates/2001/Documents/upd0104.pdf (Apr. 2001).

51. Under IFRS accounting principles, an uncertain tax position liability is a present or possible obligation that arises from past events in which there is uncertainty as to the probability that the obligation will result in an outflow of resources or uncertainty as to the amount of the outflow. *See* Deloitte, *Income Taxes – Key differences between U.S. GAAP and IFRSs* ("**Deloitte IFRS**"), http://www.iasplus.com/en-us/standards/ifrs-usgaap/income-taxes.

52. IAS 12 prescribes the accounting treatment for income taxes under the IFRS, but does not specifically address the accounting for tax uncertainties. *See id.* The recognition and measurement provisions of IAS 37, which prescribes the accounting treatment for provisions, contingent liabilities, and contingent assets, are relevant to the accounting for tax uncertainties under the IFRS. *See id.* Thus, IAS 37 is the applicable accounting principle for uncertain tax positions under the IFRS from fiscal years 2011 through 2015. *See id.*

53. A liability is a present obligation of an entity that arises from a past event, the settlement of which is expected to result in an outflow of resources from the entity. IAS 37 at ¶10. Under IAS 37, an uncertain liability is recognized in an entity's financial statements when (a) an entity has a present obligation as a result of a past event; (b) it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation; and (c) a reliable estimate can be made of the amount of the obligation. *Id*. at ¶14. For a past event to lead to a present obligation, an entity cannot have a realistic alternative to settling the obligation created by the event. *Id.* at ¶19. In other words, if a present obligation cannot be avoided by the entity's future actions, it must be recognized. *Id*.

54. Accordingly, under IAS 37 an entity is required to **recognize** an uncertain liability in its financial statements if it is probable that an outflow of resources will occur and can be reasonably estimated. *See* Deloitte IFRS. "Probable" is defined as "more likely than not" (*i.e*., the probability that the event

will occur is greater than the probability that it will not). *Id.* Under the IFRS, this means that a contingency which has a "greater than 50 percent" chance of occurring qualifies for recognition under the IFRS. *See* Deloitte, *Contingencies: Key differences between U.S. GAAP and IFRSs*, http://www.iasplus.com/en-us/standards/ifrs-usgaap/contingencies; *see also* SEC, *A Comparison of U.S. GAAP and IFRS*, at 30, https://www.sec.gov/spotlight/globalaccountingstandards/ifrs-work-plan-paper-111611-gaap.pdf (Nov. 16, 2011).

55. With respect to uncertain tax liabilities, therefore, an entity is required to recognize and record a tax liability in its financial statements if it is more likely than not that it will be assessed additional income taxes, penalties, or interest and those amounts can be reliably estimated.

56. If any of the foregoing criteria for recognizing an uncertain liability is not met, an entity will not need to recognize an uncertain liability, but may need to disclose it in its financial statements as a contingent liability. *See* IAS 37 at ¶¶10-11.

57. A contingent liability is defined as (a) a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events that are not wholly within the entity's control; or (b) a present obligation that arises from past events but is not recognized because (i) it is not probable that an outflow of resources embodying economic benefits will be required to settle the obligation; or (ii) the amount of the obligation cannot be reliably estimated. IAS 37 at ¶10.

58. With respect to tax-related contingent liabilities, IAS 12 provides that they must be disclosed in accordance with IAS 37:

> An entity discloses any tax-related contingent liabilities and contingent assets in accordance with IAS 37 Provisions, Contingent

> Liabilities and Contingent Assets. **Contingent liabilities and contingent assets may arise, for example, from unresolved disputes with the taxation authorities.** Similarly, where changes in tax rates or tax laws are enacted or announced after the reporting period, an entity discloses any significant effect of those changes on its current and deferred tax assets and liabilities (see IAS 10 Events after the Reporting Period).

IAS 12 at ¶88.

59. A contingent liability is disclosed unless the possibility of an outflow of resources embodying economic benefits is remote. IAS 37 at ¶28. Consequently, an entity is required to **<u>disclose as a contingent liability</u>** an uncertain tax liability when it is more than likely that no additional income taxes, penalties, or interest will be assessed (*i.e.*, 50% or less likelihood of occurrence) but the chances that they will be assessed are not remote. *Id.* Stated differently, a contingent liability must be disclosed when the probability of its occurrence is less than 50%, but is not remote. *See id.* at ¶¶10, 28. The entity disclosing a contingent liability must disclose: (a) an estimate of its financial effect; (b) an indication of the uncertainties relating to the amount or timing of any outflow; and (c) the possibility of any reimbursement. IAS 37 at ¶86.

60. Under the IFRS, contingent liabilities are to be "assessed continually to determine whether an outflow of resources embodying economic benefits has become probable" as they "may develop in a way not initially expected." IAS 37 at ¶30.

61. IAS 34, which prescribes the accounting treatment for interim financial statements, provides that current tax liabilities and any changes to contingent liabilities need to be provided in an entity's interim financial statements. *See* PWC, *Illustrative interim financial information for existing IFRS* Preparers, at 3, 12, https://www.pwc.com/gx/en/ifrs-reporting/pdf/illusinterimccfs.pdf (June 2008).

62. When reporting under IAS 34, "[a]n entity shall apply the same accounting policies in its interim financial statements as are applied in its annual financial statements, except for accounting policy changes made after the date of the

most recent annual financial statements[.]" IAS 34 at ¶28, http://ec.europa.eu/internal_market/accounting/docs/consolidated/ias34_en.pdf (June 21, 2012).

63. At a minimum, interim financial statements must include "each of the headings and subtotals that were included in its most recent annual financial statements and the selected explanatory notes as required by this Standard." IAS 34 at ¶10. In sum, "the principles for recognizing assets, liabilities, income, and expenses for interim periods are the same as in annual financial statements." IAS 34 at ¶29.

## V. FACTUAL BACKGROUND

### A. Relevant History of the San Dimas Mine

64. The San Dimas mine consists of three gold-silver mining operations at Tayoltita, San Antonio (Central Block) and Santa Rita. Form 40-F, Ex. 99.1 at 10 (Aug. 11, 2011). The mine is located in Mexico's San Dimas district, which is on the border of the Durango and Sinaloa states. *Id*. at 9.

65. Prior to Primero's purchase of the San Dimas mine in 2010, the mine was owned by Goldcorp Inc. ("**Goldcorp**").

66. On October 15, 2004, Silver Wheaton entered into a metal streaming agreement with Goldcorp. Silver Wheaton Corp., *San Dimas (Mexico)* ("**San Dimas History**"), http://www.silverwheaton.com/streams/san-dimas/default.aspx. Steaming agreements allow a company like Silver Wheaton "to purchase, in exchange for an upfront payment, the by-product silver or gold production of a mine [Silver Wheaton] does not own or operate," at a fixed price. Silver Wheaton, *Streams*, www.silverwheaton.com/streams.

67. Mining companies enter into such agreements to receive upfront financing. Rather than take on more debt or issue equity, they sell future metal production instead.

68. The metal streaming agreement between Goldcorp and Silver Wheaton provided that Silver Wheaton would purchase all of the silver produced by Goldcorp's Luismin mining operations in Mexico, which consisted primarily of the San Dimas and Los Filos mines, and was documented in two silver purchase agreements, an "**External SPA**" and an "**Internal SPA**", which set forth the transaction's structure.

69. The External SPA was between Goldcorp's Barbadian subsidiary, Goldcorp Trading (Barbados) Ltd. ("**Goldcorp Barbados**") and Silver Wheaton's Caymanian subsidiary, Silver Wheaton Caymans ("**SW Caymans**"), and provided that Goldcorp Barbados would sell silver from the mines to SW Caymans at the contract price of the lesser of $3.90 per ounce or the Spot Price. San Dimas History; *see* Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12. In 2004, the average price of silver was $6.68 per ounce. *See* Ex. D, Silver Price Chart.[4] As partial consideration for the silver sold to SW Caymans, SW Caymans paid Goldcorp Barbados CAN $46 million and 540 million Silver Wheaton common shares on October 15, 2004. External SPA[5] at 2.

70. While Goldcorp owned San Dimas, the External SPA was amended on March 30, 2006, eliminating any capital expenditure contributions previously required to be paid by Silver Wheaton. San Dimas History. To induce Goldcorp to amend the agreement, SW Caymans agreed to pay Goldcorp Barbados (1) 18 million Silver Wheaton common shares; and (2) a non-interest bearing promissory

---

[4] The historical silver prices contained in Exhibit D and referenced throughout were derived using a Bloomberg Terminal.

[5] The External SPA is formally titled the Second Amended and Restated Silver Purchase Agreement (Aug. 6, 2010), which was filed as Exhibit 99.103 of Primero's August 11, 2011 Form 40-F.

note for US $20 million, which was paid in full on March 29, 2007. External SPA at 17; San Dimas History.

71. The Internal SPA was between the Goldcorp subsidiary that owned the mines, Desarrollos Mineros San Luis, S.A. de C.V. ("**DMSL**")[6], and Goldcorp Barbados, and provided that DMSL would sell the silver from the mines to SW Caymans at the Spot Price. *See* Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12. Pursuant to the payment structure set forth in the Internal SPA and the applicable transfer pricing rules, Goldcorp paid income taxes in Mexico on silver from the San Dimas mine at the Spot Price rather than at the SW Purchase Price. *See id.* ("Until October, 2011, the Company computed income taxes in Mexico based on selling all silver produced at the San Dimas mine at market prices (the price in the Internal SPA that it was required to assume on the acquisition of the San Dimas mine).").

72. Silver Wheaton, however, paid no income tax on its profits from sales of silver from the San Dimas mine to any country. *See* The Motley Fool, *4 Reasons to Avoid Silver Wheaton Corp.*, http://www.fool.ca/2014/09/30/4-reasons-to-avoid-silver-wheaton-corp/ (Sept. 30, 2014) ("Silver Wheaton currently provides no tax in the income statement . . . [t]he company states that the tax position is a result of the incorporation and operation of main subsidiaries in the Cayman Islands and Barbados where low corporate income tax rates prevail."). In fact, a federal securities class action lawsuit is currently pending in this District against Silver Wheaton in relation to a July 2015 determination by Canada's tax authority, the Canada Revenue Agency (the "**CRA**"), that Silver Wheaton had violated the relevant transfer pricing rules and that, accordingly, its taxable income from the metal streaming agreements entered into by SW Caymans should be increased by approximately $567 million for the period between 2005 and 2010,

---

6 DMSL's ownership of San Dimas is reflected in the External SPA, which Primero filed with the SEC on Aug. 11, 2011.

resulting in additional taxes and penalties assessed against the Company in excess of $207 million. Press Release, *Silver Wheaton Remains Confident in Business Structure Following Receipt of CRA Proposal Letter* (July 6, 2015). U.S. District Judge Christina A. Snyder recently sustained the plaintiffs' claims against Silver Wheaton, denying the Silver Wheaton defendants' motion to dismiss. Ex. E, *In re Silver Wheaton Corp. Sec. Litig.*, No. 15-cv-5173-CAS(JEMx), 2016 U.S. Dist. LEXIS 74162 (C.D. Cal. June 6, 2016).

73. On August 6, 2010, Goldcorp sold the San Dimas mine to Primero in exchange for US $510 million, structured as follows: $216 million in cash; 31,151,200 in common shares of Primero, which represented 36% of the Company's outstanding common shares; a $60 million convertible note; and a $50 million 5-year note. Press Release, *Primero Announces Completion of San Dimas Acquisition* (Aug. 6, 2010). In Mexico, mines can be owned by foreign companies, but only Mexican companies or individuals may own mining concessions (*i.e.*, the right to explore and exploit the mineral resources from a particular area). *See* International Comparative Legal Guides, *Mexico Mining Law 2016* (Aug. 24, 2015), http://www.iclg.co.uk/practice-areas/mining-law/mining-law-2016/mexico. The San Dimas mine would be owned and operated by PEM. Nov. 8, 2012 Form 6-K, Ex. 99.2 at 10. In addition to the San Dimas mine, Primero also acquired Goldcorp's Barbadian subsidiary, which was renamed ST Barbados. *Id.* at 11.

74. In connection with the sale, Primero was required to assume the External SPA and the Internal SPA, with amendments. *Id.* at 12. For each of the first four years after the acquisition date, the first 3.5 million ounces per year of silver produced by the San Dimas mine, plus 50% of the excess silver above this amount, was to be sold by PEM to ST Barbados at Spot Prices. *Id.* ST Barbados in turn must sell that silver to SW Caymans at the lesser of $4.04 per ounce (adjusted by 1% per year) and Spot Prices. *Id.* After four years, the first 6 million

ounces per year of silver produced by the San Dimas mine, plus 50% of the excess silver above this amount, must be sold to SW Caymans at the lesser of $4.20 per ounce (adjusted by 1% per year) and Spot Prices for the life of the mine. *Id.* Primero[7] may sell all silver not sold to SW Caymans at Spot Prices. *Id*. at 12. When the Company acquired the San Dimas mine in August 2010 and assumed the External and Internal SPAs, the Spot Price of silver was about $17-$18 per ounce. *See* Ex. D, Silver Price Chart.

75. Notably, the Company did not receive any of the original upfront payment that Silver Wheaton made to Goldcorp's then-subsidiary ST Barbados under the original agreements. Nov. 8, 2012 Form 6-K, Ex. 99.2 at 12. Indeed, as of 2008, ST Barbados no longer held the 540 million shares of Silver Wheaton it received on October 4, 2015 (*see* Bloomberg Terminal), and as of August 6, 2010, ST Barbados had disposed of the shares it acquired to induce it to enter into the March 30, 2006 amendment and the promissory note had been satisfied in full (External SPA at 17).

76. In 2009, the San Dimas mine produced 5.1 million ounces of silver. Press Release, Goldcorp Announces Sale of San Dimas mine (June 2, 2010). In 2010, the mine produced 4.53 million ounces of silver. Aug. 11, 2011 Form 40-F, Ex. 99.1 at 10. Based on these historical figures, it is clear that PEM would sell a substantial portion of the silver produced from the San Dimas mine to SW Caymans at the SW Purchase Price of about $4 per ounce.

---

[7] At all relevant times, Primero referred to its silver sales, revenues, income, and taxes as belonging to the Company or PEM interchangeably. *See, e.g.*, Nov. 8, 2012 Form 40-F/A, Ex. 99.2 at 9 (explaining under "basis of consolidation" that "[a]ll material intercompany transactions and balances, revenues and expenses have been eliminated" in the Company's financial statements."); Apr. 2, 2013 Form 40-F, Ex. 99.2 at 8; Apr. 1, 2014 Form 40-F, Ex. 99.2 at 7. Accordingly, silver sales, revenues, income, and taxes are also referred to herein as belonging to Primero or PEM interchangeably.

77. By March 2011 the Spot Price of silver had soared even higher, to about $35 per ounce. *See* Ex. D, Silver Price Chart. Meanwhile, PEM computed income taxes in Mexico based on selling all silver produced at the San Dimas mine to ST Barbados at Spot Prices as provided in the Internal SPA. Nov. 8, 2012 Form 6-K, Ex. 99.2 at 42. Through 2013, two federal taxes in Mexico applied to the operations of mining companies like Primero, the corporate income tax and the Flat Rate Business Tax ("**FRBT**"). Apr. 2, 2013 Form 40-F, Ex. 99.1 at 37. For the years 2010 to 2013, Mexico's corporate tax rate was around 30%, and the FRBT, which was in effect until 2013, was approximately 17.5%. *Id*. As such, the high silver Spot Price made the income taxes assessed by Mexico quite substantial. For example, in the first quarter of 2011, Primero recorded a net loss of $7.895 million ***after paying $12.9 million in income taxes on pre-tax income of just $5.05 million***. Aug. 11, 2011 Form 40-F, Ex. 99.8 at 16.

## B. Primero's Tax Evasion Scheme

78. As the soaring price of silver threatened the Company's prospects, Primero devised a scheme to evade income taxes in Mexico. The first step in the Company's scheme was, as described above in ¶7, to amend its corporate structure, by which Primero changed the price payable by ST Barbados to PEM in the Internal SPA from the Spot Price to the SW Purchase Price reflected in the External SPA. Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12. The second step was to hire someone with sufficient connections at the Mexican tax authority, the SAT, to improperly obtain a positive ruling on the Company's APA.

### 1. Corporate Restructuring and Amendment of the Internal SPA

79. During a May 17, 2011 conference call, Defendant Conway cryptically discussed the Company's plan to reduce the amount of taxes it pays in

Mexico, which involved an "internal review" of "corporate restructuring." Q1 2011 Earnings Call, Bloomberg Tr. at 3 (May 17, 2011).

80. When asked about the Company's tax initiatives and corporate restructuring on a July 13, 2011 conference call, Conway noted the need to get Mexico's approval for the restructuring through an "advance pricing ruling" and judged the Company's chances of success of getting this approval as "50-50." When an analyst asked why the Mexican government might agree to a structure that would ultimately reduce its income tax revenue, Conway gave a convoluted answer:

* * *

> [Conway]: . . . . Obviously we have got some initiatives going, which we have highlighted in the past and we are going to continue with those. So I think it's just – and I think we'll continue to move forward on those with – under Jon's leadership in that respect.
>
> [Anita Soni, Analyst]: Just for my benefit, because I don't cover Primero, although I did cover San Dimas through Goldcorp. Could you just reiterate what those initiatives are?
>
> [Conway]: Sure. Basically what we've been doing, we announced one which is called accelerated depreciation, but what we're looking at is some other structures where as you may realize, we pay tax on a good portion of our production at spot and yet, we only received – on the silver side only, and we only receive C$4.
>
> So there is an inequity, if you like, between the taxation structure and where we actually getting and **we've been looking at a number of, let's call them transfer pricing scenarios under OECD law regulations, which Mexico is part of to look at that.** And we've retained – we've got literally four groups working with us as advisors since about November of this year and we're looking through a number of ways. These are not quick fixes, they are probably longer-term fixes. But if we could do that and it is in excess of a 50/50 scenario, let's say, you're looking at about C$40 million of incremental cash flow here. So, it's a real prize. Don't know that for sure whether we can get it or not, but if we can, it's certainly a value that's going to be coming to the table and shared by both sets of shareholders.
>
> [Anita Soni, Analyst]: I mean, my quick and dirty analysis on that was that it doubles your – based on your reserves right now it kind of doubles your NPV.

> [Conway]: Yeah, that's right. That is literally what the prize is, but again, we don't know that the – **I'd say the probability is 50/50 and it will probably take us because of the way we're looking at it, to go through what's called an advanced ruling process in Mexico,** it will take some time, but we feel that's the appropriate way to go.
>
> [Anita Soni, Analyst]:**And the Mexican government is on board with this, because I mean, they're obviously going to be the net loser in that?**
>
> [Conway]: **No, they are not on board.** We're literally at a point where we're looking at structures and then we'll obviously approach the Mexican taxation authorities to get the advanced ruling or not get the advanced ruling obviously.
>
> [Anita Soni, Analyst]: **What's in it for them to agree to this?**
>
> [Conway]: **Well, I think a couple of things is really -- again, they are part of NAFTA. There are rules and regulations. And if you look at the situation that we're in, it is inequitable, right? And I think the flip side is that if we have that -- that the – what we can do is, obviously, put more money for example into the development of San Dimas or other Mexican properties. But it's really going down to what is the right regulatory environment. And again, they are part of NAFTA, and they are -- these rules are – well, they are open for interpretation that's certainly important. If you would like more detail on it, Anita, I would suggest talking to Tamara in our IR group.**

* * *

Bloomberg Tr.

81. The restructuring would ultimately result in the Internal SPA being amended to change the price that ST Barbados paid to PEM for silver from the San Dimas mine. On October 11, 2011, Primero amended the Internal SPA so that the price payable by ST Barbados to PEM was the same as the SW Purchase Price charged by ST Barbados to SW Caymans under the External SPA (the "**Amended Internal SPA**"). Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12.

### 2. The Revised Transfer Price Between ST Barbados and PEM Recorded in the Amended Internal SPA Does Not Comply with the Arm's Length Principle

82. Under the OECD Guidelines and Mexican transfer pricing rules, there is no real dispute that any transaction between PEM and ST Barbados would be analyzed as a transaction between related parties. *See* ¶39 (Parties are considered

related "if one participates, directly or indirectly, in the management, control or capital of the other or if one individual or entity, or a group of individuals or entities participates, directly or indirectly, in the management, control or capital of two or more entities or individuals.") (quoting OECD Peer Review at 7).

