**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 16-01034-BRO (RAOx)** | Date | January 30, 3017 |
| Title | **PATRICK LOFTUS V. PRIMERO MINING CORP. ET AL.** | | |

| | | |
|---|---|---|
| Present: The Honorable | **BEVERLY REID O'CONNELL, United States District Judge** | |
| Renee A. Fisher | Not Present | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS)

**ORDER RE DEFENDANTS' MOTION TO DISMISS [74]**

## I. INTRODUCTION

Pending before the Court is Defendants Primero Mining Corp. ("Primero"), Joseph Conway, Ernest Mast, David Blaiklock, and Wendy Kaufman[1] (collectively, "Defendants") Motion to Dismiss. (*See* Dkt. No. 74 (hereinafter, "Mot.").) After considering the papers filed in support of and in opposition the instant Motion, the Court finds this matter appropriate for resolution without oral argument of counsel. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## II. BACKGROUND

### A. The Parties

The Lead Plaintiffs in this proposed class action are Royal Wulff Ventures LLC and Robert E. Cook, as trustee of The Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988 (hereinafter, "Plaintiffs"), who claim they acquired Primero securities at artificially inflated prices during the Class Period. (AC ¶ 21.) Primero is a producer of precious metals who operates mines in Canada and Mexico. (AC ¶ 22.) Defendant Joseph F. Conway was Primero's Chief Executive Officer ("CEO") from June 2010 until January 31, 2016. (AC ¶ 23.) Defendant Conway then became Primero's Executive Vice Chairman. (*Id.*) Defendant Ernest Mast served as

[1] The Court will refer to Defendants Conway, Mast, Blaiklock, and Kaufman collectively as the "Individual Defendants."

Primero's Chief Operating Officer ("COO") until he became Primero's CEO on January 31, 2016. (AC ¶ 24.) Defendant David Blaiklock served as Primero's Chief Financial Officer ("CFO") from the beginning of the Class Period[2] until September 29, 2014. (AC ¶ 25.) Defendant Wendy Kaufman became Primero's CFO on September 29, 2014, and was in her position through the end of the Class Period. (AC ¶ 26.)

## B. Factual Background

The crux of Plaintiff Patrick Loftus's ("Plaintiff") claim[3] is that Defendants acted fraudulently and misled its investors through representations about a ruling issued by Mexico's tax authority (the "APA Ruling") in 2012. (*See* Dkt. No. 69 (hereinafter, "AC").)

### 1. Relevant Accounting Standards

Because part of Plaintiffs' claims are that Defendants failed to comply with the relevant accounting standards, a brief overview of the relevant accounting standards is necessary. For the fiscal years ending December 31, 2011 through 2015, Primero prepared its financial statements with the SEC in accordance with Internal Financial Reporting Standards ("IFRS"). (AC ¶ 50.) The International Accounting Standards ("IAS") are part of the IFRS's accounting principles. (*Id.*) The IFRS defines an uncertain tax position liability as a present or possible obligation arising from prior conduct about which there is uncertainty as to whether the obligation will result in an outflow of resources or uncertainty as to the amount of that outflow. (AC ¶ 51.) Under IAS 37, a liability arises when a past event is expected to result in an outflow of company resources. (AC ¶ 53.) IAS 37 also requires a company to recognize uncertain liabilities in its financial statements if it is probable that an outflow will occur and can be reasonably estimated. (AC ¶ 54.) Under the IFRS, this means a "great [sic] than 50 percent" chance of occurrence. (*Id.*)

Similarly, contingent tax liabilities are defined as either (1) possible obligations arising from past events whose existence will be confirmed only by the occurrence or non-occurrence of future events not entirely within the entity's control, or, (2) a present

---

[2] The Class Period is defined as October 5, 2012, to February 3, 2016. (AC ¶ 1.)

[3] Plaintiff brings this action on behalf of himself and a class consisting of all persons (or entities) who purchased Primero's securities "at artificially inflated prices" during the Class Period. (AC ¶ 1.)

obligation arising from past events that is not recognized because it is not probable that an outflow of resources will be required to settle the obligation or the amount of the obligation cannot reasonably be estimated. (AC ¶ 57.) IAS 37 provides that contingent liabilities may arise from "unresolved disputes with the taxation authorities." (AC ¶ 58.) According to Plaintiffs' interpretation of the IAS, "an entity is required to disclose as a contingent liability an uncertain tax liability when it is more than likely that no additional income taxes, penalties, or interest will be assessed . . . but the chances that they will be assessed are not remote. (AC ¶ 59 (emphasis omitted) (citing IAS 37 ¶ 28).) Contingent liabilities should be "assessed continually to determine whether an outflow of resources embodying economic benefits has become probable." (AC ¶ 60 (quoting IAS 37 ¶ 30).)

### 2. Primero's Silver Sales Agreements

In 2004, Silver Wheaton Corp. ("SW") entered into an agreement with Goldcorp (Primero's predecessor) to purchase metals from one of Goldcorp's mines—the San Dimas mine—for a fixed price. (*See* AC ¶¶ 66–69.) The agreement stated that Goldcorp would sell SW silver at the lesser amount of $3.90 per ounce or the "spot price" (i.e., market price). (AC ¶ 69.) At the time, Goldcorp paid income taxes in Mexico for the silver sold from the San Dimas mine based on the spot price, rather than the actual sale price of the silver to SW. (AC ¶ 71.) On August 6, 2010, Goldcorp sold the San Dimas mine to Primero for $510 million. (AC ¶ 73.) As part of the deal, Primero also acquired Goldcorp's subsidiary, ST Barbados. (*Id.*) In addition, Primero was required to comply with several preexisting silver purchase agreements ("SPAs")—such as the agreement with SW—that required it to sell the silver from the San Dimas mine to various companies for previously-set prices that were often well below the spot price at the time. (AC ¶ 74.)

By March 2011, the spot price of silver was near $35 per ounce. (AC ¶ 77.) The Mexican government taxed Primero at the spot price for the silver it extracted and sold from the San Dimas mine, though under the terms of the SPAs it was required to sell the silver at substantially discounted prices. (AC ¶ 4.) Thus, Primero's tax liability was significant; for instance, for the first quarter of 2011, Primero recorded a net loss of $7.895 million after paying approximately $12.9 million in income taxes based on pre-tax income of $5.05 million. (AC ¶ 77.)

//

### 3. Primero's Alleged Tax Evasion Scheme

Due to this significant tax liability, Plaintiffs allege that Primero hatched a tax evasion scheme. (AC ¶ 78.) Specifically, Plaintiffs claim that (1) Primero restructured the company and amended one of its SPAs, and, (2) that Primero hired "someone with sufficient connections at the Mexican tax authority, the SAT, to improperly obtain a positive ruling on the Company's APA." (AC ¶ 78.) In Mexico, a taxpayer can seek a ruling on an "advance pricing agreement" ("APA") from Mexico's tax authority, the Servicio de Administraction Tributaria (the "SAT") to determine the appropriate pricing method for the taxpayer to apply to sales under the arm's length principle.[4]

In May 2011, Defendant Conway discussed the company's plan to reduce the amount of taxes it was paying in Mexico by participating in a corporate restructure. (AC ¶ 79.) Under the pricing arrangements at the time, Primero sold silver from the San Dimas mine through an "Internal SPA" to ST Barbados (which it owned) at the spot price of silver. (*See* AC ¶ 87.) ST Barbados then sold the silver through an "External SPA" to SW Caymans at a fixed price of $4.04 per ounce. (*Id.*) Under the new arrangement, Primero would amend its Internal SPA to also sell silver to ST Barbados at the fixed price of $4.04 per ounce. (*See id.*) He explained, however, that to get Mexico's approval for the restructuring, Primero would have to seek an APA. (AC ¶ 80.) He judged the chance of success on an APA as "50-50." (*Id.*)

Plaintiff contends that this amendment violated Mexico's Income Tax Law. (AC ¶ 8.) Article 179 of the Income Tax Law includes the "arm's length principle," which provides that taxpayers dealing with foreign related parties must determine their gross income and their tax liability "deductions by using the prices and consideration that they would have used with independent parties in comparable transactions." (*Id.*) According to Plaintiffs, the decision to sell silver at approximately $4 per ounce through its Internal SPA when the spot price was significantly higher could not be the result of an arm's length transaction. (AC ¶ 89.) At least one analyst questioned Defendant Conway on Primero's decision and the Mexican tax authority's position on their SPA amendment in August 2011, asking why "in essence Silver Wheaton contractual stuff should supersede

[4] Plaintiffs explain that "[i]n Mexico, APAs are not agreements between the tax administration and the taxpayer. . . . Rather they are administrative tax resolutions, or rulings, made by the SAT in response to a specific request by a taxpayer." (AC ¶ 45.)