83. Primero was straightforward about the fact that the purpose of restructuring the Company by amending the Internal SPA was to substantially reduce Primero's tax burden in Mexico. *See* ¶¶80-81 above. Here, Primero is plainly at the top of the "control" pyramid, as at all relevant times, PEM and ST Barbados were its wholly-owned subsidiaries. Aug. 11, 2011 Form 40-F, Ex. 99.1 at 6; Apr. 2, 2013 Form 40-F, Ex. 99.1 at 7; Mar. 31, 2015 Form 40-F, Ex. 99.1 at 5. The Company's annual SEC filings issued during the Class Period consistently reported the operations of Primero and its subsidiaries, including PEM and ST Barbados, on a consolidated basis. *See, e.g.*, Nov. 8, 2012 Form 40-F/A, Ex. 99.2 at 9 (explaining under "basis of consolidation" that "[a]ll material intercompany transactions and balances, revenues and expenses have been eliminated" in the Company's financial statements."); Apr. 2, 2013 Form 40-F, Ex. 99.2 at 8; Apr. 1, 2014 Form 40-F, Ex. 99.2 at 7. Primero did not distinguish ST Barbados or PEM as free-standing enterprises in its SEC filings, describing both subsidiaries almost exclusively in the context of their roles with respect to the External SPA and Internal SPA.

84. Moreover, the risk structure of the External SPA illuminates the nature of the relationship among Primero, PEM, and ST Barbados. In the External SPA, Primero agreed "to guarantee the payment and performance of all" of ST Barbados's covenants and obligations under the External SPA. External SPA at 2. Should ST Barbados lack any independent assets, Primero would be responsible for any default by ST Barbados. Furthermore, Primero agreed to "guarantee[] the

prompt and complete observance and performance" of PEM and STB pursuant to the terms of the External SPA. External SPA at 35.

85. Further, it does not appear that Primero even maintained an office in Barbados at any point since acquiring ST Barbados. *See, e.g.*, Apr. 1, 2014 Form 40-F, Ex. 99.1 at 13 (listing offices in Canada and Mexico only). Primero's annual information forms and other SEC filings during the Class Period indicate that all of its directors and officers, with the exception of Mexico resident Eduardo Luna, resided in Canada, not Barbados. *See, e.g.*, Apr. 1, 2014 Form 40-F, Ex. 99.1 at 69-70. Any notice or communication required to be given under the External SPA to ST Barbados or Primero was required to be in writing and addressed to the attention of the "Chief Executive Officer" of an unspecified corporation—presumably Primero—at a Canadian address[8] and fax number. External SPA at 43. Ultimately, no third-party would have contracted independently with ST Barbados or PEM absent the fact that each was wholly-owned by Primero and had their performance guaranteed by Primero.

86. To the best of Plaintiffs' counsel's knowledge, the Company has not made the Amended Internal SPA publicly available. Based upon Primero's own description of the Amended Internal SPA, however, it appears that no consideration—much less material consideration—was exchanged between PEM and ST Barbados for the change in silver price from spot to fixed:

> On October 11, 2011, as part of its restructuring initiatives and based on recognized transfer pricing methodology, the Company amended the Internal SPA to provide that the price payable by Silver Trading to

[8] Indeed, the Canadian address and fax number listed in the External SPA are the same as those listed for the head office of Mala Noche Resources Corp. in Primero's annual information form for 2009, filed as Exhibit 99.27 to the Company's Form 40-F. *See* Aug. 11, 2011 Form 40-F, Ex. 99.27 at 3. Mala Noche Resources Corp. was Primero's name before it acquired the San Dimas mine. "Mala Noche" means "bad night" in Spanish.

purchase silver is the same price as the fixed price charged by Silver Trading under the External SPA.

Nov. 8, 2012 Form 6-K, Ex. 99.2 at 12.

87. The following charts[9] illustrate the structure of the silver transaction between PEM and ST Barbados before and after the October 2011 amendment of the Internal SPA:

Cross-Border Silver Transactions Before The October 2011 Amendment of the Internal SPA




[9] These charts are modeled after the chart titled, "Cross-border Silver Transactions Subject to APA," which appeared at ¶9 of Primero's Notice of Intent to Submit a Claim to International Arbitration Against the Government of the United Mexican States (the "**NOIA**") (June 2, 2016), discussed below.

Cross-Border Silver Transactions After The October 2011 Amendment of Internal SPA




88. The OECD Guidelines note that the arm's length principle and the guidelines themselves "do not and should not apply differently to [business] restructurings or post-restructuring transactions than to transaction that were structured as such from the beginning." OECD Guidelines at ¶9.9. "The relevant question under Article 9 of the OECD Model Tax Convention and the arm's length principle," the guidelines explain, "is whether there are conditions made or imposed in a business restructuring that differ from the conditions that would be made between independent enterprises." *Id.* Accordingly, the fact that the Company chose to restructure the relationship between PEM and ST Barbados does not change the transfer pricing analysis. For Mexico to assess PEM's income taxes based on the SW Purchase Price of silver rather than the Spot Price, Mexico would have to have concluded that the new transfer price recorded in the Amended

Internal SPA was the product of an arm's length transaction at the time the amendments were entered.

89. When analyzed under the OECD Guidelines' comparability factors described above at ¶40, the transfer price for the silver transactions between PEM and ST Barbados as revised in the Amended Internal SPA violates the arm's length principle. For example, with respect to the characteristics of the transaction, the OECD Guidelines note that "differences in the specific characteristics" of the property or services at issue often account "for differences in their value in the open market." OECD Guidelines at 1.39. In the case of a commodity like silver, which is traded on the open market and has a Spot Price readily assigned to it, it is much easier to compare transactions between independent and associated entities. When the Internal SPA was amended in October 2011, the Spot Price of silver was around $38 per ounce. *See* Ex. D, Silver Price Chart. The Amended Internal SPA, however, provided that PEM would accept the SW Purchase Price of approximately $4 per ounce rather than the Spot Price in exchange for nothing. Common sense dictates that an independent party would not accept $4 per ounce for silver that is worth nearly ten times more, unless some additional substantial payment or other benefit was exchanged.

90. Furthermore, Mexico stood to lose out on substantial tax revenue by allowing Primero to pay income taxes on the SW Purchase Price rather than the Spot Price. This resulting shortfall would not be made up by any other party that profited from sales of silver from the San Dimas mine. Neither SW Caymans, the entity that subsequently purchases the San Dimas silver from PEM (via ST Barbados), nor its parent company Silver Wheaton, paid ***any income tax*** in Mexico on the profits they made by thereafter selling the San Dimas silver at Spot Price. An analyst questioned Defendant Conway about this issue during the Company's Q2 2011 Earnings Call:

* * *

[Christopher Shulz, Analyst]: . . . I just wanted to ask with regards to this tax ruling and also implications potentially on Silver Wheaton. Is there a possibility that Silver Wheaton could be the weak link in this tax negotiation? **I mean if the Mexican Government has to view that they should continue to get spot, but that the agreement should be negotiated, renegotiated at a different level. Is there also a potential risk that Silver Wheaton may have to give some concessions on here, because at the end of the day it's a contractual interpretation and <u>I don't know why in essence Silver Wheaton contractual stuff should supersede Mexican tax law</u>?**

[Conway]: Mr. Schulz it's really a -- Silver Wheaton in short we don't think will have any, there will be any impact at all them. **The way the reason that is, because the arrangement with Silver Wheaton between Barbados and the Caymans. And Mexico has no an nexus through on that basis**. So no we don't see any impact on it at all.

[Analyst] Okay. All right. **But there is a chance that they could see things different?**

[Conway] They are being -- so Wheaton you're saying about this Mexican tax?

[Analyst]: **The Mexican tax authority who depends on tax revenues.**

[Conway]: **No, I don't think so again, because there is no method, there is no way that someone could. Again I don't think it relates to Silver Wheaton, but even if the Mexican authorities thought they could, they can't go in, and address, or deal with or an agreement that is outside their own tax jurisdiction. The arrangement between Silver Wheaton in Primero are exclusively in Barbados and in Caymans Islands.**

[Analyst]: Next. And in terms of understanding which arrangement has been signed before, has it been that the Mexican kind of way of assessing taxes on the spot basis, or is it the Silver Wheaton?

[Conway]: No. It's more of assessing on a spot basis. It really doesn't have anything to do with Silver Wheaton.

* * *

Bloomberg Tr., at 9 (Aug. 10, 2011).

91. In light of these rules, the Company could not arbitrarily amend the Internal SPA after it acquired the San Dimas mine and then pay income taxes in Mexico based on the SW Purchase Price without being assessed additional income

taxes on the Spot Price and steep penalties. Indeed, if the applicable transfer pricing rules allowed the Company to pay taxes on the SW Purchase Price of silver rather than the Spot Price by merely amending the Internal SPA's transfer price, surely Goldcorp, from whom Primero inherited the Internal SPA, would have done so at some point during the nearly six-year period in which Goldcorp owned the San Dimas mine.

92. To get the SAT to agree to tax PEM at the reduced transfer price provided in the Amended Internal SPA, Primero needed someone with connections at the SAT to obtain authorization for the new tax payment through an APA. As the Mexican Press would later reveal, the Company found the person it needed, Christian Natera, who previously worked for the SAT.

93. According to Spanish-language news source *Proceso*, in 2009, Christian Natera had been named by Mexican Senator Graco Ramírez as one of the three high-level officials in the SAT who simultaneously worked for White & Case LLP while representing clients in disputes with the SAT. *Proceso*, *"Conflict of interest" between the SAT and an office linked to Gil Diaz* (Aug. 27, 2009).[10] Two days later, the news source *La Jornada* summarized the conflict as follows, "principal officials of the [SAT] are simultaneously partners or are connected to the transnational law firm White & Case, which has been conducting litigation proceedings on behalf of large companies intended to help them avoid the payment of taxes to the Federation." Andrea Becerril, *Legislators require the SAT to clarify presumed influence peddling*, La Jornada, Aug. 29, 2009, at 1. According to the articles, Senator Ramírez's information was based on an examination started in 2008 by Mexico's Supreme Audit Office of the Federation into the performance of the SAT, which was prompted by the large amount of taxes refunded and the high

[10] All quotes from Spanish-language periodicals cited herein are from certified translations.

incidence of cases lost by the Secretary of the Treasury and Public Credit in recent years against taxpayers. Andrea Becerril, *Legislators require the SAT to clarify presumed influence peddling*, La Jornada, Aug. 29, 2009, at 1.

94. As described in further detail below, in 2011, Christian Natera was working at his firm, Natera Consultores, S.C, which specializes in transfer pricing, while his brother Luis served as the head of the SAT's Transfer Pricing Audit Administration. As would later be revealed, Luis Natera just so happened to be the SAT official in charge of reviewing and approving Primero's APA.

### 3. Primero's APA Application and the Natera Brothers

95. On October 17, 2011, just a few days after the Internal SPA was amended, Primero submitted an APA application to the SAT. Press Release, *Primero Announces Commencement of Advance Tax Ruling Process in Mexico and Provides Update on Tax Strategies; Seeking Taxes Be Based on Realized Revenue* (Oct. 18, 2011) ("**Oct. 18, 2011 Press Release**").

96. In light of their application, PEM recorded revenues from sales of silver to SW Caymans, and taxes thereon, at the SW Purchase Price of approximately $4 per ounce since August 6, 2010, the date of the purchase of the San Dimas mine, and the October 2011 filing of the APA. Nov. 8, 2012 Form 40F-A, Ex. 99.2 at 25-26.

97. In addition to filing the APA, PEM claimed a refund for the overpayment of taxes from August 6, 2010 to the date of filing the APA. Primero, Form 40-F (Apr. 3, 2014), Ex. 99.2 at 26. The Company recorded the recovery of this overpayment prospectively, in the fourth quarter of 2011. *Id.* This impacted the Company's 2011 income tax expense by decreasing the Company's current tax expense by $25.3 million and decreasing the Company's deferred tax expense by $11.1 million. *Id.*

98. Before Mexican tax authorities ruled on the APA, the Company disclosed as a contingent liability the maximum amount that it would have to pay if the APA was rejected and it had to revert to paying taxes based on the Spot Price of silver. May 24, 2012 Form 40-F/A, Ex. 99.1 at 41. As of December 31, 2011, the maximum contingent liability was $28.6 million, and would grow during the APA process. *Id.* By March 31, 2012, the amount of the contingent liability had grown to $41.6 million. May 3, 2012 Form 6-K, Ex. 99.2 at 22. As of June 30, 2012 the amount of the contingent liability was $52.4 million plus estimated interest of $5.8 million. Aug. 2, 2012 Form 6-K, Ex. 99.2 at 24.

99. These amounts were significant considering that the Company recorded income of approximately $58.9 million before taxes for the year ended December 31, 2011 (Apr. 3, 2012 Form 40-F, Ex. 99.2 at 3) and recorded income of approximately $37.868 million before taxes for the six months ended June 30, 2012 (May 3, 2012, Form 6-K, Ex. 99.1 at 15).

100. Publicly, Primero discussed its chances of receiving a positive ruling on its APA as greater than 70%, based on "should level" opinions from its advisors. Oct. 18, 2011 Press Release. Despite the Company's optimism, an analyst following Primero noted on August 3, 2012 that the chances of a positive ruling on the Company's APA was "***highly unlikely***." Macquarie, *Primero Mining, Operations improving but risk remains*, at 1 (Aug. 3, 2012). The analyst's skepticism was understandable, particularly in light of the amount of income tax revenue that Mexico stood to lose out on, as evidenced by the contingent liabilities Primero disclosed during the APA process.

101. On October 5, 2012, however, Primero shocked the markets by issuing a press release entitled "Primero Announces Positive Advance Tax Ruling," announcing that the SAT ruled in its favor:

> TORONTO, ONTARIO—(Marketwire – Oct. 5, 2012) – Primero Mining Corp. (Primero" or the Company") (TSX:P)(NYSE:PPP) announced today that the Company's Mexican subsidiary has received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its Advance Pricing Agreement ("APA") filing made in October 2011. ***The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement[1] at realized prices rather than spot prices effective from August 6, 2010***.
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell its silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine***.
>
> [1] According to the silver purchase agreement between the Company and Silver Wheaton Corp. ("Silver Wheaton"), until August 6, 2014 Primero will deliver to Silver Wheaton a per annum amount equal to the first 3.5 million ounces of silver produced at San Dimas and 50% of any excess at US$4.08 per ounce (increasing by 1% per year). Thereafter Primero will deliver to Silver Wheaton a per annum amount equal to the first 6.0 million ounces of silver produced at San Dimas and 50% of any excess at US$4.20 per ounce (increasing by 1% per year). The Company will receive silver spot prices only after the annual threshold amount has been delivered.

* * *

102. This announcement shocked the market, sending Primero stock up 36%, nearly $2 per share, in one day.

103. Shortly after Primero's announcement, an analyst expressed "surprise[] that Primero ha[d] won such a decisive and positive ruling on its silver sales tax treatment" and estimated that the APA Ruling removed $620 million in potential tax liabilities over the life of the San Dimas mine. Macquarie, *Primero Mining, Tax ruling win, upgrade to Outperform*, at 1 (Oct. 9, 2012).

104. The significance of the APA Ruling on the Company's bottom line was touted repeatedly by Defendants and analysts alike. For example, on October 16, 2012, during the Canaccord Genuity Resources Conference, an analyst described the APA as "***<u>a miracle of life</u>***" for the Company, noting that Primero's

stock price increased $2 in one day upon the announcement of the APA Ruling. During that conference, Conway described the Company as having been "cleared" of a "significant tax burden." *Id.*

105. On November 9, 2012, the Company participated in a conference call to discuss Primero's third quarter 2012 earnings, during which Defendant Conway described the APA Ruling as transformative for the Company:

> *   *   *
>
> . . . As you've been following this company you will probably recognize that since June 30, **this company has effectively been transformed largely through the benefit of a positive tax ruling** and announcement of the significant expansion, as well as increased reserves.
>
> And most of that has been at least partially reflected in our share price, where we've gone from $2.52 to roughly $7 in that same period of time. In addition, we continue to improve our balance sheet through debt repayment and increased cash availability. And I will say that we're - generally with our year-to-date results we are pleased but certain aspects of our operating results during the quarter were lower than expected due to a number of events that occurred during the quarter. Fortunately we remedied all of these technical issues and remain very confident of meeting our guidance for the whole year.
>
> *   *   *
>
> In terms of the Silver Purchase Agreement, this is an area of discussion that has quite frankly turned extremely positive very recently. **The recent tax ruling has not only increased our silver leverage, it's effectively transformed the company and added significant cash flow to our long-term plans here**.
>
> Just to remind people, currently under our agreement with Silver Wheaton, the first 3.5 million ounces from August to August, we sell to Silver Wheaton and then anything we do in the remainder of the year we split them 50-50. So and that hurdle rate will come up to 6 million ounces in august 2014 and beyond. However, with the expansion, which will take us to at least 7.3 million ounces of silver, we expect to generate summer spot sales to what we have had historically.
>
> *   *   *

Seeking Alpha Tr. at 1, 3.

106. About a month later, on December 13, 2012, Primero participated in a conference call regarding its acquisition of Cerro Del Gallo, during which Defendant Conway again described the importance of the APA, stating in relevant part:

* * *

> But probably certainly the highlight of this year has been the positive tax ruling where we paid our taxes on realized prices, which was not the case in the past and that in itself adds about $35 million to $40 million of incremental cash flow per year incorporated into that $120 million of after-tax operating cash flow noted above.

* * *

Conference Call, FD (Fair Disclosure) Wire Tr., at 4-5 (Dec. 12, 2013).

107. On January 23, 2013, Primero issued a press release in which Defendant Conway stated that the Company's improved tax position "substantially increase[ed] its annual cash flow." For example, as a result of the APA Ruling, the Company received $22.2 million as a full refund of previously overpaid taxes during 2012. Press Release, Feb. 21, 2013.

108. On February 21, 2013, Primero issued a press release entitled, "Primero Reports Fourth Quarter and Full Year 2012 Results; Generates Record Revenues and Operating Cash Flow and Significant Free Cash Flow," which stated in relevant part:

* * *

> We are very proud of Primero's success in 2012 and the results achieved by our operating team," stated Joseph F. Conway , President and C.E.O. "We built significant value in Primero during the year, increasing reserves, resources and production while being one of the few producers to reduce cash costs. The Company also significantly increased free cash flow as the result of a positive tax ruling while also significantly reducing its debt. These achievements translated into a superior share price performance, with Primero shares appreciating 97% in 2012, as well as inclusion into the S&P/TSX Gold Index.

* * *

109. The February 21, 2013 press release also repeated the following language that was substantially similar to that which appeared in the October 5,

2012 press release that first announced the APA Ruling. This language would become a mantra for the Company about the APA Ruling's importance to Primero and its virtual unassailability absent a change in the terms of the silver purchase agreements or Mexican tax laws:

* * *

> On October 4, 2012 the Company announced that its Mexican subsidiary received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its advance pricing agreement ("APA") filing made in October 2011. **The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010. This ruling significantly improves the Company's free cash flow. Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized silver prices for the life of the San Dimas mine**.

* * *

110. That same day, the Company held its fourth quarter 2012 earnings conference call, during which Defendant Conway described the APA Ruling as removing the "overhang" of the tax burden in Mexico:

* * *

> . . . **An important achievement during the year was certainly the positive tax ruling which we received from the Mexican tax authorities and that has been an overhang on the company for the last relatively two years and that overhang has gone**.

* * *

Q4 2012 Conference Call, Bloomberg Tr. at 2.

111. On December 16, 2013, Defendant Conway emphasized that only a change in industry-wide tax rules in Mexico would lead to a change in the APA's term, stating as follows:

* * *

> [Don Blyth, Analyst]: Okay. And finally, on the Mexican tax ruling that you guys got, there are a lot of qualifiers when that was

> announced, rulings are generally applicable. You assumed that if there were no changes to the application, that you would expect to pay the taxes on the realized prices. Has anything changed on that front? Do you still pretty much expect that the taxes going forward will be on the actual realized silver prices for the life of the mine, as far as you're aware?
>
> [Conway]: Yes. We've had nothing to the contrary. We understand that generally within these APA ruling types of arrangements, which we've got, that's generally the case. As long as they don't make any changes for the overall industry in terms of tax rules, then we'll be continuing to pay on realized prices.

* * *

FD (Fair Disclosure) Wire Tr., at 11.

112. Throughout the Class Period, Primero's SEC filings contained similar statements regarding the APA's continued viability and the likelihood of renewal. *See* ¶¶123-224, *infra*. Unbeknowst to investors, however, the APA was far from bulletproof.

**C. Mexican Tax Authorities Uncover Primero's Scheme**

113. Just two months after Primero announced the positive APA Ruling, a new government administration came to power in Mexico. The new administration consisted of President Enrique Peña Nieto and members of the Institutional Revolutionary Party, succeeding Felipe Calderon's National Action Party, which had been in power since 2000. Many heads and high officials of Mexico's federal government agencies were replaced with the new government. NOIA at ¶16.