Mexican tax law?" (AC ¶ 90.) Defendant Conway answered that he believed the decision was outside of the Mexican tax authority's jurisdiction. (*Id.*)

As noted above, for the SAT to agree to tax Primero at the lower sale price rather than the spot price, Primero had to obtain authorization through an APA. (AC ¶ 92.) To assist with the APA, Primero hired Christian Natera, an attorney whose firm, Natera Consultores, S.C., specialized in transfer pricing. (*See* AC ¶¶ 10, 94.) At the time, his brother, Luis Natera, served as the head of the SAT's Transfer Pricing Audit Administration. (*Id.*)

On October 17, 2011, several days after amending the Internal SPA, Primero submitted an application to the SAT. (AC ¶ 95.) Based on the application, Primero recorded revenues from sales of its silver to SW Caymans (and the associated taxes) based on the lower contracted price of approximately $4 per ounce starting on August 6, 2010, and also filed a refund for the overpayment of taxes between August 6, 2010, and the October 2011 application filing date. (AC ¶¶ 96–97.) Primero recorded the recovery of this overpayment prospectively, in the fourth quarter of 2011. (AC ¶ 97.)

Before the SAT ruled on Primero's APA application, Primero disclosed as a contingent tax liability the maximum amount it would be required to pay if its application was rejected. (AC ¶ 98.) As of December 31, 2011, this amount was approximately $28.6 million, eventually rising to approximately $52.4 million (plus estimated interest of $5.8 million) by June 30, 2012. (*Id.*) These amounts were substantial, as Primero recorded approximately $58.9 million in income for the 2011 fiscal year and approximately $37.8 million for the six months ended June 30, 2012. (AC ¶ 99.) Primero represented that its chances of success on its APA application were higher than seventy percent, though some analysts remained skeptical. (AC ¶ 100.)

On October 5, 2012, Primero announced that the SAT ruled in its favor. (AC ¶ 101.) This announcement resulted in Primero's stock increasing by 36%, nearly two dollars per share, in one day. (AC ¶ 102.) Some analysts were surprised by the ruling. (AC ¶¶ 103–04.) Primero repeatedly stated publicly that the APA Ruling would have significant impact on its future business and the condition of the company. (*See* AC ¶¶ 105–12.) For example, a February 21, 2013 press release stated that:

> The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at

> realized prices rather than spot prices effective from August 6, 2010. This ruling significantly improves the Company's free cash flow. Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized silver prices for the life of the San Dimas mine.

(AC ¶ 109.)

**4. The Alleged Discovery of Primero's "Scheme"**

Two months after Primero announced its APA Ruling, a new government administration came to power, resulting in the replacement of many Mexican officials. (AC ¶ 113.) Further, the new administration began to "crack down" on corporations who were suspected of avoiding their Mexican tax obligations by shifting profits to other countries. (AC ¶ 114.) As part of the transfer, Luis Natera was no longer part of the SAT. (AC ¶ 115.) In November 2013, Luis Natera was found liable for "irregularities" committed while in his position and was temporarily disqualified from holding a public position for six years and six months. (*Id.*) According to Plaintiffs, the "Mexican press" reported in May 2016 that his suspension was because Luis Natera failed to recuse himself from his involvement in Primero's APA application. (*Id.*)

Around this same time, Primero later revealed, the SAT was "challenging Primero's tax situation" by threatening its tax arrangements and initiating tax audits for certain fiscal years covered by the APA Ruling. (AC ¶ 117.) Eventually, these investigations resulted in Primero's suspension from Mexico's list of importers and exports in May 2015, impacting Primero's ability to export silver to ST Barbados. (*Id.*) Plaintiffs contend that Primero "concealed" that the APA was under attack and did not disclose its license suspension until July 13, 2015. (AC ¶ 118.) Specifically, Primero claimed that its suspension was due to a "discrepancy over the Company's address related to its corporate office relocation" rather than due to the tax investigation. (*Id.*)

On August 4, 2015, the SAT initiated a proceeding called a juicio de lesividad (the "Juicio") with the Federal Court of Tax and Administrative Justice, seeking to nullify Primero's APA Ruling. (AC ¶ 119.) Primero did not publicly acknowledge the Juicio's

existence until February 3, 2016, when it announced in a press release that it had received service of a legal claim from the SAT. (AC ¶¶ 120, 227.) The company's shares fell by $0.74 per share (or over 28%) to close at $1.89 on February 4, 2016.[5] (AC ¶¶ 121, 228.)

On May 2, 2016, one of Mexico's most widely-read newspapers, *Reforma*, published an article alleging that Luis Natera was disqualified from his position with the SAT "for granting benefits" to Primero, which was represented by his brother, Christian Natera. (AC ¶ 230.) Luis Natera apparently argued that he was not required to recuse himself during the transaction with Primero because his subordinate, Sergio Perez Cruz, signed the SAT document in favor of Primero. (*Id.*) As stated above, he was disqualified for a period of six years and six months; a decision that he has appealed by filing an "amparo," which will be ruled on by Mexico's Supreme Court. (*Id.*)

According to *Reforma*, the APA Ruling resulted in a tax savings of $20.6 million in 2011 and a tax return of $22.2 million in 2012. (AC ¶ 231.) The *Reforma* claimed that the SAT filed the Juicio in August 2015, seeking to nullify the APA, and new proceedings were opened against Luis Natera in September 2015. (AC ¶ 232.) Plaintiffs claim that the *Reforma*'s allegations are supported by the First Chamber of the Supreme Court of Justice of the Nation's ruling in October 2015.[6] (AC ¶ 233.) The Supreme Court's decision suggests that Luis Natera was disciplined partially due to his failure to recuse himself from the handling of a petition submitted by a company (whose name is redacted) on October 17, 2011—the day that Primero filed its APA. (*Id.*)

Other articles have since been published as well, claiming that Primero "unlawfully received SAT benefits" based on the Natera brothers' collusion, and noting that if the SAT eventually seeks retroactive taxes from Primero it will have a major effect on Primero's business. (AC ¶¶ 235–37.) On March 28, 2016, according to *MS Noticias* (another Mexican news source), Primero filed an amparo, seeking to block the SAT's nullification claim that could reverse the APA Ruling. (AC ¶ 237.) Primero was granted

---

[5] Plaintiffs provide seventy pages of examples of statements, many of which are made or signed by the Individual Defendants, that Plaintiffs claim were false or misleading based on Primero's alleged tax evasion scheme. (*See* AC ¶¶ 122–226.) For the sake of brevity, the Court will not individually identify each statement here.

[6] Plaintiffs note that the court's decision redacts the names of the relevant parties, but "the page which provides the link on the Supreme Court's website states that the decision pertains to Luis Natera's *amparo*." (AC ¶ 233.)

a temporary suspension. (*Id.*) Further, Plaintiff explains that the Mexican legal proceedings are not public, so the Mexican press's representations are the only available explanations for investors, because Primero has never directly commented on the Natera brothers' involvement. (AC ¶¶ 238–39.)

On June 2, 2016, Primero announced that it had issued a Notice of Intent to Submit a Claim to International Arbitration Against the Government of the United Mexican States (the "NOIA") pursuant to Article 1119 of the North American Free Trade Agreement ("NAFTA"). (AC ¶ 240.) Primero posted the NOIA on its website. (AC ¶ 242.) In the NOIA, Primero claimed that it was being discriminated against for being Canadian. (AC ¶ 243.)

On February 18, 2016, Primero filed a Form 6-K with the SEC in which it stated that, due to the SAT's claim against it, it believes it unlikely that the SAT would agree to an APA for the 2015–2019 tax years on similar terms to the prior APA. (AC ¶ 249.) On August 4, 2016, Primero filed another Form 6-K in which it stated that the SAT could reassess Primero for the tax years 2010 to 2014, but that the amount of liability cannot reasonably be estimated. (AC ¶ 250.)