114. Additionally, shortly after the new government came to power in in December 2012, the SAT began to crack down on multinational corporations, including those in the mining industry, who were suspected of avoiding their tax obligations in Mexico by shifting profits to countries with lower taxes despite having substantial operations in the country. Luis Rojas & Alexandra Alper, *Mexico eyes seven multinationals in tax avoidance probe*, Reuters (Jan. 23, 2014). As Oscar Molina Chie, appointed head of the SAT's large taxpayer unit with the

new administration, noted, "[i]t matters a lot to us that these companies change their structure to structures where the taxes they pay in Mexico are exactly right." *Id.*

115. SAT officials were also in the crosshairs. In August 2013, not long after the new party took office, Luis Natera was no longer with the SAT. *See Reforma, Firm offers advice on how to defraud the SAT* (May, 3, 2016) (the "**May 3, 2016 *Reforma* Article**"). In fact, in November 2013, Luis Natera had been found "administratively liable for irregularities committed in the position of Central Administrator of Auditing of Transfer Prices of the General Administrator for Major Taxpayers", in violation of the Federal Law on Administrative Responsibilities of Public Servants and was given the administrative sanction of being disqualified temporarily from holding positions, duties or commissions in the public sector for the term of six years and six months." Decision on Petition to Assert Jurisdiction[11] at ¶¶1, 25. The Mexican press would eventually report in May 2016 that Luis Natera's suspension was due to his failure to recuse himself from being involved in Primero's APA application. *See* ¶¶230-32; 235-37, *infra*. To the best of Plaintiffs' counsel's knowledge, this suspension was never publicly reported during the Class Period.

116. As a multinational corporation that had changed its structure for tax purposes and consequently paid millions less in income tax to Mexico, Primero was a prime candidate for the SAT's scrutiny at this time, particularly in light of the fact that Luis Natera had been suspended in connection with the Company's APA.

[11] The October 21, 2015 decision of the First Chamber of the Supreme Court of Justice of the Nation on the petition to assert jurisdiction is described in further detail at ¶¶233-34 below.

117. As Primero would later reveal in June 2016 in its Notice of Intent to Submit a Claim to International Arbitration Against the Government of the United Mexican States, the NOIA, the SAT was challenging Primero's tax situation around this time, threatening PEM's tax arrangements, and even initiating tax audits for certain fiscal years covered by the APA Ruling. *See* NOIA at ¶19. Additional investigations into PEM's operations occurred as well, leading to the May 2015 suspension of PEM from Mexico's list of importers and exporters by Mexican customs officials, impacting PEM's ability to export silver to ST Barbados. *Id.*

118. Despite these threats, audits, and the export license suspension, Primero concealed the fact that the APA was—quite rightly—under attack. Indeed, the Company did not even disclose the license suspension until July 13, 2015, and then only because it could not export silver to ST Barbados in time, delaying the company's silver revenue. Press Release, *Primero Advises of Delay in Silver Revenue Due to Delay in Mexican Exports* (July 13, 2015). Stunningly, the Company made no mention of the fact that the suspension was a part of the SAT's tax investigation—attributing it instead to a mere "discrepancy over the Company's address related to its corporate office relocation." *Id.*

119. Amidst these threats, tax audits, and the license suspension, the SAT filed a *juicio de lesividad* on August 4, 2015 with the Federal Court of Tax and Administrative Justice, seeking to nullify the Company's APA Ruling. NOIA at ¶13.

120. As the Company would later admit, the mere filing of the *juicio de lesividad* "has generated significant legal uncertainty and has harmed Primero." NOIA at ¶15. Notably, however, Primero did not acknowledge the *juicio*'s existence until February 3, 2016, when the Company announced in a press release

that PEM ***received*** ***service*** of a legal claim from the SAT seeking to nullify the APA. The press release stated in relevant part:

> TORONTO, ON--(Marketwired - February 03, 2016) - Primero Mining Corp. ("Primero" or the "Company") (TSX: P) (NYSE: PPP) announced today that its Mexican subsidiary, Primero Empresa Minera, S.A. de C.V. ("PEM"), has received a legal claim from the Mexican tax authorities, Servicio de Administración Tributaria ("SAT"), seeking to nullify the Advance Pricing Agreement ("APA") issued by SAT in 2012. The APA confirmed the Company's basis for paying taxes on realized silver prices for the years 2010 to 2014 and represented SAT's agreement to accept that basis for those years. The legal claim initiated does not identify any different basis for paying taxes. The Company believes this legal claim is without merit and it intends to vigorously defend the validity of its APA. The Company's operations continue as usual.
>
> PEM and its legal counsel are in the process of completing a detailed review of the legal claim, which is in excess of 200 pages. The Company's Mexican legal and financial advisors have informed the Company that SAT's judicial challenge to the validity of an APA is without precedent. The Company's advisors maintain that seeking to nullify an APA undermines the function of an APA, which is to assure a taxpayer of certainty. The Mexican Supreme Court of Justice recently concluded that where a tax ruling is challenged by the tax authorities through a legal claim, there can be no retroactive consequences or payments levied against a taxpayer that obtained the ruling in good faith within applicable legal principles. The Company, and its Mexican legal and financial advisors, continue to believe that the Company has filed its tax returns, and paid all applicable taxes, in compliance with Mexican tax laws.

* * *

121. On this news, the Company's shares fell $0.74 per share, or over 28%, to close at $1.89 per share on February 4, 2016.

## VI. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

122. The bold and italicized statements in this section are those statements alleged to be false and/or misleading.

123. The Class Period starts on October 5, 2012 when the Company issued a press release entitled "Primero Announces Positive Advance Tax Ruling" stating in relevant part:

TORONTO, ONTARIO—(Marketwired – Oct. 5, 2012) – ***Primero Mining Corp. ("Primero" or the Company") (TSX:P)(NYSE:PPP) announced today that the Company's Mexican subsidiary has received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its Advance Pricing Agreement ("APA") filing made in October 2011. The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement[1] at realized prices rather than spot prices effective from August 6, 2010***.

Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell its silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine***.

[1] According to the silver purchase agreement between the Company and Silver Wheaton Corp. ("Silver Wheaton"), until August 6, 2014 Primero will deliver to Silver Wheaton a per annum amount equal to the first 3.5 million ounces of silver produced at San Dimas and 50% of any excess at US$4.08 per ounce (increasing by 1% per year). Thereafter Primero will deliver to Silver Wheaton a per annum amount equal to the first 6.0 million ounces of silver produced at San Dimas and 50% of any excess at US$4.20 per ounce (increasing by 1% per year). The Company will receive silver spot prices only after the annual threshold amount has been delivered.

* * *

124. The Company's statements in ¶123 above were materially false and/or misleading when made because it knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

125. On October 16, 2012, at the Canaccord Genuity Resource Conference, Defendant Conway stated the following in relevant part:

* * *

> [Steve Butler, Analyst]: Our next presenting company is Primero Mining, Joe Conway, President and CEO. I have known Joe for -- Joe, I don't know, 19 years maybe. We worked together at BMO years ago, a big bank, but Nesbitt, Thomson actually by the way.
>
> Primero Mining, what a difference about three months makes. The stock was about $2.50 a share and had little negative exposure to the silver price courtesy of the silver stream deal, but the miracle of life came through for the Company about two to three weeks ago, that is what I'd call it and the stock went up $2 in one day because Mexican authorities agreed that the offshore restructuring of the Company's tax position was kosher, use that term. But anyway, thanks, Joe, for coming and great story in Primero.
>
> [Conway]: Thanks, Steve and thank you for coming this morning. I guess as Steve mentioned, the Company has -- he has had a couple of things happen more recently, but to put it in context, we have been, for the last couple of years, really focused on a couple of things really. One, optimizing the asset because it was under -- it was very inefficient when we bought it and secondly, working on our corporate structure. And that is what Steve alluded to earlier on. ***We had a significant tax burden, which we have just recently got cleared of,*** but more importantly I think as well now that that is done, what else are we doing? And we announced last night an expansion of the mine and I am going to take you through that this morning as well. . . .

* * *

FD (Fair Disclosure) Wire Tr., at 1.

126. The Company's and Conway's statements in ¶125 above were materially false and/or misleading when made because it knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63; and

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification.

127. On November 8, 2012, the Company issued a press release entitled, "Primero Reports Third Quarter 2012 Results; and Maintains Annual Production Guidance," which stated in relevant part:

* * *

> ***On October 4, 2012, the Company received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its APA filing made in October 2011. The ruling confirmed that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver under the silver purchase agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.***

* * *

128. The Company's statements in ¶127 above were materially false and/or misleading when made because it knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

129. On November 8, 2012, the Company filed a Form 40-F/A for the fiscal year ended December 31, 2011 with the SEC, which was signed by Defendant Conway provided the Company's restated year-end financial results for the year ended December 30, 2011. Exhibit 99.2 to the Nov. 8, 2012 Form 40-F/A discussed the APA at note 19, Commitments and Contingencies, stated in relevant part:

* * *

As described in Note 8, on October 17, 2011 the Company's Mexican subsidiary filed a formal application to the Mexican tax authorities for an advance ruling on the Company's restructuring plan that, if successful, would result in paying income taxes in Mexico based on realized rather than spot revenue.

The Company's restructuring plan relies on a detailed transfer pricing analysis in order to support the ongoing sale of silver from Mexico to a related party at the fixed price. Given the intensified scrutiny of transfer pricing in recent years and the significant adjustments and penalties assessed by tax authorities, many jurisdictions (including Mexico) allow companies to mitigate this risk by entering into an advance pricing agreement ("APA").

The APA review is an interactive process between the taxpayer and the tax authority. At the end of the APA process, the tax authority will issue a tax resolution letter specifying the pricing method that they consider appropriate for the Company to apply to intercompany sales under the silver purchase agreement.

For the duration of the APA process, the taxpayer can record its revenues and intercompany pricing under the terms that the taxpayer considers reasonable (given that they are compliant with applicable transfer pricing requirements). ***As such, the Company's Mexican subsidiary has recorded revenues from sales of silver under the silver purchase agreement (and taxes thereon) at the contracted price of approximately $4 since the date of acquisition of the San Dimas Mine (August 6, 2010), and in addition to this has claimed a refund for the "overpayment" of taxes between the date of purchase of the San Dimas Mine (August 6, 2010) and the date of the filing.***

Should the Company be unsuccessful in its APA application, then it will need to pay to the Mexican government the amount of tax which the government deems to be owing in respect of taxation on silver sales under the silver purchase agreement. The Company considers this to be a contingent liability, the outcome of which will not be known until the tax authority issue its final opinion. The maximum contingent liability in respect of such an adverse ruling as at December 31, 2011 is $28.6 million; however at December 31, 2011, the Company's Mexican subsidiary had a taxes receivable balance of $19.6 million and as such the cash that would have to be paid to satisfy the contingent liability at December 31, 2011 is $9.0 million. Since the Company intends to continue to record taxes in Mexico based on realized prices, the contingent liability will grow during the APA process.

* * *

Ex. 99.2 at 44.

130. The Company's and Conway's statements in ¶129 above were materially false and/or misleading when made because it knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63; and

(b) As a result, PEM had not overpaid taxes between the date of the purchase of the San Dimas mine and the date of the APA filing and was therefore not entitled to a refund.

131. Exhibit 99.2 of the Nov. 8, 2012 Form 40-F/A contained a statement signed by Defendants Conway and Blaiklock that the Company's "***consolidated financial statements*** . . . are the responsibility of the Company's management" and "***are prepared in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board***, and reflect management's best estimates and judgment based on information currently available." Ex. 99.2 at 1.

132. In Exhibit 99.2 of the Nov. 8, 2012 Form 40-F/A, ***Primero reported net income of $49.644 million, an income tax expense of $8.594 million, and $11.04 million as a recovery of 2010 taxes based on silver revenue at realized prices for the year ended December 31, 2011***. Ex. 99.2 at 3, 24.

133. Primero's, Conway's, and Blaiklock's statements in ¶¶131-32 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37 and as a result its net income was materially overstated and its income tax expense was materially understated for the year ended December 31, 2011, given the fact that the Company sold 4.12 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[12] whereas the average spot price of silver for the year ended December 31, 2011 was approximately $35.32 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applies in addition to the corporate income tax, was 17.5%; and

[12] *See* Nov. 8, 2012 Form 40-F/A, Ex. 99.3 at 17.

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the year ended December 31, 2011 as required by IAS 12 and IAS 37, given the fact that the Company sold 4.12 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the year ended December 31, 2011 was approximately $35.32 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applies in addition to the corporate income tax, was 17.5%.

134. The Company also filed a Form 6-K with the SEC on November 8, 2012, which was signed by Defendant Blaiklock. Exhibit 99.1 of the Nov. 8, 2012 Form 6-K contained the "Management's Discussion and Analysis" for the third quarter of 2012, which stated in relevant part:

* * *

**RECENT CORPORATE DEVELOPMENTS**

*Advance pricing agreement ruling*

***On October 17, 2011 the Company's Mexican subsidiary, Primero Empresa Minera, S.A. de C.V. ("PEM"), filed a formal application to the Mexican tax authorities for an advance pricing agreement ("APA") on the appropriate price for sales of silver under the silver purchase agreement. In its 2010 and 2011 financial statements and income tax returns, PEM had recorded revenue at the fixed price realized from Silver Wheaton Caymans and computed income taxes on the same basis.***

***On October 4, 2012, the Company received a ruling from the Mexican tax authorities that confirmed the silver pricing in PEM's 2010 and 2011 income tax returns.*** Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming PEM continues to sell silver under the silver purchase agreement on the same terms and there are no changes in the application of Mexican***

> ***tax laws relative to the APA ruling, PEM expects to record revenues and pay taxes on realized prices for the life of the San Dimas mine***.
>
> * * *

Nov. 8, 2012 Form 6-K, Ex. 99.1, at 3.

135. Primero's and Blaiklock's statements in ¶134 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

136. Exhibit 99.1 of the Nov. 8, 2012 Form 6-K also stated in relevant part:

> ***On October 4, 2012, the Company received a positive ruling from the Mexican tax authorities on the APA filing. The ruling confirmed that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010. This ruling significantly improves the Company's cash flow over the duration of the ruling (under Mexican tax law, an APA ruling is***

> ***generally applicable for up to a five year period; for Primero this applies to the fiscal years 2010 to 2014). Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine***.
>
> ***During the nine months ended September 30, 2012, the Company received $22 million as <u>full refund</u> of previously overpaid taxes***.

Nov. 8, 2012 Form 6-K, Ex. 99.1, at 29.

137. The Company's and Blaiklock's statements in ¶136 above were materially false and/or misleading when made because it knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, (i) PEM had not overpaid taxes between the date of the purchase of the San Dimas mine and the date of the APA filing and was therefore not entitled to a full refund; and (ii) the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not

reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

138. The Nov. 8, 2012 Form 6-K also attached Exhibit 99.2, "Condensed Consolidated Interim Financial Statements – September 30, 2012," which stated in relevant part:

* * *

**15. Subsequent events**

**APA ruling**

***As described in Note 6, on October 17, 2011 the Company's Mexican subsidiary filed a formal application to the Mexican tax authorities for an advance ruling on the appropriate price for intercompany silver sales under the Internal SPA.***

***On October 4, 2012, the Company received a positive ruling from the Mexican tax authorities on its APA filing. The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***

Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas Mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas Mine.***

* * *

Nov. 8, 2012 Form 6-K, Ex. 99.2, at 26.

139. Primero's and Blaiklock's statements in ¶138 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San

Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

140. Exhibit 99.2 of the November 8, 2012 Form 6-K provided financial statements amounts for the third quarter of 2012 that the ***Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.2 at 8. In the third quarter of 2012, ***Primero reported net income of $11.586 million and an income tax expense of $369,000***. Ex. 99.2 at 1, 13.

141. Primero's and Blaiklock's statements in ¶140 above were materially false and/or misleading because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated for the third quarter of 2012 given the fact that the Company sold 0.80 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[13] whereas the average Spot Price of silver for the third quarter of 2012 was approximately $29.94 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the third quarter of 2012 as required by IAS 12 and IAS 37, given the fact that the Company sold 0.80 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the third quarter of 2012 was approximately $29.94 per

[13] See Nov. 8, 2012 Form 6-K, Ex. 99.1 at 9.

ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%.

142. On January 23, 2013, the Company issued a press release entitled, "Primero Achieves 2012 Guidance and Provides 2013 Outlook," which stated in relevant part:

* * *

> "Primero had an excellent year in 2012," stated Joseph F. Conway , President and C.E.O. "We demonstrated that the San Dimas mine has significant geological potential and we announced an expansion which will boost production by at least 40% within the next two years. ***We also improved our tax position – substantially increasing our annual cash flow***. In December we announced the pending acquisition of the Cerro Del Gallo development project in Mexico, which will increase our medium-term production to over 250,000 gold equivalent ounces per year and more than triples our resource base. All of these activities translated into a superior share price performance. Primero's share value increased by 97% in 2012 compared against industry equity benchmarks which were all negative. We intend to continue to deliver positive results for all our stakeholders in 2013 and beyond."

* * *

143. The Company's and Conway's statements in ¶142 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at

the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

144. On February 21, 2013, the Company issued a press release entitled, "Primero Reports Fourth Quarter and Full Year 2012 Results; Generates Record Revenues and Operating Cash Flow and Significant Free Cash Flow," which stated in relevant part:

* * *

Tax Ruling Increases Free Cash Flow

***On October 4, 2012 the Company announced that its Mexican subsidiary received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its advance pricing agreement ("APA") filing made in October 2011. The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement[5] at realized prices rather than spot prices effective from August 6, 2010. This ruling significantly improves the Company's free cash flow.*** Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized silver prices for the life of the San Dimas mine.***

***During 2012 the Company received $22.2 million as a <u>full refund</u> of previously overpaid taxes.***

* * *

145. The Company's statements in ¶144 above were materially false and/or misleading when made because it knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, (i) PEM had not overpaid taxes between the date of the purchase of the San Dimas mine and the date of the APA filing and was therefore not entitled to a full refund; and (ii) the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

146. That same day, February 21, 2013, the Company held its Fourth Quarter 2012 Earnings Call, during which Defendant Conway stated in relevant part:

* * *

> ***. . . An important achievement during the year was certainly the positive tax ruling which we received from the Mexican tax authorities and that has been an overhang on the company for the last relatively two years and that overhang has gone***.

* * *

Q4 2012 Earnings Call, Bloomberg Tr., at 2 (Feb. 21, 2013).

147. The Company's and Conway's statements in ¶146 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

148. On February 21, 2013, the Company filed a Form 6-K which contained the Company's financial results and position for the fiscal year ended December 31, 2012 with the SEC, which was signed by Defendant Blaiklock. Exhibit 99.1 of the February 21, 2013 Form 6-K stated in relevant part:

* * *

***On October 17, 2011, the Company's Mexican subsidiary, Primero Empresa Minera, S.A. de C.V. filed a formal application to the Mexican tax authorities for an advance pricing agreement ("APA") on the appropriate price for sales of silver under the silver purchase agreement. In its 2010 and 2011 financial statements and income***

> ***tax returns, PEM had recorded revenue at the fixed price realized from Silver Wheaton Caymans and computed income taxes on the same basis.***
>
> ***On October 4, 2012, the Company received a ruling from the Mexican tax authorities that confirmed the silver pricing in PEM's 2010 and 2011 income tax returns***. Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming PEM continues to sell silver under the silver purchase agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, PEM expects to record revenues and pay taxes on realized prices for the life of the San Dimas mine***.

* * *

Feb. 21, 2013 Form 6-K, Ex. 99.1 at 4. A substantially similar version of Exhibit 99.1 was also submitted with the Company's Form 40-F for the fiscal year ended December 31, 2012 filed with the SEC on April 2, 2013 (*see* April 2, 2013 Form 40-F, Ex. 99.3), signed by Conway, and with Primero's Form 6-K filed on April 11, 2013 (*see* April 11, 2013 Form 6-K, Ex. 99.3), signed by Blaiklock.

149. The Company's and Blaiklock's statements in ¶148 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured

by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

150. Exhibit 99.2 of the Feb. 21, 2013 Form 6-K contained a statement signed by Conway and Blaiklock that the Company's "***consolidated financial statements*** . . . are the responsibility of the Company's management" and ***"are prepared in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board***, and reflect management's best estimates and judgment based on information currently available." Ex. 99.2 at 1. A substantially similar version of Exhibit 99.2 was also submitted with the Company's April 2, 2013 Form 40-F (*see* April 2, 2013, Form 40-F, Ex. 99.3), and with the Company's April 11, 2013 Form 6-K (*see* April 11, 2013 Form 6-K, Ex. 99.3).

151. In Exhibit 99.2 of the Feb. 21, 2013 Form 6-K, ***Primero reported net income of $49.553 million and an income tax recovery of $4.878 million for the year ended December 31, 2012***. Ex. 99.2 at 3.

152. Primero's, Conway's, and Blaiklock's statements in ¶¶150-51 above were materially false and/or misleading because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San

Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated for the year ended December 31, 2012, given the fact that the Company sold 4.30 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[14] whereas the average Spot Price of silver for the year ended December 31, 2012 was approximately $31 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the year ended December 31, 2012 as required by IAS 12 and IAS 37, given the fact that the Company sold 4.30 million ounces of silver and computed taxes at the SW

[14] *See* Feb. 21, 2013 Form 6-K, Ex. 99.1 at 11.

> Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the year ended December 31, 2012 was approximately $31 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%.

153. On April 2, 2013, the Company filed the April 2, 2013 Form 40-F for the fiscal year ended December 31, 2012 with the SEC, which was signed by Defendant Conway and provided the Company's year-end financial results and position. Exhibit 99.1 of the April 2, 2013 Form 40-F contained the "Annual Information Form of the Company for the year ended December 31, 2012," which stated in relevant part:

* * *

> ***On October 17, 2011, Primero Empresa filed a formal application to the Mexican tax authorities for an advance pricing agreement ("APA") on the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement. In its 2010 and 2011 financial statements and income tax returns, Primero Empresa had recorded revenue at the fixed price realized from Silver Wheaton Caymans ("SW Caymans") and computed income taxes on the same basis. On October 4, 2012, the Company received a ruling from the Mexican tax authorities that confirmed the silver pricing in Primero Empresa's 2010 and 2011 income tax returns***. Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming Primero Empresa continues to sell silver under the silver purchase agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, Primero Empresa expects to record revenues and pay taxes on realized prices for the life of the San Dimas Mine***. See "Risk Factors –APA Ruling".

* * *

April 2, 2013 Form 40-F, Ex. 99.1 at 9.

154. The Company's and Conway's statements in ¶153 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

155. On May 8, 2013, Primero filed a Form 6-K with the SEC which provided the Company's financial results and position as of March 31, 2013, the first quarter of 2013, and was signed by Defendant Blaiklock. Exhibit 99.1 of the May 8, 2013 Form 6-K contained the "Management's Discussion and Analysis of Financial Conditions and Results of Operations for the Three Months Ended March 31, 2013," which stated in relevant part:

* * *

When the Company purchased the San Dimas mine it assumed a silver purchase agreement under which the majority of silver produced at the mine was sold at a fixed price of approximately $4 per ounce. ***On October 4, 2012, the Company received a ruling from the Mexican tax authorities on the APA filing that confirmed that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010***. ***This***

> ***ruling significantly improves the Company's cash flow over the duration of the ruling (under Mexican tax law, an APA ruling is generally applicable for up to a five year period; for Primero this applies to the fiscal years 2010 to 2014). Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.***

* * *

May 8, 2013 Form 6-K, Ex. 99.1 at 22.

156. The Company's and Blaiklock's statements in ¶155 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

157. Exhibit 99.2 of the May 8, 2013 Form 6-K provided financial statements for the first quarter of 2013 that the ***Company claimed to have prepared***

***in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.2 at 6. ***In the first quarter of 2013, Primero reported net income of $17.325 million and an income tax expense of $781,000***. Ex. 99.2 at 1, 13.

158. The Company's and Blaiklock's statements in ¶157 above were materially false and/or misleading because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated for the first quarter of 2013, given the fact that the Company sold 1.48 million ounces of silver and computed taxes at the SW Purchase Price of about $4

per ounce[15] whereas the average Spot Price of silver for the first quarter of 2013 was approximately $30 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the first quarter of 2013 as required by IAS 12 and 37, given the fact that the Company sold 1.48 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce and recorded taxes on these sales at the SW Purchase Price whereas the average Spot Price of silver for the first quarter of 2013 was approximately $30 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%.

159. On August 28, 2013, Primero filed a Form 6-K with the SEC signed by Defendant Blaiklock, which provided the Company's financial information and position for the period ended June 30, 2013, the second quarter of 2013. Exhibit 99.2 of the Aug. 28, 2013 Form 6-K contained the Company's "Notes to the Condensed Consolidated Interim Financial Statements" as of June 30, 2013, which stated in relevant part:

* * *

***On October 17, 2011 the Company's Mexican subsidiary filed an application for an advance pricing agreement ("APA")***

[15] *See* May 8, 2013 Form 6-K, Ex. 99.1 at 9.

> ***with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas Mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas Mine.***
>
> * * *

Aug. 28, 2013 Form 6-K, Ex. 99.2 at 14.

160. The Company's and Blaiklock's statements in ¶159 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the

Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

161. Exhibit 99.2 of the Aug. 28, 2013 Form 6-K provided the Company's condensed consolidated interim financial statements for the second quarter of 2013 that the ***Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.2 at 7. ***In the second quarter of 2013, Primero reported net income of $4.241 million and an income tax expense of $11.966 million***. Ex. 99.2 at 1.

162. The Company's and Blaiklock's statements in ¶161 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax

expense was materially understated for the second quarter of 2013 given the fact that the Company sold 0.82 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[16] whereas the average Spot Price of silver for the second quarter of 2013 was approximately $23 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the second quarter of 2013 as required by IAS 12 and IAS 37, given the fact that the Company sold 0.82 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the second quarter of 2013 was approximately $23 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%.

163. On November 6, 2013, Primero filed a Form 6-K with the SEC signed by Defendant Blaiklock, which contained the Company's financial information and position for the period ended September 30, 2013, the third quarter of 2013. Exhibit 99.2 of the Nov. 6, 2013 Form 6-K contained the Company's "Notes to the Condensed Consolidated Interim Financial Statements" as of September 30, 2013, which stated in relevant part:

---

[16] *See* Aug. 28, 2013 Form 6-K, Ex. 99.1 at 8.

> ***On October 17, 2011 the Company's Mexican subsidiary filed an application for an advance pricing agreement ("APA") with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas Mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas Mine.***

Nov. 6, 2013 Form 6-K, Ex. 99.2 at 12.

164. The Company's and Blaiklock's statements in ¶163 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the

Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

165. Exhibit 99.2 of the Nov. 6, 2013 Form 6-K provided the Company's condensed consolidated interim financial statements for the third quarter of 2013 that ***the Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.2 at 6. In the third quarter of 2013, ***the Company recorded $10.08 million in net income and $4.96 million in income tax expenses***. Ex. 99.2 at 1.

166. The Company's and Blaiklock's statements in ¶165 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax

expense was materially understated for the third quarter of 2013 given the fact that the Company sold 1.18 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[17] whereas the average Spot Price of silver for the third quarter of 2013 was approximately $21 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the third quarter of 2013 as required by IAS 12 and IAS 37, given the fact that the Company sold 1.18 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the third quarter of 2013 was approximately $21 per ounce, during which time Mexico's corporate income tax rate was 30% and the FRBT, which applied in addition to the corporate income tax, was 17.5%.

167. On December 16, 2013, the Company participated in a conference call to discuss Primero's acquisition of Brigus Gold, during which Defendant Conway stated in relevant part:

* * *

> [Don Blyth, Analyst]: Okay. And finally, on the Mexican tax ruling that you guys got, there are a lot of qualifiers when that was announced, rulings are generally applicable. You assumed that if there were no changes to the application, that you would expect to pay the taxes on the realized prices. Has anything changed on that front? Do

---

[17] *See* Nov. 6, 2013 Form 6-K, Ex. 99.1 at 7.

> you still pretty much expect that the taxes going forward will be on the actual realized silver prices for the life of the mine, as far as you're aware?
>
> [Conway]: ***Yes. We've had nothing to the contrary. We understand that generally within these APA ruling types of arrangements, which we've got, that's generally the case. As long as they don't make any changes for the overall industry in terms of tax rules, then we'll be continuing to pay on realized prices.***

* * *

FD (Fair Disclosure) Wire Tr., at 11.

168. The Company's and Conway's statements in ¶167 above were materially false and/or misleading when made when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

169. On February 13, 2014, Primero filed a Form 6-K for the fiscal year ended December 31, 2013 with the SEC, which provided the Company's year-end financial

results and position and was signed by Defendant Blaiklock. Exhibit 99.1 of the Feb. 13, 2014 Form 6-K contained the "Management's Discussion and Analysis for the Years Ended December 31, 2013 and 2012, which stated in relevant part under "Critical Accounting Estimates and Judgments":

* * *

> **Tax ruling in Mexico**
>
> ***The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine***. Should this judgment change, there would be a material change in both the income and deferred tax position recognized by the Company.

* * *

Feb. 13, 2014 Form 6-K, Ex. 99.1 at 44.

170. Exhibit 99.2 of the Feb. 13, 2014 Form 6-K contained the Company's "Notes to the Consolidated Financial Statements," as of December 31, 2013, which stated in relevant part:

* * *

> ***On October 17, 2011 the Company's Mexican subsidiary filed an application for an advance pricing agreement ("APA") with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement***. ***On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine***.

* * *

Feb. 13, 2014 Form 6-K, Ex. 99.2 at 31. A substantially similar version of Exhibit 99.2 was also submitted with the Company's Form 40-F for the fiscal year ended December 31, 2013, which was filed with the SEC on April 1, 2014 (*see* April 1, 2014 Form 40-F, Ex. 99.2) and signed by Conway.

171. The Company's and Blaiklock's statements in ¶¶169-70 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

172. Exhibit 99.2 of the Feb. 13, 2014 Form 6-K contained a statement signed by Defendants Conway and Blaiklock that the Company's "***consolidated financial statements*** . . . are the responsibility of the Company's management" and "***are prepared in accordance with . . . IFRS . . . issued by the . . . IASB***, and

reflect management's best estimates and judgments based on information currently available." Ex. 99.2 at 1.

173. In Exhibit 99.2 of the Feb. 13, 2014 Form 6-K, for the San Dimas mine, ***Primero reported net income of $34.785 million and an income tax expense of $45.301 million for the year ended December 31, 2013***. Ex. 99.2 at 48.

174. Primero's, Conway's, and Blaiklock's statements in ¶¶172-73 above were materially false and/or misleading because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 5.17 million ounces of silver and computed

taxes at the SW Purchase Price of about $4 per ounce[18] whereas the average Spot Price of silver for the year ended December 31, 2013 was approximately $24 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%[19]; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the year ended December 31, 2013 as required by IAS 12 and IAS 37, given that the Company sold 5.17 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the year ended December 31, 2013 was approximately $24 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

175. On April 1, 2014, the Company filed the April 1, 2014 Form 40-F for the fiscal year ended December 31, 2013 with the SEC, which provided the Company's year-end financial results and position and was signed by Defendant Conway. Exhibit 99.1 of the April 1, 2014 Form 40-F contained the Company's Annual Information Form for the year ended December 31, 2013, which stated in relevant part:

* * *

---

[18] *See* Feb. 13, 2014 Form 6-K, Ex. 99.1 at 10.

[19] On October 31, 2013, Mexico approved an extensive tax reform bill that repealed the FRBT but "included a tax-deductible mining royalty of 7.5% on taxable earnings before the deduction of interest, taxes, depreciation and amortization, with precious metals mining companies paying an additional 0.5% on gold and silver revenue." April 1, 2014 Form 40-F, Ex. 99.1 at 28. The reforms were effective from January 1, 2014. *Id.* The corporate income tax rate, however, remained at 30%. *Id.*

> ***On October 17, 2011, Primero Empresa filed a formal application to the Mexican tax authorities for an advance pricing agreement ("APA") on the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement. In its 2010 and 2011 financial statements and income tax returns, Primero Empresa had recorded revenue at the fixed price realized from Silver Wheaton Caymans ("SW Caymans") and computed income taxes on the same basis. On October 4, 2012, the Company received a ruling from the Mexican tax authorities that confirmed the silver pricing in Primero Empresa's 2010 and 2011 income tax returns.*** Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming Primero Empresa continues to sell silver under the silver purchase agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, Primero Empresa expects to record revenues and pay taxes based on realized prices for the life of the San Dimas Mine***. See "Risk Factors – APA Ruling".

* * *

April 1, 2014 Form 40-F, Ex. 99.1 at 11.

176. The Company's and Conway's statements in ¶175 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

177. On April 15, 2014, the Company filed a Form 6-K with the SEC, which was signed by Defendant Blaiklock. Exhibit 99.1 of the April 15, 2014 Form 6-K contained the Company's 2013 Annual Report as Exhibit 99.1, which stated in relevant part under "Critical Accounting Estimates and Judgments":

* * *

> ***The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine.*** Should this judgment change, there would be a material change in both the income and deferred tax position recognized by the Company.

* * *

April 15, 2014 Form 6-K, Ex. 99.1 at 62.

178. Exhibit 99.1 of the April 15, 2014 Form 6-K stated the following with respect to the APA Ruling:

* * *

> ***On October 17, 2011 the Company's Mexican subsidiary filed an application for an advance pricing agreement ("APA") with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.***

* * *

*Id.* at 101.

179. The Company's and Blaiklock's statements in ¶¶177-78 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that at all times during the Class Period:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

180. On May 8, 2014, Primero filed a Form 6-K with the SEC, which was signed by Defendant Blaiklock. Exhibit 99.1 of the May 8, 2014 Form 6-K contained the "Management's Discussion and Analysis for the Three Months Ended March 31, 2014 and 2013," which stated in relevant part under "Critical Accounting Estimates and Judgments":

* * *

> ***The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company***

> ***does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine.*** Should this judgment change, there would be a material change in both the income and deferred tax position recognized by the Company.
>
> * * *

May 8, 2014 Form 6-K, Ex. 99.1 at 37.

181. Exhibit 99.2 of the May 8, 2014 Form 6-K stated in relevant part:

> * * *
>
> ***On October 17, 2011 the Company's Mexican subsidiary filed an APA with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine***.
>
> * * *

May 8, 2014 Form 6-K, Ex. 99.2 at 19.

182. The Company's and Blaiklock's statements in ¶¶180-81 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

183. Exhibit 99.2 of the May 8, 2014 Form 6-K provided the ***Company's condensed consolidated interim financial statements for the first quarter of 2014 that the Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting.*** Ex. 99.2 at 9. ***In the first quarter of 2014, the Company recorded a net income loss of $9.087 million and an income tax expense of $1.753 million***. Ex. 99.2 at 1, 18.

184. Primero's and Blaiklock's statements in ¶183 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at

the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 1.15 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[20] whereas the average Spot Price of silver for the first quarter of 2014 was approximately $20 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the first quarter of 2014 as required by IAS 12 and IAS 37, given the fact that the Company sold 1.15 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the first quarter of 2014 was approximately $20 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

---

[20] *See* May 8, 2014 Form 6-K, Ex. 99.1 at 11.

185. On August 7, 2014, Primero filed a Form 6-K with the SEC, which was signed by Defendant Blaiklock. Exhibit 99.1 of the Aug. 7, 2014 Form 6-K contained the "Management's Discussion and Analysis for the Three and Six Months Ended June 30, 2014 and 2013," which stated in relevant part under "[o]ther liquidity considerations":

* * *

> APA rulings generally have a five year term and ***the APA ruling that the Company received from the Mexican tax authorities that confirmed that the appropriate price for silver sales under the silver purchase agreement was the fixed price realized***, expires on December 31, 2014. The Company and its advisers are reviewing what, if anything, is required to ensure that the ruling remains in effect. ***The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine.*** Should the Mexican tax authorities disagree with this position and assess taxes based on amounts higher than realized prices, the Company's cash flow could be significantly impacted.

* * *

Aug. 7, 2014 Form 6-K, Ex. 99.1 at 24.

186. Exhibit 99.2 of the Aug. 7, 2014 Form 6-K stated in relevant part:

* * *

> ***On October 17, 2011 the Company's Mexican subsidiary filed an APA with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.***

* * *

Aug. 7, 2014 Form 6-K, Ex. 99.2 at 20-21.

187. The Company's and Blaiklock's statements in ¶¶185-86 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

188. Exhibit 99.2 of the Aug. 7, 2014 Form 6-K provided the Company's condensed consolidated interim financial statements for the second quarter of 2014 that the ***Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.2 at 9. ***For the second quarter of 2014, Primero recorded net income of $572,000 and a net income tax expense of $4.321 million***. Ex. 99.2 at 1.

189. The Company's and Blaiklock's statements in ¶188 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 0.82 million ounces of silver and computed taxes at the SW Purchase Price of about $4[21] whereas the average Spot Price of silver for the second quarter of 2014 was approximately $20 per ounce, during which time Mexico's

[21] *See* Aug. 7, 2014 Form 6-K, Ex. 99.1 at 12.

corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the second quarter of 2014 as required by IAS 12 and IAS 37, given the fact that the Company sold 0.82 million ounces of silver and computed taxes at the SW Purchase Price of about $4 whereas the average Spot Price of silver for the second quarter of 2014 was approximately $20 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

190. On November 6, 2014, the Company filed a Form 6-K with the SEC, which was signed by Defendant Kaufman. Exhibit 99.1 of the Nov. 6, 2014 Form 6-K contained the "Management's Discussion and Analysis for the Three and Nine Months Ended September 30, 2014 and 2013," which stated in relevant part under "[o]ther liquidity considerations":

* * *

> ***On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement and the silver pricing for purposes of its 2010 and 2011 income tax returns***. Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period and the Company's APA Ruling covers the five years ending December 31, 2014. ***Assuming silver continues to be sold under the Amended and Restated Silver Purchase Agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA Ruling, we expect to record revenues and pay taxes based on realized prices for the life of the San Dimas mine.*** There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling when the current APA Ruling expires on December 31, 2014 or that the authorities will assess the Company's taxes on the basis of its realized prices for silver thereafter. To the extent the Mexican tax authorities determine that the appropriate price of silver

> sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on our results of operations, financial condition and cash flows.
>
> * * *

Nov. 6, 2014 Form 6-K, Ex. 99.1 at 24.

191. Exhibit 99.1 of the Nov. 6, 2014 Form 6-K stated in relevant part under "Critical Accounting Estimates and Judgments":

> * * *
>
> ***The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine***. Should this judgment change, there could be a material change in the Company's results of operations, financial condition and cash flows.
>
> * * *

Nov. 6, 2014 Form 6-K, Ex. 99.1 at 42.

192. Exhibit 99.2 of the Nov. 6, 2014 Form 6-K also stated in relevant part:

> * * *
>
> ***On October 17, 2011 the Company's Mexican subsidiary filed an APA with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine***.
>
> * * *

Nov. 6, 2014 Form 6-K, Ex. 99.2 at 20.

193. Primero's and Kaufman's statements in ¶¶190-92 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

194. Exhibit 99.2 of the Nov. 6, 2014 Form 6-K provided the Company's condensed consolidated interim financial statements for the third quarter of 2014 that the ***Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.2 at 9. ***For the third quarter of 2014, the Company reported a net income loss of $105.904 million and an income tax expense of $7.325 million in the third quarter of 2014***. Ex. 99.2 at 1.

195. The Company's and Kaufman's statements in ¶194 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 1.17 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[22] whereas the average Spot Price of silver for the third quarter of 2014 was approximately $20 per ounce, during which time Mexico's

[22] Nov. 6, 2014 Form 6-K, Ex. 99.1 at 12.

corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the third quarter of 2014 as required by IAS 12 and IAS 37, given the fact that the Company sold 1.17 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce while the average Spot Price of silver for the third quarter of 2014 was approximately $20 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

196. On February 12, 2015, the Company filed a Form 6-K with the SEC, signed by Defendant Kaufman. Exhibit 99.3 of the Feb. 12, 2015 Form 6-K contained the "Management's Discussion and Analysis for the Years Ended December 31, 2014 and 2013," which stated in relevant part under "[o]ther liquidity considerations":

* * *

> ***On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement and the silver pricing for purposes of its 2010 and 2011 income tax returns.*** Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period (the year in which the ruling application is filed, the immediately preceding year and the three subsequent years) and the Company's APA Ruling covered the five years ending December 31, 2014. The Company has until the end of 2016 to file a new APA Ruling application in respect of 2015. ***In 2015 silver is expected to continue to be sold under the Amended and Restated Silver Purchase Agreement on the same terms and there are no known changes in the application of Mexican tax laws relative to the APA Ruling, so the Company expects to record revenues and pay taxes based on realized prices for the life of the San Dimas mine.*** There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling

> or that the authorities will assess the Company's taxes on the basis of its realized prices for silver. To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on our results of operations, financial condition and cash flows.
>
> * * *

Feb. 12, 2015 Form 6-K, Ex. 99.3 at 28.

197. Exhibit 99.3 of the Feb. 12, 2015 Form 6-K also stated in relevant part under "Critical Accounting Estimates and Judgments":

> * * *
>
> ***The Company has taken the position that if the Mexican tax laws relative to the APA Ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine***. Should this judgment change, there could be a material change in the Company's results of operations, financial condition and cash flows.
>
> * * *

Feb. 12, 2015 Form 6-K, Ex. 99.3 at 51.

198. Exhibit 99.2 of the Feb. 12, 2015 Form 6-K contained the Company's "Notes to the Consolidated Financial Statements," as of December 31, 2014, which stated in relevant part:

> * * *
>
> ***On October 17, 2011 the Company's Mexican subsidiary filed an APA with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.***
>
> * * *

Feb. 12, 2015 Form 6-K, Ex. 99.2 at 40. A substantially similar version of Exhibit 99.1 was also submitted with the Company's Form 40-F for the fiscal year ended December 31, 2014 filed with the SEC on March 31, 2015 (*see* March 31, 2015 Form 40-F, Ex. 99.2).