**5. Evidence of Scienter**

Plaintiffs further allege that because "Primero has a small number of employees, . . . it can be presumed that the Individual Defendants, as officers and/or directors, had knowledge of the facts underlying the fraud." (AC ¶ 256.) In addition, Plaintiffs contend that Defendants were aware no later than November 2012 that its transfer pricing arrangement (i.e., its amendments under the SPAs) was under "intensified scrutiny," and this scrutiny was intensified after the change in the political climate in December 2012. (AC ¶¶ 260–61.) Plaintiffs also claim that the Individual Defendants had monetary motivation for participating in the alleged tax evasion scheme based on Primero's incentive-based compensation programs. (*See* AC ¶¶ 265–71.)

Further, the Individual Defendants received compensation through Primero's "Phantom Share Unit" ("PSU") Plan. (AC ¶ 272.) According to Plaintiffs, the sale of the Individual Defendants' shares at times were "highly suspicious in both timing and amount." (AC ¶ 278.) Specifically, Plaintiffs allege that: (1) Defendant Conway sold approximately $8.4 million in PSUs between 2012 and 2015; (2) Defendant Blaiklock sold approximately $1.3 million in PSUs between 2012 and 2014; and, (3) Primero's

founder and Chairman of the Board Wade Nesmith (who is not a party to this action) sold approximately $7.6 million in PSUs between 2012 and 2015. (*See* AC ¶¶ 278–84.) In addition, Plaintiffs claim that Primero had many financial motivations for participating in the alleged fraud, such as expanding and acquiring additional mines. (AC ¶¶ 285–90.)

Plaintiffs next claim that Primero should have disclosed any pressure that SAT was putting on Primero, such as the threats, complaints, or audits that Primero mentioned in its NOIA. (AC ¶¶ 291–92.) Primero's NOIA states that these pressures began in May 2015, but Primero did not mention them publicly until June 2, 2016, when it filed the NOIA. (AC ¶ 291.) Plaintiffs contend that because of the SAT's pressure, Primero knew its tax arrangements were in jeopardy no later than May 2015 when its license was suspended. (AC ¶ 293.)

### 6. Summary of Defendants' Allegedly Fraudulent Activity

Thus, in sum, Plaintiffs effectively claim that Primero acted fraudulently by failing to recognize a tax liability on the tax years for 2010 to 2014 despite, according to Plaintiffs, it being "more likely than not that the SAT would require" Primero to revert to paying income taxes on the spot price, rather than the lower Internal SPA price. (AC ¶ 298.) Plaintiffs allege that Primero knew this was more likely than not because: (1) the $4 per ounce transfer price between Primero and ST Barbados did not comply with Mexican law; (2) in December 2012, a new government body came into power and replaced most of the officials in the federal government agencies; (3) as of August 2013, Luis Natera, "whose improper involvement was needed to procure the APA Ruling in the first place, was no longer with the SAT"; and, (4) Defendants were aware that the new government officials were "targeting" foreign officials suspected of avoiding tax obligations. (*Id.*)

Further, Plaintiffs contend that Primero failed to recognize an uncertain tax position in its financial statements during the Class Period after 2014, because it was more likely than not that the SAT would not renew the APA Ruling on the same terms. (AC ¶ 299.) This is because Primero should have been aware no later than May 2015, when its license was suspended, that its tax arrangements led to its suspension. (*Id.*) Despite these uncertainties, Primero did not disclose an uncertain tax position until February 18, 2016, when it disclosed that the SAT was seeking to nullify the APA Ruling and was unlikely to renew the APA on the same terms. (AC ¶ 300.) Moreover, according to Plaintiffs, even if Primero was not required to recognize and record a tax

liability, it was required to disclose in the notes of its financial statements the existence of its uncertain tax position liability. (AC ¶ 301.)

### C. Procedural History

Initially, two separate actions were filed in this Court: first, the instant action was filed on February 15, 2016; and, second, on February 17, 2016, another action was filed in *Andre White v. Primero Mining Corp. et al.*, No. 16-cv-1095-BRO-RAO. (*See* Dkt. No. 1; *see also White*, No. 16-cv-1034-BRO-RAO, ECF No. 1.) On April 15, 2016, the Plaintiffs in both the *White* action and the instant action filed Motions for Consolidation, Appointment of Lead Plaintiff, and Appointment of Lead Counsel. (*See* Dkt. No. 22; *White*, No. 16-cv-1095-BRO-RAO, ECF No. 19.) On May 12, 2016, the Court granted Plaintiffs' Motions to Consolidate, named Royal Wulff Ventures LLC and Robert E. Cook the Lead Plaintiffs, and approved the parties' request that Faruqi & Faruqi, LLP be named Lead Counsel. (Dkt. No. *White*, No. 16-cv-1095-BRO-RAO, ECF No. 21.)

On August 22, 2016, Plaintiffs filed their Consolidated Amended Complaint. (*See* AC.) Plaintiffs bring two causes of action: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5; and, (2) violations of Section 20(a) of the Exchange Act. (*See* AC ¶¶ 355–75.) On October 6, 2016, Defendants filed the instant Motion to Dismiss. (*See* Mot.) Plaintiffs filed their Opposition on November 21, 2016, (*see* Dkt. No. 77 (hereinafter, "Opp'n")), and, on December 21, 2016, Defendants replied, (*see* Dkt. No. 78). On December 30, 2016, Plaintiffs filed a request to file a Surreply. (*See* Dkt. No. 79.) Defendants opposed the request on January 4, 2017, (*see* Dkt. No. 80), and, the next day, Plaintiffs replied, (*see* Dkt. No. 81). The Court denied Plaintiffs' request on January 9, 2017. (*See* Dkt. No. 82.)

## II. EXTRINSIC EVIDENCE

Along with their Motion to Dismiss, Defendants include the declaration of their counsel, Daniel M. Perry, along with twenty-four exhibits that they apparently ask the Court to consider when deciding their Motion. (*See* Declaration of Daniel M. Perry (Dkt. No. 75) (hereinafter, "Perry Decl.").) When considering a motion to dismiss, a court typically does not look beyond the complaint in order to avoid converting a motion to dismiss into a motion for summary judgment. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). Notwithstanding this precept, a court may

properly consider two categories of documents: (1) material which is "incorporated by reference" into the complaint included, and, (2) matters properly subject to judicial notice. *See Hsu v. Puma Biotechnology, Inc.*, __ F. Supp. 3d __, No. SACV 15-0865 AG (JCGx), 2016 WL 5859000, at *3 (C.D. Cal. Sept. 30, 2016); *see also Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1137 (C.D. Cal. 2010) (holding that a court may "consider documents that are incorporated by reference but not physically attached to the complaint if they are central to the plaintiff's claim and no party questions their authenticity").

Defendants attach the following documents to Mr. Perry's declaration:

(1) the PDF of a webpage located at Primero's website titled "San Dimas Mine," (Perry Decl., Ex. A);

(2) Primero's APA Ruling in English, dated October 4, 2012, (Perry Decl., Ex. B);

(3) the Certificate of Accuracy of Consortra Translations certifying the translation of Primero's APA Ruling, dated September 9, 2016, (Perry Decl., Ex. C);

(4) a copy of "Peer Review of Mexican Transfer Pricing Legislation and Practices" issued by the Organisation for Economic Co-Operation and Development, (Perry Decl., Ex. D);

(5) a PDF of a webpage located at the website belonging to Natera Consultores, S.C. titled "Euromoney," (Perry Decl., Ex. E);

(6) a copy of the Notice of Intent to Submit a Claim to Arbitration filed by Primero on June 2, 2016, (Perry Decl., Ex. F);

(7) a copy of a press release issued by Primero titled "Primero Advises of Delay in Silver Revenue Due To Delay in Mexican Imports" dated July 13, 2015, (Perry Decl., Ex. G);

(8) a copy of a press release issued by Primero titled "Primero Announces Receipt of Mexican Import and Export Permits; Inventoried Silver Being Sold Immediately" dated August 6, 2015, (Perry Decl., Ex. H);

(9) a copy of Exhibit 99.1 to Primero's Form 6-K for the month of August 2016, filed August 4, 2016, (Perry Decl., Ex. I);

(10) a copy of Primero's Form 40-F for the fiscal year ended December 31, 2015, filed March 31, 2016, (Perry Decl., Ex. J);

(11) a copy of Exhibit 99.8 to Primero's Form 40-F for the fiscal year ended December 31, 2015, filed March 31, 2016, (Perry Decl., Ex. K);

(12) a copy of a press release issued by Primero titled "Primero Announces Positive Advance Tax Ruling" dated October 5, 2012, (Perry Decl., Ex. L);

(13) a copy of Primero's Form 40-F for the fiscal year ended December 31, 2012, filed April 2, 2013, (Perry Decl., Ex. M);