199. The Company's and Kaufman's statements in ¶¶196-98 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

200. Exhibit 99.2 of the Feb. 12, 2015 Form 6-K contained a statement signed by Defendants Conway and Kaufman that the Company's "***consolidated financial statements*** . . . are the responsibility of the Company's management" and "***are prepared in accordance with . . . IFRS . . . issued by the . . . IASB*** and reflect

management's best estimates and judgment based on information currently available." Ex. 99.2 at 1.

201. In Exhibit 99.2 of the Feb. 12, 2015 Form 6-K, ***Primero reported for the San Dimas mine net income of $24.940 million and an income tax expense of $22.986 million for the year ended December 31, 2014***. Ex. 99.2 at 61.

202. Primero's, Conway's, and Kaufman's statements in ¶¶200-01 above were materially false and/or misleading because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 4.70 million ounces of silver and computed

taxes at the SW Purchase Price of about $4 per ounce[23] whereas the average Spot Price of silver for the year ended December 31, 2014 was approximately $19 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(d) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the year ended December 31, 2014 as required by IAS 12 and IAS 37, given the fact that the Company sold 4.70 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the year ended December 31, 2014 was approximately $19 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

203. On March 31, 2015, the Company filed the March 31, 2015 Form 40-F for the fiscal year ended December 31, 2014 with the SEC, which contained Primero's year-end financial results and position and was signed by Defendant Conway. Exhibit 99.1 of the March 31, 2015 Form 40-F contained the Company's Annual Information Form for the year ended December 31, 2014, which stated in relevant part:

* * *

> ***For purposes of its financial statements and tax returns for the last five taxation years, the Company has recorded revenues received from sales of silver at the contracted price paid to the Company pursuant to the Amended and Restated Silver Purchase Agreement (See - Mining Activities – San Dimas Mine – Amended and Restated Silver Purchase***

[23] *See* Feb. 12, 2015 Form 6-K, Ex. 99.1 at 12.

> ***Agreement). On October 4, 2012, the Company received an advance pricing ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the basis on which the Company records revenues it receives from sales of silver under the Amended and Restated Silver Purchase Agreement.*** This APA Ruling was applicable until December 31, 2014. In 2015, ***the Company intends to continue to record its revenue from sales of silver under the Amended and Restated Silver Purchase Agreement in a manner consistent with prior years, the APA Ruling and applicable Mexican laws.*** The Company is entitled to file an application for a new advance pricing ruling in respect of 2015 and the subsequent four taxation years at any time prior to December 31, 2016. There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change, or that the applicable authorities will issue a renewal of the APA Ruling or a similar advance pricing ruling or that the authorities will continue to assess the Company's taxes on the basis of its realized prices for silver. To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on the results of the Company's operations, financial condition and cash flows. See "Risk Factors – Financial Risks - APA Ruling".

* * *

March 31, 2015 Form 40-F, Ex. 99.1 at 9.

204. The Company's and Conway's statements in ¶203 above were materially false and misleading when made because they materially false and misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured

by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification; and

(c) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

205. On May 6, 2015, the Company filed a Form 6-K with the SEC, which was signed by Defendant Kaufman. Exhibit 99.1 of the May 6, 2015 Form 6-K contained the Company's "Notes to the Condensed Consolidated Interim Financial Statements," which stated in relevant part:

* * *

> ***On October 17, 2011 the Company's Mexican subsidiary filed an APA with the Mexican tax authorities on the appropriate price for the intercompany sale of silver under the silver purchase agreement. On October 4, 2012, the Mexican tax authorities ruled on the APA. The ruling confirmed that the Company's Mexican subsidiary appropriately recorded revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010.***
>
> Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.*** Should this judgment change, there could be a material change in the Company's results of operations, financial condition and cash flows.

* * *

May 6, 2015 Form 6-K, Ex. 99.1 at 10.

206. Exhibit 99.2 of the May 6, 2015 Form 6-K contained the "Management's Discussion and Analysis for the Three Months Ended March 31, 2015," which stated in relevant part under "Other liquidity considerations":

* * *

> ***On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the***

> ***appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement***. Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period (which in the Company's case, covered the year in which the ruling application was filed, the immediately preceding year and the three subsequent years) and the Company's APA Ruling covered the five years ending December 31, 2014. ***In 2015, the Company intends to continue to record its revenue from sales of silver under the Amended and Restated Silver Purchase Agreement in a manner consistent with prior years, the APA Ruling and applicable Mexican laws.*** The Company has until the end of 2016 to file an application for a renewed APA Ruling in respect of 2015 and the subsequent four taxation years. ***There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling or that the authorities will continue to assess the Company's taxes on the basis of its realized prices for silver.*** To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on our results of operations, financial condition and cash flows.

* * *

May 6, 2015 Form 6-K, Ex. 99.2 at 22.

207. Exhibit 99.2 of the May 6, 2015 Form 6-K stated in relevant part under "Estimates and Judgments":

* * *

> ***The Company has taken the position that if the Mexican tax laws relative to the APA Ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine.*** Should this judgment change, there could be a material change in the Company's results of operations, financial condition and cash flows.

* * *

May 6, 2015 Form 6-K, Ex. 99.2 at 36.

208. Exhibit 99.2 of the May 6, 2015 Form 6-K stated in relevant part under "Other Risks and Uncertainties":

* * *

> ***In October 2012 the Company received an APA ruling on the appropriate price of silver sales under the silver purchase agreement.*** Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. ***Assuming Primero continues to sell silver under the silver purchase agreement on the same terms and there***

> ***are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to record revenues and pay taxes on realized prices for the life of the San Dimas mine. There can be no assurance that Mexican tax laws applicable to the APA ruling will not change or that the Mexican tax authorities will not change their views on the appropriate price for the sale of silver under the silver purchase agreement. If the Mexican tax authorities determine that the appropriate price of silver sales under the silver purchase agreement is different than the realized price, Primero's cash flows and earnings could be significantly adversely impacted.***

* * *

May 6, 2015 Form 6-K, Ex. 99.2 at 40.

209. The Company's and Kaufman's statements in ¶¶205-08 above were materially false and/or misleading when made because they materially false and misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats,

audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal; and

(d) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

210. Exhibit 99.1 of the May 6, 2015 Form 6-K provided the Company's condensed consolidated interim financial statements for the first quarter of 2015 that the ***Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.1 at 6. ***For the first quarter of 2015, Primero reported for the San Dimas mine net income of $7.530 million and an income tax expense of $5.370 million***.

211. The Company's and Kaufman's statements in ¶210 above were materially false and/or misleading because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal;

(d) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 1.9 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[24] whereas the average Spot Price of silver for the first quarter of 2015 was approximately $17 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(e) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the first quarter of 2015 as required by IAS 12 and IAS 37, given the fact that the Company sold 1.9 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the first quarter of 2015 was approximately $17 per ounce,

[24] *See* May 6, 2015 Form 6-K, Ex. 99.2 at 9.

during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

212. On July 13, 2015, Primero issued a press release entitled, "Primero Advises of Delay in Silver Revenue Due to Delay in Mexican Exports." The press release stated in relevant part:

> TORONTO, ON--(Marketwired - July 13, 2015) - Primero Mining Corp. ("Primero" or the "Company") (TSX: P) (NYSE: PPP) today advises that as a result of a delay in exports from its San Dimas mine in Mexico, its subsidiary Primero Empresa Minera S.A. de C.V. ("PEM") has been delayed in selling silver. As a result approximately 880,000 ounces of silver were not sold during the second quarter of 2015, representing approximately $6.5 million in delayed revenue.
>
> ***PEM's import and export licences were suspended in May 2015 by the Mexican customs authorities due to a discrepancy over the Company's address related to its corporate office relocation from Mexico City to Durango, Mexico. PEM has since clarified the discrepancy and has been meeting with customs officials, but has regrettably not been reinstated to the customs registry.*** PEM is able to source necessary supplies locally so that the San Dimas mine and mill continue to operate uninterrupted.
>
> PEM is currently refining its gold-silver doré in Mexico and selling its gold in the normal course. However, the Company is unable to deliver silver under its silver purchase agreement with Silver Wheaton Corp., which requires delivery outside of Mexico. As a result, approximately 630,000 ounces of silver were not delivered under the silver purchase agreement in the second quarter and PEM did not get the benefit of spot sales on approximately 250,000 ounces.
>
> ***Senior customs officials have confirmed that the Company's registry status is being reviewed, but the Company has not been given a definitive date for reinstatement of the licenses.*** If the Company's export licence is not reinstated before August 5, 2015, the date that its silver purchase agreement annual threshold is reset, then the Company may not realize spot silver sales in the third quarter of 2015 but could then expect to reach the annual threshold earlier in 2016.

* * *

213. The Company's statements in ¶212 above were materially false and/or misleading because it knowingly or recklessly failed to disclose that the true reason that PEM's import and export licenses were suspended was due to the Mexican government's recognition of the improper nature of the APA Ruling and the

circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal.

214. On August 5, 2015, the Company filed a Form 6-K with the SEC, which was signed by Defendant Kaufman, which reported the company's financial information and position for the third quarter of 2015, which ended on June 30, 2015. Exhibit 99.1 of the Aug. 5, 2015 Form 6-K contained the Company's "Notes to the Condensed Consolidated Interim Financial Statements," as of June 30, 2015, which stated in relevant part:

* * *

> ***On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement.*** Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period (which in the Company's case, covered the year in which the ruling application was filed, the immediately preceding year and the three subsequent years) and the Company's APA Ruling covered the five years ending December 31, 2014. ***In 2015, the Company intends to continue to record its revenue from sales of silver under the Amended and Restated Silver Purchase Agreement in a manner consistent with prior years, the APA Ruling and applicable Mexican laws.*** The Company has until the end of 2016 to file an application for a renewed APA Ruling in respect of 2015 and the subsequent four taxation years. ***There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling or that the authorities will continue to assess the Company's taxes on the basis of its realized prices for silver.*** The Company continues to evaluate alternatives to achieve long-term tax certainty. ***To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on the Company's results of operations, financial condition and cash flows.***

* * *

Aug. 5, 2015 Form 6-K, Ex. 99.1 at 11.

215. The Company's and Kaufman's statements in ¶214 above were materially false and/or misleading when made because they materially false and

misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal; and

(d) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

216. Exhibit 99.1 of the Aug. 5, 2015 Form 6-K provided the Company's condensed consolidated interim financial statements for the second quarter of 2015 that the ***Company claimed to have prepared in accordance with IAS 34, Interim***

***Financial Reporting***. Ex. 99.1 at 6. ***For the second quarter of 2015, Primero reported for the San Dimas mine net income of $3.832 million and an income tax expense of $5.466 million.*** Ex. 99.1 at 24.

217. The Company's and Kaufman's statements in ¶216 above were materially false and/or misleading when made because they materially false and misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal;

(d) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in

its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated for the second quarter of 2015 given the fact that the Company sold 1.26 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[25] whereas the average Spot Price of silver for the first quarter of 2015 was approximately $16.74 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(e) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the second quarter of 2015 as required by IAS 12 and IAS 37, given the fact that the Company sold 1.26 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the first quarter of 2015 was approximately $16.74 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

218. On August 6, 2015, the Company issued a press release entitled, "Primero Announces Receipt of Mexican Import and Export Permits; Inventoried Silver Being Sold Immediately," which stated in relevant part:

* * *

***PEM's import and export licences were suspended by the Mexican customs authorities in May 2015 due to a discrepancy over the Company's address related to its corporate office relocation from Mexico City to Durango, Mexico***. . . .

* * *

---

[25] *See* Aug. 5, 2015 Form 6-K, Ex. 99.2 at 8.

219. The Company's statements in ¶218 above were materially false and/or misleading because it knowingly or recklessly failed to disclose that the true reason that PEM's import and export licenses were suspended was due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal.

220. On November 3, 2015, the Company filed a Form 6-K with the SEC, which reported the Company's financial information and position for the third quarter of 2015 that ended on September 30, 2015 and was signed by Defendant Kaufman. Exhibit 99.1 of the Nov. 3, 2015 Form 6-K contained the Company's "Notes to the Condensed Consolidated Interim Financial Statements," as of September 30, 2015, which stated in relevant part:

* * *

> ***On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement.*** Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period (which in the Company's case, covered the year in which the ruling application was filed, the immediately preceding year and the three subsequent years) and the Company's APA Ruling covered the five years ending December 31, 2014. ***In 2015, the Company intends to continue to record its revenue from sales of silver under the Amended and Restated Silver Purchase Agreement in a manner consistent with prior years, the APA Ruling and applicable Mexican laws.*** The Company has until the end of 2016 to file an application for a renewed APA Ruling in respect of 2015 and the subsequent four taxation years. ***There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling or that the authorities will continue to assess the Company's taxes on the basis of its realized prices for silver.***
>
> The Company continues to evaluate alternatives to achieve long-term tax certainty including through engaging in a dialogue with the Mexican tax authorities in this regard. ***To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different***

> ***than the realized price, it could have a material adverse effect on the Company's results of operations, financial condition and cash flows.***
>
> * * *

Nov. 3, 2015 Form 6-K, Ex. 99.1 at 11.

221. The Company's and Kaufman's statements in ¶220 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal; and

(d) As a result, the APA Ruling was highly unlikely to be renewed on the same or similar terms after 2014 and therefore the

Company could not reasonably expect to pay taxes on the SW Purchase Price for the life of the San Dimas mine.

222. Exhibit 99.1 of the Nov. 3, 2015 Form 6-K provided the Company's condensed consolidated interim financial statements for the third quarter of 2015 that the ***Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting***. Ex. 99.1 at 6. ***For the third quarter of 2015, Primero recorded for the San Dimas mine a net income loss of $6.922 million and an income tax expense of $17.785 million.*** Ex. 99.1 at 24.

223. The Company's and Kaufman's statements in ¶222 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the following:

(a) The Company's accounting for the transfer price between PEM and ST Barbados did not comply with applicable Mexican transfer pricing rules as set forth in ¶¶34-40, 82-91 and therefore it was inappropriate for the Company to record revenue and taxes from sales of silver produced from the San Dimas mine based on the SW Purchase Price rather than Spot Prices, as set forth in ¶¶50-63;

(b) The APA Ruling which the Company claimed allowed it to pay taxes on sales of silver produced from the San Dimas mine at the SW Purchase Price rather than the Spot Price was procured by fraud or misrepresentation as set forth in ¶¶78, 115, 230-35 and was therefore vulnerable to retroactive nullification;

(c) No later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats,

audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal;

(d) Primero's financial statements did not comply with IFRS because Primero failed to recognize and record a tax liability in its financial statements as required by IAS 37, and as a result its net income was materially overstated and its income tax expense was materially understated given the fact that the Company sold 2.01 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce[26] whereas the average Spot Price of silver for the third quarter of 2015 was approximately $15 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%; and

(e) Alternatively, Primero's financial statements did not comply with IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability for the third quarter of 2015 as required by IAS 12 and IAS 37, given the fact that the Company sold 2.01 million ounces of silver and computed taxes at the SW Purchase Price of about $4 per ounce whereas the average Spot Price of silver for the third quarter of 2015 was approximately $15 per ounce, during which time Mexico's corporate income tax rate was 30% and the mining royalty tax was 7.5%.

---

[26] *See* Nov. 3, 2015 Form 6-K, Ex. 99.2 at 9.

224. On November 3, 2015, the Company held its Third Quarter 2015 Earnings Call, which Defendants Conway and Mast were in attendance. During the call, Defendant Conway stated in relevant part:

* * *

> [Mike Parkin, Analyst]: Okay. And then on the transfer pricing agreement, can you give us an update where you guys stand on that, have you filed for re-application at this point?
>
> [Conway]: No. We've had some -- ***we are having some discussions with the tax authorities on that front, just on an informal basis.*** We have until the end of 2016 to formally do it. ***But we have opened up a dialog.***

* * *

Bloomberg Tr., at 14.

225. The Company's and Conway's statements in ¶224 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose the fact that no later than May 2015, the Company's tax arrangements were being threatened by the SAT due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured, resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal.

226. At no point during the Class Period did Defendants ever correct or update these statements.

## VII. POST-CLASS PERIOD EVENTS

227. On February 3, 2016, the Company issued a press release announcing that PEM received the SAT's legal claim seeking to nullify PEM's APA issued in 2012.

228. On this news, the Company's shares fell $0.74 per share, or over 28%, to close at $1.89 per share on February 4, 2016.

229. After disclosing the nullification claim, Primero repeatedly claimed in its SEC filings, Canadian securities regulatory filings, and other public statements that the SAT's claim was meritless. Without explaining the specifics of the SAT's claims, the Company maintained that it was being discriminated against because it was Canadian and vowed to fight the nullification claim.

### A. Mexican Press Coverage of the SAT's Reason for Filing the Nullification Claim Uncovers the Natera Brothers' Involvement

230. Meanwhile, the Mexican press told a completely different story. On May 2, 2016, one of the most widely read newspapers in Mexico, *Reforma*, published an article titled, "Mining company defrauds the SAT." The article provides that the Ministry of Public Administration (the Secretaría de la Función Pública ("**SFP**"), in Spanish), disqualified Luis Natera, the former head of the Transfer Pricing Audit Administration, "for granting benefits" to Primero mining, which was represented by his brother Christian Natera. *Id.* at 1. The article explained that in October 2012 Luis Natera authorized Primero to sell silver at prices that were much lower than Spot Prices, which caused the SAT to (1) have to return taxes that Primero had already paid and (2) fail "to receive an as yet undetermined amount." *Id.* The SFP disqualified Luis Natera from serving in the public sector for six-and-a-half years for failing to recuse himself from making a decision regarding Primero's October 2011 application that was analyzed by his office for one year. *Id.* Luis Natera brazenly argued that he did not need to recuse himself because his subordinate, Sergio Perez Cruz, signed "the document which favored Primero[.]" *Id.* Luis Natera appealed the SFP's decision by filing an *amparo*, which will be ruled on by Mexico's Supreme Court. *Id.*

231. "The document" at issue (namely the APA Ruling) authorized Primero to sell silver at $4.04 per ounce, which was far below the Spot Price of $35.22 per ounce on average in 2011. *Id.* According to *Reforma*, as a result of this

authorization, in 2011, Primero paid taxes in Mexico on income of $17 million, rather than $149 million, saving $20.6 million in taxes in 2011. *Id.* In 2012, Primero received a tax return of $22.2 million dollars, which gave it a "significant" boost in cash flow. *Id.*

232. According to *Reforma*, the SAT filed a *juicio de lesividad* in August 2015, by which it sought to nullify the APA. *Id.* Shortly thereafter, in September 2015, the SFP opened new proceedings against Luis Natera. *Id.*

233. *Reforma*'s allegations about Luis Natera's suspension are supported by the October 21, 2015 decision of the First Chamber of the Supreme Court of Justice of the Nation on the petition to assert jurisdiction to hear and rule on Luis Natera's *amparo*.[27] Although the decision itself redacts the names of the relevant parties, the page which provides the link on the Supreme Court's website states that the decision pertains to Luis Natera's *amparo*. Furthermore, the decision provides other details which support the conclusion that Luis Natera's suspension was due to his failure to recuse himself from participating in Primero's APA. For example, the text of the decision confirms that the complainant was found "administratively liable for irregularities committed in the position of Central Administrator of Auditing of Transfer Prices of the General Administrator for Major Taxpayers" by resolution dated November 21, 2013, in violation of the Federal Law on Administrative Responsibilities of Public Servants and was given the administrative sanction of being disqualified temporarily from holding positions, duties or commissions in the public sector for the term of six years and six months." *Id*. at ¶¶1, 25. The decision elaborated that Luis Natera violated the

---

[27] The decision is available from the Supreme Court of Justice of the Nation's website at the following link: http://www2.scjn.gob.mx/ConsultaTematica/PaginasPub/DetallePub.aspx?AsuntoID=177234&SinBotonRegresar=1

law by failing "to recuse himself from participating in any manner in the handling, processing, or resolution of a petition submitted by the company "**********", on the subject of transfer prices on October seventeenth two thousand eleven, before the Central Administration of the Audit of Transfer Prices." *Id.* at ¶¶1, 25-26. As Primero stated repeatedly during the Class Period, PEM filed the APA on October 17, 2011. *See, e.g.*, ¶¶95, 129, 134, 205, *supra*.

234. The decision further provides that the resolution on the transfer pricing petition "was issued in substitution due to the absence of the current complainant." Decision on Petition at ¶27. The Internal Body for Auditing of the Tax Administration Service, the decision stated, determined that the responsibility for the issuance of the resolution on the transfer pricing petition could not be attributed to the substitute official and, accordingly, determined that the responsibility was attributed instead to the complainant. *Id.* at ¶28.