(14) a copy of Primero's Form 40-F for the fiscal year ended December 31, 2013, filed April 1, 2014, (Perry Decl., Ex. N);

(15) a copy of Primero's Form 40-F for the fiscal year ended December 31, 2014, filed March 31, 2015, (Perry Decl., Ex. O);

(16) a copy of Exhibit 99.1 to Primero's Form 6-K for the month of February 2013, filed February 21, 2013, (Perry Decl., Ex. P);

(17) a PDF of a webpage belonging to Deloitte & Touche titled "Income taxes — Key differences between U.S. GAAP and IFRSs," (Perry Decl., Ex. Q);

(18) a PDF of a webpage belonging to Deloitte & Touche titled "IAS 12 — Accounting for uncertainties in income taxes," (Perry Decl., Ex. R);

(19) a copy of a Reuters article titled "Mexico eyes seven multinationals in tax avoidance probe," dated January 23, 2014, (Perry Decl., Ex. S);

(20) a copy of Primero's Notice of Annual General and Special Meeting and Information Circular issued April 16, 2012, (Perry Decl., Ex. T);

(21) a press release issued by Primero titled "Primero Receives Legal Claim Filed By Mexican Tax Authorities," dated February 3, 2016, (Perry Decl., Ex. U);

(22) a copy of a report generated by Yahoo Finance on October 4, 2016, reflecting Primero's stock price activity from January 4, 2016, through July 29, 2016, (Perry Decl., Ex. V);

(23) a press release issued by Primero titled "Primero Announces Planned Succession of Ernest Mast to President and C.E.O. and Joseph Conway to Executive Vice Chairman" dated November 11, 2015, (Perry Decl., Ex. W); and,

(24) a copy of Primero's APA Ruling in Spanish, dated October 4, 2012, (Perry Decl., Ex. X).

Neither Mr. Perry's declaration nor Defendants' Motion identifies the grounds on which Defendants request that the Court consider these documents.[7] In Defendants'

[7] There is one exception: Defendants argue that Plaintiffs' Amended Complaint incorporates Exhibit A, a PDF printout of Primero's website, by reference. (*See* Mot. at 4 n.2 (citing AC ¶ 244 n.28).) Plaintiffs' Amended Complaint references a page on Primero's website entitled "Board of Directors." (*See* AC ¶ 244 n.28.) Defendants provide a copy of a page on Primero's website entitled "San Dimas Mine." (*See* Perry Decl., Ex. A.) Defendants provide no explanation for how the two webpages are related to one another or how content on the "San Dimas Mine" page is incorporated by reference to Primero's "Board of Directors" webpage. *Cf. Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005) (considering webpage incorporated by reference where additional portions of website were relevant to

Reply, however, they contend that the proffered documents are incorporated by reference into Plaintiffs' Amended Complaint. (Reply at 1.) "The district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *see also Fofona v. Holder*, 327 F. App'x 42, 42 (9th Cir. 2009) ("We do not consider Fofona's contentions raised for the first time in his reply brief . . . ."). Thus, even if Defendants' contention is correct and these documents are incorporated by reference into Plaintiffs' Amended Complaint, the Court does not consider them as Defendants make this argument for the first time in reply.

## III. LEGAL STANDARD

"To plead a claim under section 10(b) and Rule 10b-5, the Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta Inc.*, 552 U.S. 148, 157 (2008)). If a complaint fails to adequately state a claim, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A federal securities fraud complaint "is also subject to the demanding pleading requirements of the Private Securities Litigation Reform Act ("PSLRA")," which "strengthened the already-heightened pleading requirements of Fed. R. Civ. P. 9(b)." *In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMx), 2016 WL 3226004, at

---

and incorporated by the plaintiffs' allegations). Regardless, even if the Court considered Exhibit A incorporated by reference, the Court does not rely on Exhibit A in reaching its decision.

Defendants further argue that "as to the other Exhibits, the Motion specifies where the AC incorporates each such document." (Reply at 1 n.3.) This contention is overbroad. (*See, e.g.*, Mot. at 6 & n.4 & 5 (citing Exhibits B and C without mentioning where they are incorporated by reference), 8 (citing Exhibit H with no mention of its incorporation in the Amended Complaint), 9 (same as to Exhibits I, J, and K).) In any event, Defendants provide no argument as to how or in what way these documents are incorporated by reference in their Motion. Accordingly, the Court does not consider them in reaching its decision.

*6 (C.D. Cal. June 6, 2016). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). But the PSLRA requires that any action based on alleged material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, as to scienter, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## III. DISCUSSION

Defendants challenge the adequacy of Plaintiffs' first cause of action pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. ¶ 78j(b), and the Securities and Exchange Commission's ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. (*See* Mot.) As explained above, a section 10(b) and Rule 10b-5 claim has six elements: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 603 (citation omitted)). Defendants raise three primary arguments: (1) Plaintiffs have failed to establish a material misrepresentation or omission; (2) Plaintiffs have failed to plead facts sufficient to establish scienter; and, (3) Plaintiffs have failed to establish loss causation. (*See* Mot.)

### A. Whether Plaintiffs Have Established a Material Misrepresentation or Omission

Defendants argue that (1) "[a] significant portion of" Primero's representations are protected by the PSLRA's safe harbor provision, and, (2) Plaintiffs have not established any of the statements' falsity, regardless. (Mot. at 12–24.) The Court will address each argument in turn.

#### 1. Whether Primero's Statements Are Forward-Looking Statements Protected by the PSLRA's Safe Harbor Provision

The PSLRA includes a "safe harbor provision" that provides that an individual or entity may not be held liable for any "forward-looking statement" that is: (1) "identified

as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) immaterial; or, (3) that the plaintiff fails to prove was "made with actual knowledge" that the statement "was false or misleading." 15 U.S.C. § 78u-5(c)(1). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (quoting 15 U.S.C. § 78u-5(i)). The Ninth Circuit has held that these three categories of forward-looking statements which fall within the safe harbor provisions are disjunctive; that is, each provides a separate method for falling within the safe harbor. *See In re Cutera*, 610 F.3d at 1112–13. Thus, for instance, an identified forward-looking statement that is accompanied by a cautionary statement is protected by the safe harbor provisions, even if it is made with knowledge of its falsity.[8] *See id.*

**a. Whether Primero's Representations Made Prior to May 2015 are Protected by the Safe Harbor Provisions**

Defendants contend that many of Primero's allegedly fraudulent representations are protected by the safe harbor provision because they contained the following language (or "non-substantive variations" thereof):

> Assuming the Company [Primero] continues to sell its silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.

(Mot. at 12–13 (citing AC ¶¶ 123, 127, 134, 136, 138, 144, 148, 153, 155, 159, 163, 170, 175, 178, 180, 181, 185, 186, 190, 191, 192, 196, 197, 198, 205, 207, 208).) Some of the

[8] While several district courts within this Circuit had previously held otherwise based on dicta from an earlier Ninth Circuit decision, the *In re Cutera* court explicitly noted that it was overruling these decisions. *See In re Cutera*, 610 F.3d at 1113 n.5 ("Our clear statement today that the statute should be read in the disjunctive should clear up the issue for the handful of district courts that have embraced that passing reference as a holding from this court.").

language in Defendants' cited allegations from the Complaint vary slightly, however. For instance, some of the representations include the following language:

> The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized pries of silver will continue for the life of the San Dimas mine.

(AC ¶¶ 180, 185, 191, 197.) In addition, Primero's February 12, 2015 Form 6-K includes the following representation:

> In 2015 silver is expected to continue to be sold under the Amended and Restated Silver Purchase Agreement on the same terms and there are no known changes in the application of Mexican tax laws relative to the APA Ruling, so the Company expects to record revenue and pay taxes based on realized prices for the life of the San Dimas mine.

(AC ¶ 196.)