235. On May 3, 2016, *Reforma* published another article, titled "Firm offers advice on how to defraud the SAT," about the nullification claim and the Natera brothers' involvement. *Reforma* reiterated the fact that the SAT initiated a legal claim in 2015 to nullify the APA Ruling and explained that "the Natera brothers, involved in the case of . . . Primero Mining; which unlawfully received SAT benefits, have a consulting firm that specializes in litigating against that agency." *Id.* According to the article, the Natera consulting firm, Natera Consultores, S.C., has been in existence since the '90s and "emphasizes that it specializes in issues involving advance transfer pricing agreements, which the SAT authorized for Primero in 2012, to sell refined silver at prices that were far below market prices." *Id.* In 2007, Luis Natera left private practice for the SAT Transfer Pricing Administration, "which oversees complex issues related to transactions between related companies headquartered in different countries which may result in payment of lower taxes, since they do not pay market prices." *Id.* According to

the article, "Luis Natera was the head of the SAT Transfer Price Audit Central Administration Office throughout the previous presidential term and until August 2013." *Id.*

236. The May 3, 2016 *Reforma* Article also included a side column titled, "Mining company vulnerable in Canada," which quoted Carlos Espinosa, the former head of the Mining Development Unit of the Toronto Stock Exchange, as stating that if Primero is found guilty of tax fraud, its shares on the Toronto Stock Exchange could be frozen." Mr. Espinosa was also quoted as stating that if the Mexican Government wins the lawsuit against Primero and requires Primero "to pay taxes on a price that was 8 times higher than the registered price," it will have a "significant" impact on the Company's cash flow. *Id.*

237. The next day, on May 4, 2016, *MS Noticias* followed up on the story (the "**MS Noticias Article**"). The article provides that if the SAT eventually seeks to collect retroactive taxes from Primero, it will need to prove the APA Ruling was issued in bad faith. *Id.* at 1. The Company, *MS Noticias* reported, "seeks to obstruct the SAT's efforts to annul" the APA Ruling "which allowed it to sell silver at very low prices and pay lower taxes in Mexico between 2010 and 2014." *Id.* The article explained Primero's actions since the nullification claim was filed, noting that Primero filed an *amparo* on March 28, 2016 seeking to block the processing of the nullification claim initiated by the SAT in August 2015 which seeks to reverse the APA Ruling. *Id.* Shortly thereafter, Primero was granted a temporary suspension, which impeded the issuance of a ruling on the nullification claim, but not a full suspension, which meant that the process will continue. *Id.*

### B. Primero Continues To Conceal the Substance of the SAT's Claims

238. Meanwhile, despite press coverage in Mexico about the reasons behind the SAT's nullification claim, Primero has never directly commented on the Mexican government's contentions about the Natera brothers' involvement.

239. As the legal proceedings in Mexico are not public, Mexican press accounts of this information are the only sources available about the substance of the SAT's nullification claim—aside from Primero's whitewashed English-language commentary. To the best of Plaintiffs' counsel's knowledge, no English-language news media has published the SAT's reasons for pursuing the nullification claim. This has allowed Primero to play dumb with investors since the Class Period ended.

240. On June 2, 2016, Primero announced that it issued a Notice of Intent to Submit a Claim to International Arbitration Against the Government of the United Mexican States, the NOIA, pursuant to Article 1119 of NAFTA. Press Release, *Primero Notifies Mexico of an Investment Dispute Under NAFTA* (June 2, 2016).

241. NAFTA Article 1119 is part of Chapter Eleven of NAFTA, which "establishes a mechanism for the settlement of investment disputes that assures both equal treatment among investors of the Parties to the Agreement [*i.e.*, Canada, the United States, and Mexico] in accordance with the principle of international due process before an impartial tribunal." NAFTA Secretariat, Overview of the Dispute Settlement Provisions, https://www.nafta-sec-alena.org/Home/Dispute-Settlement/Overview-of-the-Dispute-Settlement-Provisions. An investor from one of the NAFTA parties who alleges that another NAFTA party in which it is invested has breached its investment obligations under Chapter 11 may choose to submit a claim to arbitration. NAFTA Chapter 11, Organization of American States, Foreign Trade Information System, http://www.sice.oas.org/trade/nafta/chap-111.asp. To do this, the investor must deliver to the government whose actions it is disputing written notice of its intent to submit a claim to arbitration 90 days before the claim is submitted. *Id.* The

notice must specify, among other things, the issues and the factual basis for the claim. *Id.*

242. The NOIA, dated June 2, 2016, was eventually posted on Primero's website and provided information about Primero's interactions with the SAT since the APA Ruling was issued, which were not previously disclosed by the Company.

243. According to the Company, "Primero's Notice of Intent under NAFTA highlights improper actions taken by the [SAT]." Primero explained that the SAT's "actions ha[d] the intent of revoking legal rights previously granted to Primero and upon which Primero relied to expand its investment in Mexico." June 2, 2016 PR. The Company further noted that it "believes that the SAT's actions are discriminatory against Primero as a foreign investor," and that consequently Mexico "failed to uphold the core values of NAFTA, including its obligation to protect Primero's investment under NAFTA Chapter 11, and therefore the Company is entitled to full compensation." In other words, Primero claimed that it was being discriminated against by Mexico because it is Canadian.

244. According to Primero, the Company was not shifting its profits to another country because "[a]ll of the actual revenues of Primero's group of companies that come from Mexican operations are taxed in Mexico." NOIA at ¶18. The reality of the situation, however, is that Mexico was receiving a small fraction of the revenues from sales of Mexico's natural resources due to contracts between two Canadian companies, Primero and Silver Wheaton, who shared directors and executives before and during the term of the APA Ruling.[28] Indeed,

[28] Before and during the Class Period, Wade Nesmith and Eduardo Luna served as directors of both Silver Wheaton and Primero. Nesmith founded Primero and served as its CEO and Co-Chair until June 2010, when he became Primero's Executive Chairman. Primero, *Board of Directors*, http://www.primeromining.com/company/board-of-directors/default.aspx. Nesmith continued to serve in that capacity until March 2012, when he was appointed Primero's Chairman of the Board, a position in which he continues to serve. *Id.* Nesmith is also a founding Board member of Silver Wheaton and

neither SW Caymans, the entity that purchases the San Dimas silver from PEM, nor its parent company Silver Wheaton, paid any income tax in Mexico on revenue from silver sales at Spot Prices at any time during the term of the APA Ruling.

245. Notably, Primero disclosed for the first time in the NOIA a purported campaign of harassment by the SAT to "pressure PEM into relinquishing its legal rights stemming from the APA." NOIA at p. 1, Executive Summary; ¶13. According to Primero, this campaign had been ongoing **prior to the August 4, 2015 filing of the *juicio***. *Id*. at ¶19.

> Even before the *juicio* was filed, SAT sought to intimidate PEM, during meetings or otherwise, making vague, unsubstantiated complaints about PEM's tax arrangements. SAT threatened to "make an example" out of PEM and initiated tax audits for certain fiscal years covered by the APA. **Other investigations and inspections were also conducted against PEM, such as by customs officials, even leading to PEM's temporary suspension from Mexico's list of importers and exporters. This suspension, which was in effect from May 2015 until August 2015, compromised PEM's operations and caused substantial damage to Primero**.

NOIA at ¶19.

246. Primero disclosed nothing about these "complaints," threats, "tax audits," or "investigations and inspections" prior to the publication of the NOIA. Indeed, when Primero announced on July 13, 2015 that Mexican customs authorities suspended PEM's import and export licenses in May 2015, it attributed the suspension to "a discrepancy over the Company's address related to its corporate office relocation from Mexico City to Durango, Mexico," not to a campaign of harassment by a supposedly discriminatory Mexican administration.

---

served on its board from October 2008 until May 2016. Luna served as a director of Primero from October 2008 to July 6, 2016, and in various other capacities at the Company during that time. *See* Silver Wheaton, *Management*, http://www.silverwheaton.com/company/management-and-directors/default.aspx. Luna also served as a director of Silver Wheaton from December 2004 to the present, and held various executive positions at Silver Wheaton before the Class Period. *Id.*

Press Release, Primero Advises of Delay in Silver Revenue Due to Delay in Mexican Exports (July 13, 2015).

247. By Primero's own admission in the Notice of Intent, the *juicio de lesividad* was material. The Company noted, "[t]he mere filing of the *juicio de lesividad* has generated significant legal uncertainty that has harmed Primero." NOIA at ¶15.

248. Primero also stated the following:

> Primero's shares are listed in the New York and Toronto stock exchanges and Primero was therefore obligated to disclose SAT's filing of the juicio de lesividad to the financial markets. As a result, the value of Primero's stock decreased by over 28% of its market capitalization the day the juicio was disclosed.

NOIA at ¶30.

249. On February 18, 2016, the Company filed a Form 6-K with the SEC, in which the Company stated that due to the nullification claim, the Company "currently believes it is unlikely the SAT will agree to an Advance Pricing Agreement for the 2015-2019 tax years on terms similar to the challenged APA." Ex. 99.1 at 34. As a result, the Company disclosed that its tax treatment for the years following 2014 was uncertain, but continued to record its revenue from sales of silver from the San Dimas mine at the SW Purchase Price rather than the Spot Price. *Id.*

250. Then, on August 4, 2016, Primero filed a form 6-K with the SEC in which it disclosed the following:

> The amount of additional taxes for which the SAT could reassess PEM for the tax years 2010 through 2014 on the silver sold in connection with the Silver Purchase Agreement cannot be reasonably estimated at this time but if the SAT is successful in retroactively nullifying the APA and issuing reassessments, it would likely have a material adverse effect on the Company's results of operations, financial condition and cash flows. PEM would have rights of appeal in connection with any reassessments.

Ex. 99.1 at 6.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

251. As alleged herein, Defendants acted with scienter because at the time that they issued public documents and made other public statements in Primero's name, they knew or recklessly disregarded the fact that such statements, when made were materially false and misleading and/or omitted material facts concerning the improper nature of Primero's tax accounting and the circumstances under which the Company obtained the positive APA Ruling that would cause the SAT to initiate the nullification claim. Defendants (a) knew that such documents and statements would be issued or disseminated to the investing public; (b) knew that persons were likely to rely upon those misrepresentations and omissions, and (c) knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and/or documents as primary violators of the federal securities laws. Defendants' materially false and misleading statements and omissions of material fact artificially inflated Primero's stock price during the Class Period.

### A. Core Operations

252. Because the fraud alleged herein relates to the core business of Primero, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants. *See* *Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014). Indeed, Primero acknowledged the significance of the San Dimas mine and the APA Ruling to the Company's "results of operations, financial conditions, and cash flows," and therefore the Individual Defendants, as senior level executives and/or directors were in such positions at the Company to access all material, non-public information concerning the improper nature of Primero's tax accounting, the circumstances under which the Company obtained the positive APA Ruling, the actions taken by the Mexican authorities, and their impact on the continued viability of the APA on a real-time basis. *See, e.g.*, Conference Call, FD (Fair Disclosure) Wire Tr., at 5 (Dec. 16, 2013); Nov. 6, 2014 Form 6-K, Ex. 99.1 at 24;

Feb. 12, 2015 Form 6-K, Ex. 99.3 at 28; May 6, 2015 Form 6-K, Ex. 99.1 at 10; Aug. 5, 2015 Form 6-K, Ex. 99.1 at 11.

253. Throughout the Class Period, the Company emphasized the importance of the San Dimas mine to its business. For example, in Primero's annual report for the year ended 2012, Defendant Conway described the mine as its "flagship property" in his "Letter to Shareholders." Apr. 11, 2013 Form 6-K, Ex. 99.3 at 6. The San Dimas mine was also described as a flagship in other Class Period SEC filings. *See* May 8, 2014 Form 6-K, Ex. 99.1 at 3; Aug. 7, 2014 Form 6-K, Ex. 99.1 at 3; Nov. 6, 2014, Form 6-K, Ex. 99.1 at 3. Indeed, the San Dimas mine was the Company's only producing property from August 6, 2010, the date on which it acquired the mine, until at least March 5, 2014 when the Company acquired Brigus Gold and its Black Fox Complex. *See* Apr. 1, 2014 Form 40-F, Ex. 99.1 at 9. Even when San Dimas was no longer the Company's only producing mine, it remained its "flagship asset." *See* NOIA at 1, Executive Summary. Accordingly, Defendants would be privy to and actively involved in anything pertaining to the profitability of the San Dimas mine, such as the tax structure which prevented the mine from being profitable and the steps taken to address it.

254. Even before the Company filed the APA application, Defendants were vocal about their focus on the tax structure between PEM and ST Barbados and mitigating the tax burden in Mexico, addressing it in numerous SEC filings, press releases, and conference calls. For example, Defendants attempted to offset the Company's tax burden by purchasing call options on silver in 2011 and seeking a ruling on its accelerated depreciation plan. *See* Press Release, *Primero Reports First Quarter 2011 Results; Maintains 2011 Production Guidance* (May 17, 2011). Indeed, following a May 17, 2011 earnings call during which Defendant Conway discussed the Company's tax strategy at length, Mackie Research published an

analyst report the following day titled, "Tax Problems Remain Key Focus," which stated that "[t]axes remain a key focus as in Q1/11 alone Primero paid a nearly $13mm in tax with only $5mm in earnings."

255. When the APA Ruling was issued, Defendants touted its significance in press releases and conference calls (*see* ¶¶101; 104-11) and noted the fact that a failure to renew the APA Ruling on the same terms for the years after 2014 could have a material adverse effect" on the Company's "results of operations, financial condition, and cash flows" (*see* ¶¶190-91, 196-97, 205-07, 214, 220). Defendants' frequent speech about the Company's tax structure, the APA application, the APA Ruling, and the prospects for renewal show that they were knowledgeable about these topics. Indeed, on the July 13, 2011 conference call, Conway specifically mentioned familiarity with the OECD transfer pricing guidelines prior to the filing of the APA in the context of restructuring the Company: ". . . we've been looking at a number of, let's call them transfer pricing scenarios under OECD law regulations, which Mexico is part of to look at that." Conference Call, Bloomberg Tr. (July 13, 2011).

256. Furthermore, Primero has a small number of employees, and it can be presumed that the Individual Defendants, as officers and/or directors, had knowledge of the facts underlying the fraud. At all relevant times, the Company's headquarters have been located in Canada, where all of its officers and directors, except for Eduardo Luna, resided during the Class Period. As of December 31, 2010, the Company had 8 employees in its Canadian offices and 8 in its Mexico City office. Aug. 11, 2011 Form 40-F, Ex. 99.1 at 16. As of December 31, 2011, the Company had 13 employees in its Canadian office and 13 in its Mexico City office. May 24, 2012 Form 40-F/A, Ex. 99.1 at 18. As of December 31, 2012, the Company had 19 employees in its Canadian office and 10 in its Mexico City office. Apr. 2, 2013 Form 40-F, Ex. 99.1 at 17. As of March 31, 2014, the

Company had 30 employees in its Canadian offices and 13 in its Mexico City Office. Apr. 1, 2014 Form 40-F, Ex. 99.1 at 13. As of December 31, 2015, the Company had 37 employees in its Canadian office and 31 in its Mexican office in Durango. Mar. 31, 2016 Form 40-F, Ex. 99.1 at 13.

**B. Magnitude of the Fraud**

257. The magnitude of the fraud provides additional support for Defendants' scienter. For example, after the APA application was filed and before the positive APA Ruling was issued, the Company recorded as a contingent liability the maximum amount that it would have to pay should the APA application be unsuccessful. The amounts were significant. As of December 31, 2011, the maximum contingent liability was $28.6 million, approximately 49% of the Company's $58.9 million in income before taxes for the year. Form 40-F/A, Ex. 99.1 at 41 (May 24, 2012); Apr. 3, 2012 Form 40-F, Ex. 99.2 at 3. As of June 30, 2012 the amount of the contingent liability was $52.4 million plus estimated interest of $5.8 million, nearly equal to the prior year's gross income. Form 6-K, Ex. 99.2 at 24 (Aug. 2, 2012); Apr. 3, 2012 Form 40-F, Ex. 99.2 at 3.

258. Indeed, on a July 13, 2011 conference call Conway confirmed that if the Company were able to pay income taxes on the SW Purchase Price rather than the Spot Price, it would double Primero's net present value,[29] or NPV. *See* ¶80 (citing Bloomberg Tr.).

259. Furthermore, the fact that Defendants were aware that Primero was Mexico's only source of tax revenue on silver from the San Dimas mine (*see* ¶90)

[29] Net present value is the present value of the cash flows at the required rate of return of a project compared to the initial investment. Practically, it is a method of calculating return on investment for a project or expense. Amy Gallo, *A Refresher on Net Present Value*, Harvard Business Review (Nov. 19, 2014), https://hbr.org/2014/11/a-refresher-on-net-present-value.

suggests that they were aware of how difficult, if not impossible, it would have been to procure the APA Ruling without fraud.

### C. Press Coverage of the SAT's Crack Down on Tax Evasion Schemes and Silver Wheaton's Tax Woes Put Defendants on Notice that Primero's Tax Arrangements Were Vulnerable To Challenge

260. Defendants were aware no later than November 2012 that transfer pricing was under "intensified scrutiny," as the Company noted this fact in its Form 40-F/A for the fiscal year ended December 31, 2011. Nov. 8, 2012 Form 40-F/A at note 19.

261. This scrutiny only intensified after the Company procured the APA Ruling. Not long after Peña Nieto's new government came to power in Mexico in December 2012, the SAT began to crack down on multinational corporations, including those in the mining industry, who were suspected of avoiding their tax obligations in Mexico by shifting profits to countries with lower taxes despite having substantial operations in the country. Luis Rojas & Alexandra Alper, *Mexico eyes seven multinationals in tax avoidance probe*, Reuters (Jan. 23, 2014).[30] As Oscar Molina Chie, newly appointed head of the SAT's large taxpayer unit with the new administration, noted, "[i]t matters a lot to us that these companies change their structure to structures where the taxes they pay in Mexico are exactly right." *Id.*

262. As a multinational corporation that had significantly changed its structure for tax purposes and consequently paid many millions less in income tax to Mexico, Primero was a prime candidate for the SAT's investigation, particularly in light of the fact that Luis Natera had been suspended in connection with the Company's APA. *See* ¶¶230-35. Thus, Defendants were likely aware that its tax

---

[30] This article was cited in Primero's NOIA at ¶17 n.7.

arrangements would be in the SAT's cross-hairs, particularly considering that its APA had expired on December 31, 2014 and needed to be renewed by the SAT.

263. Furthermore, on July 6, 2015, about a month after Mexico suspended PEM's import and export licenses, Silver Wheaton, the ultimate profiteer from the silver from the San Dimas mine, announced that its tax scheme was under fire. The Canada Revenue Agency—Canada's analog to the Internal Revenue Service—determined that Silver Wheaton's taxable income from the streaming agreements entered into by its subsidiary SW Caymans should be increased approximately $567 million for the period between 2005 and 2010, resulting in additional taxes and penalties assessed against the Company in excess of $207 million. Press Release, Silver Wheaton, *Silver Wheaton Remains Confident in Business Structure Following Receipt of CRA Proposal Letter* (July 6, 2015).

264. As stated above, SW Caymans was a party to the External SPA and therefore the transfer pricing dispute should have put Defendants on alert that its tax arrangements would be subject to additional scrutiny.

### D. Financial Motive of the Individual Defendants

265. According to Primero's SEC filings, the Company's executive compensation program included base salary, annual performance-based cash incentives, stock options, and phantom share units. May 2, 2012 Form 6-K, Exhibit 99.2 at 28. Primero's executive compensation program is designed "to emphasize performance-based incentives that reward its executives for the achievement of specific annual and long-term business goals." *Id.* at 25. Due to this "emphasis on performance-based compensation," the Company explains, "it is critical that its incentive programs reward executives for performance-based measures that **they are able to influence**." *Id.*; *see also* April 11, 2013 Form 6-K, Exhibit 99.1 at 23.

266. In recommending the compensation to be paid to the Company's executive officers, the Human Resources Committee ("**HRC**") considers, *inter alia*, "rewarding performance, both on an individual basis and with respect to operations generally." May 2, 2012 Form 6-K, Ex. 99.1 at 25; *see also* April 11, 2013 Form 6-K, Exhibit 99.1 at 23.

267. The HRC receives a recommendation from the President and CEO, and reviews the basis for the recommendation and has discretion to modify it prior to making a recommendation to the board. May 2, 2012 Form 6-K, Ex. 99.1 at 26. The President and CEO make "recommendations to the Board regarding the Company's annual business goals and objectives that provide the structure by which the annual goals and objectives of other executive officers and employees of the Company are aligned." *Id.* at 27. The President and CEO also make recommendations to the HRC regarding (1) "the Company's annual and long-term quantitative goals and the annual qualitative goals for the other executive officers"; and (2) executive officer base salary adjustments, target annual incentive awards and actual payouts, stock-based grants, and ***PSU grants and actual payouts***. *Id.*

268. In 2012, a portion of Defendants Conway's and Blaiklock's compensation was attributable to the APA Ruling.

269. For executives' annual performance-based cash incentive awards in 2011, the Board based awards upon Conway's, Blaiklock's, Wade Nesmith's ("**Nesmith**"), and Luna's targets and attainment of annual Company and personal performance goals. *Id.* at 30.