Plaintiffs present three primary arguments in support of its position that the safe harbor provisions do not apply to these statements: (1) Primero's statements were materially misleading because Defendants omitted that their position did not comply with Mexican transfer pricing rules, that the APA Ruling was improperly procured and therefore vulnerable to retroactive invalidation, and that the APA Ruling was unlikely to be renewed; (2) the safe harbor provisions do not apply to omissions of historical fact; and, (3) at least some of Primero's statements referred to the present, rather than the future. (*See* Opp'n at 22–23.) In addition, Plaintiffs claim that in or after May 2015, Primero's representations were misleading because it failed to disclose that the SAT was threatening Primero's tax arrangements and performing audits; thus, in Plaintiffs' view, this failure was not forward-looking but was an omission of historic fact. (*Id.*)

As explained above, "[t]he definition of forward-looking statements includes statements containing projections of revenues, income, earnings per share, management's plans or objectives for future operations and predictions of future economic performance." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004). In addition, "[a]ny statements of the *assumptions underlying or relating to these*

*types of statements* fall within the meaning of a forward-looking statement." *Id.* (emphasis added). Further, "a present-tense statement may qualify as forward-looking if the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Id.*

As a threshold matter, the Court finds that though these statements do not directly contain "projections of revenues, income, earnings per share" or other "predictions of future economic performance," *see In re Copper Mountain*, 311 F. Supp. 2d at 880, these statements involve "assumptions underlying or relating to these types of statements," *id.*; *see also Police Ret.* 1059 (9th Cir. 2014) (holding that general statements about the growth of a business "relate[d] to future economic performance or assumptions underlying those projections"); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1098 (C.D. Cal. 2008) (finding predictions regarding a company's projected loan production fell within the safe harbor provision because the company's "future income was dependent on loan production"). Each statement relates directly to Primero's future tax obligations and the way in which it planned to record its taxes, which has a direct effect on its income and profits. Moreover, Plaintiffs do not appear to dispute that these statements relate to Primero's financial performance or the assumptions underlying its performance. (*See* Opp'n at 21–23.) Thus, the statements identified by Plaintiffs are of the type generally protected by the safe harbor provisions.

Further, Plaintiffs claim that these representations are not forward-looking statements because (1) they were actually representations of historical facts, and, (2) at least some of these statements are about Primero's present position and are not forward-looking. (Opp'n at 22–23.) First, to the extent Plaintiffs argue that the safe harbor provisions may never apply to material omissions of fact, the Court disagrees. (*See* Opp'n at 22.) For example, Plaintiffs cite *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(THK), 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013), which held that "the safe harbor does not apply to material omissions." But the PSLRA explicitly provides that it applies when an action "is based on an untrue statement of a material fact *or omission* of a material fact necessary to make [a] statement not misleading," 15 U.S.C. § 78u-5(c)(1), and Plaintiffs provide no Ninth Circuit authority—and the Court is unaware of any—holding otherwise. Thus, the Court disagrees with Plaintiffs' proffered out-of-circuit authority to the extent it suggests that the safe harbor can *never* apply to material omissions of fact.

But it appears that the more accurate interpretation of Plaintiffs' argument is not that they are seeking to recharacterize the statements as not forward-looking at all because the representations should have included—and therefore omitted—prior historical facts. In effect, Plaintiffs contend that the only way Primero's misrepresentations could have avoided being misleading was for Primero to include information about its past conduct in relation to the allegedly fraudulent APA Ruling and its tax arrangements. Courts have held that such omissions of prior allegedly fraudulent acts do not fall within the safe harbor provisions. *See In re Celera Corp. Sec. Litig.*, No. 5:10-cv-02604 EJD, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) ("[T]he failure to alert investors to the reimbursement problem was not forward-looking; rather, it was an omission of a historical fact."); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) ("[T]o the extent Plaintiffs also challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply." (emphasis in original)); *In re CV Therapeutics, Inc.*, No. C 03-03709 SI, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) ("The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements."). Accordingly, because Plaintiffs allege that the way in which Primero's representations about future tax projections were misleading was by omitting already-existing historical facts, the Court finds that these representations are not protected by the safe harbor provisions.

#### b. Whether Primero's Representations Made in or After May 2015 are Protected by the Safe Harbor Provisions

Plaintiffs cite other statements, however, made after May 2015, which it claims were false or misleading rather than material omissions. (*See* AC ¶¶ 205–26.) First, Plaintiffs aver that the following statement that was made on May 6, 2015, in documents associated with Primero's Form 6-K filed with the SEC was false or misleading:

> Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine.

(AC ¶¶ 205–12.) Next, on August 5, 2015, and on November 3, 2015, Primero made the following representation in its Form 6-Ks: "In 2015, the Company intends to continue to record its revenue from sales of silver under the Amended and Restated Silver Purchase

Agreement in a manner consistent with prior years, the APA Ruling and applicable Mexican laws." (AC ¶¶ 214–15, 220–21.)

Plaintiffs aver that these statements made in or after May 2015 were false or misleading because, no later than May 2015, the SAT had begun threatening Primero's tax arrangements, "resulting in threats, audits, and other negative actions by the Mexican government relating to the APA Ruling and its renewal." (AC ¶ 217(c).) These statements are forward-looking statements as explained above because they relate to assumptions underlying Primero's future financial performance. *See In re Copper Mountain*, 311 F. Supp. 2d at 880. It is not clear into which of the three categories of protected forward-looking statements Defendants believe these statements fall. (*See* Mot. at 23.) The Court finds that they fall into the third category, because Plaintiffs have not established that Defendants made these statements with actual knowledge that they were false or misleading. *See* 15 U.S.C. § 78u-5(c)(1)(B).

Though Plaintiffs claim that Primero was aware that its tax arrangements were "under attack," Plaintiffs do not provide facts indicating whether the SAT's actions would have led Primero to believe that its APA Ruling would not be renewed. The fact that the Mexican government was generally "threatening" Primero or was conducting an audit does not, on its own, indicate that the APA Ruling was unlikely to be renewed. Further, Plaintiffs' conclusory allegation that the SAT took "other negative actions . . . relating to the APA Ruling and its renewal" provide no facts as to whether Primero knew, or should have known, that the SAT was unlikely to be renewed. Consequently, Plaintiffs have failed to meet their burden of establishing that Primero's representation that it would "pay taxes on realized prices for the life of the San Dimas mine" was made with actual knowledge of its falsity.[9] (*See, e.g.*, AC ¶ 205.) Thus, because Plaintiffs have failed to establish that Primero had actual knowledge of the statements false or misleading nature, these statements are protected, non-actionable forward-looking statements.

---

[9] While Plaintiffs allege that the Juicio was filed in August 2015, (Opp'n at 19), their allegations concede that Primero did not receive notice of the Juicio until February 3, 2016, (AC ¶ 120). None of the proffered statements were made after this date; thus, to the extent Plaintiffs argue that the Juicio gave Primero notice that the APA Ruling was being threatened when it made representations in 2015, the Court finds Plaintiffs' argument unpersuasive.

### 2. Whether Plaintiffs Have Established the Falsity of Primero's Statements

Next, Defendants contend that Plaintiffs have failed to establish the falsity or misleading nature of any of Primero's misrepresentations. (Mot. at 13–24.) Plaintiffs allege three primary ways in which Primero's statements were allegedly misleading: (1) Primero failed to comply with Mexico's transfer pricing rules and the IFRS; (2) Primero's statements about the APA Ruling were false; and, (3) any statements made during or after May 2015 failed to inform investors that Primero's tax arrangements were being challenged. Because Plaintiffs' allegations as to the APA Ruling drive discussion of the majority of Plaintiffs' arguments, the Court will address these allegations first.

#### a. The APA Ruling

Plaintiffs' central allegation is that Primero (and the Individual Defendants) improperly obtained the favorable APA Ruling by hiring Christian Natera, whose brother was in a position of power with the SAT. (AC ¶¶ 306–11.) According to Plaintiffs, Primero failed to adequately disclose to investors the likelihood that this APA Ruling would be retroactively nullified and was unlikely to be renewed. (*See* Opp'n at 9.) But Plaintiffs' allegations suffer from two primary issues: (1) they have not adequately alleged that the APA Ruling was improperly obtained; and, (2) even if the APA Ruling was the result of improper conduct by the Natera brothers, Plaintiffs have pleaded insufficient facts indicating that Defendants participated in or were aware of the improper conduct.