270. In 2012, Conway's personal goals included matters relating to the "building of the Company's portfolio of precious metals assets, building key skills within the company and ***tax strategies***." April 11, 2013 6-K, Ex. 99.1 at 30. The HRC considered the significant accomplishments of the Company in 2012 ***including obtaining the APA tax ruling***, enhanced mine planning processes,

consistent production improvements, extraordinary shareholder returns and the announcement of the acquisition of Cerro Resources NL. *Id.* They determined his personal achievement factor was 2.0 out of a possible 2.0. *Id.*

271. For 2012, Blaiklock's personal goals included matters relating to the Company's ***tax strategies***, financial planning, internalizing metal sales, corporate development, and provision of leadership to corporate administration in Mexico. For 2012, "***Blaiklock's performance significantly exceeded expectations, including obtaining the APA ruling***" and his personal achievement factor was assessed at 2.0 out of a possible 2.0. *Id.*

**1. Phantom Share Units**

272. In addition to annual incentive-based compensation, the Company's officers and directors also received benefits under Primero's Phantom Share Unit ("**PSU**") Plan ("**PSU Plan**"). PSUs "are a variable element of compensation intended to reward the Company's executive team for its success in achieving sustained shareholder value *reflected in stock price*." Primero Mining Corp., Mgmt. Info Circular, at 11 (Apr. 16, 2012) (on file with Canada's System for Electronic Document Analysis and Retrieval ("**SEDAR**")). A PSU is a "right granted under [a] plan to receive [an] [a]ward [p]ayout" which is usually in cash or a combination of cash and stock. Primero Mining Corp., 2013 Phantom Share Unit Plan (Apr. 18, 2016). PSUs, therefore, "[are] like a cash bonus deferred until the future, but typically much bigger than an annual bonus." Forbes.com, David King, *Why Phantom Stock Can Be Better Than Real Stock*, http://www.forbes.com/sites/dking/2013/10/15/why-phantom-stock-can-be-better-than-real-stock/#c6107f92bcbb (Oct. 15, 2013).

273. The Company's first PSU Plan was originally approved by the Board in 2010 (the "**2010 Plan**"). Primero Mining Corp., Mgmt. Info Circular, at 32 (Apr. 16, 2012). The 2010 Plan was "intended to promote a greater alignment of

interests between the shareholders and executive officers and employees by providing a non-dilutive opportunity to participate in increases in the value of the Company." *Id.* In other words, the 2010 Plan provides the officers and employees to whom they are granted with contingent future compensation based on the Company's Common Share price performance. The PSUs issued under the 2010 Plan are "payable only in cash and represent[ ] no potential for share dilution." *Id.* at 32.

274. Once a PSU vests under the 2010 Plan, the grantee is entitled to receive an amount in cash equal to the average trading price per Common Share over the 20 preceding trading days. *Id.* at 32. Each PSU granted under the 2010 Plan in 2010 vests on the third anniversary of the grant. *Id.* Each PSU granted under the 2010 Plan in 2011 would vest over a three year period or as otherwise determined by the Board. Each PSU expires on December 31 of the year in which it vests and is paid out between the vesting date and the expiry date. In other words, grantees must exercise the PSU before the end of the year in which they vest or risk losing the PSU altogether.

275. The Board also approved two similar PSU Plans in 2012 and 2013. In 2012, the Board approved the Directors' PSU Plan (the "**2012 Plan**"). Primero Mining Corp., Mgmt. Info. Circular, at 28 (Apr. 7, 2014) (on file with SEDAR). In 2013, the Board also approved the 2013 PSU Plan (the "**2013 Plan**") for key officers and employees. *Id.*

276. PSUs granted under both Plans vested upon the board's discretion, or if the board did not determine a vesting date, on the third anniversary of the grant. *Id.* at 41-43. Under both plans, PSUs can be paid in either cash or common shares not to exceed 10% of the Company's outstanding stock. *Id.* at 42-43.

277. The cash amounts payable under the 2012 and 2013 Plans were also tied to the stock price of Primero; the 2012 Plan and 2013 Plan entitled an

employee or director-grantee to cash in "an amount equal to the volume weighted average price per Common Share over the five preceding trading days" or a number of common shares equal to the PSUs. *See* Primero Mining Corp., Mgmt. Info. Circular, at 11 (Apr. 8, 2013) (on file with SEDAR); Primero Mining Corp., Mgmt. Info. Circular, at 28 (Apr. 7, 2014) (on file with SEDAR). As set forth below, certain Defendants benefited greatly from Primero's artificially inflated stock price when selling their PSUs.

### 2. Insiders Cash Out

278. According to reports filed with the Canadian System for Electronic Disclosure by Insiders ("**SEDI**"), certain Individual Defendants and certain members of the Company's Board of Directors sold PSUs in a manner that was both highly suspicious in both timing and amount.

279. ***Chief Executive Officer and Director Joseph F. Conway***: During the Class Period, Defendant Conway's base annual salary ranged from approximately $600,000 to $650,000. *See* Primero Mining Corp., Mgmt. Info. Circular, at 36 (Apr. 16, 2012) (on file with SEDAR); Primero Mining Corp., Mgmt. Info. Circular, at 48 (Mar. 22, 2016) (on file with SEDAR). During the Class Period, Conway sold over one million PSUs for cash, as set forth in the following chart:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|
| 3/15/2012 | 33333 | $2.90 | $96.665.70 |
| Class Period | | | |
| 3/15/2013 | 33333 | $6.11 | $203,664.63 |
| 4/15/2013 | 153846 | $6.10 | $938,460.60 |
| 8/30/2013 | 865384 | $4.82 | $4,171,150.88 |
| 3/14/2014 | 33334 | $6.92 | $230,671.28 |

| | | | |
|---|---|---|---|
| 3/14/2014 | 89384 | $6.86 | $613,174.24 |
| 5/31/2014 | 153846 | $7.90 | $1,215,383.40 |
| 3/13/2015 | 89384 | $4.47 | $399,546.48 |
| 4/30/2015 | 153846 | $4.16 | $639,999.36 |
| **Total** | **1,572,357** | **$5.35 (Average)** | **$8,412,050.87** |

280. When annualized, the proceeds amount to approximately four times Conway's annual base salary during the Class Period.

281. ***Chief Financial Officer David Blaiklock***: During the Class Period, Defendant Blaiklock's salary ranged from approximately $335,000 to $350,000. *See* Primero Mining Corp., Mgmt. Info. Circular, at 36 (Apr. 16, 2012) (on file with SEDAR); Primero Mining Corp., Mgmt. Info. Circular, at 35 (Apr. 8, 2013) (on file with SEDAR). Blaiklock's PSU cash sales before and during the Class Period are summarized below:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|
| 3/15/2012 | 13333 | $2.90 | $38,665.70 |
| Class Period | | | |
| 3/15/2013 | 13333 | $6.11 | $81,464.63 |
| 4/15/2013 | 50000 | $6.10 | $305,000.00 |
| 8/30/2013 | 50000 | $4.82 | $241,000.00 |
| 3/14/2014 | 13334 | $6.92 | $92,271.28 |
| 3/14/2014 | 30253 | $6.86 | $207,535.58 |
| 5/30/2014 | 50000 | $7.90 | $395,000.00 |
| **Total** | **206,920** | **$6.39 (Average)** | **$1,322,271.4** |

282. When annualized, the proceeds amount to approximately double Blaiklock's annual base salary during the Class Period.

283. ***Primero's Founder and Chairman of the Board Wade Nesmith***: During the Class Period, Nesmith also sold over one million PSUs for cash. During the Class Period, Nesmith received $250,000 annually in base director fees. *See* Primero Mining Corp. Mgmt. Info. Circular, at 40 (Apr. 8, 2013) (on file with SEDAR). Nesmith's PSU sales are summarized below:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|
| 3/15/2012 | 16666 | $2.90 | $48,331.40 |
| Class Period | | | |
| 3/15/2013 | 16667 | $6.11 | $101,835.37 |
| 4/15/2013 | 291667 | $6.10 | $1,779,168.70 |
| 8/30/2013 | 432692 | $4.82 | $2,085,575.44 |
| 3/14/2014 | 16666 | $6.92 | $115,328.72 |
| 5/30/2014 | 291666 | $7.90 | $2,304,161.40 |
| 4/30/2015 | 291667 | $4.16 | $1,213,334.72 |
| **Total** | **1,341,025** | **$5.66 (Average)** | **$7,599,404.35** |

284. When annualized, the proceeds amount to approximately ten times Nesmith's annual base director fees during the Class Period.

### E. Financial Motives of the Company

285. Before and during the Class Period, Defendants were also motivated to keep the Company's stock high and maintain substantial cash flow in order to expand its existing operations and acquire additional mines. Primero repeatedly described itself as "focused on building a portfolio of high quality, low cost

precious metals assets in the Americas through acquiring, exploring, developing and operating mineral resource properties." *See*, *e.g.*, Aug. 11, 2011 Form 40-F, Ex. 99.1 at 9; Nov. 8, 2012 Form 40-F/A, Ex. 99.2 at 6; Apr. 2, 2013 Form 40-F, Ex. 99.1 at 11. In addition, the Company repeatedly expressed its goal of becoming an "intermediate gold producer" by increasing production at San Dimas "and if appropriate, making additional acquisitions of precious metal properties in Latin America." Aug. 11, 2011 Form 40-F Ex. 99.1 at 9; *see also* Q3 2011 Earnings Call, Bloomberg Tr., at 3 (Nov. 4, 2011); Q2 2012 Earnings Call, Bloomberg Tr. at 3. These expansions and acquisitions were important to the Company's strategy as it was receiving less than market value for the majority of the silver sold from the San Dimas mine.

286. On October 16, 2012, shortly after the Company received the positive APA Ruling, Primero announced its plans to expand the San Dimas mine. Press Release, *Primero Announces Expansion of its San Dimas Mine* (Oct. 16, 2012). That day, Defendant Conway noted on a conference call that "one of the reasons we wanted to expand this operation is obviously to get more positive leverage to silver[.]" Primero Mining Corp. at Canaccord Genuity Resources Conference, Fair Disclosure Wire Tr., at 2.

287. On the November 9, 2012 Q3 2012 Earnings Call, Defendant Conway noted that future acquisitions could be completed with cash and/or shares of the company, as "most people that we've been chatting to in terms of business combinations in general would have definitely declared they would prefer to be equity participants in Primero going forward." Seeking Alpha Tr., at 9.

288. The increased cash flow and artificially inflated stock price that Primero received from the filing of the APA application and positive APA Ruling allowed it to acquire two companies and their respective mining interests during the Class Period using artificially inflated Primero stock: (1) Cerro Resources NL

on May 22, 2013, whose principal asset was 69.2% of the Cerro Del Gallo project, a gold/silver deposit in Mexico, for stock (*see* Press Release, Primero Announces Closing of Cerro Del Gallo Acquisition (May 22, 2013)) and Goldcorp's remaining interests in the Cerro del Gallo Gold/Silver Deposit on December 19, 2013 for an upfront payment of $8 million, plus contingent payments based on meeting certain milestones or market conditions (*see* Press Release, Primero Closes Acquisition of Remaining 30.8% of Cerro del Gallo (Dec. 19, 2013)); and (2) Brigus Gold Corp, whose principal assets were the Black Fox Mine and mill and adjoining properties in Canada, for stock (*see* Press Release, Primero Announces Closing of Brigus Acquisition (Mar. 5, 2014); Feb. 21, 2015 Form 6-K, Ex. 99.2 at 29).

289. On December 13, 2012, just two months after the Company announced the positive APA Ruling, Primero announced its intention to acquire the Cerro Del Gallo project, which, according to Defendant Conway, took "more than 12 months of effort." *Primero Mining Corp to Acquire Cerro Del Gallo Conference Call*, FD (Fair Disclosure) Wire Tr., at 1. With respect to the rationale of the transaction, Conway stated that "if you are familiar with this Company, we have been very much focused on diversification from a single asset, which is the San Dimas operation and this fulfills that." *Id.* at 21.

290. During the February 21, 2013 Q4 2012 Earnings Call, Defendant Conway explained the Company's goals as follows:

* * *

> We want to become a mid-tier player, which is sort of 400,000 to 500,000 ounces of production. We want to do that in low-risk regions and we want to do that through establishing of a pipeline of projects, which all of those things if we follow the strategy that we talk about that around the circle here should lead to per share growth in terms of reserves resources, cash flow and earnings and we basically take a very simple approach here, one is to maintain our balance sheet strength and that's important part of it. We definitely need to, in this industry, deliver on operational and achieve financial results.
>
> We need to expand our existing operations or optimize them in any way we can, and in terms of increasing reserves and resources through

> the drill bit is certainly a value-added proposition that we think is important for us. And then last but not least is a concept of diversification and reduction of risk.
>
> * * *

Bloomberg Tr., at 1-2. Conway further explained the importance of cash flow for expanding the Company, stating, "Important feature, as well as if you're in a growth mode of any company, it's important to demonstrate that you have the cash flow and the capital to fund that growth and I think that's fairly clear from our financial position as we stand today." Bloomberg Tr., at 5. As Conway previously noted, the filing of the APA application and subsequent APA Ruling provided Primero with a significant cash boost in the form of the $22.2 million refund for taxes previously paid and reduced income taxes going forward. *See* Q3 2012 Earnings Call, Seeking Alpha Tr., at 3 (Nov. 9, 2012); Press Release, *Primero Reports Fourth Quarter and Full Year 2012 Results; Generates Record Revenues and Operating Cash Flow and Significant Free Cash Flow* (Feb. 21, 2013).

**F. Concealment of the SAT'S Threats, the Initial Filing of the Nullification Claim, and the SAT's Stated Reasons for Seeking to Nullify the APA Ruling**

291. Until Primero filed the NOIA on June 2, 2016, the Company did not reveal the fact that its APA Ruling and subsequent renewal were being threatened by the SAT, the very entity that enforces the tax laws in Mexico. Even if Defendants believed that the SAT's claims were meritless, they were still material. In the NOIA, Primero disclosed for the first time in the NOIA an alleged campaign of harassment by the SAT to "pressure PEM into relinquishing its legal rights stemming from the APA" that had been ongoing since at least May 2015 and included tax audits for the years covered by the APA. NOIA at p. 1, Executive Summary; ¶13. According to the NOIA:

> Even before the *juicio* was filed, SAT sought to intimidate PEM, during meetings or otherwise, making vague, unsubstantiated complaints about PEM's tax arrangements. SAT threatened to "make

> an example" out of PEM and initiated tax audits for certain fiscal years covered by the APA. **Other investigations and inspections were also conducted against PEM, such as by customs officials, even leading to PEM's temporary suspension from Mexico's list of importers and exporters. This suspension, which was in effect from May 2015 until August 2015, compromised PEM's operations and caused substantial damage to Primero**."

NOIA at ¶19.

292. Primero disclosed nothing about these "complaints," threats, "audits," or "investigations and inspections" prior to the publication of the NOIA even though they obviously were aware of them as they were on the receiving end of these threats. Indeed, when Primero announced on July 13, 2015 that Mexican customs authorities suspended PEM's import and export licenses in May 2015, it attributed the suspension to "a discrepancy over the Company's address related to its corporate office relocation from Mexico City to Durango, Mexico," not to a campaign of harassment by a discriminatory administration. Press Release, Primero Advises of Delay in Silver Revenue Due to Delay in Mexican Exports (July 13, 2015).

293. The Company's admission with respect to the license suspension is significant for several reasons. First, it reveals that Primero knew that its "tax arrangements" (*i.e.*, the APA Ruling and its subsequent renewal) were in jeopardy **no later than May 2015**, when the license suspension went into effect, as the SAT's threats and other investigations and inspections lead to the suspension.

294. Second, it reveals that the license suspension was not the innocent address snafu that the Company wanted investors to think it was in July 2015. *See* ¶212, *supra*. To the contrary, according to Primero's allegations in the NOIA, it was part of an attempt by Mexican authorities to renege on the APA that "comprised PEM's operations and caused substantial damage to Primero." *Id.* at ¶19. Thus, Primero deliberately misrepresented the reason for the license suspension to conceal the fact that its tax avoidance scheme was coming unraveled.

295. Third, it shows that Primero was most likely aware of the filing of the nullification claim in or around the date of its filing in August 2015, as it seems unlikely that the SAT would make threats, initiate tax audits, and suspend PEM's import and export licenses, but neglect to inform Primero that it had filed the nullification claim until six months later. Indeed, Primero was careful to note that "PEM only received service of process regarding this *juicio* on February 2, 2016," which is different than PEM and Primero having no idea of the *juicio*'s existence prior to that date.

296. To date, Primero has never disclosed or explained the substance of the SAT's nullification claim. The NOIA is short on details about the SAT's reasons for filing the nullification claim, containing only vague statements contending that the nullification claim highlights the SAT's own alleged mishandling of the APA application and Ruling and that the wrongdoing alleged in the nullification claim would only "be imputable to Primero's predecessors in interest." NOIA at ¶¶20, 24.

297. Considering the allegations in the Mexican press that Primero "defraud[ed]" the SAT (May 2, 2016 *Reforma* Article at 1) and "unlawfully received SAT benefits" (May 3, 2015 *Reforma* Article at 1) in obtaining the APA Ruling, the Company's concealment of the SAT's actual position suggests that Defendants were always acting with deceptive intent.

### G. The IFRS Imposed a Duty Upon Primero To Record a Tax Liability or To Disclose a Contingent Liability with Respect to the APA Ruling

298. Throughout the Class Period, Primero failed to recognize a tax liability in its financial statements with respect to the years "covered" by the APA Ruling (2010 to 2014) even though it was more likely than not that the SAT would require the Company to revert to paying income taxes on the Spot Price of silver rather than

the SW Purchase Price of silver for the following reasons: (1) at all times during the Class Period, the transfer price between PEM and ST Barbados as recorded in the 2011 Amendment of the Internal SPA did not comply with applicable Mexican transfer pricing rules; (2) just two months after the APA Ruling was issued, in December 2012, a new government came into power in Mexico and replaced most high officials of federal government agencies; (3) as of August 2013, Luis Natera, the SAT official whose improper involvement was needed to procure the APA Ruling in the first place, was no longer with the SAT and had been disqualified from serving in the public sector as of November 21, 2013 in connection with Primero's APA Ruling; and (4) there was information in the market and known to Defendants that after the new government ascended to power, the SAT was "targeting" foreign companies that it suspected of avoiding taxes (*see* NOIA at ¶17), and Primero fit the profile considering that Luis Natera had been suspended from public service in connection with the APA Ruling.

299. As stated previously, the APA Ruling expired on December 31, 2014. Primero failed to recognize an uncertain tax position in its financial statements during the Class Period with respect to the years following 2014 even though it was more likely than not that the SAT would not renew the APA Ruling on the same terms and would require the Company to revert to paying income taxes on the Spot Price of silver rather than the SW Purchase Price of silver for the reasons listed above in ¶298 and for the following additional reasons: (1) even before the nullification claim was filed in August 2015, the SAT threatened PEM's tax arrangements, "threatened to 'make an example' out of PEM," and "initiated tax audits for certain fiscal years covered by the APA" (NOIA at ¶19); and (2) the Company was aware no later than May 2015 that PEM's "tax arrangements" (*i.e.*, the APA) when the license suspension went into effect, as the SAT's threats and other investigations and inspections led to the suspension.

300. Notwithstanding, Primero did not disclose an uncertain tax position liability until February 18, 2016, after it finally disclosed the fact that the SAT was seeking to nullify the APA Ruling and would be unlikely to renew the APA Ruling on the same terms. *See* ¶249. With respect to uncertain tax positions, Primero stated the following in its February 18, 2016 Form 6-K: "Uncertain income tax positions are recorded in the consolidated financial statements when probable and measured at the amount expected to be paid to (recovered from) the taxation authority using the Company's best estimate of the amount." Feb. 18, 2016 Form 6-K, Ex. 99.1 at 18. In that filing, Primero disclosed, for the first time, the "uncertain tax treatment for tax years following 2014" due to the SAT's nullification claim. *Id.* at 34.

301. Even if Primero was not required to recognize and record a tax liability as described above—it was—IAS 12 and 37 still mandated that Primero disclose in the notes to its financial statements the existence of the uncertain tax position liability as a contingent liability because the chance of being assessed income tax based on the Spot Price of silver rather than the SW Purchase Price for the years covering the APA Ruling (2010-2014) and the years following 2014 was not "remote" at any time throughout the Class Period, for the reasons set forth above in ¶¶298-99.