##### i. Plaintiffs Have Not Established that Primero Improperly Obtained the APA Ruling

Plaintiffs claim that Primero obtained the APA Ruling "by fraud or misrepresentation," which made it "vulnerable to retroactive nullification." (*See, e.g.*, AC ¶ 124(b).) But to support this contention, Plaintiffs allege insufficient *facts* establishing that the APA Ruling was the result of improper or fraudulent conduct. For instance, Plaintiffs allege that Primero "devised a scheme to evade income taxes in Mexico," one part of which included hiring "someone with sufficient connections at the Mexican tax authority, the SAT, to improperly obtain a positive ruling on the Company's APA." (AC ¶ 78.) Plaintiffs claim that this led Primero to hire Christian Natera, whose brother Luis Natera was the head of the Transfer Pricing Audit Administration. (*See* AC

¶¶ 92, 230.) According to Plaintiffs, *Reforma*, a Mexican newspaper[10] reported in May 2016 that Luis Natera was later suspended from holding positions of public service "for granting benefits" to Primero because he "authorized" Primero's transfer pricing plan despite his brother's involvement with the company. (AC ¶ 230.) *Reforma* indicated that his suspension was due to his failure to recuse himself from dealings with Primero.[11] (*Id.*)

But Plaintiffs' allegations fail to sufficiently establish that the APA Ruling was improperly obtained. First, Plaintiffs characterize *Reforma*'s representations as "allegations about Luis Natera's suspension." (AC ¶ 233.) Thus, Plaintiffs have merely reiterated *Reforma*'s *allegations* in their Amended Complaint and have not alleged *facts* indicating that Luis Natera acted improperly. "[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *In re McKesson*, 126 F. Supp. 2d at 1272. Second, Plaintiffs also concede that the APA Ruling has, as of the filing of the Amended Complaint, not yet been nullified. (AC ¶ 237.) And while Plaintiffs claim that the SAT has filed a Juicio seeking to nullify Primero's APA Ruling, (*see* AC ¶ 232), Plaintiffs allege no facts indicating the basis for the SAT's Juicio or establishing that the SAT is seeking nullification because the APA Ruling was improperly obtained. Plaintiffs concede that "*if* the SAT eventually seeks to collect retroactive taxes from Primero, it will need to prove the APA Ruling was issued in bad faith." (AC ¶ 237 (emphasis added).) It appears that no such finding has been made thus far. (*See id.*) Thus, while Plaintiffs provide myriad allegations regarding the

---

[10] "To the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can—at least in combination with plaintiff's investigative efforts—be a reasonable source of information and belief allegations." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000).

[11] Plaintiffs' allegations about Luis Natera's suspension partially rely on an October 21, 2015 decision by the First Chamber of the Supreme Court of Justice of the Nation discussing his conduct. (*See* AC ¶ 233.) Plaintiffs note, however, that the decision "redacts the names of the relevant parties." (*Id.*) The decision indicates that Luis Natera likely violated the law due to an APA that was filed on October 17, 2011—the same day that Primero filed its application. (*Id.*) But even drawing the inference in favor of Plaintiffs that Primero's is the APA referenced, the Plaintiffs do not allege that the decision indicates that Luis Natera's involvement in the APA Ruling would subject it to retroactive nullification or indicate any wrongdoing on the part of Primero.

conduct of Luis Natera and broadly claiming the APA Ruling was obtained unlawfully, they provide insufficient *facts* to support their propositions.

**ii. Even If the APA Ruling Was Improperly Obtained, Plaintiffs Have Not Established that Primero Participated in, or Was Aware of, the Improper Conduct**

Moreover, even if the Court found that Plaintiffs had presented sufficient facts to establish the inference that the APA Ruling was improperly obtained, Plaintiffs do not otherwise plead facts indicating that Primero intended to participate in, or was aware of, any improper conduct at the time of the APA Ruling. For instance, even if Luis Natera should have recused himself from handling Primero's APA, Luis Natera's conduct does not indicate unlawful conduct on the part of Primero. Further, it is not clear from Plaintiffs' allegations whether Primero was aware that Luis Natera's failure to recuse himself would result in the APA's possible nullification. In fact, it is unclear whether Primero knew of his involvement in the APA Ruling at all, as it was Luis Natera's subordinate who signed the ruling. (*See* AC ¶¶ 230, 311.) Plaintiffs' allegations indicate that Luis Natera was "head of the Transfer Pricing Audit Administration at the SAT." (AC ¶ 10.) While it was "later revealed" that Luis Natera was "the SAT official in charge of reviewing and approving Primero's APA," (AC ¶ 94), it is unclear when Primero became aware that Luis Natera was involved in the APA Ruling.

Further, Plaintiffs have presented no facts, other than mere conjecture, indicating that Christian Natera acted unlawfully in conjunction with his brother, or that Primero acted unlawfully by hiring Christian Natera to handle its APA.[12] Plaintiffs allege only

---

[12] Plaintiffs cite Canada's Corruption of Foreign Public Officials Act which provides that a violation occurs when

> in order to obtain or retain an advantage in the course of business, directly or indirectly gives, offers or agrees to give or offer a loan, reward, advantage of any kind to a foreign public official or to any person for the benefit of a foreign public official (a) as consideration for an act or omission by the official in connection with the performance of the official's duties or functions; or (b) to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions.

(AC ¶ 312.) According to Plaintiffs, Defendants violated this law by retaining Christian Natera to approve the APA, which made the APA Ruling "null *ab initio*." (*Id.*) First, Plaintiffs do not plead facts indicating that Primero hired Christian Natera in order to obtain a benefit from Luis Natera; rather,

that "the odds that, our of approximately 120 million residents of Mexico, Defendants coincidentally hired the brother of the person who ultimately decided to authorize Primero's APA are approximately 120 million to 1." (AC ¶ 307.) But as noted above, it is unclear whether Primero was aware that Luis Natera was the official reviewing its APA at the time they hired Christian Natera.

In addition, Plaintiffs cite Mexico's suspension of Primero's license in May 2015, explaining that at the time the SAT was "challenging Primero's tax situation . . . threatening [Primero's] tax arrangements, and even initiating tax audits for certain fiscal years covered by the APA Ruling. (AC ¶ 117.) Plaintiffs also claim that "Mexico would never agree to receive a fraction of the tax revenues it previously received and was entitled to from the sale of its own natural resources due to contracts arranged by two foreign companies." (Opp'n at 12 (citing AC ¶¶ 90, 244).) None these allegations, however, indicate that Primero unlawfully obtained the APA Ruling. And, as noted above, while the SAT has filed a Juicio challenging the APA Ruling, Plaintiffs have provided no facts indicating the basis for the Juicio and, the SAT has not yet nullified the ruling. (*See* AC ¶ 237.)

While the Court must draw reasonable inferences in favor of Plaintiffs at this stage, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint is insufficient. *Iqbal*, 556 U.S. at 679. Plaintiffs allege facts that only support a *possibility* that Primero acted unlawfully by hiring Christian Natera, a *possibility* that Primero intended to improperly influence Luis Natera in order to obtain a positive APA Ruling, and only a *possibility* that Defendants otherwise obtained the APA Ruling unlawfully. Therefore, Plaintiffs' allegations fail to sufficiently plead that Primero improperly obtained the APA Ruling.

Thus, to the extent Plaintiffs allege that Defendants acted fraudulently or misled investors by failing to disclose that the APA Ruling was improperly procured, the Court finds that Plaintiffs' allegations fail.

//

Christian Natera was an attorney whose firm specialized in transfer pricing. (*See* AC ¶ 94.) Second, Plaintiffs do not explain why, even if violated, a violation of *Canadian* law would void the APA Ruling—a decision by a *Mexican* governmental entity—ab initio.

### b. Whether Primero's Accounting Was False or Misleading

Next, Plaintiffs claim that Primero "failed to recognize a tax liability in its financial statement with respect to the years 'covered' by the APA Ruling (2010 to 2014) even though it was more likely than not that the SAT would require the Company to revert to paying income taxes" on the higher spot price of silver, rather than the lower Internal SPA price. (AC ¶ 298.) According to Plaintiffs, IFRS standards IAS 37 "requires an entity to recognize an uncertain liability in its [financial statements] when it has a present obligation as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation, and a reliable estimate can be made of the amount of obligation." (Opp'n at 15.) Probable is defined as "more likely than not." (*Id.*) Plaintiffs provide four reasons why Primero should have been aware that it was probable that it would be required to pay taxes on the higher spot price: (1) the Internal SPA price violated the applicable Mexican transfer pricing rules; (2) after the APA Ruling was issued, a new government came into power that replaced officials in Mexican government entities; (3) Luis Natera was no longer with the SAT and had been disqualified from working for the government; and, (4) there was information known to Primero that the SAT was 'targeting' foreign companies suspected of avoiding taxes. (*Id.*)

#### i. Whether Primero Violated Mexican Transfer Pricing Rules

First, Defendants argue that Plaintiffs have failed to establish that Primero was violating the Mexican transfer pricing rules. (*See* Mot. at 14–15.) In fact, as Plaintiffs' allegations indicate, the APA Ruling explicitly held that Primero's "Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices." (AC ¶ 109.) Plaintiffs contend that, despite the SAT's ruling, "Primero was required to recognize and record a tax liability if it was more likely than not that the SAT would require Primero to revert to paying income taxes on the Spot Price of silver." (Opp'n at 15.) But while Plaintiffs rely on the reasons enumerated above for the proposition that it was more likely than not that Primero would be required to pay taxes at the higher spot price, none of the reasons adequately indicate that Primero should have believed that the SAT was likely to review or nullify its decision.