302. After filing the APA application, Defendant Conway stated that the probability of receiving a positive APA ruling was 70%, meaning that there was a 30% percent chance that the APA application would be rejected. *See* Nov. 4, 2011 Q3 2011 Earnings Call (Bloomberg Tr., at 5); Aug. 2, 2012 Q2 2012 Earnings Call at 3. Despite purportedly having 70% confidence that the APA Ruling would be positive, the Company recorded as a contingent liability the maximum amount that it would have to pay if the APA was rejected and it had to revert to paying taxes based on the Spot Price of silver for all sales to SW Caymans. *See* ¶99 (citing Form 40-F/A, Ex. 99.1 at 41 (May 24, 2012); Form 6-K, Ex. 99.2 at 22 (May 3, 2012); Form

6-K, Ex. 99.2 at 24 (Aug. 2, 2012)). If the Company deemed a 30% chance of rejection sufficiently not "remote" such that it disclosed a contingent liability, then certainly threats to its tax arrangements from the very authority that is in charge of them made the probability of being assessed additional income taxes more than remote.

303. Under similar circumstances in the *Silver Wheaton* case, Judge Snyder found that the plaintiffs alleged sufficient facts to show that under the applicable accounting rules, including IFRS, the defendants were required to record or disclose a tax liability on Silver Wheaton's balance sheets. Ex. E, *In re Silver Wheaton*, 2016 U.S. Dist. LEXIS 74162, at *23-25.

304. Judge Snyder also noted that "the fact that the CRA, the agency charged with interpreting and enforcing Canada's income tax laws, has determined to reassess Silver Wheaton's tax liability is, at a minimum, relevant to assessing whether plaintiffs have stated a plausible claim that defendants misrepresented Silver Wheaton's potential tax liability." Ex. E, *In re Silver Wheaton*, 2016 U.S. Dist. LEXIS 74162, at *27 n.6. The court further stated that, "[t]his is particularly true given the significant extent of the CRA's reassessment—virtually all of SW Cayman's profits." *Id.*

305. Here, as the agency charged with interpreting and enforcing Mexico income tax laws, the SAT's decision to file a legal claim seeking to nullify the APA Ruling because it does not follow the applicable transfer pricing rules is likewise probative of whether Primero misrepresented its potential tax liability.

**H. Defendants' Tax Scheme Was Inherently Fraudulent**

306. Primero's hiring of the brother of a government official to evade paying income taxes in Mexico adds to the inference of scienter because such conduct is inherently fraudulent and therefore evidence of intentional or conscious misbehavior.

307. Furthermore, the odds that, out of approximately 120 million residents of Mexico,[31] Defendants coincidentally hired the brother of the person who ultimately decided to authorize Primero's APA are approximately 120 million to 1.

308. As an agent of Primero, Christian Natera's scienter is imputable to the Company under the doctrine of *respondeat superior*. *See also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015).

309. Christian Natera obviously knew that his brother was the head of the Transfer Pricing Audit Administration with the SAT and could not have believed that the Company was in compliance with the applicable transfer pricing rules. After all, as described in the May 3, 2016 *Reforma*, his firm specializes in "advance transfer pricing agreements" and "specializes in litigating against" the SAT. In addition, he published an article titled, "Getting an APA in Mexico" on his firm's website which explains how APAs work in Mexico and cites to the OECD Guidelines. *See* http://www.natera.com.mx/euromoney/Transfer_Pricing_2011-12.pdf.

310. Additionally, as a former SAT employee (*see* Aug. 27, 2009 Proceso Article and Aug. 29, 2009 La Jornada Article), Christian Natera would have been familiar with the Federal Law on Administrative Responsibilities of Public Servants that his brother was found administratively liable for having violated.

311. Lastly, the fact that Luis Natera had his subordinate sign the APA Ruling is highly suggestive of conscious misbehavior. *See* ¶230. Luis Natera would only do such a thing to conceal his participation.

### I. Defendants' Tax Scheme Violated the CFPOA

312. Defendants' scheme was also in violation of Canada's Corruption of Foreign Public Officials Act ("**CFPOA**"). The CFPOA is violated when a person,

---

[31] *See* Worldbank, *Data*, *Mexico*, http://data.worldbank.org/country/mexico.

> *in order to obtain or retain an advantage in the course of business, directly or indirectly gives*, offers or agrees to give or offer a loan, reward, advantage of any kind to a foreign public official *or to any person for the benefit of a foreign public official* (a) as consideration for an act or omission by the official in connection with the performance of the official's duties or functions; or (b) to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions.

CFPA, S.C. 1998, at §3(1). Defendants violated this law by retaining Christian Natera, the brother of Luis Natera who was the head of the Transfer Pricing Audit Adminstration of the SAT, in order to approve the APA—which was null *ab initio*—and to obtain a material business advantage for Primero, a Canadian corporation. *See id*.; *see also* ¶¶78, 92, 230-35, 242, 245-46.

**J. Conway Resigned as CEO**

313. On January 31, 2016, Mast succeeded to the role of CEO and Conway because Primero's Executive Vice Chairman. Press Release, *Primero Announces Planned Succession of Ernest Mast to President and C.E.O. and Joseph Conway to Executive Vice Chairman* (Nov. 11, 2015). Although the Company presented Conway's resignation and Mast's succession to the role of CEO role as "planned," the timing of the announcement of Mast's appointment in November 11, 2015 is suspicious. *See* Press Release, *Primero Announces Planned Succession of Ernest Mast to President and C.E.O. and Joseph Conway to Executive Vice Chairman* (Nov. 11, 2015). By November 11, 2015, Defendants were well aware that the SAT was threatening to retroactively nullify its APA Ruling and that renewal was likely impossible. *See* ¶¶242, 245-46.

314. When Mast took over the role of CEO on January 31, 2016, he failed to update and correct Defendants' false and/or misleading statements.

### K. Violations of Primero's Code of Business Conduct and Ethics

315. On August 11, 2011, Primero filed a Form 40-F with the SEC which contained the Company's "Code of Business Conduct and Ethics" ("**Code**") as of May 26, 2010.[32] Aug. 11, 2011, Form 40-F, Ex. 99.116. The Code provides that it is "intended to document the principles of conduct and ethics to be followed by Mala Noche Resources Corp [ ] employees, officer and directors." *Id.* at 1. The Code's purpose was to:

> i) Promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> ii) Promote avoidance of conflicts of interest, including disclosure to an appropriate person of any material transaction or relationship that reasonably could be expected to give rise to such a conflict;
>
> iii) Promote full, fair, accurate, timely and understandable disclosure in reports and documents that Mala Noche files with, or submits to, the securities regulators and in other public communications made by Mala Noche;
>
> iv) Promote **<u>compliance with applicable governmental laws, rules and regulations</u>**;
>
> v) Promote the prompt internal reporting to an appropriate person of violations of this Code;
>
> vi) Promote accountability for adherence to this Code;
>
> vii) Provide guidance to employees, officers and directors to help them recognize and deal with ethical issues;
>
> viii) Provide mechanisms to report unethical conduct; and
>
> ix) Help foster Mala Noche's culture of honesty and accountability.

---

[32] Before and during the Class Period, Primero disclosed that the Code could be viewed on the Company's website and did not disclose that it made any substantive changes to the Code before 2012. See, e.g., Apr. 2, 2013, Form 40-F at 12. Primero's website currently has a version of the Code revised as of November 2, 2015, which contains provisions substantially similar to the one filed in 2011, which is available at the following link: http://s1.q4cdn.com/439504096/files/doc_downloads/corporate_governance/Code-of-Business-Conduct-and-Ethics_Nov-2-2015_FINAL.pdf.

> **<u>Mala Noche expects all its employees, officers and directors to comply at all times with the principles in this Code.</u>** Violations of this Code are grounds for disciplinary action up to and including immediate termination of employment and possible legal prosecution. For the purpose of this Code, the Company's Chief Risk Officer shall be its Chief Financial Officer.

*Id*. at ¶1.

316. Paragraph 3 of the Code, "Compliance with Law," provides that Primero employees, officers, and directors "i) must at all times comply fully with applicable laws and avoid any situation that could be perceived as improper, unethical or indicate a casual attitude towards compliance with the law"; ii) shall not "commit or condone an illegal act or instruct another employee to do so"; iii) "be sufficiently familiar with any legislation that applies to their circumstances and shall recognize potential liabilities, seeking advice where appropriate"; and iv) "[w]hen in doubt, employees, officers and directors are expected to seek clarification from their immediate supervisor or the Chief Risk Officer." *Id.* The Code provides that Primero's Chief Risk Officer is its CFO. *Id*. at ¶1.

317. The Code also provides that "[a]gents or other non-employees cannot be used to circumvent the law," and "employees, officers and directors will not retain agents or other representatives to engage in practices that run contrary to this Code." *Id*. at ¶14.

318. Accordingly, it was a violation of the Company's own Code to hire Christian Natera, an agent of Primero, to use his brother's position at the SAT to procure the APA Ruling because it (1) led to an illegal act (*i.e*., the violation of the Federal Law on Administrative Responsibilities of Public Servants, as evidenced by Luis Natera being found administratively liable for failing to recuse himself from the Company's APA application and Ruling); and (2) at the very least, is the type of "situation that could be perceived as improper, unethical or indicate a casual attitude towards compliance with the law" because the transfer pricing set

forth in the 2011 Amendment to the Internal SPA did not comply with the applicable laws on transfer pricing.

### L. Certain Individual Defendants Swore To the Accuracy of Certain Filings

319. The Company's annual reports filed with the SEC during the Class Period which are alleged herein to be false or misleading (*see* ¶¶123-224) contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("**SOX**") signed by certain Defendants. The Apr. 2, 2013 Form 40-F SOX certification signed by CEO Conway and CFO Blaiklock states that the annual report "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities and Exchange Act of 1934" and "the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company. Defendants Conway and Blaiklock further signed a separate certification stating in relevant part:

(1) I have reviewed this Annual Report on Form 40-F of Primero Mining Corp. for the year ended December 31, 2012.

**(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.**

**(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report.**

(4) The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be

designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

(5) The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of the internal control over financial reporting, to the issuer's auditors and the audit committee of issuer's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involve management or other employees who have a significant role in the issuer's internal control over financial reporting.

320. The April 1, 2014 Form 40-F contained substantially similar certifications for the fiscal year ended December 31, 2013, signed by Defendants Conway and Blaiklock.

321. The March 31, 2015 Form 40-F contained substantially similar certifications for the fiscal year ended December 31, 2014 signed by Defendants Conway and Kaufman.

322. The Company's quarterly reports filed with the SEC during the Class Period which contain statements alleged herein to be false or misleading (*see* ¶¶123-224) contained certifications of interim filings filed on Form 52-109F2 signed by certain Defendants. The May 8, 2013 Form 6-K signed by Defendants Conway and Blaiklock stated in relevant part:

> 1. **Review**: I have reviewed the interim financial report and interim MD&A (together, the "interim filings") of Primero Mining Corp. (the "issuer") for the interim period ended March 31, 2013.
>
> 2. **No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.**
>
> 3. **Fair presentation: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.**
>
> 4. **Responsibility:** The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.
>
> 5. **Design*:*** Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer(s) and I have, as at the end of the period covered by the interim filings
>
> > A. designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

I. material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

II. information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

B. designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1 **Control framework*:*** The control framework the issuer's other certifying officer(s) and I used to design the issuer's ICFR is *Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission.

5.2 **N/A**

5.3 **N/A**

6. **Reporting changes in ICFR*:*** The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on **January 1, 2013** and ended on **March 31, 2013** that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

323. The Aug. 28, 2013 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, which are substantially similar to those which appeared in ¶322, but for the interim period ended June 30, 2013.

324. The Nov. 6, 2013 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, which are substantially similar to those which appeared in ¶322, but for the interim period ended September 30, 2013.

325. The May 8, 2014 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, which are substantially similar to those which appeared in ¶322, but for the interim period ended March 31, 2014.

326. The Aug. 7, 2014 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, which are substantially similar to those which appeared in ¶322, but for the interim period ended June 30, 2014.

327. The Nov. 6, 2014 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, which are substantially similar to those which appeared in ¶322, but for the interim period ended September 30, 2014.

328. The May 6, 2015 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, which are substantially similar to those which appeared in ¶322, but for the interim period ended March 31, 2015.

329. The Aug. 5, 2015 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, which are substantially similar to those which appeared in ¶322, but for the interim period ended June 30, 2015.

330. The Nov. 3, 2015 Form 6-K contained certifications of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, which are substantially similar to those which appeared in ¶322, but for the interim period ended September 30, 2015.

## IX. CLASS ACTION ALLEGATIONS

331. Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all persons and

entities who purchased or otherwise acquired Primero securities during the Class Period (the "**Class**") and were damaged thereby, seeking to pursue remedies under the Exchange Act.

332. Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

333. Also excluded from the Class are those who purchased or otherwise acquired Primero securities on foreign exchanges or purchased or otherwise acquired Primero securities outside of the United States, in accordance with the United States Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010) ("[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.").

334. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Primero securities were actively traded, including on the NYSE. While the exact number of Class members cannot be determined at this early stage, Plaintiffs believe that thousands of people held Primero securities during the Class Period. Record owners and other members of the Class may be identified from records maintained by Primero or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

335. Plaintiffs' claims are typical of the claims of the other members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

336. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

337. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, *inter alia*:

a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) Whether statements made by Defendants during the Class Period continued untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c) Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Primero's securities to be artificially inflated during the Class Period;

d) Whether Defendants acted with the requisite level of scienter in issuing false and misleading financial statements;

e) Whether the Individual Defendants were controlling persons of Primero;

f) Whether reliance may be presumed pursuant to the *Affiliated Ute* presumption or the fraud-on-the-market presumption; and

g) Whether the Class members have sustained damages, and if so, the proper measure of damages.

338. Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

339. A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable. In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## X. LOSS CAUSATION

340. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Primero's stock price and operated as a fraud or deceit on those who purchased or otherwise acquired Primero securities during the Class Period by misrepresenting the Company's business and prospects. During the Class Period, Defendants misrepresented and concealed the true facts regarding the circumstances surrounding the APA application and its ramifications. Later, as Defendants' prior misrepresentations, omissions, and scheme were disclosed and became apparent to the market, the price of Primero securities fell precipitously. As a result of their purchases or acquisitions of Primero securities during the Class Period at artificially inflated prices, Plaintiffs and other Class members suffered damages as the truth was revealed.

341. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class. Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period directly caused losses to Plaintiffs and the Class. On the strength of these statements, the Company's stock price was artificially inflated to a Class period high of $8.47 per share on July 7, 2014. Those misrepresentations and omissions that were not immediately followed by an

upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Primero's business, operations, performance, and prospects. The allegations herein suffice under both a corrective disclosure theory and a materialization of the risk theory of loss causation.

342. When the truth emerged regarding the improper nature of Primero's tax accounting and the improper procurement of the APA Ruling, the price of Primero's securities declined as the market processed this previously undisclosed fact. This disclosure removed a portion of the artificial inflation in the price of Primero's securities and directly and proximately caused Plaintiffs and other Class members to suffer damages. For example, on February 3, 2016, when Primero announced *inter alia* that the SAT filed a legal claim seeking to nullify the Company's APA Ruling, Primero stock declined $0.74 per share to close at $1.89 per share on February 4, 2016, a one-day decline of 28% on unusually high volume of shares.

343. Until shortly before Plaintiffs filed this Complaint, they were unaware of the facts alleged herein and could not have reasonably discovered Defendants' misrepresentations and omission by the exercise of reasonable diligence.

## XI. CONTROL PERSON LIABILITY

344. The Individual Defendants are liable as direct participants with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of Primero's business and the disclosures made by Primero and themselves.

345. Specifically, because of their positions within the Company, the Individual Defendants possessed the power and authority to control the contents of Primero's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, individual and institutional investors, *i.e.*, the market, including those containing the materially misleading statements and omissions of material fact alleged herein. Each of the Individual Defendants, by reason of his or her respective management position, had the ability and opportunity to review copies of the Company's SEC filings, reports, press releases, and other public statements alleged herein to be false and misleading, prior to, or shortly after their issuance or to cause them to be corrected or updated.

346. By virtue of their positions, the Individual Defendants had access to material nonpublic information. Each of the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

## XII. THE FRAUD ON THE MARKET PRESUMPTION

347. At all relevant times, the market for Primero's securities was an efficient market for the following reasons, among others:

a. Primero's common stock was listed and actively traded on the NYSE (symbol PPP), a highly efficient market;

b. As a registered and regulated issuer of securities, Primero filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c. Primero regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d. The market reacted to public information disseminated by Primero;

e. At least 14 analysts followed Primero's business and wrote reports which were publicly available and affected the public marketplace;

f. The material misrepresentation and omissions alleged herein would tend to induce a reasonable investor to overvalue Primero's stock; and

g. Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired Primero securities between the time that the Defendants made the material misrepresentations and omissions the time that the truth was revealed, during which time the price of Primero securities was artificially inflated by Defendants' misrepresentations and omissions.

348. As a result of the above, the market for Primero securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' prices. The historical daily trading prices and volumes of Primero securities are incorporated herein by reference. Under these circumstances, all those who purchased or otherwise acquired Primero securities during the Class Period suffered similar injuries through their purchases or acquisitions of securities at prices which were artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## XIII. THE AFFILIATED UTE PRESUMPTION

349. At all relevant times, Plaintiffs and the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the Class would not have purchased or otherwise acquired Primero securities at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent Defendants wrongfully failed to disclose material facts and information concerning the circumstances surrounding the APA application, or otherwise omitted material facts and information, Plaintiffs and the Class are presumed to rely on Defendants' omissions as established by the Supreme Court in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972).

## XIV. NO STATUTORY SAFE HARBOR

350. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

351. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact.

352. Second, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

353. Third, such false and misleading stamens were not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release,

SEC filings, earnings class, or other public statement described herein were general, "boilerplate" statements of risk that would affect any mining company, and misleadingly contained no factual disclosure of any of the specific details of the endemic problems affecting the Company during the Class Period, or similar important factors that would give investors adequate notice of such risks.

354. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Primero who actually knew that each such statement was false or misleading when made.

## XV. CAUSES OF ACTION

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

355. Plaintiffs re-allege each allegation above as if fully set forth herein.

356. This Count is brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against all Defendants.

357. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press release, conference calls, and analyst reports concerning the improper nature of Primero's tax accounting and the improper procurement of the APA Ruling, whose truth they knowingly or recklessly disregarded when they

failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

358. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiffs and other members of the Class in that Defendants concealed the improper procurement of the APA Ruling and its impact from the investing public.

359. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

360. Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

361. As a result of Defendants' dissemination of materially false and misleading information ant their failure to disclose material facts, Plaintiffs and the Class Members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

362. Primero is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Primero in taking the actions alleged herein.

363. Plaintiffs and Class Members purchased or otherwise acquired Primero securities, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects. In so doing, Plaintiffs and Class members relied directly or indirectly on false and misleading statements by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Plaintiffs and Class Members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

364. At the time of each Defendants' false statements, misrepresentations and omissions, Plaintiff and Class members were unware of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have purchased or acquired Primero securities at the prevailing prices had they known the truth about the matters discussed above.

365. Plaintiffs are filing this action within two years after discovery of the facts constitution the violation, including facts establishing scienter and other elements of Plaintiffs' claims, and within five years after the violations with respect to Plaintiffs' investments.

366. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

367. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchases or acquisitions of Primero securities.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

368. Plaintiffs reallege each allegation above as if fully set forth herein.

369. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

370. As set forth above, Primero committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by participating in a scheme to conceal the fact that its APA Ruling was procured by fraud and subject to retroactive nullification and was highly unlikely to be renewed on the same or similar terms from the investing public.

371. Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of Primero, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of § 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class's investments in Primero securities within the meaning of § 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

372. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

373. The Individual Defendants knew or recklessly disregarded the fact that Primero's representations were materially false and misleading and/or omitted

material facts when made. In so doing, the Individual Defendants did not act in good faith. By virtue of their high-level positions and their participation in and awareness of Primero's operations and public statements, the Individual Defendants were able to and did influence and control Primero's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

374. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

375. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases or acquisitions of Primero securities.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding rescissory damages in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be

determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

E. Awarding such other and further relief as this Court may deem just and proper.

## XVII. JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: August 22, 2016

Respectfully submitted,

By: /s/ *Richard W. Gonnello*
Richard W. Gonnello

Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice*)
Megan M. Sullivan (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: rgonnello@faruqilaw.com
klenahan@faruqilaw.com
msullivan@faruqilaw.com

Barbara A. Rohr
SBN 273353
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimilie: 424-256-2885
Email: brohr@faruqilaw.com

*Attorneys for Lead Plaintiffs Royal Wulff Ventures LLC and Robert E. Cook, as Trustee for the Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988 and Lead Counsel for the Class*