First, Plaintiffs appear to request that Court to reevaluate the propriety of the SAT's ruling as to whether Primero complied with the transfer pricing rules. The Court declines to do so. "The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1171 (C.D. Cal. 2005) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)); *see also Roe v. Unocal*, 70 F. Supp. 2d 1073, 1076 (C.D. Cal. 1999) ("The act of state doctrine precludes a court of the United States from considering a plaintiff's claims where either the claims or the defenses asserted would require the court to determine that a foreign sovereign's official acts performed in its own territory were invalid."). Thus, where, as here, a Mexican governmental body has already reached a decision as to whether Primero's transfer pricing complied with Mexican law, this Court should not reevaluate the foreign government's decision. *See Unocal*, 70 F. Supp. 2d at 1082 (finding the act of state doctrine applied where the plaintiff's "allegations turn[ed] on the effect of an official act by an authorized representative of a foreign sovereign"); *see also Tiangang Sun v. China Petroleum & Chem. Corp. Ltd.*, No. CV 13-05355 BRO (Ex), 2014 WL 11279466, at *9 (C.D. Cal. Apr. 15, 2014) ("The Court will not rule on the legality of an 'official act of a foreign sovereign state performed within its own territory.'" (quoting *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp.*, 493 U.S. 400, 405–06 (1990))).

Plaintiffs argue that "Defendants' reasoning is flawed," because by presuming the validity of the SAT's ruling, Defendants "are necessarily asking the Court to presume invalid the actions of the SAT in seeking to nullify *its own ruling*."[13] (Opp'n at 13

---

[13] Plaintiffs argue that the Court's decision in *In re Silver Wheaton*, another recent case addressing the San Dimas mine, "is directly on point." (Opp'n at 13 (citing *In re Silver Wheaton*, 2016 WL 3226004).) But there, the defendant mining company "took the position that" one of its subsidiaries was a separate entity, which led to an alternative tax structure than the company would have used had the two organizations been considered one entity. *See In re Silver Wheaton*, 2016 WL 3226004, at *3. The plaintiffs in that case argued that the defendants acted fraudulently by taking this position and that it should have recorded significantly higher tax liability on its financial statements based on the non-alternative tax structure. *See id.* at *3–*4. The defendants argued that they did not act fraudulently because they "believe that the Canadian tax courts will *ultimately* vindicate their tax position and reject the CRA's proposed reassessment of Silver Wheaton's tax liability." *Id.* at *7 (emphasis added). The Court disagreed, explaining that "[w]hether defendants were required to record or disclose a tax liability depends, not on whether the Canadian tax courts will ultimately affirm the CRA's reassessment, but rather on whether it is *probable* that Silver Wheaton will eventually be required to pay unpaid income

(emphasis in original).) The Court disagrees with Plaintiffs for two reasons. First, while the SAT has apparently filed a Juicio seeking to nullify the APA Ruling, it has not yet done so, and it is not clear whether the APA Ruling will *ever* be nullified. (AC ¶ 237.) Thus, the APA Ruling currently still stands. Second, Plaintiffs have not provided any facts indicating *why* the SAT is seeking to nullify its ruling, meaning that, even if the Juicio moves forward, it is impossible to predict what portions of the ruling, if any, will be nullified. Accordingly, the Court declines to reconsider the substance of the APA Ruling and presumes its validity. Therefore, the Court finds that Primero had no reason to predict that it was not more likely than not that it would be taxed at the higher spot price of silver when the SAT had explicitly determined that it had complied with Mexican transfer pricing rules.

#### ii. Whether Primero Was Otherwise Required to Record Possible Tax Liability

Further, Plaintiffs argue that Primero should have believed it was more likely than not that it would be required to pay taxes at the spot price because (1) the APA Ruling was "improperly procured and was therefore subject to retroactive nullification at any time," (2) a new administration came to power shortly after the APA Ruling, (3) the SAT began to crack down on multinational corporations suspected of avoiding taxes in Mexico, (4) Luis Natera was disqualified from working in the public sector, and, (5) "Primero was likely to be a prime target of the SAT's scrutiny, especially because Luis [Natera]'s suspension was related to Primero's Ruling." (Opp'n at 15.) But none of these proffered reasons indicate *why* it was more likely than not that Primero would be required to retroactively pay taxes at the higher spot price for the 2010 to 2014 tax years. For instance, as determined above, Plaintiffs' allegations fail to establish how Luis Natera's suspension placed Primero on notice that the SAT was likely to nullify its APA

---

taxes and applicable penalties." *Id.* But unlike this case, the defendants in *Silver Wheaton* had yet to receive a ruling from the Canadian tax authority explicitly approving their tax structure.

The Court finds *Silver Wheaton* inapposite as the Court there was not required to reassess the Canadian tax authority's prior ruling and the defendants were not relying on any such prior tax court ruling but rather had merely "taken a position" as to its tax structure. The Court finds that in this case Plaintiffs have provided insufficient facts indicating that Primero should have disregarded the APA Ruling and believed that it more likely than not that it would be required to pay taxes for the years 2010 to 2014. This is particularly so where, as determined above, Plaintiffs have not established that Defendants were aware of any improper conduct surrounding the APA Ruling. It is also unclear on what grounds the SAT is now allegedly seeking to nullify the Ruling.

Ruling. Similarly, the fact that a new administration was in power, that the SAT "began to crack down" on corporations "suspected of avoiding taxes in Mexico," and that Primero "was likely to be a prime target of the SAT's scrutiny" do not indicate that it was more likely than not that the SAT would review or nullify its APA Ruling. Plaintiffs do not suggest, for example, that part of the SAT's "crack down" was nullifying APA Rulings of companies and requiring them to pay taxes retroactively. Therefore, Plaintiffs fail to plead facts indicating that Primero unlawfully failed to record tax liability for the years 2010 to 2014.

**iii. Whether Primero Was Required to Record Contingent Tax Liability**

Next, Plaintiffs contend that even if it was not "more than likely" that Primero would be required to pay taxes for the years 2010 to 2014, under the IFRS, "IAS 37 provides that a contingent liability must be disclosed when a possible obligation arises from past events and the obligation's existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events that are not wholly within the entity's control." (Opp'n at 17–18.) According to Plaintiffs, an entity is required to record contingent tax liabilities any time "the chances that they will be assessed are not remote." (AC ¶ 59.) Plaintiffs claim that Primero had contingent tax liability for 2010 to 2014 because a possible obligation arose from a past event—"the improper procurement of the Ruling and the failure to comply with applicable transfer pricing rules"—that could be confirmed only by the occurrence or non-occurrence of events outside of Primero's control—"the SAT's filing of a *juicio* seeking to nullify the Ruling." (Opp'n at 18.) Plaintiffs' claim as to a contingent liability fails for the same reason its tax liability claim fails above. Plaintiffs have not adequately established how Primero was on notice that the APA Ruling was subject to nullification where Plaintiffs have not sufficiently alleged facts indicating that (1) Primero was aware of any improper conduct relating to the APA Ruling, (2) Primero was not complying with the relevant accounting standards, or, (3) there was any other reason to believe that Primero's APA Ruling was subject to

nullification.[14] Therefore, the Court finds that Primero did not fail to record a contingent tax liability.[15]

### c. Whether Primero's Statements Made in or After May 2015 Were False or Misleading

As partially explained above, Plaintiffs contend that certain statements Primero made after May 2015 were false or misleading for different reasons. *See* discussion *supra* Section III.A.1.b. The Court found several of these statements were protected forward-looking statements under the PSLRA's safe harbor provisions. *See* discussion *supra* Section III.A.1.b. But Plaintiffs also allege that two other statements made after May 2015 were false or misleading.

First, on November 3, 2015, Defendant Conway stated during Primero's Third Quarter 2015 Earnings Call that "we are having some discussion with the tax authorities [regarding the renewal of the APA Ruling], just on an informal basis. . . . But we have opened up a dialog." (FAC ¶ 224.) Second, Plaintiffs allege that two July 13, 2015, and August 6, 2015 press releases in which Primero stated that its "import and export licenses were suspended in May 2015 by the Mexican customs authorities due to a discrepancy over the Company's address related to its corporate office relocation from Mexico City to Durango, Mexico" were false because Primero failed to disclose that the true reason its license was suspended "was due to the Mexican government's recognition of the improper nature of the APA Ruling and the circumstances by which it was procured." (AC ¶¶ 212–13, 218–19.)

---

[14] Again, Plaintiffs cite *In re Silver Wheaton*. (*See* Opp'n at 18.) There, the court held that plaintiffs had adequately pleaded facts indicating that Silver Wheaton had failed to disclose a contingent tax liability because "the probability of a tax reassessment was more than remote." *In re Silver Wheaton*, 2016 WL 3226004, at *9. But here, Plaintiffs have not pleaded adequate facts establishing that the probability of the SAT nullifying its APA Ruling was more than remote at the time Primero made the alleged representations.

[15] Further, Plaintiffs concede that, before the APA Ruling, Primero "disclosed as a contingent liability the maximum amount that it would have to pay if the APA was rejected and it had to revert to paying taxes based on the Spot Price of silver." (AC ¶ 98.) Thus, it appears that after the APA Ruling, Primero understood the likelihood of its tax obligation being based on the spot price of silver was remote. As explained above, Plaintiffs provide insufficient reasons why Primero's belief was not justified.

As to the statements made on the Earnings Call, the Court finds that they were not false or misleading. "Rule 10b-5 . . . prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, "[t]o be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* Defendant Conway's statement did not indicate whether renewal was likely or unlikely; in fact, it did not address the *likelihood* of renewal at all. (*See* AC ¶ 224.) It merely stated that Primero had begun discussing renewal informally with the SAT. Plaintiffs provide no allegations indicating that this statement is false (i.e., that Primero was *not* informally discussing renewal with the SAT), and the Court finds that it is not misleading, because Plaintiffs have provided no allegations indicating that Defendant's Conway statements "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."[16] *See Brody*, 280 F.3d at 1006.

As to the press releases regarding the reason for Primero's license suspension, Plaintiffs claim that these statements were false, relying on statements Primero made in its NOIA in June 2016. (AC ¶ 245.) Specifically, Primero stated that the SAT had led "investigations and inspections" into Primero, "leading to PEM's temporary suspension from Mexico's list of importers and exporters." (*Id.*) Defendants argue, however, that Plaintiffs do not provide facts indicating that in July or August 2015 (when Primero represented that the suspension was due to a discrepancy with its address), Primero knew the reason for its suspension was due to the APA Ruling. (*See* Mot. at 23.) In other words, it is not clear whether Primero was aware at the time it made the statements that the reason for its suspension was anything *other than* a discrepancy in its address. (*See id.*) Plaintiffs counter that by Defendants' own admissions, "the SAT's campaign to threaten Primero's tax arrangements led to the license suspension." (Opp'n at 21.) But Defendants' June 2016 belief that the suspension was due to the SAT's campaign against it does not sufficiently establish that Primero was aware its statement that the suspension was due to an address discrepancy was false. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1217 (S.D. Cal. 2010) ("The fact that an allegedly fraudulent statement

---

[16] Plaintiffs also claim that Defendant Conway's statement are particularly misleading because he made this representation "nearly a year after the original APA's term had expired." (Mot. at 20.) But Defendant Conway also noted that Primero had "until the end of 2016" to formally file for a renewal. (AC ¶ 224.) Thus, the timing regarding the renewal does not appear to make the statement more misleading.

and a later statement are *different* does not necessarily establish falsity because the statement must be evaluated at the time it was made and not by hindsight." (internal quotation marks omitted)). Therefore, Plaintiffs have failed to allege that this statement was false.

### 3. Whether Primero had a Duty to Correct Its Prior Statements

Plaintiffs claim that, regardless of whether Primero was aware any of its representations were false or misleading at the time it made them, Primero had a duty to correct the statements once it discovered that its "tax arrangements" were being threatened by the SAT. (Opp'n at 23.) However, "[n]either the Supreme Court nor the Ninth Circuit has recognized a duty to correct." *In re Yahoo! Sec. Litig.*, 611 F. App'x 387, 389 (9th Cir. 2015). Plaintiffs argue that, nonetheless, district courts in the Ninth Circuit have recognized a duty to correct. (*See* Opp'n at 23 (citing *In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB, 2012 WL 3282819, at *13 (N.D. Cal. Aug. 10, 2012)).) But the Ninth Circuit's guidance is more recent than these district court decisions. *See In re Yahoo!*, 611 F. App'x at 389. Accordingly, the Court finds these district court cases unavailing. In addition, Plaintiffs cite a Ninth Circuit case addressing Rule 12b-20, rather than Rule 10b-5. (*See* Opp'n at 24 (citing *Ponce v. SEC*, 345 F.3d 722, 735 (9th Cir. 2003).) Again, because the Ninth Circuit has recently addressed this issue, the Court finds Plaintiffs' authority unpersuasive.

In any event, even if a duty to correct does exist, as determined above, Plaintiffs have not provided sufficient allegations indicating on what basis or in what way Primero should have corrected its prior statements, or which statements should have been corrected. Plaintiffs have not provided sufficient facts to determine whether Primero was aware that the APA Ruling could be nullified or that it was unlikely to be renewed based on the SAT's investigation into Primero beginning in May 2015. Thus, it is unclear what information Plaintiffs expected Defendants to provide to "correct" their prior statements.

Moreover, to the extent Plaintiffs are alleging that Primero had a duty to update any forward-looking statements, it appears Primero did so once it became aware of the Juicio on February 3, 2016. First, Primero immediately issued a press release indicating that the SAT was seeking to nullify the APA. (*See, e.g.*, AC ¶ 120, 227, 342.) And, second, in a Form 6-K filed on February 18, 2016, Primero stated that it believed "it is unlikely the SAT will agree to an Advance Pricing Agreement for the 2015-2019 tax

years on terms similar to the challenged APA." (AC ¶ 249.) Thus, the Court finds that Plaintiffs' duty to correct argument fails.

### B. Whether Plaintiffs Have Adequately Alleged Scienter

Next, Defendants argue that Plaintiffs have failed to plead the requisite scienter. (Mot. at 24–35.) "[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The Ninth Circuit uses a "dual inquiry" to determine whether a plaintiff has adequately pleaded scienter:

> First, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citation omitted). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607.

Here, the Court is unable to determine whether Plaintiffs have adequately pleaded scienter until it is first determined what, if any, of Primero's alleged conduct was fraudulent. As Plaintiffs have not, at this stage, sufficiently pleaded facts indicating that any of Primero's conduct was fraudulent, the Court declines to determine whether Plaintiffs have adequately pleaded scienter at this stage.[17]

---

[17] In addition, the Court declines to reach the issue of loss causation. "To establish loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the

### C. Plaintiffs' Section 20(a) Claims

Plaintiffs claim that Defendants have waived their right to dismiss Count II of the Amended Complaint, because they do not address Plaintiffs' section 20(a) claims in their Motion. (*See* Opp'n at 40.) However, "[c]laims under Section 20A are derivative and therefore require an independent violation of the Exchange Act." *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002)). Thus, while Defendants did not raise this argument in their Motion, because the Court finds that Plaintiffs' predicate section 10(b) claim fails, Plaintiffs' section 20(a) claim nonetheless fails as a matter of law. Therefore, Plaintiffs second cause of action is **DISMISSED without prejudice**.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's claims are **DISMISSED without prejudice**. Plaintiffs are **ORDERED** to file a First Amended Consolidated Complaint, if any, **no later than February 27, 2017, by 4:00 p.m.**[18]

**IT IS SO ORDERED.**

| | : |
|---|---|
| Initials of Preparer | rf |

claim of securities fraud and the injury suffered by the plaintiff." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks omitted). As the Court has determined that Plaintiff has not pleaded facts sufficient to establish "deceptive acts," the Court finds it would be a futile activity to determine whether Plaintiffs have adequately pleaded a causal connection between those undefined acts and Plaintiffs' alleged injury.

[18] If Plaintiffs choose to amend their Complaint, the Court encourages Plaintiffs to plead its allegations in a more concise manner. While the Court acknowledges the PSLRA's heightened pleading standards, any 162-page complaint clearly lacks brevity.