Barbara A. Rohr SBN 273353
Email: brohr@faruqilaw.com
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885

Richard W. Gonnello (*pro hac vice*)
Email: rgonnello@faruqilaw.com
Katherine M. Lenahan (*pro hac vice*)
Email: klenahan@faruqilaw.com
Megan M. Sullivan (*pro hac vice*)
Email: msullivan@faruqilaw.com
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

*Attorneys for Lead Plaintiffs*
*Royal Wulff Ventures LLC and Robert E. Cook, as*
*Trustee for the Robert E. Cook and Paula J. Brooks*
*Living Trust Under An Agreement Dated 12/30/1988*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK LOFTUS, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>PRIMERO MINING CORP., JOSEPH F. CONWAY, ERNEST MAST, DAVID BLAIKLOCK, AND WENDY KAUFMAN,<br><br>    Defendants. | Case No. 2:16-cv-01034 BRO(RAOx)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.     NATURE AND SUMMARY OF THE ACTION .......................................2

II.    JURISDICTION AND VENUE..................................................................8

III.   PARTIES ....................................................................................................8

IV.    TRANSFER PRICING BACKGROUND .................................................10

       A.    Transfer Pricing and the Taxation of Intercompany Cross-Border
             Transactions....................................................................................10

       B.    Mexican Tax Law and Advance Pricing Agreements .....................11

             1.    Threshold Transfer Pricing Principles ....................................11

             2.    Transfer Pricing Methods ........................................................12

             3.    APAs ........................................................................................15

V.     MEXICO'S TAX AUTHORITY ..............................................................16

       A.    Relevant Structure and Duties.........................................................16

       B.    Relevant Positions and Officials .....................................................17

       C.    Legal Duties of SAT Officials .........................................................19

VI.    ACCOUNTING STANDARDS ................................................................20

VII.   HISTORY OF THE SAN DIMAS MINE..................................................22

VIII.  PRIMERO'S APA ....................................................................................27

       A.    Corporate Restructuring and Amendment of the Internal SPA ..........28

       B.    Analysts Greet Primero's Proposed APA with Great Skepticism ......28

       C.    Luis Natera Violated Mexican Law by Refusing To Recuse
             Himself and Involving Himself in Primero's APA Ruling................31

       D.    Luis Natera Violated Mexican Law by Approving the APA Ruling
             Based on a Transfer Pricing Methodology That Was Not Advanced
             By Primero ......................................................................................32

       E.    Primero Submitted Its APA Application Based on a Flawed CUP
             Method.............................................................................................35

       F.    Announcement of the APA Ruling ...................................................37

       G.    Primero Goes on a Shopping Spree ..................................................38

IX.    THE SAT UNCOVERS NATERA'S WRONGDOING AND THE
       DEFECTS IN THE APA RULING...........................................................40

i

X.    FALSE AND MISLEADING STATEMENTS ...........................................44

      A.    Statements About The APA Ruling And Its Impact ..........................44

      B.    Statements That Primero's Quarterly And Annual Financial
            Statements Were Prepared In Accordance With IFRS ......................53

XI.   POST-CLASS PERIOD EVENTS ...........................................................55

      A.    Primero Announces Service Of The *Juicio de Lesividad* ..................55

      B.    Mexican Press Coverage of the *Juicio de Lesividad* and the
            Natera Brothers' Scheme ...............................................55

      C.    Primero Continues To Conceal the Substance of the SAT's
            Claims ...............................................................57

XII.  ADDITIONAL SCIENTER ALLEGATIONS ...........................................58

      A.    *Respondeat Superior* and Agency Principles Apply ..........................58

      B.    Access To And Possession Of Adverse Facts ...................................58

      C.    Core Operations ...................................................................63

      D.    Magnitude of the Fraud ..........................................................66

      E.    Press Coverage of the SAT's Crackdown on Tax Evasion Schemes
            and Silver Wheaton's Tax Woes ...............................................67

      F.    Financial Motives of Primero's Executives ...................................68

            1.    Phantom Share Units ...................................................70

            2.    Insiders Cash Out ......................................................72

      G.    Financial Motives of Primero ...............................................75

      H.    SOX Certifications ...............................................................78

XIII. CLASS ACTION ALLEGATIONS ...............................................81

XIV.  LOSS CAUSATION ...............................................................83

XV.   CONTROL PERSON LIABILITY ...............................................86

XVI.  THE FRAUD ON THE MARKET PRESUMPTION ...............................87

XVII. THE AFFILIATED UTE PRESUMPTION ...............................................89

XVIII.       NO STATUTORY SAFE HARBOR ...............................................89

XIX.  THE ACT OF STATE DOCTRINE IS INAPPLICABLE ...............................90

XX.   CAUSES OF ACTION ...............................................................94

1
2

XXI.  PRAYER FOR RELIEF ...............................................................................102

XXII. JURY TRIAL DEMAND ...........................................................................103

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

1    The allegations in this First Amended Class Action Complaint[1] are based on

2  the personal knowledge of Lead Plaintiffs Royal Wulff Ventures LLC and Robert

3  E. Cook, as trustee for the Robert E. Cook and Paula J. Brooks

4  Living Trust Under An Agreement Dated 12/30/1988, ("**Plaintiffs**")[2], as to

5  Plaintiffs' own acts, and are based upon information and belief as to all other

6  matters alleged herein.  Plaintiffs' information and belief is based upon the

7  investigation by Plaintiffs' counsel into the facts and circumstances alleged herein,

8  including as follows: (i) review and analysis of those public filings Primero Mining

9  Corp. ("**Primero**" and the "**Company**") made with the United States Securities

10  and Exchange Commission ("**SEC**") and Canadian securities regulatory authorities

11  referenced herein; (ii) review and analysis of those press releases, analyst reports,

12  public statements, news articles, and other publications referenced herein

13  disseminated by or concerning the Defendants (defined below); (iii) review and

14  analysis of those Company conference calls, press conferences, and related

15  statements and materials referenced herein; and (iv) review and analysis of those

16  other documents referenced herein.  Many additional facts supporting the

17  allegations are known only to Defendants and/or are within their exclusive custody

18  or control and/or in the custody and control of the SEC, Mexican courts of law,

19  Mexican government authorities, or Canadian government authorities.  Plaintiffs

20  believe that additional evidentiary support for their allegations will emerge after a

21  reasonable opportunity to conduct discovery.

22

23

24

_____

[1]     All internal citations and quotations are omitted and all emphases are added
25  unless otherwise noted.

26  [2]     For ease of reference, a Table of Defined Terms and Abbreviations is
provided as Exhibit A; a Glossary is provided as Exhibit B; and a Chronology of
27  Key Events is provided as Exhibit C.

28

1

## I. NATURE AND SUMMARY OF THE ACTION

1.      Subject to certain exclusions, this is a federal securities class action brought on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the securities of Primero in the United States or on the NYSE at artificially inflated prices between October 5, 2012 to February 3, 2016, inclusive (the "**Class Period**"), and who suffered damages thereby, which seeks to pursue remedies under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "**Exchange Act**") and SEC Rule 10b-5 promulgated thereunder.

2.      Primero is a Canadian mining company whose principal asset at the outset of the Class Period was the San Dimas mine in Mexico.  Although the mine has a large silver reserve which can be mined at a relatively low cost, due to contracts that Primero's predecessors entered into (and which Primero assumed when it purchased the mine), Primero faced an onerous tax obligation to the Mexican government.

3.      Primero was only receiving approximately $4.00 per ounce for the vast majority of the silver it was selling, instead of the significantly higher prevailing spot price (*i.e.*, the market price) ("**Spot Price**").  This unusual situation occurred because Primero had agreed to sell the silver from the San Dimas mine to another Canadian mining company, Silver Wheaton Corp. ("**Silver Wheaton**") at $4/oz. ("**SW Purchase Price**"), through a series of cross-border contractual arrangements involving Primero, Silver Wheaton, and an assortment of their related party subsidiaries across four nations' jurisdictions.

4.      Primero (like its predecessors), was being taxed by the Mexican government at the Spot Price for the majority of the silver it sold from the San Dimas mine.  This was because Mexican tax laws require taxpayers dealing with foreign related parties to determine their gross income and allowable tax deductions based on the "arm's length principle" ("**ALP**"), meaning by using the prices and consideration

1  that they would have used with or between *independent* parties in comparable
2  transactions.

3       5.     When the original versions of these silver sales agreements were entered
4  into in 2004, silver traded at around $6.47 per ounce, but when Primero assumed the
5  agreements in August 2010, silver traded at about $18.99 per ounce. By the outset of
6  the Class Period, silver traded at $34.53 per ounce. Thus, while Primero was only set
7  to receive approximately $4 for each ounce of silver it sold to Silver Wheaton,
8  Primero was to be taxed at the significantly higher Spot Prices.

9       6.     With the price of silver skyrocketing, Primero's already heavy tax burden
10  became even more crushing and threatened the Company's prospects; thus Primero
11  came up with a scheme to attempt to reduce its tax liability in Mexico by seeking to
12  obtain an "advance pricing agreement" ("**APA**") ruling from Mexico's tax authority,
13  the Servicio de Administración Tributaria (the "**SAT**").

14       7.     An APA is a request that the tax authority confirm a proposed transfer
15  pricing methodology for the corporate taxpayer to apply to intercompany sales
16  consistent with the ALP. APAs are handled exclusively by the SAT's Transfer
17  Pricing Audit Administration. Under Mexican law, the head of the Transfer Pricing
18  Audit Administration, known as the Central Administrator for Transfer Pricing
19  Audits, is one of a few people in the Transfer Pricing Administration who may decide
20  them and in any event is in charge of the remaining few who can. APA Rulings are
21  valid for five years, spanning the fiscal year in which they are acquired, the
22  immediately preceding year, and the following three fiscal years. However, if an APA
23  Ruling is not properly grounded in the law or the facts, it can be retroactively annulled
24  by Mexico's Tax Court through a proceeding initiated by the SAT, known as a *juicio*
25  *de lesividad*.

26       8.     The first step in Primero's plan was to amend a contract between Primero
27  Empresa Minera, S.A. de C.V. ("**PEM**"), Primero's Mexican subsidiary that owned
28

3

1   the San Dimas mine, and Silver Trading (Barbados) Ltd. ("**STB**"), Primero's

2   Barbadian subsidiary that served as the pass-through for silver sales to Silver

3   Wheaton's Cayman subsidiary.  Primero amended the contract so that the transfer

4   price (*i.e*., the sale price) from PEM to STB was no longer the significantly higher

5   Spot Price of silver but rather the approximately $4 per ounce SW Purchase Price.

6        9.      The second step was to submit an APA application requesting that

7   Mexico essentially agree to a tax concession that would allow Primero to pay taxes on

8   silver sales at the SW Purchase Price rather than the Spot Price, as reflected in the

9   amended contract between PEM and STB.

10       10.     Primero's tax reduction plan suffered from serious flaws, however.  As

11  an initial matter, APAs do not supersede the ALP.  In other words, whatever pricing

12  method Primero proposed to the SAT in its APA application would have to show that

13  an independent party would have agreed to accept $4 per ounce for silver that it could

14  sell on the open market for $38 per ounce.  Just as it is common sense that

15  independent parties would not agree to such an arrangement, Mexico likewise would

16  not agree to receive a fraction of the tax revenues it previously received and was

17  entitled to simply due to "contracts" arranged by two foreign companies (Primero and

18  Silver Wheaton).

19       11.     Accordingly, analysts greeted Primero's plan to submit an APA with

20  great skepticism.  One analyst candidly asked what possible incentive could Mexico

21  have to agree to this, as the country would be the "net loser" if Primero only had to

22  pay taxes on the SW Purchase Price.  After Primero submitted its APA application,

23  another analyst commented that the probability of a positive ruling was "highly

24  unlikely."

25       12.     Thus, when Primero announced on October 5, 2012 that it had received a

26  positive ruling on its APA (the "**APA Ruling**"), which covered the years 2010

27

28

4

1 | through 2014, investors were shocked and Primero's stock rose 36% that day, closing
2 | at $7.37. One analyst referred to the development as a "*miracle of life*" for Primero.

3 |      13.    Unbeknowst to the market, Primero had knowledge of material adverse
4 | facts about the APA Ruling that rendered it highly vulnerable to the filing of a *juicio*
5 | *de lesividad* and/or non-renewal. The APA Ruling, which was not publicly available
6 | but obviously was in Primero's possession, was on its face vulnerable to attack for
7 | several reasons.

8 |      14.    First, the SAT official who approved the APA Ruling, the Central
9 | Administrator for Transfer Pricing Audits, Luis Eduardo Natera Niño de Rivera,
10 | improperly failed to recuse himself from any involvement in Primero's APA even
11 | though his brother, attorney Christian Natera Niño de Rivera, represented Primero in
12 | its APA submission.

13 |      15.    Second, Luis Natera approved Primero's application based on a transfer
14 | pricing method that the Company did not submit, and then additionally failed to
15 | perform the comparability analysis required by Article 215 of the Mexican Income
16 | Tax Law that is used to determine whether a transaction complies with the ALP.

17 |      16.    Third, the so-called comparable uncontrolled price ("**CUP**") method that
18 | Primero proposed in its APA application was flawed because the Company
19 | improperly compared the amended transaction between PEM and STB to a transaction
20 | between *related parties*, rather than to a transaction *with or between independent*
21 | *parties*, as the CUP method requires.

22 |      17.    The problems with the APA Ruling were on the Mexican government's
23 | radar shortly after it was granted. Just two months after Primero received the APA
24 | Ruling, a new administration came into power in Mexico that began to crack down on
25 | tax evasion schemes of multinational corporations. Soon thereafter, Luis Natera was
26 | summoned in July 2013 to testify with regard to his failure to recuse himself from
27 | being involved with Primero's APA even though his brother represented Primero and

28 |

had submitted additional information in support of Primero's APA application midway through the APA evaluation process.  By August 2013 Luis Natera was no longer with the SAT; and in November 2013, he was found administratively liable for failing to recuse himself from being involved in Primero's APA and was suspended from working in the public sector for six and a half years.

18.     Around this time, and unbeknownst to investors, the SAT began to threaten Primero's APA Ruling, initiating investigations into and tax audits of PEM. The SAT's actions culminated in the August 2015 filing of a *juicio de lesividad* against PEM which sought to nullify the APA Ruling.

19.     Shortly thereafter, in September 2015, Luis Natera was again summoned to testify regarding his involvement in Primero's APA.  This time, he was accused of (1) having resolved the APA in Primero's favor based on a different transfer pricing method than the one advanced by Primero; and (2) having failed to apply the comparability factors required by Mexican law to determine whether Primero's transaction complies with the ALP.

20.     Despite these adverse facts, Primero repeatedly touted the APA as virtually unassailable for its initial term and presented the likelihood of its subsequent renewal on the same terms as virtually guaranteed.  Throughout the Class Period, Primero and certain of its officers described the APA Ruling as "transformative," having substantially increased the Company's free cash flow and "translated into a superior share price performance, with Primero shares appreciating 97% in 2012[.]"

21.     Primero took advantage of the increased cash flow and artificially inflated stock price to (1) acquire two companies and their respective mining interests using artificially inflated Primero stock, including Brigus Gold Corp. on or around March 5, 2014; and (2) to conduct a $75 million bought-deal offering of 5.75% convertible subordinated debentures on or around January 20, 2015.

22.    It was not until February 3, 2016 that the truth began to emerge as Primero announced that PEM received a legal claim (a *juicio de lesividad*) by the SAT which sought to nullify the APA Ruling.  In response, Primero's stock plummeted 28% and investors suffered massive losses.

23.    On February 18, 2016, Primero disclosed that it was unlikely that the SAT would agree to renew the APA Ruling for the 2015-2019 tax years on the same or similar terms.

24.    In response, Primero's stock suffered a one-day decline of 4% on an unusually high volume of shares.

25.    Unbeknowst to investors during the Class Period, the true facts, which were known and/or recklessly disregarded by Primero and its officers and directors but concealed from the investing public during the Class Period, were that the APA Ruling was vulnerable to the filing of a *juicio de lesividad* and/or non-renewal because of the following:

(a)    Luis Natera improperly failed to recuse himself from Primero's APA even though his brother, Christian Natera, represented Primero in its APA submission;

(b)    The APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero;

(c)    The APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a transaction complies with the ALP; and

(d)    Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its comparable independent transaction was actually a related party transaction and was therefore an inappropriate comparison transaction.

FIRST AMENDED CLASS ACTION COMPLAINT 2:16-cv-01034 BRO(RAOx)

## II.  JURISDICTION AND VENUE

26.    This action arises under and pursuant to Sections 10(b), 20A, and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b), 78t-1, 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.    This Court has jurisdiction over the action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

28.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as certain of the acts and conduct complained of herein, including dissemination or omission of materially false and misleading information to the investing public, occurred in this District.

29.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## III.  PARTIES

30.    Lead Plaintiffs Royal Wulff Ventures LLC and Robert E. Cook, as trustee of The Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988, as set forth in their shareholder certifications (ECF No. 13-4), acquired Primero securities at artificially inflated prices during the Class Period.

31.    Primero is a producer of precious metals with operating mines in Canada and Mexico.  Primero is incorporated in Canada and is headquartered in Toronto, Ontario, Canada; its stock trades on the NYSE under the ticker symbol "PPP."

32.    Defendant Joseph F. Conway ("**Conway**") served as the Company's Chief Executive Officer ("**CEO**") from June 2010 until January 31, 2016.

33.     Defendant David Blaiklock ("**Blaiklock**") served as the Company's Chief Financial Officer ("**CFO**") from July 6, 2009 until September 29, 2014.

34.     Defendant Wendy Kaufman ("**Kaufman**") became Primero's CFO on September 29, 2014 and served in that position through the end of the Class Period.

35.     The defendants referenced above in ¶¶32-34 are sometimes referred to herein as the "**Officer Defendants**."

36.     Defendant Wade Nesmith ("**Nesmith**") founded Primero and served as its Chairman and a director since October 29, 2008.  Nesmith also currently serves as a director of Silver Wheaton and was co-founder of that company.

37.     Defendant Eduardo Luna ("**Luna**") served as a director of Primero from October 29, 2008 until July 6, 2016.  Luna was also a co-founder of Silver Wheaton.

38.     Defendant David Demers ("**Demers**") has served as a director of Primero since October 29, 2008.

39.     Defendant Grant Edey ("**Edey**") has served as a director of Primero since June 28, 2010.

40.     Defendant Rohan Hazelton ("**Hazelton**") served as a director of Primero from August 25, 2010 until August 31, 2015.

41.     Defendant Timo Jauristo ("**Jauristo**") served as a director of Primero from August 25, 2010 until April 7, 2014, when he announced that he would not stand for re-election as a director.

42.     Defendant Brad Marchant ("**Marchant**") has served as a director of Primero since June 26, 2013.

43.     Defendant Robert Quartermain ("**Quartermain**") has served as director of Primero since June 28, 2010.

44.     Defendant Michael Riley ("**Riley**") has served as director of Primero since April 22, 2010.

9

45.     Defendants Nesmith, Luna, Demers, Edey, Hazelton, Juaristo, Marchant, Quartermain, and Riley (collectively, the "**Director Defendants**") directly participated in and conducted Primero's acquisition of Brigus Gold Corp. on or around March 5, 2014. *See* Feb. 3, 2014 Form 6-K, Ex. 99.1 at 2.

46.     The Officer Defendants and Director Defendants are referred to herein, collectively, as the "**Individual Defendants**."

47.     Defendants Primero, the Officer Defendants, and the Director Defendants are referred to herein, collectively, as the "**Defendants**."

## IV.  TRANSFER PRICING BACKGROUND

### A.     Transfer Pricing and the Taxation of Intercompany Cross-Border Transactions

48.     A major issue facing governments today involves attempts by multinational enterprises ("**MNEs**") to avoid taxes by using intercompany transfer pricing to shift profits to related entities in low tax jurisdictions, like the Cayman Islands and Barbados.[3] An MNE is a company with business establishments in two or more countries. Organisation for Economic Co-Operation and Development (the "**OECD**"), Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations (July 2010) ("**Guidelines**"), at 27.

49.     "Transfer pricing" refers to the "prices at which an enterprise transfers physical goods and intangible property or provides services to associated enterprises." Guidelines at 11.

50.     The OECD has attempted to address this tax evasion problem by creating international transfer pricing rules, which are set forth in the Guidelines. The ALP is the guiding standard of the transfer pricing rules, which provides:

---

[3]     *See* Prem Sikka, *Shifting profits across borders*, The Guardian (Feb. 12, 2009), https://www.theguardian.com/commentisfree/2009/feb/11/taxavoidance-tax.

10

> [Where] conditions are made or imposed between the two [associated] enterprises in their commercial or financial relations which differ from those which would be made between ***independent*** enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

Guidelines at 1.6.

51.    Indeed, OECD member countries, including Mexico, "have agreed" that the ALP "should be used for tax purposes by [MNE] groups and tax administrations." Guidelines at 1.1.

52.    The application of the ALP is generally based on a comparison of the price, margin, or profits from comparable transactions between ***independent*** enterprises.  Guidelines at 2.6.

**B.    Mexican Tax Law and Advance Pricing Agreements**

**1.    Threshold Transfer Pricing Principles**

53.    In 1997, Mexico adopted the Guidelines to construe the transfer pricing provisions set forth in Mexico's Income Tax Law (the "**MITL**").  The Guidelines apply to the extent that they do not contradict Mexico's laws and treaties.  MITL Article 215.  Article 215 of the MITL sets forth the ALP, providing that corporate taxpayers dealing with foreign related parties are required to determine their gross income and allowable deductions by using the prices and consideration that would have been used with or between independent parties in comparable transactions.[4]

54.    Parties are considered to be "related" if one participates, directly or indirectly, in the management, control or capital of the other, or if one individual or entity, or a group of individuals or entities participates, directly or indirectly, in the management, control or capital of two or more entities or individuals.  MITL Article 215.  Failure to follow the ALP is grounds for the Mexican tax authority, the SAT, to

---

[4]    This principle appeared in Article 215 of the MITL until December 31, 2013 and currently appears in Article 179 of the MITL).

1  determine the income and allowable deductions by considering the prices and
2  consideration that *independent parties* would have used in comparable transactions.
3  MITL Article 215.

4         **2.**    **Transfer Pricing Methods**

5      55.    Mexico sets forth six transfer pricing methods that taxpayers may use
6  when appropriate to their transactions with non-resident related parties. *See* MITL
7  Article 216. The transfer pricing methods are used to determine taxpayer's income
8  and deductions at prices or amounts that would have been used with or between
9  independent parties in comparable transactions (*i.e.*, in accordance with the ALP). *See*
10 MITL Article 216; Guidelines at 2.1.

11     56.    Mexico's six transfer pricing methods are divided into "traditional
12 transaction methods" and "transactional profit methods." Guidelines at 2.1. The
13 traditional transaction methods include, *inter alia*, the CUP method. Guidelines at
14 2.12. The transactional profit methods include, *inter alia*, the transactional profit
15 margin method, also referred to as the transactional operating profit margin method
16 ("**TOPMM**"). MITL Article 216; Guidelines at 2.12.

17     57.    Mexican law sets forth a strict hierarchy of the six transfer pricing
18 methods, with express preference given to the CUP method. MITL Article 216. That
19 is, the CUP method must be used first. MITL Article 216. If the CUP method is not
20 an appropriate method to determine whether the related party transactions at issue are
21 carried on at arm's length, then the remaining five methods can be used, with
22 preference given to the other traditional transactional methods (the resale price
23 method and the cost plus method), before the transactional profit methods (the profit
24 split method, the residual profit split method, and the TOPMM). MITL Article 216.

25     58.    If the CUP method is not used in a transfer pricing analysis, it must be
26 shown that the method used is the most appropriate or reliable method based on
27 available information. MITL Article 216.

28

59.     The CUP method focuses on comparing the price or amount of consideration of the related party transaction at issue to the price or amount of consideration that would have been contracted by ***independent parties in comparable transactions***.  MITL Article 216.

60.     To apply the CUP method, then, an entity must identify uncontrolled transactions (*i.e.*, transactions between two ***independent*** parties) that are comparable to the controlled transaction (*i.e.*, the transaction between the taxpayer and its related foreign party) at issue.  For the purposes of the CUP method, an uncontrolled transaction is comparable to a controlled transaction if either of two conditions is met: (1) none of the differences, if any, between the transactions being compared or between the enterprises undertaking those transactions could materially affect the price in the open market; or (2) reasonably accurate adjustments can be made to eliminate the material effects of such differences.  Guidelines at 2.14, pp. 24-25; *see also* MITL Article 216.

61.     The TOPMM method consists of determining in related-party transactions the transaction profit that would have been obtained by comparable companies or independent parties in comparable transactions, based on profitability factors and taking into account variables such as assets, sales, costs, expenses, and cash flow.  MITL Article 216.

62.     Under all transfer pricing methods, transactions or companies are comparable when there are no differences between them that significantly affect the price or amount of consideration or the profit margin to which the six transfer pricing methods established in Article 216 of the Income Tax Law refer; or when said differences exist, they may be eliminated through reasonable adjustments.  MITL Article 216.

63.     To determine whether a transaction or company is comparable, the five factors set forth in Article 215 of Mexico's Income Tax Law must be taken into

13

account: (1) the characteristics of the transactions; (2) the functions or activities of each party involved in the transactions; (3) contractual terms; (4) economic circumstances; and (5) business strategies.  MITL Article 215.

64.    The characteristics of the transactions include, for the sale or use of tangible goods (such as silver), the physical characteristics, quality, and availability of the good.  MITL Article 215; *see also* Guidelines at 1.39.

65.    The functional analysis seeks to identify and compare the economically significant activities and responsibilities undertaken, assets used, and risks assumed by the parties to the transactions.  Guidelines at 1.42.

66.    The contractual terms, if any, between the parties should be reviewed to determine how the responsibilities, risks, and benefits are to be divided between the parties.  Guidelines at 1.52.

67.    The economic circumstances that may be relevant to the comparability analysis include the geographic location, market size, extent of competition and the relative competitive positions of the buyers and sellers, the availability of substitutes, supply and demand, the nature and extent of government regulation of the market, the date and time of transactions, and so forth.  Guidelines at 1.55.

68.    The business strategies would take into account many aspects of an enterprise, such as innovation and new product development, degree of diversification, risk aversion, assessment of political changes, duration of arrangements, and other factors bearing upon the daily conduct of business. Guidelines at 1.59.

**FIRST AMENDED CLASS ACTION COMPLAINT 2:16-cv-01034 BRO(RAOx)**

### 3.     APAs

69.     Mexico allows taxpayers to avoid future disputes over transfer pricing by entering into a prospective agreement regarding the taxpayer's transfer prices, known as an "advance pricing agreement," or APA.[5]

70.     Article 34-A of Mexico's Federal Fiscal Code ("**FFC**") provides the statutory basis for APAs.  It provides that the tax authorities may rule on taxpayer requests to confirm the methodology the taxpayer used to determine the prices or amounts of consideration in the taxpayer's transactions with related parties, ***pursuant to Article 215 of the MITL***, provided that the taxpayer provides the information, data, and documentation necessary for the issuance of the ruling.

71.     Article 19 of the FFC prohibits unauthorized action by attorneys in APA applications.  To become an authorized representative of an entity before the tax authorities, a public deed or power of attorney granting the authorization must be signed before two witnesses, and the signature of the grantor of the authorization and witnesses must be ratified before the tax authorities or a notary, among other requirements.  FFC Article 19.  An authorized representative may offer and submit evidence and make filings related to the administrative procedure.  FFC Article 19.

72.     Once granted, APA rulings are valid for five years, spanning the fiscal year in which they are acquired, the immediately preceding year, and the following three fiscal years.  FFC Article 34-A.  After that time, a company may apply for renewal by submitting the circumstances of the case to the tax authority.  FFC Article 36-BIS.

73.     If improperly issued, an APA ruling can be nullified by Mexico's Federal Court of Tax and Administrative Justice through a proceeding initiated by the tax

---

[5]     Ernst & Young, Guide to Advance Pricing Agreements (APA), Mexico, http://www.ey.com/GL/en/Services/Tax/International-Tax/Guide-to-advance-pricing-agreements--APA----Mexico.

authorities, known as a *juicio de lesividad* if it violates applicable laws.  *See* FFC Article 36.  Article 51 of the Federal Administrative Litigation Procedure Law ("**FALPL**") provides that an APA ruling can be annulled if, *inter alia*, (1) the ruling was issued by an official who lacks the requisite authority to do so (*see* FALPL Article 51, § I); (2) the ruling was improperly grounded in fact (*see* FALPL Article 51, § IV); or (3) the ruling failed to apply the applicable laws (*see* FALPL Article 51, § IV).

74.    Cancellation of an APA Ruling by the Federal Court of Tax and Administrative Justice would result in an annulment of the ruling as being void *ab initio*.  FALPL, Articles 51 & 52.

## V. MEXICO'S TAX AUTHORITY

### A.    Relevant Structure and Duties

75.    The SAT is Mexico's tax authority.  The organizational structure, functions, and responsibilities of the SAT and each department within it are set forth in the Reglamento Interior del Servicio de Administración Tributaria ("**RISAT**").

76.    The SAT department responsible for handling APAs is the Central Transfer Pricing Audit Administration ("**Transfer Pricing Administration**"), which is part of the General Administration of Major Taxpayers.  *See* RISAT Articles 20 § A(XLIX) & 21 § H.  The head of this department is the Central Administrator for Transfer Pricing Audits ("**Central Administrator**").  Below the Central Administrator are Administrators "1" through "4", and then Subadministrators "1" through "16."  RISAT Article 20 § B (XI) (8).

77.    The RISAT provides that the Central Administrator and Administrators "1" through "4" are authorized to sign APA requests submitted by taxpayers.  RISAT Articles 20 § A(XLIX) & 21 § H.

### B.   Relevant Positions and Officials

78.   From 2010-2012, the Transfer Pricing Administration consisted of the following personnel and positions:



79.   As shown in the above chart, Luis Natera served as the Central Administrator in 2010, a position that he held from January 16, 2007 to about August 2013.  *See* Sept. 2, 2016 decision of the Thirteenth Collegiate Court, Docket 130/2016 ("**Appellate Decision**"); *Reforma, Firm offers advice on how to defraud the SAT* (May 3, 2016) (the "**May 3, 2016 *Reforma* Article**").

80.   Luis Natera's position as Central Administrator was widely known in the relevant legal and tax community, as his name and title were included in SAT directories and OECD and United Nations documents regarding tax and transfer pricing matters, among others, from at least 2008 through November 2012.[6]

---

[6]   *See* OECD, *Consultation with the Organisations Which Provided Written Comments [ . . . ], List of Participants, 17-18 Nov. 2008*, 23 (Nov. 17, 2008), http://www.oecd.org/ctp/transfer-pricing/41699315.pdf; SAT, *Technical Sheet*, 2 (Feb. 9, 2012),
http://www.sat.gob.mx/informacion_fiscal/normatividad/Documents/PerfilautoridadcompetenteparaMAPs_ingles_formatoSAT.pdf; United Nations, *Econ. & Soc. Council, Comm. of Experts on Int'l Cooperation in Tax Matters, 8th Sess., Geneva,*

81.     During part of Luis Natera's tenure as Central Administrator, his brother, Christian Natera, was also a high ranking official in the SAT.  *Proceso*, *"Conflict of interest" between the SAT and an office linked to Gil Diaz* (Aug. 27, 2009). According to Spanish-language news source *Proceso*, in 2009, Christian Natera had been named by Mexican Senator Graco Ramírez as one of the three high-level officials in the SAT who simultaneously worked for White & Case LLP while representing clients in disputes with the SAT.  *Id.*  Two days later, the news source *La Jornada* summarized the conflict as follows, "principal officials of the [SAT] are simultaneously partners or are connected to the transnational law firm White & Case, which has been conducting litigation proceedings on behalf of large companies intended to help them avoid the payment of taxes to the Federation."  Andrea Becerril, *Legislators require the SAT to clarify presumed influence peddling*, *La Jornada*, Aug. 29, 2009, at 1.  According to the articles, Senator Ramírez's information was based on an examination started in 2008 by Mexico's Supreme Audit Office of the Federation into the performance of the SAT, which was prompted by the large amount of taxes refunded and the high incidence of cases lost by the Secretary of the Treasury and Public Credit in recent years against taxpayers.  *Id.*

82.     At some point in 2011, Christian Natera left the SAT, but worked at his firm, Natera Consultores, S.C, which specializes in transfer pricing.  *See* May 3, 2016 *Reforma* Article.  As relevant here, Primero hired Christian Natera in connection with its APA.  *See* May 3, 2016 *Reforma* Article; Appellate Decision.  Meanwhile, his

*15-19 October 2012, Provisional List of Participants*, 13 (Oct. 15, 2012), http://www.un.org/esa/ffd/tax/eighthsession/ProvListParticipants.pdf; OECD, *Public Consultation on Transfer Pricing Discussion Drafts, 12-14 November 2012, List of Participants*, 4 (Nov. 12, 2012), http://www.oecd.org/ctp/transfer pricing/TP_consultation_Nov_2012_LOP_final.pdf; 47a Asamblea General del CIAT, *Control de los Precios de Transferencia, La experencia mexicana*, http://webdms.ciat.org/action.php?kt_path_info=ktcore.actions.document.view&fD ocumentId=8252 (lists Luis Natera as the competent authority for transfer pricing)

18

brother Luis continued to serve as the Central Administrator of the Transfer Pricing Administration.  Appellate Decision.

### C.    Legal Duties of SAT Officials

83.    SAT officials are required to comply with the Federal Law of Administrative Responsibilities of Public Servants (in Spanish, "**LFRASP**").

84.    Pursuant to the LFRASP, public servants are required to perform their duties in such a way as to safeguard the principles of legality, honesty, loyalty, impartiality and efficiency that govern public service.  LFRASP Article 7.  They must also fulfill the service entrusted to them and abstain from any act or omission that may be caused by the suspension or deficiency of said service, or which may involve an abuse or undue exercise of an employment, position or mandate.  LFRASP Article 8 § 1.

85.    Mexico requires public servants to recuse themselves from being involved in decisions in which their family members have an interest.  The recusal provisions set forth in the LFRASP are quite broad, requiring public servants to recuse themselves from intervening, in any way, in overseeing, managing or responding to the matters in which a family member (such as a brother), or certain other affiliated parties, has an interest.  LFRASP Article 8 § XI.  In addition, a public servant must inform his immediate superior *in writing* of any matters in which such a conflict arises.  LFRASP Article 8 § XI.

86.    Public servants with supervisory authority must also supervise that the public servants under their management comply with the provisions of this Article.  LFRASP Article 8 § XVII.

87.    In addition, public servants must refrain from any act or omission involving breach of any legal, regulatory or administrative provisions relating to public service.  LFRASP Article 8 § XXIV.

19

88.     SAT officials must therefore comply with their duties under RISAT. *See* ¶75, *supra*.

89.     The RISAT, which contains the Transfer Pricing Administration's responsibilities, and the LFRASP, which contains the responsibilities of public servants, are public knowledge, as they are published in the *Diario Oficial de la Federación*, the official gazette of Mexico's federal government.[7]

## VI. ACCOUNTING STANDARDS

90.     For the fiscal years ended December 31, 2011 through 2015, Primero purported to prepare its financial statements with the SEC in accordance with Internal Financial Reporting Standards ("**IFRS**").[8] The IFRS are a set of accounting standards developed by the International Accounting Standards Board for the preparation of public company financial statements.[9] The International Accounting Standards ("**IAS**") are part of the accounting principles included in the IFRS.[10]

91.     IAS 12 prescribes the accounting treatment for income taxes under the IFRS. *See id.* The recognition and measurement provisions of IAS 37, which

---

[7]     University of San Diego School of Law, *Guide to Finding Mexican Legislation (Diario Oficial)*, http://www.sandiego.edu/law/library/student-resources/law-reviews/finding-mexican-legislation.php (last visited Feb. 22, 2017)

[8]     At all relevant times, Primero referred to its silver sales, revenues, income, and taxes as belonging to the Company or PEM interchangeably. *See, e.g.,* Nov. 8, 2012 Form 40-F/A, Ex. 99.2 at 9 (explaining under "basis of consolidation" that "[a]ll material intercompany transactions and balances, revenues and expenses have been eliminated" in the Company's financial statements."); Apr. 2, 2013 Form 40-F, Ex. 99.2 at 8; Apr. 1, 2014 Form 40-F, Ex. 99.2 at 7. Accordingly, silver sales, revenues, income, and taxes are also referred to herein as belonging to Primero or PEM interchangeably.

[9]     See What is IFRS?, AICPA IFRS Resources, http://www.ifrs.com/updates/aicpa/ifrs_faq.html#q1.

[10]    *See* IFRS.org, *2001 IASB Updates*, http://www.ifrs.org/Updates/IASB-Updates/2001/Documents/upd0104.pdf (Apr. 2001).

1   prescribes the accounting treatment for provisions, contingent liabilities, and

2   contingent assets, are relevant to the accounting for tax uncertainties under the IFRS.

3   *See id.*

4        92.    A liability is a present obligation of an entity that arises from a past

5   event, the settlement of which is expected to result in an outflow of resources from the

6   entity.  IAS 37 at ¶10.  For a past event to lead to a present obligation, an entity cannot

7   have a realistic alternative to settling the obligation created by the event.  *Id.* at ¶19.

8   In other words, if a present obligation cannot be avoided by the entity's future actions,

9   it must be recognized.  *Id*.

10        93.    A contingent liability is defined as (a) a possible obligation that arises

11   from past events and whose existence will be confirmed only by the occurrence or

12   non-occurrence of one or more uncertain future events that are not wholly within the

13   entity's control; or (b) a present obligation that arises from past events but is not

14   recognized because (i) it is not probable that an outflow of resources embodying

15   economic benefits will be required to settle the obligation; or (ii) the amount of the

16   obligation cannot be reliably estimated.  IAS 37 at ¶10.

17        94.    A contingent liability is disclosed unless the possibility of an outflow of

18   resources embodying economic benefits is remote.  IAS 37 at ¶28.

19        95.    Tax-related contingent liabilities must be disclosed in accordance with

20   IAS 37.  IAS 12 at ¶88.

21        96.    IAS 34, which prescribes the accounting treatment for interim financial

22   statements, provides that current tax liabilities and any changes to contingent

23   liabilities need to be provided in an entity's interim financial statements.  *See* PWC,

24   *Illustrative interim financial information for existing IFRS* Preparers, at 3, 12,

25   https://www.pwc.com/gx/en/ifrs-reporting/pdf/illusinterimccfs.pdf (June 2008).

26        97.    At a minimum, interim financial statements must include "each of the

27   headings and subtotals that were included in its most recent annual financial

28

21

statements and the selected explanatory notes as required by this Standard." IAS 34 at
¶10. In sum, "the principles for recognizing assets, liabilities, income, and expenses
for interim periods are the same as in annual financial statements." IAS 34 at ¶29.

## VII. HISTORY OF THE SAN DIMAS MINE

98.     On April 24, 2002, Wheaton River Minerals Ltd. ("**Wheaton River**")
agreed to acquire Minas Luismin, S.A. de C.V ("**Luismin**"). Wheaton River, Apr. 26,
2002 Form 6-K, Ex. 99.1 at 2. Luismin owned, *inter alia*, the San Dimas mine.[11]

99.     Wheaton River mined and sold both gold and silver. *See* May 12, 2004
Form 6-K, Ex. 99.1 at 6. Then, in 2004, Ian W. Telfer ("**Telfer**") and Peter Barnes
("**Barnes**"), Wheaton River's CEO and CFO, respectively, devised a plan to "spin[]
off the silver produced by [Wheaton River's] Luismin mine into a shell company
called Chap Mercantile Inc. The new company [would be] named Silver Wheaton
Corp., with 80 percent of it owned by Wheaton River." Samantha Reynolds, *Out of
Nowhere: The Wheaton River Story*, at 83 (Jan. 2008). As Barnes explained, by
creating a publicly traded company devoted solely to silver, the company "would
receive a premium valuation because silver companies trade at higher market
multiples than gold companies do. As it stood now, the value of our silver wasn't
being reflected in our share price." *Id.* Telfer noted that creation of this silver-
focused company would allow Wheaton River "to unlock significant value within

---

[11]     Press Release, *Wheaton River Provides Update on Luismin Acquisition*,
http://www.goldcorp.com/English/Investor-Resources/News/News-
Details/2002/WheatonRiverProvidesUpdateonLuisminAcquisition/default.aspx
(May 27, 2002)

22

Wheaton for the benefit of the Wheaton shareholders.  Silver Wheaton will be a pure silver play and ***Wheaton [River] will continue to own 80% of Silver Wheaton***."[12]

100.   On October 15, 2004, Wheaton River announced the closing of the "Silver Wheaton Transaction."  Press Release, *Wheaton River Minerals Ltd. and Chap Mercantile Inc.: Silver Wheaton Transaction Completed*, http://www.businesswire.com/news/home/20041015005483/en/Wheaton-River-Minerals-Ltd.-Chap-Mercantile-Silver (Oct. 15, 2004).  Pursuant to the transaction, Chap Mercantile Inc. ("**Chap**") paid Wheaton River an upfront payment of CAN$46 million in cash and 540 million Chap common shares, plus the lesser of $3.90 per ounce or market price for all silver produced in the San Dimas mine.  *Id.*

101.   Chap also changed its name to "Silver Wheaton[,]" and its board and officers would be reconstituted by the following individuals from Wheaton River:  Telfer (the CEO and director of Wheaton River) and Nesmith (the future founder of Primero) would serve as directors on Silver Wheaton's board; Luna (President of Wheaton River's Luismin subsidiary) would become Silver Wheaton's interim CEO; and Barnes (Wheaton River's CFO) would also serve as CFO of Silver Wheaton.  *Id.*  Crucially, "Wheaton [River] [] acquired indirect beneficial ownership, through Wheaton Trading (Caymans) Ltd., a wholly owned subsidiary of Wheaton, of approximately 75% of the issued and outstanding shares of Chap" and Chap/Silver Wheaton granted Wheaton River a right "to maintain its pro rata equity position in Chap for three years so long as its common share holdings do not fall below 20%."  *Id.*  Additionally, Silver Wheaton received approval to publicly trade its shares on the Toronto Stock Exchange.  *Id.*

---

[12]      Press Release, *Wheaton To Create New Pure Silver Play*, http://www.goldcorp.com/English/Investor-Resources/News/News-Details/2004/WheatonToCreateNewPureSilverPlay/default.aspx (July 15, 2004).

102.   Wheaton River and Silver Wheaton recognized that someone had to pay taxes on the profits made on the sales of San Dimas' silver, and decided that Wheaton River would do so pursuant to a complex series of transactions that were designed to maximize the profitability of Silver Wheaton, whose stock (75% of which was owned by Wheaton River) would trade at a higher multiple as a pure silver play. Consequently, the silver agreement was documented in two separate silver purchase agreements: the "**Internal SPA 2004**" and the "**External SPA 2004**."

103.   The Internal SPA 2004 was entered into between Wheaton River's Mexican subsidiary, Luismin, S.A. de C.V. ("**Luismin**") and its Cayman Island's subsidiary Wheaton Trading (Caymans) Ltd. ("**WT Caymans**") whereby WT Caymans would "purchase 100% of all the silver produced by Luismin from certain of its existing Mexican mining operations [] at the then prevailing *market price [i.e., Spot Price] per ounce of silver*." Wheaton River, Oct. 25, 2004 Form 6-K, at 4.

104.   The External SPA 2004 was entered into between WT Caymans and Silver Wheaton (Caymans) Ltd. whereby Silver Wheaton (Caymans) Ltd. ("**SW Caymans**") would purchase 100% of the silver WT Caymans purchased from Luismin at "*the lesser of: (a) US$3.90 per ounce* (subject to an inflationary price adjustment after three years from the closing of the Silver Transaction); and (b) the then prevailing market price per ounce of silver." *Id.*

105.   In describing these transactions, Telfer, the founding director of Silver Wheaton boasted about the arrangement and how he would capitalize on the higher multiples afforded to silver companies, *"we [Wheaton River and Silver Wheaton] were negotiating with ourselves[.]"* The Globe and Mail, *Telfer, ever the modern alchemist, merrily counts his silver blessings*, http://www.theglobeandmail.com/report-on-business/rob-commentary/telfer-ever-the-modern-alchemist-merrily-counts-his-silver-blessings/article740574/ (Dec. 15, 2005)

106.   Shortly thereafter, on December 6, 2004, Goldcorp Inc. ("**Goldcorp**") announced that it had agreed to buy Wheaton River.  Associated Press, *Goldcorp to Buy Wheaton River Minerals* (Dec. 6, 2004), and the acquisition closed shortly thereafter on April 15, 2005.[13]

107.   Goldcorp assumed the obligations arising out of the silver sales agreements between Silver Wheaton and Wheaton River after acquiring Wheaton River.  *See* Primero, Nov. 8, 2012 Form 6-K, Ex. 99.1 at 11-12.  Goldcorp also recorded revenues from the Internal SPA 2004 under the Spot Rice, and paid income taxes in Mexico on silver sales at the Spot Price even though it ultimately received only about $4/oz. for the silver from Silver Wheaton.  *See* Primero, Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12 ("Until October, 2011, the Company computed income taxes in Mexico based on selling all silver produced at the San Dimas mine at market prices (the price in the Internal SPA that it was required to assume on the acquisition of the San Dimas mine).").

108.   Goldcorp conduced its first offering of Silver Wheaton shares on December 7, 2006.  Press Release, *Goldcorp Completes Sale of Silver Wheaton Shares*, http://www.goldcorp.com/English/Investor-Resources/News/News-Details/2006/GoldcorpCompletesSaleofSilverWheatonShares/default.aspx (Dec. 7, 2006).  Goldcorp then sold its remaining Silver Wheaton share interest on February 14, 2008, completely divesting itself of its entire interest in Silver Wheaton.  Press Release, *Goldcorp Completes sale of its 48% Interest in Silver Wheaton*, http://www.silverwheaton.com/news/press-releases/press-release-details/2008/Goldcorp-completes-sale-of-its-48-interest-in-Silver-Wheaton/default.aspx (Feb. 14, 2008).

---

[13]    *See* Bloomberg, *Company Overview of Wheaton River Minerals, Ltd.*, http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=876307 (last visited Feb. 27, 2017).

109.   On August 6, 2010, Goldcorp sold the San Dimas mine to Primero in exchange for US $510 million, structured as follows: $216 million in cash; 31,151,200 in common shares of Primero, which represented 36% of the Company's outstanding common shares; a $60 million convertible note; and a $50 million 5-year note.  Press Release, *Primero Announces Completion of San Dimas Acquisition* (Aug. 6, 2010).  In Mexico, mines can be owned by foreign companies, but only Mexican companies or individuals may own mining concessions (*i.e.*, the right to explore and exploit the mineral resources from a particular area).  *See* International Comparative Legal Guides, *Mexico Mining Law 2016* (Aug. 24, 2015), http://www.iclg.co.uk/practice-areas/mining-law/mining-law-2016/mexico.  The San Dimas mine would be owned and operated by PEM.  Nov. 8, 2012 Form 6-K, Ex. 99.2 at 10.  In addition to the San Dimas mine, Primero also acquired Goldcorp's Barbadian subsidiary, which was renamed Silver Trading Barbados ("**STB**").  *Id.* at 11.

110.   In connection with the sale, Primero was required to assume the External SPA 2004 and the Internal SPA 2004, with amendments.  *Id.* at 12.  For each of the first four years after the acquisition date, the first 3.5 million ounces per year of silver produced by the San Dimas mine, plus 50% of the excess silver above this amount, was to be sold by PEM to STB at Spot Prices.  *Id*.  STB in turn must sell that silver to SW Caymans at the lesser of $4.04 per ounce (adjusted by 1% per year) and Spot Prices.  *Id*.  After four years, the first 6 million ounces per year of silver produced by the San Dimas mine, plus 50% of the excess silver above this amount, was to be sold to SW Caymans at the lesser of $4.20 per ounce (adjusted by 1% per year) and Spot Prices for the life of the mine.  *Id*.  Primero[14] could sell all silver not sold to SW Caymans at Spot Prices.  *Id*. at 12.  When the Company acquired the San Dimas mine

---

[14]   At all relevant times, Primero referred to its silver sales, revenues, income, and taxes as belonging to the Company or PEM interchangeably.  *See, e.g.,* Nov. 8, 2012 Form 40-F/A, Ex. 99.2 at 9.

in August 2010 and assumed the External and Internal SPAs, the Spot Price of silver was about $17-$18 per ounce.  Bloomberg Terminal, Daily Historical Prices for Silver.

111.   As one writer observed about Goldcorp's sale of San Dimas to Primero, "[i]f ever a Canadian junior explorer was ever blessed by a marquee value of a small circle of current and former mining CEOs, it might be [Primero]," noting that: (1) the President of Primero's Mexican division was Luna, the former chairman and CEO of Silver Wheaton; (2) Goldcorp's Chairman and former CEO Telfer is also a co-founder of Silver Wheaton; and (3) Primero's then-CEO Nesmith was also a founding and current director of Silver Wheaton, and would remain as a director of Primero but would be succeeded by former Iamgold CEO Conway.  Dorothy Kosich, *A Who's Who of Mining fosters Goldcorp-Mala Noche silver/gold mine deal*, Mineweb (June 3, 2010), http://www.mineweb.com/archive/a-whos-who-of-mining-fosters-goldcorp-mala-noche-silvergold-mine-deal/ (last visited Feb. 25, 2017).

## VIII.  PRIMERO'S APA

112.   By March 2011 the Spot Price of silver had soared to about $35 per ounce.  Bloomberg Terminal, Daily Historical Prices for Silver.  Meanwhile, PEM computed income taxes in Mexico based on selling all silver produced at the San Dimas mine to STB at Spot Prices as provided in the Internal SPA.  Nov. 8, 2012 Form 6-K, Ex. 99.2 at 42.  Through 2013, two federal taxes in Mexico applied to the operations of mining companies like Primero: (1) the corporate income tax; and (2) the Flat Rate Business Tax ("**FRBT**").  Apr. 2, 2013 Form 40-F, Ex. 99.1 at 37.  For the years 2010 to 2013, Mexico's corporate tax rate was around 30%; and the FRBT, which was in effect until 2013, was approximately 17.5%.  *Id*.  As such, the high silver Spot Price made the income taxes assessed by Mexico quite substantial.  For

27

example, in the first quarter of 2011, Primero recorded a net loss of $7.895 million *after paying $12.9 million in income taxes on pre-tax income of just $5.05 million*. Aug. 11, 2011 Form 40-F, Ex. 99.8 at 16.

113.   As the soaring price of silver made Primero's tax obligations more burdensome, Primero came up with a plan to attempt to reduce its tax liability in Mexico.  The first step was to amend its corporate structure, by which Primero changed the price payable by STB to PEM in the Internal SPA from the Spot Price to the SW Purchase Price reflected in the External SPA.  Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12.  The second step was to submit an APA application to request that Mexico agree to a transfer pricing methodology that would allow the Company to pay taxes on silver sales at the SW Purchase Price instead of the Spot Price as its predecessors had paid.  Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12.

## A.   Corporate Restructuring and Amendment of the Internal SPA

114.    On October 11, 2011, Primero amended the Internal SPA so that the price payable by STB to PEM was the same as the SW Purchase Price charged by STB to SW Caymans under the External SPA (the "**Internal SPA 2011**").  Nov. 8, 2012 Form 6-K, Ex. 99.1 at 12.

115.   On October 17, 2011, just a few days after the Internal SPA was amended, Primero submitted an APA application to the SAT, seeking approval of their transfer price based on the CUP method, and which would have allowed Primero to pay income taxes in Mexico based on the SW Purchase Price rather than Spot Prices.  Press Release, *Primero Announces Commencement of Advance Tax Ruling Process in Mexico and Provides Update on Tax Strategies; Seeking Taxes Be Based on Realized Revenue* (Oct. 18, 2011); APA Ruling at 7.

## B.   Analysts Greet Primero's Proposed APA with Great Skepticism

116.   Despite the Company's enthusiasm about its APA application, professional analysts who were familiar with Primero's tax situation and Mexico's

transfer pricing rules greeted Primero's APA with great skepticism.  For example, one analyst following Primero noted on August 3, 2012 that the chances of a positive ruling on the Company's APA was "***highly unlikely***."  Macquarie, *Primero Mining, Operations improving but risk remains*, at 1 (Aug. 3, 2012).

117.   Analysts' skepticism was understandable for a number of reasons.

118.   First, the best indicator of whether a transaction for the sale of silver is at arm's length is a comparison to the Spot Price, which is what independent parties pay for silver on the open market.  APAs do not supersede the ALP, which requires that corporations report their income from transactions with foreign related parties based on prices that the parties would have agreed to at the time they were entered into if the transactions were between two independent parties.  *See* FCC Article 34-A.

119.   As a second analyst doubtful about Primero's chances of receiving a positive ruling on its APA noted, "I don't know why in essence Silver Wheaton contractual stuff should supersede Mexican tax law[.]"  Bloomberg Tr., at 9 (Aug. 10, 2011).

120.   Second, Primero's predecessors paid taxes on the Spot Price.  If the applicable transfer pricing rules allowed the Company to pay taxes on the SW Purchase Price of silver rather than the Spot Price by merely amending the Internal SPA 2004's transfer price, surely Goldcorp would have done so at some point during the nearly six-year period in which it owned the San Dimas mine.  Or, more likely, the Internal SPA 2004 would have been structured that way from the beginning.

121.   Third, Mexico stood to lose out on a great deal of tax revenue if the APA was approved.  As a third analyst put it, what possible incentive did Mexico have to approve the APA, as the country would be the "net loser" if Primero only had to pay taxes on the Spot Price.  Conference Call, July 13, 2011 (Bloomberg Tr.).

122.   The amount of tax revenue Mexico would lose if the APA was approved was substantial, as set forth in Primero's financial statements for the period between

29

its submission of the APA and its receipt of the APA Ruling.  For that period, Primero disclosed as a contingent liability the maximum amount that it would have to pay if the APA was rejected and it had to revert to paying taxes based on the Spot Price of silver.  May 24, 2012 Form 40-F/A, Ex. 99.1 at 41.  As of December 31, 2011, the maximum contingent liability was $28.6 million, and would grow during the APA process.  *Id.*  By March 31, 2012, the amount of the contingent liability had grown to $41.6 million.  May 3, 2012 Form 6-K, Ex. 99.2 at 22.  As of June 30, 2012 the amount of the contingent liability was $52.4 million plus estimated interest of $5.8 million.  Aug. 2, 2012 Form 6-K, Ex. 99.2 at 24.  These amounts were significant considering that the Company recorded income of approximately $58.9 million before taxes for the year ended December 31, 2011 (Apr. 3, 2012 Form 40-F, Ex. 99.2 at 3) and recorded income of approximately $37.868 million before taxes for the six months ended June 30, 2012 (May 3, 2012, Form 6-K, Ex. 99.1 at 15).

123.   If the APA was approved, Mexico's resulting tax shortfall would not be made up by any other party that profited from sales of silver from the San Dimas mine, as Mexico had no "nexus" to them.  *See* Primero, Q2 2011 Earnings Call, Bloomberg Tr., at 9 (Aug. 10, 2011).  Indeed, neither SW Caymans, the entity that subsequently purchases the San Dimas silver from PEM (via STB), nor its parent company Silver Wheaton, paid ***any income tax*** in Mexico on the profits they made by subsequently selling the San Dimas silver at Spot Price.  *See* The Motley Fool, *4 Reasons to Avoid Silver Wheaton Corp.*, http://www.fool.ca/2014/09/30/4-reasons-to-avoid-silver-wheaton-corp/ (Sept. 30, 2014) ("Silver Wheaton currently provides no tax in the income statement . . . [t]he company states that the tax position is a result of the incorporation and operation of main subsidiaries in the Cayman Islands and Barbados where low corporate income tax rates prevail.").

**C.   Luis Natera Violated Mexican Law by Refusing To Recuse Himself and Involving Himself in Primero's APA Ruling**

124.   As mentioned above, Primero hired Christian Natera in connection with its APA.  *See* ¶82.

125.   As a result of Christian's role, Mexican law required Luis Natera, the Central Administrator of the Transfer Pricing Administration, to recuse himself from intervening, in any way, in overseeing, managing or responding to Primero's APA. *See* LFRASP Article 8, § XI.

126.   Luis Natera was also required to inform his immediate superior *in writing* about this conflict with respect to Primero's APA.  *See* LFRASP Article 8, § XI.

127.   Despite these laws, Luis Natera did not recuse himself or inform his superior of the conflict.  This was apparent on the face of the APA Ruling, which was signed by his subordinate, Sergio Luis Pérez Cruz, Administrator "1" for Transfer Pricing Audits, but approved pursuant to Luis Natera's authority.  APA Ruling at 37. Given that Mr. Cruz could have signed the APA Ruling in his own name (*see* RISAT Article 20 § A, XLIX & Article 21 § H), this is a telling signal that Luis Natera was involved and Mr. Cruz did not feel comfortable signing the APA Ruling in his own name under the circumstances.

128.   As Mexican court filings would later reveal, Luis Natera was aware of his brother's involvement in the APA Ruling not only because Christian Natera was listed as the Company's authorized representative, but because Christian submitted information on July 20, 2012 for the Company which contained additional information for the APA.  *See* Appellate Decision.

129.   Luis Natera did not have authority to grant the APA Ruling as he was required to recuse himself from any involvement in Primero's APA; his failure to do so is grounds for the tax authority to file a *juicio de lesividad* which seeks to nullify the APA Ruling.  *See* Article 51, § 1 of the FLALP.

31

**D.    Luis Natera Violated Mexican Law by Approving the APA Ruling Based on a Transfer Pricing Methodology That Was Not Advanced By Primero**

130.    The first half of the APA Ruling set forth a description of the transfer pricing method that Primero submitted for each of its two requests.  *See* APA Ruling at 1-21.  The rest of the APA Ruling sets forth the transfer pricing analysis performed by Luis Natera and his conclusions.  *See* APA Ruling at 22-37.

131.    It is clear from the APA Ruling that Primero applied the CUP method to its Silver Sales Request, APA Ruling at 11, 12 ("With regard to the silver sales transaction, the economic analysis submitted by PEM . . . documents the transfer price of USD 4.04 per ounce of silver applied between PEM and STB under two CUP method modes . . .").  and the TOPMM method to its Administrative Services Request, APA Ruling at 11.

132.    Primero describes these methods as "the most appropriate method regarding the analysis of the sale of silver by PEM to STB, as well as the administrative services provided by STB to PEM."  APA Ruling at 11.

133.    As set forth above, the CUP method is the preferred transfer pricing method in Mexico.  MITL Article 216.  If the CUP method is not used in a transfer pricing analysis, the reasons for discarding it must be set forth.  MITL Article 216.

134.    Without explanation, however, Luis Natera ignored the CUP method in his analysis, applying a profit-based method that appears to be TOPMM or another method of his own design.  This is apparent on the face of the APA Ruling for the following reasons.

135.    First, under the CUP method, the ***price charged*** for property between related parties is compared to that charged in a comparable ***transaction*** between independent parties.  *See* MITL Article 216.  Luis Natera's analysis, however, conducts an analysis of Primero's Silver Sales Request without making any comparisons to comparable transactions or companies.  Instead, he concludes that his

32

"analysis leads to the conclusion that the PEM operation is a *profitable business*, since the above estimates show that if PEM continues to operate under the same conditions and circumstances, it will obtain profits throughout the term of the silver sales and purchase agreement entered into with its related party abroad."  APA Ruling at 33.  In other words, instead of evaluating whether the *transfer price* charged for silver between PEM and STB is the same as that charged for silver between independent parties in comparable transactions, as the CUP method requires, his analysis focuses solely on PEM's *profitability*.

136.   Second, the transfer pricing methods permitted under Mexican law that assess a related party transaction's profitability still require that the transaction be compared to one between independent parties.  *See* MITL Article 216 (describing the TOPMM method as *consisting of determining in related-party transactions the transaction profit that would have been obtained by comparable companies or independent parties in comparable transactions*, based on profitability factors taking into account variables such as assets, sales, costs, expenses, and cash flows).  Despite not having conducted any comparability analysis as required under Article 215 of the MITL, however, Luis Natera nevertheless resolves that "PEM is earning *profits* for fiscal years 2010 and 2011 that are similar to those it would have earned with or between independent parties in comparable transactions, as established under Article 215 [of the MITL]."  APA Ruling at 35.

137.   In contrast, the comparability analysis that is absent from Luis Natera's analysis of Primero's Silver Sales Request notably appears (at least in part) in Luis Natera's analysis of Primero's Administrative Services Request.  APA Ruling at 34 (applying the TOPMM method as requested by Primero and concluding that "[b]esides the fact that the companies chosen by PEM as comparable to STB in terms of administrative services transactions do not perform either the same or similar

33

1  functions, nor do they involve the commitment of assets, nor do they assume the same

2  risks as the company analyzed herein . . .").

3      138.   Not only was it odd that Luis Natera applied a different transfer pricing

4  method than that advanced by Primero and failed to conduct a comparability analysis

5  for the Silver Sales Request he granted, his actions did not comply with applicable

6  Mexican laws.

7      139.   As a public servant, Luis Natera was required to refrain from any act or

8  omission involving breach of any legal, regulatory, or administrative provisions

9  relating to public service.  LFRASP Article 8 Section XXIV.  As Central

10  Administrator, Luis Natera is authorized to sign APAs.  *See* RISAT Article 20 § A,

11  XLIX & Article 21 § H.  Article 34-A of the FFC provides that tax authorities may

12  ***respond to the queries submitted by taxpayers*** in relation to the methodology used to

13  determine the price or amount of compensation in transactions with related parties.  In

14  other words, the tax authorities' role is not to alter the methodology submitted by the

15  taxpayer, but to decide whether or not the methodology submitted is appropriate.  By

16  applying a different transfer pricing method to approve the Silver Sales Request in

17  Primero's APA, Luis Natera did not comply with this provision.

18      140.   The APA Ruling's approval of a transfer pricing methodology other than

19  the CUP methodologies that were proposed by Primero rendered the APA Ruling

20  vulnerable to the filing of a *juicio de lesividad* under the FLALP because (1) Luis

21  Natera lacked authority to issue an APA Ruling on the basis of a transfer pricing

22  methodology not advanced by Primero (*see* FLALP Article 51, § 1); and (2) the APA

23  Ruling was improperly grounded in fact (*see* FLALP Article 51, § IV).

24      141.   Additionally, the APA Ruling's failure to conduct the requisite

25  comparison of the factors under Article 215 of the MITL rendered the APA Ruling

26  improperly grounded in the law, and therefore vulnerable to the filing of a *juicio de*

27  *lesividad* under Article 51, § IV of the FLAPL.

28

### E.   Primero Submitted Its APA Application Based on a Flawed CUP Method

142.   Primero's APA application contained two requests.  APA Ruling at 7.  In the first request, Primero asked the SAT to confirm its proposed CUP methodologies to determine the $4.04 per ounce transfer price for the sale of silver between PEM and STB that was recorded in the Internal SPA 2011 ("**Silver Sales Request**").  APA Ruling at 7.  In the second request, Primero asked the SAT to confirm its proposed TOPMM method to determine the transfer price for administrative services between PEM and STB ("**Administrative Services Request**").  APA Ruling at 7.

143.   The CUP method requires that the related party transaction at issue be compared to a ***transaction between two independent parties***.  *See* Guidelines at 2.14, Glossary at 24-25; *see also* MITL Article 216.

144.   Primero, however, compared the transaction in its Internal SPA 2011 to the transaction in the External SPA 2004.  APA Ruling at 11.  As explained below, this could not be used as a comparable transaction because it was between ***two related parties***.  *See* MITL Article 215.

145.   Article 215 of Mexico's Income Tax Law provides that "two or more persons are considered to be related parties when one participates directly or indirectly in the management, control or capital of the other, or when one person or group of persons participates directly or indirectly in the management, control or capital of said persons."

146.   The parties to the External SPA 2004 clearly fit this definition.  The agreement provided that SW Caymans, a wholly owned subsidiary of Silver Wheaton, would purchase 100% of all the silver from WT Caymans, a wholly owned subsidiary of Wheaton River and itself a 75% beneficial owner of Silver Wheaton, at the lesser of $3.90 or spot price.  Wheaton River, Oct. 25, 2004 Form 6-K at 2, 5-6.  Closer scrutiny of the parties reveals that the parties to the External SPA 2004 participated directly or indirectly in the management, control or capital of the other.  The parties

35

were either directly controlled by Wheaton River (*e.g.*, Wheaton Trading (Caymans) Ltd.), or indirectly controlled by Wheaton River (*i.e.*, Wheaton Trading (Caymans) Ltd.'s 75% ownership of Silver Wheaton's capital, which itself wholly owned SW Caymans). *See id*. Wheaton River executives directly controlled and participated in the management of Silver Wheaton—Barnes served as CFO of both Wheaton River and Silver Wheaton; Luna, president of Wheaton River's Luismin subsidiary, served on Silver Wheaton's board; and Telfer served as CEO and Chairman of Wheaton River and on Silver Wheaton's board. ¶¶101-11. Those very same executives also devised the *raison d'etre* for Silver Wheaton. *Id*.

147. The following chart illustrates the structure of the External SPA 2004 and the relationship between the companies:



148. In fact, as former Wheaton River and current Goldcorp CEO Telfer proudly informed a Canadian newspaper, ***"we [Wheaton River and Silver Wheaton] were negotiating with ourselves[.]"*** The Globe and Mail, *Telfer, ever the modern alchemist, merrily counts his silver blessings*, http://www.theglobeandmail.com/report-on-business/rob-commentary/telfer-ever-the-modern-alchemist-merrily-counts-his-silver-blessings/article740574/ (Dec. 15, 2005).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### F.  Announcement of the APA Ruling

149.  On October 5, 2012, Primero shocked the markets by issuing a press release entitled "Primero Announces Positive Advance Tax Ruling," announcing that the SAT ruled in its favor.

150.  This announcement shocked the market, sending Primero stock up 36%, nearly $2 per share, in one day.

151.  Shortly after Primero's announcement, an analyst expressed "surprise[] that Primero ha[d] won such a decisive and positive ruling on its silver sales tax treatment" and estimated that the APA Ruling removed $620 million in potential tax liabilities over the life of the San Dimas mine.  Macquarie, *Primero Mining, Tax ruling win, upgrade to Outperform*, at 1 (Oct. 9, 2012).

152.  The significance of the APA Ruling on the Company's bottom line was touted repeatedly by Defendants and analysts alike.  For example, on October 16, 2012, during the Canaccord Genuity Resources Conference, an analyst described the APA as "***a miracle of life***" for the Company, noting that Primero's stock price increased $2 in one day upon the announcement of the APA Ruling.  During that conference, Conway described the Company as having been "cleared" of a "significant tax burden."  *Id.*

153.  On November 9, 2012, the Company participated in a conference call to discuss Primero's third quarter 2012 earnings, during which Defendant Conway described the APA Ruling as having "effectively . . . transformed" the Company and "having added significant cash flow" to its "long-term plans" in Mexico.  *See* Seeking Alpha Tr. at 1, 3.

154.  On January 23, 2013, Primero issued a press release in which Defendant Conway stated that the Company's improved tax position "substantially increas[ed] its annual cash flow."  For example, as a result of the APA Ruling, the Company

received $22.2 million as a full refund of previously overpaid taxes during 2012. Press Release, Primero, Feb. 21, 2013.

155.   According to Conway, the "increased free cash flow" from the APA Ruling significantly reduced the Company's debt and "translated into a superior share price performance, with Primero shares appreciating 97% in 2012[.]"  Press Release, Primero, Feb. 21, 2013.

156.   On December 16, 2013, Defendant Conway emphasized that only a change in industry-wide tax rules in Mexico would lead to a change in the APA's term, stating as follows:

*        *        *

[Don Blyth, Analyst]: Okay. And finally, on the Mexican tax ruling that you guys got, there are a lot of qualifiers when that was announced, rulings are generally applicable. You assumed that if there were no changes to the application, that you would expect to pay the taxes on the realized prices. Has anything changed on that front? Do you still pretty much expect that the taxes going forward will be on the actual realized silver prices for the life of the mine, as far as you're aware?

[Conway]: Yes. We've had nothing to the contrary. We understand that generally within these APA ruling types of arrangements, which we've got, that's generally the case. As long as they don't make any changes for the overall industry in terms of tax rules, then we'll be continuing to pay on realized prices.

*        *        *

FD (Fair Disclosure) Wire Tr., at 11.

**G.   Primero Goes on a Shopping Spree**

157.   The increased cash flow and artificially inflated stock price that Primero received from the filing of the APA application and announcing the receipt of the positive APA Ruling allowed Primero to acquire two companies and their respective mining interests during the Class Period using artificially inflated Primero stock.

158.   On May 22, 2013, Primero acquired Cerro Resources NL, whose principal asset was 69.2% of the Cerro Del Gallo project—a gold/silver deposit in

38

Mexico—for stock.  *See* Press Release, *Primero Announces Closing of Cerro Del Gallo Acquisition* (May 22, 2013).  Then on December 19, 2013, Primero announced that it acquired the remaining 30.8% interest of the Cerro Del Gallo development project from a subsidiary of Goldcorp for an upfront payment of $8 million.  *See* Press Release, *Primero Closes Acquisition of Remaining 30.8% of Cerro Del Gallo* (Dec. 19, 2013).

159.   Wasting no time at all, on December 16, 2013, Primero announced on that it had entered into an Arrangement Agreement with Brigus Gold Corp. ("Brigus") to acquire all of Brigus' outstanding common shares along with Brigus' principal asset, its Black Fox mine.  *See* Press Release, *Primero to Acquire Brigus Gold and Create a Diversified, Americas Based Mid-Tier Gold Producer*, http://www.primeromining.com/investors/news/press-release-details/2013/Primero-to-Acquire-Brigus-Gold-and-Create-a-Diversified-Americas-Based-Mid-Tier-Gold-Producer/default.aspx (Dec. 16, 2013).  Under the terms of the Arrangement Agreement, Primero would tender 0.175 of a Primero common share, 0.1 of a common share in a newly incorporated company dubbed Spinco, and $0.000001 in cash to Brigus shareholders per Brigus share.  *Id.*

160.   The Arrangement Agreement was signed by Defendant Conway (Feb. 3, 2014 Form 6-K, Ex. 99.1, Schedule A, at 64) and Primero's board of directors unanimously recommended that Primero's shareholders vote in favor of issuing shares to consummate the transaction in Primero's Notice of Special Meeting of Shareholders dated January 27, 2014 (Feb. 3, 2014 Form 6-K, Ex. 99.1 at 2).  On February 27, 2014, Primero and Brigus jointly announced shareholder approval of the acquisition.  Press Release, *Primero and Brigus Announce Shareholders Vote in Favour of Acquisition of Brigus*, http://www.primeromining.com/investors/news/press-release-details/2014/Primero-

39

and-Brigus-Announce-Shareholders-Vote-in-Favour-of-Acquisition-of-Brigus/default.aspx (Feb. 27, 2014).

161.   On March 5, 2014, Primero announced the successful completion of its Brigus acquisition.  Press Release, *Primero Announces Closing of Brigus Acquisition*, http://www.primeromining.com/investors/news/press-release-details/2014/Primero-Announces-Closing-of-Brigus-Acquisition/default.aspx (Mar. 5, 2014).

162.   As part of the acquisition, Primero issued and delivered approximately 41,340,664 Primero common shares to the former shareholders of Brigus in exchange for their Brigus shares, including Plaintiffs.  *Id.*; *see* ECF No. 13-4 at 3, 5 (noting Plaintiffs' PSLRA certifications that their shares were acquired "as the result of an acquisition of Brigus Gold Corp. by Primero Mining Corp").

## IX.  THE SAT UNCOVERS NATERA'S WRONGDOING AND THE DEFECTS IN THE APA RULING

163.   Just two months after Primero announced the positive APA Ruling, a new government administration came to power in Mexico.  The new administration consisted of President Enrique Peña Nieto and members of the Institutional Revolutionary Party, who had won Mexico's general election on July 1, 2012, succeeding Felipe Calderon's National Action Party, which had been in power since 2000.  Nick Miroff & William Booth, *Peña Nieto is winner of Mexican election*, The Washington Post (July 2, 2012).

164.   Shortly after the new government came to power on December 1, 2012, the SAT began to crack down on multinational corporations, including those in the mining industry, who were suspected of avoiding their tax obligations in Mexico by shifting profits to countries with lower taxes despite having substantial operations in the country.  Luis Rojas & Alexandra Alper, *Mexico eyes seven multinationals in tax avoidance probe*, Reuters (Jan. 23, 2014).  As Oscar Molina Chie, appointed head of

the SAT's General Administration of Major Taxpayers with the new administration, noted, "[i]t matters a lot to us that these companies change their structure to structures where the taxes they pay in Mexico are exactly right." *Id.*

165.   On July 18, 2013, Luis Natera was summoned by the Head of the Responsibilities Department of the Internal Control Body of the SAT (the "**Responsibilities Department**") to testify at a hearing for failing to comply with his duties, as he failed to recuse himself from intervening, in any way, in overseeing, managing or responding to Primero's APA application.  Appellate Decision.

166.   Luis Natera was required to recuse himself not only because his brother was Primero's authorized representative.  Appellate Decision.  The Responsibilities Department also found it relevant that Luis Natera's brother provided additional information to that requested regarding Primero's APA in a letter submitted on July 20, 2012.  Appellate Decision.

167.   Notably, in analyzing Primero's Silver Sales Request under the profit-based methodology not requested by the Company, Luis Natera cited as his source information received on July 20, 2012.  *See* APA Ruling at 24, 28-29, 33.

168.   In August 2013, not long after the new party took office, Luis Natera was no longer with the SAT.  *See Reforma, Firm offers advice on how to defraud the SAT* (May, 3, 2016) (the "**May 3, 2016 *Reforma* Article**").

169.   On November 21, 2013, the Responsibilities Department issued a resolution (the "**Accountability Assessment**") holding Luis Natera administratively liable for failing to recuse himself from any involvement in Primero's APA, in breach of Articles 7 and 8, sections I and XI of the LFRASP.  Appellate Decision.

170.   In other words, the Responsibilities Department found that Luis Natera breached his duties of legality, honesty, loyalty, fairness, and efficiency, LFRASP Article 7, because he failed to recuse himself from being involved in Primero's APA

1    and to notify his immediate superior in writing of his conflict of interest, LFRASP

2    Article 8, §§ I & XI.

3        171.   As a result, Luis Natera was disqualified from public employment,

4    positions, or mandates, for the six and a half years.  Appellate Decision.

5        172.   On February 12, 2014, Luis Natera filed an annulment lawsuit against the

6    Accountability Assessment, which was sent to the Seventh Metropolitan Regional

7    Chamber of the Federal Court of Administrative Justice ("**Administrative Court**")

8    under docket number 3998/14-17-08-8.

9        173.   On May 2, 2014, the Responsibilities Department submitted their answer

10   to the claim, arguing that (i) Luis Natera's contentions were ambiguous because there

11   are explicit legal provisions obliging public servants to excuse themselves from taking

12   part in matters where their relatives are involved; (ii) that the minutes from a meeting

13   regarding the APA reveal that Luis Natera was directly involved in the APA Ruling;

14   and (iii) that the blood relationship between Luis Natera and his brother has been

15   proved and thus proves the family interest in the management, processing, and

16   decision of the APA Ruling.  June 13, 2014 decision of the Administrative Court

17   ("**Administrative Court Decision**").

18       174.   On June 13, 2014, the Administrative Court decided to uphold the

19   Accountability Assessment.  Administrative Court Decision.  It considered that Luis

20   Natera breached the duty contained in Articles 7 and 8, Sections I and XI of the

21   LFRASP because he intervened in the APA Ruling.  Administrative Court Decision.

22   The Administrative Court noted that the APA Ruling was signed by Administrator

23   "1", in substitution of Luis Natera, the Central Administrator for Transfer Pricing,

24   because Luis Natera was absent at the time it was signed.  Administrative Court

25   Decision.  The Administrative Court reasoned that the signature of Luis Natera's

26   subordinate did not substitute the will and responsibility of the public servant

27   replaced.  Administrative Court Decision.  In other words, the Administrative Court

28

1  found sufficient evidence that Luis Natera directly participated in and authorized the

2  APA Ruling.  Administrative Court Decision.

3      175.   The Administrative Court also found that Luis Natera breached his duty

4  to recuse himself from the management, processing, and decision of the APA because

5  his brother was authorized to act on Primero's behalf under Article 19 of the FFC.

6  Administrative Court Decision.

7      176.   Then, in August 2015, the SAT filed a *juicio de lesividad* seeking to

8  retroactively nullify the APA Ruling.  *Reforma, Mining company defrauds the SAT*

9  (May 2, 2016).  To the best of plaintiff's counsel's knowledge, the *juicio de lesividad*

10  has never been made public.

11      177.   About a month after the *juicio de lesividad* was filed, the Responsibilities

12  Department initiated a second accountability assessment against Luis Natera regarding

13  his conduct with respect to Primero's APA for breach of Article 8, §§ I, XVII and

14  XXIV of the LFRASP ("**Second Accountability Assessment**").  Appellate Decision.

15  Thus, Luis Natera was summoned on September 11, 2015 to appear before the

16  Responsibilities Department again regarding Primero's APA.  Appellate Decision.

17  This time, he was summoned for (1) having resolved a different issue than that

18  requested by Primero in issuing the APA Ruling; and (2) failing to compare the

19  factors established in paragraph 3 of article 215 of the MITL to determine the

20  transactions or comparable companies used in the determination of the prices of

21  related party transactions, in order to choose the best method used in the resolution

22  established in Article 216 of the MITL in effect in 2012, which infringed, among

23  others, the provisions of Articles 7 and 8, sections I, XVII, and XXIV of the LFRASP.

24  Appellate Decision.[15]

25  _____

26  [15]     Luis Natera filed a constitutional appeal against this summons, but the
   Eighth Circuit District Court denied him constitutional protection.  Appellate

27  Decision.  Luis Natera appealed from this decision, but the Thirteenth Collegiate

28

43

178.   Despite the APA Ruling's glaring vulnerabilities, the litigation against Luis Natera in relation to his involvement in Primero's APA, and the filing of the *juicio de lesividad*, Primero described the APA Ruling as virtually unassailable for its initial term and presented its chances of renewal as virtually guaranteed for the life of the mine.  *See* ¶¶181-94, *infra*.  Notably, however, Primero did not acknowledge the APA Ruling's vulnerabilities until February 3, 2016, when the Company announced in a press release that PEM ***received <u>service</u>*** of a legal claim from the SAT seeking to nullify the APA.

179.   On this news, the Company's shares fell $0.74 per share, or over 28%, to close at $1.89 per share on February 4, 2016.

## X.  FALSE AND MISLEADING STATEMENTS

180.   The bold and italicized statements in this section are those statements alleged to be false and/or misleading.

### A.   Statements About The APA Ruling And Its Impact

181.   The Class Period starts on October 5, 2012 when the Company issued a press release entitled "Primero Announces Positive Advance Tax Ruling" stating in relevant part:

> TORONTO, ONTARIO—(Marketwired – Oct. 5, 2012) – ***Primero Mining Corp. ("Primero" or the Company") (TSX:P)(NYSE:PPP) announced today that the Company's Mexican subsidiary has received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its Advance Pricing Agreement ("APA") filing made in October 2011.  The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement[1] at realized prices rather than spot prices effective from August 6, 2010.***

Tribunal decided on September 2, 2016 to uphold the lower court's decision and denied constitutional protection to Luis Natera against the summons.  Appellate Decision.

*Under Mexican tax law, an APA ruling is generally applicable for up to a five year period.  For Primero this applies to the fiscal years 2010 to 2014. Assuming the Company continues to sell its silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine*.

1 According to the silver purchase agreement between the Company and Silver Wheaton Corp. ("Silver Wheaton"), until August 6, 2014 Primero will deliver to Silver Wheaton a per annum amount equal to the first 3.5 million ounces of silver produced at San Dimas and 50% of any excess at US$4.08 per ounce (increasing by 1% per year). Thereafter Primero will deliver to Silver Wheaton a per annum amount equal to the first 6.0 million ounces of silver produced at San Dimas and 50% of any excess at US$4.20 per ounce (increasing by 1% per year).  The Company will receive silver spot prices only after the annual threshold amount has been delivered.

\*       \*       \*

182.    Substantially similar if not identical language as that set forth in ¶181 above also appeared in the following documents:

a) Primero's November 8, 2012 press release;

b) Primero's Form 6-K filed with the SEC on November 8, 2012, signed by Defendant Blaiklock (Ex. 99.1 at 29);

c) Primero's Form 40-F filed with the SEC on April 2, 2013, signed by Defendant Conway (Ex. 99.3 at 4);

d) Primero's Form 6-K filed with the SEC on February 13, 2014, signed by Defendant Blaiklock (Ex. 99.2 at 31);

e) Primero's Form 40-F filed with the SEC on April 1, 2014, signed by Defendant Conway (Ex. 99.1 at 11);

f) Primero's Form 6-K filed with the SEC on February 12, 2015, signed by Defendant Kaufman (Ex. 99.2 at 40); and

g) Primero's Form 40-F filed with the SEC on March 31, 2015, signed by Defendant Conway (Ex. 99.2 at 40).

183.    On October 16, 2012, at the Canaccord Genuity Resource Conference, Defendant Conway stated the following in relevant part:

45

1          *     *     *

2     [Steve Butler, Analyst]: Our next presenting company is Primero
      Mining, Joe Conway, President and CEO. I have known Joe for -- Joe,
3     I don't know, 19 years maybe. We worked together at BMO years
      ago, a big bank, but Nesbitt, Thomson actually by the way.
4
5     Primero Mining, what a difference about three months makes. The
      stock was about $2.50 a share and had little negative exposure to
6     the silver price courtesy of the silver stream deal, but the miracle of life
      came through for the Company about two to three weeks ago, that is
7     what I'd call it and the stock went up $2 in one day because Mexican
      authorities agreed that the offshore restructuring of the Company's tax
8     position was kosher, use that term. But anyway, thanks, Joe, for
      coming and great story in Primero.
9
      [Conway]: Thanks, Steve and thank you for coming this morning. I
10    guess as Steve mentioned, the Company has -- he has had a couple of
      things happen more recently, but to put it in context, we have been,
11    for the last couple of years, really focused on a couple of things really.
      One, optimizing the asset because it was under -- it was very
12    inefficient when we bought it and secondly, working on our corporate
      structure.  And that is what Steve alluded to earlier on. ***We had a***
13    ***significant tax burden, which we have just recently got cleared of,***
      ***but more importantly I think as well now that that is done***, what else
14    are we doing? And we announced last night an expansion of the mine
      and I am going to take you through that this morning as well. . . .
15          *     *     *

16    FD (Fair Disclosure) Wire Tr., at 1.

17          184.   On January 23, 2013, the Company issued a press release entitled,

18    "Primero Achieves 2012 Guidance and Provides 2013 Outlook," which stated in

19    relevant part:

20          *     *     *

21
22    "Primero had an excellent year in 2012," stated Joseph F. Conway ,
      President and C.E.O. "We demonstrated that the San Dimas mine has
23    significant geological potential and we announced an expansion which
      will boost production by at least 40% within the next two years. ***We***
24    ***also improved our tax position – substantially increasing our annual***
      ***cash flow***. In December we announced the pending acquisition of the
25    Cerro Del Gallo development project in Mexico, which will increase
      our medium-term production to over 250,000 gold equivalent ounces
26    per year and more than triples our resource base. All of these activities
      translated into a superior share price performance. Primero's share
27    value increased by 97% in 2012 compared against industry equity

28                                  46

benchmarks which were all negative. We intend to continue to deliver positive results for all our stakeholders in 2013 and beyond."

\*       \*       \*

185.   On February 21, 2013, the Company issued a press release entitled, "Primero Reports Fourth Quarter and Full Year 2012 Results; Generates Record Revenues and Operating Cash Flow and Significant Free Cash Flow," which stated in relevant part:

\*       \*       \*

Tax Ruling Increases Free Cash Flow

**On October 4, 2012 the Company announced that its Mexican subsidiary received a positive ruling from the Mexican tax authorities (Servicio de Administración Tributaria) on its advance pricing agreement ("APA") filing made in October 2011. The ruling confirms that the Company's Mexican subsidiary appropriately records revenue and taxes from sales under the silver purchase agreement[] at realized prices rather than spot prices effective from August 6, 2010. This ruling significantly improves the Company's free cash flow.  Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. Assuming the Company continues to sell silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized silver prices for the life of the San Dimas mine.**

\*       \*       \*

186.   On February 21, 2013, the Company filed a Form 6-K with the SEC, signed by Defendant Blaiklock, which stated in relevant part:

\*       \*       \*

**Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. Assuming Primero continues to sell silver under the silver purchase agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to record revenues and pay taxes on realized prices for the life of the San Dimas mine. There can be no assurance that Mexican tax laws applicable to the APA ruling will not change or that the Mexican tax authorities will not change their views on the appropriate price for the sale of silver under the silver purchase agreement. If the Mexican tax authorities determine that the appropriate price of silver sales under the silver purchase**

47

*agreement is different than the realized price, Primero's cash flows and earnings could be significantly adversely impacted.*

\*        \*        \*

Feb. 21, 2013 Form 6-K, Ex. 99.1 at 41.

187.   That same day, February 21, 2013, the Company held its Fourth Quarter 2012 Earnings Call, during which Defendant Conway stated in relevant part:

\*        \*        \*

*. . . An important achievement during the year was certainly the positive tax ruling which we received from the Mexican tax authorities and that has been an overhang on the company for the last relatively two years and that overhang has gone.*

\*        \*        \*

Q4 2012 Earnings Call, Bloomberg Tr., at 2 (Feb. 21, 2013).

188.   On December 16, 2013, the Company participated in a conference call to discuss Primero's acquisition of Brigus Gold, during which Defendant Conway stated in relevant part:

\*        \*        \*

[Don Blyth, Analyst]: Okay. And finally, on the Mexican tax ruling that you guys got, there are a lot of qualifiers when that was announced, rulings are generally applicable. You assumed that if there were no changes to the application, that you would expect to pay the taxes on the realized prices. Has anything changed on that front? Do you still pretty much expect that the taxes going forward will be on the actual realized silver prices for the life of the mine, as far as you're aware?

[Conway]: *Yes. We've had nothing to the contrary. We understand that generally within these APA ruling types of arrangements, which we've got, that's generally the case. As long as they don't make any changes for the overall industry in terms of tax rules, then we'll be continuing to pay on realized prices.*

\*        \*        \*

FD (Fair Disclosure) Wire Tr., at 11.

189.   On February 13, 2014, Primero filed a Form 6-K for the fiscal year ended December 31, 2013 with the SEC, which provided the Company's year-end financial

48

results and position and was signed by Defendant Blaiklock.  The Feb. 13, 2014 Form 6-K stated in relevant part:

*        *        *

Tax ruling in Mexico

***The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine.*** Should this judgment change, there would be a material change in both the income and deferred tax position recognized by the Company.

*        *        *

Feb. 13, 2014 Form 6-K, Ex. 99.1 at 44.

190.   Substantially similar language as that set forth in ¶189 above also appeared in the following documents:

(a) Primero's Form 6-K filed with the SEC on April 15, 2014, which was signed by Defendant Blaiklock (Ex. 99.1 at 62);

(b) Primero's Form 6-K filed with the SEC on May 8, 2014, which was signed by Defendant Blaiklock (Ex. 99.1 at 37);

(c) Primero's Form 6-K filed with the SEC on November 6, 2014, which was signed by Defendant Kaufman (Ex. 99.1 at 42);

(d) Primero's Form 6-K filed with the SEC on February 12, 2015, which was signed by Defendant Kaufman (Ex. 99.3 at 51); and

(e) Primero's Form 6-K filed with the SEC on May 6, 2015, which was signed by Defendant Kaufman (Ex. 99.2 at 36).

191.   On August 7, 2014, Primero filed a Form 6-K with the SEC, which provided the Company's financial results and position as of June 30, 2014, the second quarter of 2014, and was signed by Defendant Blaiklock.  The Aug. 7, 2014 Form 6-K stated in relevant part:

49

\*      \*      \*

*APA rulings generally have a five year term and the APA ruling that the Company received from the Mexican tax authorities that confirmed that the appropriate price for silver sales under the silver purchase agreement was the fixed price realized, expires on December 31, 2014. The Company and its advisers are reviewing what, if anything, is required to ensure that the ruling remains in effect. The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure of the silver purchase agreement, the ability of the Company to continue to pay taxes in Mexico based on realized prices of silver will continue for the life of the San Dimas mine.* Should the Mexican tax authorities disagree with this position and assess taxes based on amounts higher than realized prices, the Company's cash flow could be significantly impacted.

\*      \*      \*

Aug. 7, 2014 Form 6-K, Ex. 99.1 at 24.

192.   On November 6, 2014, the Company filed a Form 6-K with the SEC, which provided the Company's financial results and position as of September 30, 2014, the third quarter of 2014, and was signed by Defendant Kaufman.  The Nov. 6, 2014 Form 6-K stated in relevant part:

\*      \*      \*

*On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement and the silver pricing for purposes of its 2010 and 2011 income tax returns. Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period and the Company's APA Ruling covers the five years ending December 31, 2014. Assuming silver continues to be sold under the Amended and Restated Silver Purchase Agreement on the same terms and there are no changes in the application of Mexican tax laws relative to the APA Ruling, we expect to record revenues and pay taxes based on realized prices for the life of the San Dimas mine. There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling when the current APA Ruling expires on December 31, 2014 or that the authorities will assess the Company's taxes on the basis of its realized prices for silver thereafter. To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on our results of operations, financial condition and cash flows.*

50

\*     \*     \*

Nov. 6, 2014 Form 6-K, Ex. 99.1 at 24.

193.   On February 12, 2015, the Company filed a Form 6-K with the SEC, signed by Defendant Kaufman, which stated in relevant part:

\*     \*     \*

*On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement and the silver pricing for purposes of its 2010 and 2011 income tax returns. Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period (the year in which the ruling application is filed, the immediately preceding year and the three subsequent years) and the Company's APA Ruling covered the five years ending December 31, 2014. The Company has until the end of 2016 to file a new APA Ruling application in respect of 2015. In 2015 silver is expected to continue to be sold under the Amended and Restated Silver Purchase Agreement on the same terms and there are no known changes in the application of Mexican tax laws relative to the APA Ruling, so the Company expects to record revenues and pay taxes based on realized prices for the life of the San Dimas mine. There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling or that the authorities will assess the Company's taxes on the basis of its realized prices for silver. To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on our results of operations, financial condition and cash flows.*

\*     \*     \*

Feb. 12, 2015 Form 6-K, Ex. 99.3 at 28.

194.   On November 3, 2015, the Company filed a Form 6-K with the SEC, which contained the Company's financial results and position as of September 30, 2015, the third quarter of 2015, and was signed by Defendant Kaufman.  The Nov. 3, 2015 Form 6-K stated in relevant part:

\*     \*     \*

*On October 4, 2012, the Company received a ruling (the "APA Ruling") from the Mexican tax authorities which confirmed the appropriate price for sales of silver under the Amended and Restated Silver Purchase Agreement. Under Mexican tax law, an APA Ruling is generally applicable for up to a five year period (which in*

51

*the Company's case, covered the year in which the ruling application was filed, the immediately preceding year and the three subsequent years) and the Company's APA Ruling covered the five years ending December 31, 2014. In 2015, the Company intends to continue to record its revenue from sales of silver under the Amended and Restated Silver Purchase Agreement in a manner consistent with prior years, the APA Ruling and applicable Mexican laws. The Company has until the end of 2016 to file an application for a renewed APA Ruling in respect of 2015 and the subsequent four taxation years. There can be no assurance that Mexican tax laws applicable to the APA Ruling will not change or that the applicable authorities will issue a renewal or similar ruling or that the authorities will continue to assess the Company's taxes on the basis of its realized prices for silver.*

*The Company continues to evaluate alternatives to achieve long-term tax certainty including through engaging in a dialogue with the Mexican tax authorities in this regard. To the extent the Mexican tax authorities determine that the appropriate price of silver sales under the Amended and Restated Silver Purchase Agreement is different than the realized price, it could have a material adverse effect on the Company's results of operations, financial condition and cash flows.*

\*       \*       \*

Nov. 3, 2015 Form 6-K, Ex. 99.1 at 11.

195.   The Company's and the Officer Defendants' respective statements in ¶194 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that the APA Ruling was vulnerable to the filing of a *juicio de lesividad* and/or non-renewal after its initial term because:

(a)   Luis Natera improperly failed to recuse himself from Primero's APA given that his brother, Christian Natera, was an authorized representative of the Company as set forth in ¶¶124-29;

(b)   the APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero as set forth in ¶¶130-35, 138-40;.

(c)   the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a

transaction complies with the ALP as explained in ¶¶136-37, 139, 141; and

(d)   Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its ***comparable independent*** transaction (*i.e.*, the External SPA 2004 between Wheaton River and Silver Wheaton) was actually a ***related party transaction*** and was therefore an inappropriate comparison transaction as explained in ¶¶142-48 above.

**B.   Statements That Primero's Quarterly And Annual Financial Statements Were Prepared In Accordance With IFRS**

196.   On February 21, 2013, the Company filed a Form 6-K with the SEC which contained the Company's financial results and position for the fiscal year ended December 31, 2012, which contained a statement signed by Defendants Conway and Blaiklock that the Company's "consolidated financial statements . . . are the responsibility of the Company's management" and "***are prepared in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, and reflect management's best estimates and judgment based on information currently available***."  Ex. 99.2 at 1.

197.   Identical or substantially similar language as that set forth in ¶196 also appeared in the following documents:

(a)   Primero's Form 40-F filed with the SEC on April 2, 2013 which contained the Company's financial results and position for the fiscal year ended December 31, 2012 and was signed by Defendants Conway and Blaiklock (Ex. 99.2 at 1);

(b)   Primero's Form 6-K filed with the SEC on February 13, 2014 which contained the Company's financial results and position for

the fiscal year ended December 31, 2013 and was signed by Defendants Conway and Blaiklock (Ex. 99.2 at 1); and

(c)    Primero's Form 6-K filed with the SEC on February 12, 2015 which contained the Company's financial results and position for the fiscal year ended December 31, 2014 and was filed by Defendants Conway and Kaufman (Ex. 99.2 at 1).

198.   On November 8, 2012, Primero filed a Form 6-K with the SEC for the third quarter of 2012 which was signed by Defendant Blaiklock and provided financial statements for the third quarter of 2012 that *the Company claimed to have prepared in accordance with IAS 34, Interim Financial Reporting*. Ex. 99.2 at 1.

199.   Identical and substantially similar language as that set forth in ¶198 above also appeared in the following documents:

(a)    Primero's Form 6-K filed with the SEC on May 6, 2015 which provided the Company's condensed consolidated interim financial statements for the first quarter of 2015 and was signed by Defendant Kaufman (Ex. 99.1 at 6);

(b)    Primero's Form 6-K filed with the SEC on August 5, 2015 which provided the Company's condensed consolidated interim financial statements for the second quarter of 2015 and was signed by Defendant Kaufman (Ex. 99.1 at 6); and

(c)    Primero's Form 6-K filed with the SEC on November 3, 2015 which provided the Company's condensed consolidated interim financial statements for the third quarter of 2015 and was signed by Defendant Kaufman (Ex. 99.1 at 6).

200.   Primero's and the Officer Defendants' respective statements in ¶¶196-99 above were materially false and/or misleading when made because they knowingly or recklessly failed to disclose that Primero's financial statements did not comply with

54

IFRS because Primero failed to disclose in the notes to its financial statements the existence of a substantial contingent liability as required by IAS 37 and IAS 12, that the Company was required to disclose because it faced a possible obligation to pay additional income taxes, penalties, and interest due to the flawed APA Ruling which contingency could only be confirmed by the SAT's filing of a *juicio de lesividad* or a decision by the SAT not to file a *juicio de lesividad* or to renew the APA Ruling, and this possible obligation was not remote due to the reasons set forth above in ¶¶124-48.

## XI.  POST-CLASS PERIOD EVENTS

### A.      Primero Announces Service Of The *Juicio de Lesividad*

201.   On February 3, 2016, the Company issued a press release announcing that PEM received service of the *juicio de lesividad* which sought to nullify PEM's APA Ruling.

202.   On this news, the Company's shares fell $0.74 per share, or over 28%, to close at $1.89 per share on February 4, 2016.

203.   On February 18, 2016, the Company filed a Form 6-K with the SEC, in which the Company stated that due to the nullification claim, the Company "currently believes it is unlikely the SAT will agree to an Advance Pricing Agreement for the 2015-2019 tax years on terms similar to the challenged APA." Ex. 99.1 at 34.   In other words, the Company admitted that the *juicio de lesividad* is likely to prevent Primero from being able to renew the APA Ruling.

204.   On this news, Primero's stock declined $0.06 per share to close at $1.45 per share on February 18, 2016, a one-day decline of 4% on unusually high volume of shares.

### B.      Mexican Press Coverage of the *Juicio de Lesividad* and the Natera Brothers' Scheme

205.   On May 2, 2016, one of the most widely read newspapers in Mexico, *Reforma*, published an article titled, "Mining company defrauds the SAT."  The article

55

provides that Luis Natera, the former head of the Transfer Pricing Audit Administration, was suspended from serving in the public sector for six and a half years because he failed to recuse himself from making a decision regarding Primero's October 2011 application that was analyzed by his office for one year. *Id.* The article explained that Luis Natera was suspended for granting benefits to Primero, which was represented by his brother, when he authorized Primero to sell silver at prices that were much lower than Spot Prices in October 2012, which caused the SAT to (1) have to return taxes that Primero had already paid and (2) fail to receive an as yet undetermined amount. *Id.*

206. According to *Reforma*, as a result of this authorization, in 2011, Primero paid taxes in Mexico on income of $17 million, rather than $149 million, saving $20.6 million in taxes in 2011. *Id.* In 2012, Primero received a tax return of $22.2 million dollars, which gave it a significant boost in cash flow. *Id.*

207. The SAT then filed a *juicio de lesividad* in August 2015, by which it sought to nullify the APA. *Id.* Shortly thereafter, in September 2015, government authorities opened new proceedings against Luis Natera. *Id.*

208. On May 3, 2016, *Reforma* published another article, titled "Firm offers advice on how to defraud the SAT," about the nullification claim and the Natera brothers' involvement. *Reforma* reiterated the fact that the SAT initiated a legal claim in 2015 to nullify the APA Ruling and explained that the Natera brothers, involved in the case of Primero Mining, which unlawfully received SAT benefits, have a consulting firm that specializes in litigating against that agency. *Id.* According to the article, the Natera consulting firm, Natera Consultores, S.C., has been in existence since the '90s and emphasizes that it specializes in issues involving advance transfer pricing agreements, which the SAT authorized for Primero in 2012, to sell refined silver at prices that were far below market prices. *Id.* In 2007, Luis Natera left private practice for the SAT's Transfer Pricing Administration, which oversees complex

56

1  issues related to transactions between related companies headquartered in different

2  countries which may result in payment of lower taxes, since they do not pay market

3  prices.  *Id.*  According to the article, Luis Natera was the head of the SAT Transfer

4  Price Administration throughout the previous presidential term and until August 2013.

5  *Id.*

6      209.   The May 3, 2016 *Reforma* Article also included a side column titled,

7  "Mining company vulnerable in Canada," which quoted Carlos Espinosa, the former

8  head of the Mining Development Unit of the Toronto Stock Exchange, as stating that

9  if Primero is found guilty of tax fraud, its shares on the Toronto Stock Exchange could

10 be frozen.  Mr. Espinosa was also quoted as stating that if the Mexican Government

11 wins the lawsuit against Primero and requires Primero to pay taxes on a price that was

12 8 times higher than the registered price, it will have a significant impact on the

13 Company's cash flow.  *Id.*

14     210.   *Reforma's* reports about Primero's APA, Luis Natera's suspension in

15 relation to the APA Ruling, and the Natera brothers' scheme are supported by the

16 decisions of several Mexican courts.  *See* ¶¶165-75, 177, *supra.*

17     **C.     Primero Continues To Conceal the Substance of the SAT's Claims**

18     211.   Meanwhile, despite press coverage in Mexico about the reasons behind

19 the SAT's nullification claim, Luis Natera's wrongdoing with respect to Primero's

20 APA, and the flaws apparent on the face of the APA Ruling, Primero has never

21 publicly explained the Mexican government's preferred reasons for filing the *juicio de*

22 *lesividad*.  Since the announcement of receipt of service of the *juicio de lesividad* and

23 the announcement that it is unlikely that the APA Ruling will be renewed (*see supra*

24 ¶¶201, 203), Primero has maintained—incredibly—that the SAT is just discriminating

25 against Primero as a foreign investor.  Press Release, *Primero Notifies Mexico of an*

26 *Investment Dispute Under NAFTA* (June 2, 2016).

27

28

212.   Upon information and belief, Plaintiffs believe that the *juicio de lesividad* was filed for the following reasons: (i) Luis Natera improperly failed to recuse himself from Primero's APA given that his brother, Christian Natera, was an authorized representative of the Company as set forth in ¶¶124-29; (ii) the APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero as set forth in ¶¶130-35, 138-40; (iii) the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a transaction complies with the ALP as explained in ¶¶136-37, 139, 141; and (iv) Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its ***comparable independent*** transaction (*i.e.*, the External SPA 2004 between Wheaton River and Silver Wheaton) was actually a ***related party transaction*** and was therefore an inappropriate comparison transaction as explained in ¶¶142-48 above.

## XII.  ADDITIONAL SCIENTER ALLEGATIONS

### A.   *Respondeat Superior* and Agency Principles Apply

213.   Primero is liable for the acts of Primero's officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of Primero's officers, directors, employees, and agents is similarly imputed to Primero under *respondeat superior* and agency principles.

### B.   Access To And Possession Of Adverse Facts

214.   Defendants had access to and were in possession of adverse material facts, including for example the contents of the APA application, the APA Ruling, and public information such as governing Mexican laws.

215.   Defendants were also aware that Primero hired Christian Natera in connection with its APA Ruling, as Christian Natera was Primero's authorized representative under Article 19 of the FFC, which required Primero to designate Christian Natera as such by a document signed and authorized before witnesses. *See* ¶¶71, 175, *supra*.

216.   Defendants had access to and were in possession of the information contained in the APA Ruling because the Company publicly announced that it received it on or before October 5, 2012, and because they touted its contents publicly and repeatedly throughout the Class Period. *See, e.g.*, ¶¶181-94, *supra*. Accordingly, Defendants had access to and were in possession of the following facts that rendered the APA Ruling vulnerable to the filing of a *juicio de lesividad* and/or nonrenewal after its initial term.

217.   First, Defendants had access to and were in possession of the fact that Luis Natera was involved in its APA Ruling because his name appears on it and it was signed under his authority. *See* APA Ruling at 37.  Defendants were also aware that Luis Natera's involvement in the APA Ruling rendered it vulnerable because he was the brother of Primero's authorized representative Christian Natera and it is a violation of Mexican law (not to mention a common sense proposition) that a public servant like Luis Natera must recuse himself from being involved in a matter that involves his brother. *See* ¶¶85, 124-29, *supra*.

218.   Second, it is apparent on the face of the APA Ruling that Luis Natera did not decide the Silver Sales Request based on the CUP methods proposed by Primero, but under a profitability method, without explanation for doing so. *See* ¶¶130-41, *supra*.

219.   Third, Defendants are knew or were deliberately reckless in not knowing the relevant publicly available laws pertaining to APAs because they frequently discussed the APA Ruling and the likelihood that it would be renewed after its initial

term.  *See, e.g.*, ¶¶181-94, *supra*.  In addition, they hired lawyers and consultants to

assist them with their APA application.  *See* APA Ruling at 2-5.  Thus, they were

aware that the grounds for filing a *juicio de lesividad* included the issuance of an APA

ruling by an authority who lacks jurisdiction over the matter, or if an APA ruling was

improperly grounded in fact or applicable law.  *See* ¶73, *supra*.  Thus, Defendants are

deemed to know that the following grounds for the SAT to file a *juicio de lesividad*

against the APA Ruling existed:  (1) Luis Natera improperly failed to recuse himself

from Primero's APA given that his brother, Christian Natera, was an authorized

representative of the Company as set forth in ¶¶124-29; (2) the APA Ruling approved

a transfer pricing methodology other than the CUP methodologies that were proposed

by Primero as set forth in ¶¶130-35, 138-40; (3) the APA Ruling did not conduct the

requisite comparison of the factors set forth in Article 215 of the MITL that are used

to determine whether a transaction complies with the ALP as explained in ¶¶136-37,

139, 141; and (4) Primero's proposed CUP methodologies were flawed anyway

because the transaction that Primero attempted to use as its ***comparable independent***

transaction (*i.e.*, the External SPA 2004 between Wheaton River and Silver Wheaton)

was actually a ***related party transaction*** and was therefore an inappropriate

comparison transaction as explained in ¶¶142-48 above.

220.    Primero's access to and awareness of the aforementioned adverse facts is

further supported by the fact that Christian Natera's scienter is imputable to the

Company under the doctrine of *respondeat superior*, as he was an agent of Primero

with respect to Primero's APA.

221.    Christian Natera obviously knew who his brother was and that his brother

was the Central Administrator for Transfer Pricing Audits, which was a publicly

known fact in any event.

222.    Additionally, as a former SAT official (*see* Aug. 27, 2009 Proceso

Article and Aug. 29, 2009 La Jornada Article), Christian Natera would have been

60

familiar with the Federal Law on Administrative Responsibilities of Public Servants
that his brother was found administratively liable for having violated.

223.   Christian Natera was also well-versed with Mexican transfer pricing law,
firm specializes in "advance transfer pricing agreements" and "specializes in litigating
against" the SAT.  May 3, 2016 *Reforma* article.  In addition, he published an article
titled, "Getting an APA in Mexico" on his firm's website which explains how APAs
work in Mexico and cites to the Guidelines.[16]  Accordingly, he would have been
aware of the ways in which the APA Ruling could be challenged, and the fact that the
APA Ruling was vulnerable to a *juicio de lesividad* and/or non-renewal.  Given
Christian Natera's knowledge of Mexican transfer pricing laws and his access to all
relevant contractual arrangements as part of the APA submission, he would have
known that the External SPA 2004 was not a transaction between **two independent
parties**, but one **between related parties**, which rendered it an unsuitable comparable
transaction under the CUP method.  *See* ¶¶142-48, *supra*.

224.   Furthermore, Christian Natera obviously would have known that his own
brother was suspended from serving in the public sector in connection with failing to
recuse himself from Primero's APA in November 2013, particularly because Luis
Natera came to work with him at Natera Consultores, S.C., thereafter.  *See Our Team,
Luis E. Natera*, Natera Consultores, S.C.,
http://www.natera.com.mx/index.php/en/luis-natera-n (last visited Feb. 23, 2017)
(noting that Luis Natera worked at the SAT until 2013).

225.   Additionally, after the APA Ruling had expired and the *juicio de
lesividad* had been filed, Defendant Conway acknowledged on the Company's third
quarter 2015 earnings call that the Company was having "discussions" with the tax
authorities about renewal:

---

[16] *See* http://www.natera.com.mx/euromoney/Transfer_Pricing_2011-12.pdf.

[Mike Parkin, Analyst]: Okay. And then on the transfer pricing agreement, can you give us an update where you guys stand on that, have you filed for re-application at this point?

[Conway]: No. We've had some -- *we are having some discussions with the tax authorities on that front, just on an informal basis*. We have until the end of 2016 to formally do it. But we have opened up a dialog.

*     *     *

Bloomberg Tr., at 14 (Nov. 3, 2015).  It is very doubtful that the Company could have been having discussions with the tax authorities about renewing the APA Ruling without the tax authorities acknowledging the fact that they were currently seeking to have the APA Ruling retroactively annulled, that Luis Natera had been suspended from public service in November 2013 in connection with the APA Ruling, and that renewal on the same terms was highly unlikely, if not impossible. Thus, these discussions suggest that Primero was aware that the *juicio de lesividad* had already been initiated and that renewal was off the table at least three months before they announced receipt of service of the *juicio de lesividad* on February 3, 2016.

226.   As set forth below, Defendants also had access to and were in possession of information demonstrating that the use of the External SPA 2004 as a comparable independent transaction was flawed precisely because it was a related party transaction designed to capitalize on higher silver multiples to boost Silver Wheaton's stock price.

227.   First, by buying the San Dimas mine from and assuming Goldcorp's obligations, Defendants would necessarily have had access to the 2004 External and Internal SPA documents—the obligations it would need to assume.  Moreover, Primero annexed those documents to its APA application, and used those documents under its CUP method.  *See* APA Ruling at 4, 12.  Defendants, therefore would have

62

had knowledge of, or were deliberately reckless in not knowing, the contents of those documents.

228.   Second, Primero's own transfer pricing study indicated that, under the External SPA 2004, "SW [Caymans] paid Wheaton Trading [] an advance of $46 million Canadian dollars plus ***540 million shares [] of the capital of its parent company, [Silver Wheaton]***." APA Ruling at 6. Thus Defendants had knowledge of, or were deliberately reckless in not knowing, that Wheaton River "***participate[d] directly or indirectly in the management, control or capital*** of [Silver Wheaton[.]" *Id.*; MITL Article 215.

229.   Third, Defendants had access to and possession of information known to Primero's board members, Nesmith and Luna, both of whom were present during the filing of the APA application and receipt of the APA Ruling. ¶¶101-11. Both Luna and Nesmith were the founders of Silver Wheaton, and therefore would undoubtedly have had knowledge of Silver Wheaton's capital structure, the fact that Silver Wheaton was a pure "silver play" designed to reflect the higher silver multiples in Silver Wheaton's shares, and the benefit of the External SPA 2004 to Silver Wheaton's share price. ¶¶101-11, 146. It is also notable that Luna and Nesmith served Silver Wheaton as director and CEO beside Telfer and Barnes who served Silver Wheaton as director and CFO, respectively—the architects of the "silver play"—who all belonged to the same "small circle" of mining players. ¶¶111, 146.

## C.   Core Operations

230.   Because the fraud alleged herein relates to the core business of Primero, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants. *See Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014). Indeed, Primero acknowledged the significance of the San Dimas mine and the APA Ruling to the Company's "results of operations, financial conditions, and cash flows," and therefore the Individual Defendants, as senior level executives were in such positions at the

63

Company to access all material, non-public information concerning Luis Natera's wrongdoing, the defects in Primero's application and APA Ruling, and that as a result, the APA Ruling was vulnerable to the filing of a *juicio de lesividad* and/or non-renewal APA's on a real-time basis. *See, e.g.*, Conference Call, FD (Fair Disclosure) Wire Tr., at 5 (Dec. 16, 2013); Nov. 6, 2014 Form 6-K, Ex. 99.1 at 24; Feb. 12, 2015 Form 6-K, Ex. 99.3 at 28; May 6, 2015 Form 6-K, Ex. 99.1 at 10; Aug. 5, 2015 Form 6-K, Ex. 99.1 at 11.

231.   Throughout the Class Period, the Company emphasized the importance of the San Dimas mine to its business.  For example, in Primero's annual report for the year ended 2012, Defendant Conway described the mine as its "flagship property" in his "Letter to Shareholders."  Apr. 11, 2013 Form 6-K, Ex. 99.3 at 6.  The San Dimas mine was also described as a flagship in other Class Period SEC filings.  *See* May 8, 2014 Form 6-K, Ex. 99.1 at 3; Aug. 7, 2014 Form 6-K, Ex. 99.1 at 3; Nov. 6, 2014, Form 6-K, Ex. 99.1 at 3.  Indeed, the San Dimas mine was the Company's only producing property from August 6, 2010, the date on which it acquired the mine, until at least March 5, 2014 when the Company acquired Brigus Gold and its Black Fox Complex.  *See* Apr. 1, 2014 Form 40-F, Ex. 99.1 at 9.  Accordingly, Defendants would be privy to and actively involved in anything pertaining to the profitability of the San Dimas mine, such as the tax structure which prevented the mine from being profitable and the steps taken to address it.

232.   Even before the Company filed the APA application, Defendants were vocal about their focus on the tax structure between PEM and STB and mitigating the tax burden in Mexico, addressing it in numerous SEC filings, press releases, and conference calls.  For example, Primero attempted to offset the Company's tax burden by purchasing call options on silver in 2011 and seeking a ruling on its accelerated depreciation plan.  *See* Press Release, *Primero Reports First Quarter 2011 Results; Maintains 2011 Production Guidance* (May 17, 2011).  Indeed,

64

following a May 17, 2011 earnings call during which Defendant Conway discussed the Company's tax strategy at length, Mackie Research published an analyst report the following day titled, "Tax Problems Remain Key Focus," which stated that "[t]axes remain a key focus as in Q1/11 alone Primero paid a nearly $13mm in tax with only $5mm in earnings."

233.   When the APA Ruling was issued, Defendants touted its significance in press releases and conference calls (*see* ¶¶181-94) and noted the fact that a failure to renew the APA Ruling on the same terms for the years after 2014 could have a material adverse effect" on the Company's "results of operations, financial condition, and cash flows" (*see, e.g.*, ¶192).  Defendants' frequent speech about the Company's tax structure, the APA application, the APA Ruling, and the prospects for renewal show that they were knowledgeable about these topics.  Indeed, on the July 13, 2011 conference call, Conway specifically mentioned familiarity with the OECD transfer pricing guidelines prior to the filing of the APA in the context of restructuring the Company: ". . . we've been looking at a number of, let's call them transfer pricing scenarios under OECD law regulations, which Mexico is part of to look at that."  Conference Call, Bloomberg Tr. (July 13, 2011).

234.   Furthermore, Primero has a small number of employees, and it can be presumed that the Individual Defendants, as officers and/or directors, had knowledge of the adverse facts pertaining to the APA Ruling.  At all relevant times, the Company's headquarters have been located in Canada, where all of its officers and directors, except for Eduardo Luna, resided during the Class Period.  As of December 31, 2010, the Company had 8 employees in its Canadian offices and 8 in its Mexico City office.  Aug. 11, 2011 Form 40-F, Ex. 99.1 at 16.  As of December 31, 2011, the Company had 13 employees in its Canadian office and 13 in its Mexico City office.  May 24, 2012 Form 40-F/A, Ex. 99.1 at 18.  As of December 31, 2012, the Company had 19 employees in its Canadian office and 10

1    in its Mexico City office.  Apr. 2, 2013 Form 40-F, Ex. 99.1 at 17.  As of March

2    31, 2014, the Company had 30 employees in its Canadian offices and 13 in its

3    Mexico City Office.  Apr. 1, 2014 Form 40-F, Ex. 99.1 at 13.  As of December 31,

4    2015, the Company had 37 employees in its Canadian office and 31 in its Mexican

5    office in Durango.   Mar. 31, 2016 Form 40-F, Ex. 99.1 at 13.

6        **D.    Magnitude of the Fraud**

7        235.    The magnitude of the fraud provides additional support for Defendants'

8    scienter.  For example, after the APA application was filed and before the positive

9    APA Ruling was issued, the Company recorded as a contingent liability the maximum

10   amount that it would have to pay should the APA application be unsuccessful.  The

11   amounts were significant.  As of December 31, 2011, the maximum contingent

12   liability was $28.6 million, approximately 49% of the Company's $58.9 million in

13   income before taxes for the year.  Form 40-F/A, Ex. 99.1 at 41 (May 24, 2012); Apr.

14   3, 2012 Form 40-F, Ex. 99.2 at 3.  As of June 30, 2012 the amount of the contingent

15   liability was $52.4 million plus estimated interest of $5.8 million, nearly equal to the

16   prior year's gross income.  Form 6-K, Ex. 99.2 at 24 (Aug. 2, 2012); Apr. 3, 2012

17   Form 40-F, Ex. 99.2 at 3.

18       236.    Indeed, on a July 13, 2011 conference call Conway confirmed that if the

19   Company were able to pay income taxes on the SW Purchase Price rather than the

20   Spot Price, it would double Primero's net present value,[17] or NPV.  *See* ¶80 (citing

21   Bloomberg Tr.).

22       237.    Furthermore, the fact that Defendants were aware that Primero was

23   Mexico's only source of tax revenue on silver from the San Dimas mine as Mexico

24

25   _____
     [17]    Net present value is the present value of the cash flows at the required rate of
26   return of a project compared to the initial investment.  Practically, it is a method of
     calculating return on investment for a project or expense.  Amy Gallo, *A Refresher*
27   *on Net Present Value*, Harvard Business Review (Nov. 19, 2014),
     https://hbr.org/2014/11/a-refresher-on-net-present-value.

28                                          66

had no "nexus" to the ultimate profiteers from the sale of San Dimas silver (SW Caymans, and ultimately, Silver Wheaton in Canada) suggests that they were aware that under a new government administration in Mexico, a facially flawed APA Ruling was vulnerable to the filing of a *juicio de lesividad* and/or nonrenewal after the initial term.

**E.    Press Coverage of the SAT's Crackdown on Tax Evasion Schemes and Silver Wheaton's Tax Woes**

238.    Defendants were aware no later than November 2012 that transfer pricing was under "intensified scrutiny," as the Company noted this fact in its Form 40-F/A for the fiscal year ended December 31, 2011.  Nov. 8, 2012 Form 40-F/A at note 19.

239.    This scrutiny only intensified after the Company received the APA Ruling.  Not long after Peña Nieto's new government came to power in Mexico in December 2012, the SAT began to crack down on multinational corporations, including those in the mining industry, who were suspected of avoiding their tax obligations in Mexico by shifting profits to countries with lower taxes despite having substantial operations in the country.  Luis Rojas & Alexandra Alper, *Mexico eyes seven multinationals in tax avoidance probe*, Reuters (Jan. 23, 2014).  As Oscar Molina Chie, the newly appointed head of the SAT's large taxpayer administration, noted, "[i]t matters a lot to us that these companies change their structure to structures where the taxes they pay in Mexico are exactly right."  *Id.*

240.    As a multinational corporation that had received an APA Ruling and consequently paid many millions less in income tax to Mexico, Primero was a prime candidate for the SAT's investigation, particularly in light of the fact that APA Ruling was vulnerable to attack on its face.  *See* ¶¶124-48, *supra*.  Thus, Defendants were likely aware that its tax arrangements would be in the SAT's cross-hairs sooner or later, particularly considering that its APA Ruling would expire on December 31,

2014 and would need to be renewed by the same SAT that was cracking down on tax cheats.

241.   Furthermore, on July 6, 2015, Silver Wheaton, the ultimate profiteer from the silver from the San Dimas mine, announced that its tax scheme was under fire. The Canada Revenue Agency—Canada's analog to the Internal Revenue Service—determined that Silver Wheaton's taxable income from the streaming agreements entered into by its subsidiary SW Caymans should be increased approximately $567 million for the period between 2005 and 2010, resulting in additional taxes and penalties assessed against the Company in excess of $207 million.  Press Release, Silver Wheaton, *Silver Wheaton Remains Confident in Business Structure Following Receipt of CRA Proposal Letter* (July 6, 2015).

242.   As stated above, SW Caymans was a party to the External SPA 2004 and therefore the transfer pricing dispute should have put Defendants on alert that Primero's tax arrangements would be subject to additional scrutiny.

## F.   Financial Motives of Primero's Executives

243.   According to Primero's SEC filings, the Company's executive compensation program included base salary, annual performance-based cash incentives, stock options, and phantom share units.  May 2, 2012 Form 6-K, Exhibit 99.2 at 28.  Primero's executive compensation program is designed "to emphasize performance-based incentives that reward its executives for the achievement of specific annual and long-term business goals." *Id.* at 25.  Due to this "emphasis on performance-based compensation," the Company explains, "it is critical that its incentive programs reward executives for performance-based measures that **they are able to influence**." *Id.*; *see also* April 11, 2013 Form 6-K, Exhibit 99.1 at 23.

244.   In recommending the compensation to be paid to the Company's executive officers, the Human Resources Committee ("**HRC**") considers, *inter alia*, "rewarding performance, both on an individual basis and with respect to operations

generally." May 2, 2012 Form 6-K, Ex. 99.1 at 25; *see also* April 11, 2013 Form 6-K, Exhibit 99.1 at 23.

245.   The HRC receives a recommendation from the President and CEO, and reviews the basis for the recommendation and has discretion to modify it prior to making a recommendation to the board.  May 2, 2012 Form 6-K, Ex. 99.1 at 26.  The President and CEO make "recommendations to the Board regarding the Company's annual business goals and objectives that provide the structure by which the annual goals and objectives of other executive officers and employees of the Company are aligned."  *Id.* at 27.  The President and CEO also make recommendations to the HRC regarding (1) "the Company's annual and long-term quantitative goals and the annual qualitative goals for the other executive officers"; and (2) executive officer base salary adjustments, target annual incentive awards and actual payouts, stock-based grants, and ***phantom share unit ("PSU") grants and actual payouts***.  *Id.*

246.   In 2012, a portion of Defendants Conway's and Blaiklock's compensation was attributable to the APA Ruling.

247.   For executives' annual performance-based cash incentive awards in 2011, the Board based awards upon Conway's, Blaiklock's, Nesmith's, and Luna's targets and attainment of annual Company and personal performance goals.  *Id.* at 30.

248.   In 2012, Conway's personal goals included matters relating to the "building of the Company's portfolio of precious metals assets, building key skills within the company and ***tax strategies***."  April 11, 2013 6-K, Ex. 99.1 at 30. The HRC considered the significant accomplishments of the Company in 2012 ***including obtaining the APA tax ruling***, enhanced mine planning processes, consistent production improvements, extraordinary shareholder returns and the announcement of the acquisition of Cerro Resources NL.  *Id.*  They determined his personal achievement factor was 2.0 out of a possible 2.0.  *Id.*

69

249.   For 2012, Blaiklock's personal goals included matters relating to the Company's **tax strategies**, financial planning, internalizing metal sales, corporate development, and provision of leadership to corporate administration in Mexico.  For 2012, "**Blaiklock's performance significantly exceeded expectations, including obtaining the APA ruling**" and his personal achievement factor was assessed at 2.0 out of a possible 2.0.  *Id.*

### 1.   Phantom Share Units

250.   In addition to annual incentive-based compensation, the Company's officers and directors also received benefits under Primero's PSU Plan ("**PSU Plan**").  PSUs "are a variable element of compensation intended to reward the Company's executive team for its success in achieving sustained shareholder value *reflected in stock price*."  Primero Mining Corp., Mgmt. Info Circular, at 11 (Apr. 16, 2012) (on file with Canada's System for Electronic Document Analysis and Retrieval ("**SEDAR**")).  A PSU is a "right granted under [a] plan to receive [an] [a]ward [p]ayout" which is usually in cash or a combination of cash and stock. Primero Mining Corp., 2013 Phantom Share Unit Plan (Apr. 18, 2016).  PSUs, therefore, "[are] like a cash bonus deferred until the future, but typically much bigger than an annual bonus."  Forbes.com, David King, *Why Phantom Stock Can Be Better Than Real Stock*, http://www.forbes.com/sites/dking/2013/10/15/why-phantom-stock-can-be-better-than-real-stock/#c6107f92bcbb (Oct. 15, 2013).

251.   The Company's first PSU Plan was originally approved by the Board in 2010 (the "**2010 Plan**").  Primero Mining Corp., Mgmt. Info Circular, at 32 (Apr. 16, 2012).  The 2010 Plan was "intended to promote a greater alignment of interests between the shareholders and executive officers and employees by providing a non-dilutive opportunity to participate in increases in the value of the Company."  *Id.*  In other words, the 2010 Plan provides the officers and employees to whom they are granted with contingent future compensation based on the

Company's Common Share price performance.  The PSUs issued under the 2010 Plan are "payable only in cash and represent[ ] no potential for share dilution."  *Id.* at 32.

252.   Once a PSU vests under the 2010 Plan, the grantee is entitled to receive an amount in cash equal to the average trading price per Common Share over the 20 preceding trading days.  *Id.* at 32.  Each PSU granted under the 2010 Plan in 2010 vests on the third anniversary of the grant.  *Id.*  Each PSU granted under the 2010 Plan in 2011 would vest over a three year period or as otherwise determined by the Board.  Each PSU expires on December 31 of the year in which it vests and is paid out between the vesting date and the expiry date.  In other words, grantees must exercise the PSU before the end of the year in which they vest or risk losing the PSU altogether.

253.   The Board also approved two similar PSU Plans in 2012 and 2013.  In 2012, the Board approved the Directors' PSU Plan (the "**2012 Plan**").  Primero Mining Corp., Mgmt. Info. Circular, at 28 (Apr. 7, 2014) (on file with SEDAR).  In 2013, the Board also approved the 2013 PSU Plan (the "**2013 Plan**") for key officers and employees.  *Id.*

254.   PSUs granted under both Plans vested upon the board's discretion, or if the board did not determine a vesting date, on the third anniversary of the grant.  *Id.* at 41-43.  Under both plans, PSUs can be paid in either cash or common shares not to exceed 10% of the Company's outstanding stock.  *Id.* at 42-43.

255.   The cash amounts payable under the 2012 and 2013 Plans were also tied to the stock price of Primero; the 2012 Plan and 2013 Plan entitled an employee or director-grantee to cash in "an amount equal to the volume weighted average price per Common Share over the five preceding trading days" or a number of common shares equal to the PSUs.  *See* Primero Mining Corp., Mgmt. Info. Circular, at 11 (Apr. 8, 2013) (on file with SEDAR); Primero Mining Corp.,

Mgmt. Info. Circular, at 28 (Apr. 7, 2014) (on file with SEDAR).  As set forth below, certain Defendants benefited greatly from Primero's artificially inflated stock price when selling their PSUs.

**2.    Insiders Cash Out**

256.    According to reports filed with the Canadian System for Electronic Disclosure by Insiders ("**SEDI**"), certain Officer Defendants and certain members of the Company's Board of Directors sold PSUs in a manner that was highly suspicious in both timing and amount.

257.    ***Chief Executive Officer and Director Joseph F. Conway***:  During the Class Period, Defendant Conway's base annual salary ranged from approximately $600,000 to $650,000.  *See* Primero Mining Corp., Mgmt. Info. Circular, at 36 (Apr. 16, 2012) (on file with SEDAR); Primero Mining Corp., Mgmt. Info. Circular, at 48 (Mar. 22, 2016) (on file with SEDAR).  During the Class Period, Conway sold over one million PSUs for over $8 million in cash, as set forth in the following chart:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|
| 3/15/2012 | 33333 | $2.90 | $96.665.70 |
| Class Period | | | |
| 3/15/2013 | 33333 | $6.11 | $203,664.63 |
| 4/15/2013 | 153846 | $6.10 | $938,460.60 |
| 8/30/2013 | 865384 | $4.82 | $4,171,150.88 |
| 3/14/2014 | 33334 | $6.92 | $230,671.28 |
| 3/14/2014 | 89384 | $6.86 | $613,174.24 |
| 5/31/2014 | 153846 | $7.90 | $1,215,383.40 |
| 3/13/2015 | 89384 | $4.47 | $399,546.48 |

72

| 4/30/2015 | 153846 | $4.16 | $639,999.36 |
|---|---|---|---|
| **Total** | **1,572,357** | **$5.35 (Average)** | **$8,412,050.87** |

258.   When annualized, the proceeds amount to approximately four times Conway's annual base salary during the Class Period.

259.   ***Chief Financial Officer David Blaiklock***:  During the Class Period, Defendant Blaiklock's salary ranged from approximately $335,000 to $350,000. *See* Primero Mining Corp., Mgmt. Info. Circular, at 36 (Apr. 16, 2012) (on file with SEDAR); Primero Mining Corp., Mgmt. Info. Circular, at 35 (Apr. 8, 2013) (on file with SEDAR).  Blaiklock's PSU cash sales before and during the Class Period are summarized below:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|
| 3/15/2012 | 13333 | $2.90 | $38,665.70 |
| Class Period | | | |
| 3/15/2013 | 13333 | $6.11 | $81,464.63 |
| 4/15/2013 | 50000 | $6.10 | $305,000.00 |
| 8/30/2013 | 50000 | $4.82 | $241,000.00 |
| 3/14/2014 | 13334 | $6.92 | $92,271.28 |
| 3/14/2014 | 30253 | $6.86 | $207,535.58 |
| 5/30/2014 | 50000 | $7.90 | $395,000.00 |
| **Total** | **206,920** | **$6.39 (Average)** | **$1,322,271.4** |

260.   When annualized, the proceeds amount to approximately double Blaiklock's annual base salary during the Class Period.

261.  ***Primero's Founder and Chairman of the Board Wade Nesmith***:
During the Class Period, Nesmith also sold over one million PSUs for cash.
During the Class Period, Nesmith received $250,000 annually in base director fees.
*See* Primero Mining Corp. Mgmt. Info. Circular, at 40 (Apr. 8, 2013) (on file with
SEDAR).  Nesmith's PSU sales are summarized below:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|
| 3/15/2012 | 16666 | $2.90 | $48,331.40 |
| Class Period | | | |
| 3/15/2013 | 16667 | $6.11 | $101,835.37 |
| 4/15/2013 | 291667 | $6.10 | $1,779,168.70 |
| 8/30/2013 | 432692 | $4.82 | $2,085,575.44 |
| 3/14/2014 | 16666 | $6.92 | $115,328.72 |
| 5/30/2014 | 291666 | $7.90 | $2,304,161.40 |
| 4/30/2015 | 291667 | $4.16 | $1,213,334.72 |
| **Total** | **1,341,025** | **$5.66 (Average)** | **$7,599,404.35** |

262.  When annualized, the proceeds amount to approximately ten times
Nesmith's annual base director fees during the Class Period.

263.  ***Primero's Former Director Eduardo Luna***:  During the Class Period,
Luna received $218,780 annually in base director fees.  *See* Primero Mining Corp.
Mgmt. Info. Circular, at 41 (Apr. 8, 2013) (on file with SEDAR).  Luna's PSU sales
are summarized below:

| Sales Date | Number of PSUs Sold | Sales Price | Proceeds |
|---|---|---|---|

74

| 3/15/2012 | 16666 | $2.90 | $48,331.40 |
|---|---|---|---|
| Class Period | | | |
| 3/15/2013 | 16667 | $6.11 | $101,835.37 |
| 8/30/2013 | 100000 | $4.82 | $482,000.00 |
| 12/5/2013 | 7496 | $5.50 | $41,228.00 |
| 3/6/2014 | 16666 | $6.92 | $115,328.72 |
| 12/31/2014 | 14252 | $4.98 | $70,974.96 |
| 12/15/2015 | 22546 | $2.97 | $66,961.62 |
| **Total** | **177,627** | **$5.22 (Average)** | **$878,328.67** |

264.   When annualized, the proceeds amount to approximately 1.5x Luna's annual base director fees during the Class Period.

## G.   Financial Motives of Primero

265.   During the Class Period, Defendants were also motivated to keep the Company's stock price high and maintain substantial cash flow in order to expand Primero's existing operations and acquire additional mines.  Primero repeatedly described itself as "focused on building a portfolio of high quality, low cost precious metals assets in the Americas through acquiring, exploring, developing and operating mineral resource properties."  *See, e.g.*, Aug. 11, 2011 Form 40-F, Ex. 99.1 at 9; Nov. 8, 2012 Form 40-F/A, Ex. 99.2 at 6; Apr. 2, 2013 Form 40-F, Ex. 99.1 at 11.  In addition, the Company repeatedly expressed its goal of becoming an "intermediate gold producer" by increasing production at San Dimas "and if appropriate, making additional acquisitions of precious metal properties in Latin America."  Aug. 11, 2011 Form 40-F Ex. 99.1 at 9; *see also* Q3 2011 Earnings Call, Bloomberg Tr., at 3 (Nov. 4, 2011); Q2 2012 Earnings Call, Bloomberg Tr. at 3.  These expansions and acquisitions were important to the

75

Company's strategy as it was receiving less than market value for the majority of the silver sold from the San Dimas mine.

266.   On October 16, 2012, shortly after the Company received the APA Ruling, Primero announced its plans to expand the San Dimas mine.  Press Release, *Primero Announces Expansion of its San Dimas Mine* (Oct. 16, 2012). That day, Defendant Conway noted on a conference call that "one of the reasons we wanted to expand this operation is obviously to get more positive leverage to silver[.]"  Primero Mining Corp. at Canaccord Genuity Resources Conference, Fair Disclosure Wire Tr., at 2.

267.   On the November 9, 2012 Q3 2012 Earnings Call, Defendant Conway noted that future acquisitions could be completed with cash and/or shares of the company, as "most people that we've been chatting to in terms of business combinations in general would have definitely declared they would prefer to be equity participants in Primero going forward."  Seeking Alpha Tr., at 9.

268.   The increased cash flow and artificially inflated stock price that Primero received from the filing of the APA application and positive APA Ruling allowed it to acquire two companies and their respective mining interests during the Class Period using artificially inflated Primero stock: (1) Cerro Resources NL on May 22, 2013, whose principal asset was 69.2% of the Cerro Del Gallo project, a gold/silver deposit in Mexico, for stock (*see* Press Release, Primero Announces Closing of Cerro Del Gallo Acquisition (May 22, 2013)) and Goldcorp's remaining interests in the Cerro del Gallo Gold/Silver Deposit on December 19, 2013 for an upfront payment of $8 million, plus contingent payments based on meeting certain milestones or market conditions (*see* Press Release, Primero Closes Acquisition of Remaining 30.8% of Cerro del Gallo (Dec. 19, 2013)); and (2) Brigus Gold Corp., whose principal assets were the Black Fox Mine and mill and adjoining properties

76

1   in Canada, for stock (*see* Press Release, Primero Announces Closing of Brigus

2   Acquisition (Mar. 5, 2014); Feb. 21, 2015 Form 6-K, Ex. 99.2 at 29).

3       269.   On December 13, 2012, just two months after the Company

4   announced the positive APA Ruling, Primero announced its intention to acquire

5   the Cerro Del Gallo project, which, according to Defendant Conway, took "more

6   than 12 months of effort." *Primero Mining Corp to Acquire Cerro Del Gallo*

7   *Conference Call*, FD (Fair Disclosure) Wire Tr., at 1.  With respect to the rationale

8   of the transaction, Conway stated that "if you are familiar with this Company, we

9   have been very much focused on diversification from a single asset, which is the

10  San Dimas operation and this fulfills that." *Id.* at 21.

11      270.   During the February 21, 2013 Q4 2012 Earnings Call, Defendant

12  Conway explained the Company's goals as follows:

13                 *      *      *

14  We want to become a mid-tier player, which is sort of 400,000 to
    500,000 ounces of production. We want to do that in low-risk regions

15  and we want to do that through establishing of a pipeline of projects,
    which all of those things if we follow the strategy that we talk about

16  that around the circle here should lead to per share growth in terms of
    reserves resources, cash flow and earnings and we basically take a

17  very simple approach here, one is to maintain our balance sheet
    strength and that's important part of it. We definitely need to, in this

18  industry, deliver on operational and achieve financial results.

19  We need to expand our existing operations or optimize them in any
    way we can, and in terms of increasing reserves and resources through

20  the drill bit is certainly a value-added proposition that we think is
    important for us. And then last but not least is a concept of

21  diversification and reduction of risk.

22                 *      *      *

23  Bloomberg Tr., at 1-2.  Conway further explained the importance of cash flow for

24  expanding the Company, stating, "Important feature, as well as if you're in a

25  growth mode of any company, it's important to demonstrate that you have the cash

26  flow and the capital to fund that growth and I think that's fairly clear from our

27  financial position as we stand today."  Bloomberg Tr., at 5.  As Conway previously

28

noted, the filing of the APA application and subsequent APA Ruling provided Primero with a significant cash boost in the form of the $22.2 million refund for taxes previously paid and reduced income taxes going forward. *See* Q3 2012 Earnings Call, Seeking Alpha Tr., at 3 (Nov. 9, 2012); Press Release, *Primero Reports Fourth Quarter and Full Year 2012 Results; Generates Record Revenues and Operating Cash Flow and Significant Free Cash Flow* (Feb. 21, 2013).

271. This cash boost also provided Primero with the ability to raise additional funds for expansion. Even after the APA Ruling expired on December 31, 2014, Primero expressed confidence that it would be renewed.

272. Shortly after the expiration of the APA Ruling, while its shares were still artificially inflated, Primero announced on January 20, 2015 that it entered into an agreement with a syndicate of underwriters who agreed to purchase $75 million of 5.75 % convertible subordinated debentures on a bought-deal basis. Press Release, Primero Announces US$75 Million Bought-Deal Offering of 5.75% Convertible Unsecured Subordinated Debentures (Jan. 20, 2015). The offering closed on February 9, 2015. Press Release, Primero Announces Closing of Offering of US $75 Million 5.75% Convertible Unsecured Subordinated Debentures (Feb. 2, 2015).

## H.   SOX Certifications

273. Defendants Conway and Blaiklock signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("**SOX**") that they filed with the SEC in connection with the filing of Primero's April 2, 2013 Form 40-F annual report for the fiscal year ended December 31, 2012. The Apr. 2, 2013 Form 40-F SOX certification states that the annual report "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities and Exchange Act of 1934" and "the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company. It further states in relevant part:

\*       \*       \*

**(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.**

**(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report.**

274.   The April 1, 2014 Form 40-F contained substantially similar certifications for the fiscal year ended December 31, 2013, signed by Defendants Conway and Blaiklock.

275.   The March 31, 2015 Form 40-F contained substantially similar certifications for the fiscal year ended December 31, 2014 signed by Defendants Conway and Kaufman.

276.   Defendants Conway and Blaiklock signed certifications of interim filings filed on Form 52-109F2 that they filed with the SEC in connection with Primero's May 8, 2013 Form 6-K, which stated in relevant part:

\*       \*       \*

**2.     No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.**

**3.     Fair presentation: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.**

1                              *      *      *

2        277.    The Aug. 28, 2013 Form 6-K contained substantially similar

3   certifications of interim filings on Form 52-109F2 signed by Defendants Conway and

4   Blaiklock, but for the interim period ended June 30, 2013.

5        278.    The Nov. 6, 2013 Form 6-K contained substantially similar certifications

6   of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, but

7   for the interim period ended September 30, 2013.

8        279.    The May 8, 2014 Form 6-K contained substantially similar certifications

9   of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, but

10  for the interim period ended March 31, 2014.

11       280.    The Aug. 7, 2014 Form 6-K contained substantially similar certifications

12  of interim filings on Form 52-109F2 signed by Defendants Conway and Blaiklock, but

13  for the interim period ended June 30, 2014.

14       281.    The Nov. 6, 2014 Form 6-K contained substantially similar certifications

15  of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, but

16  for the interim period ended September 30, 2014.

17       282.    The May 6, 2015 Form 6-K contained substantially similar certifications

18  of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, but

19  for the interim period ended March 31, 2015.

20       283.    The Aug. 5, 2015 Form 6-K contained substantially similar certifications

21  of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, but

22  for the interim period ended June 30, 2015.

23       284.    The Nov. 3, 2015 Form 6-K contained substantially similar certifications

24  of interim filings on Form 52-109F2 signed by Defendants Conway and Kaufman, but

25  for the interim period ended September 30, 2015.

26

27

28

# XIII. CLASS ACTION ALLEGATIONS

285. Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities who purchased or otherwise acquired Primero securities during the Class Period (the "**Class**") and were damaged thereby, seeking to pursue remedies under the Exchange Act.

286. Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

287. Also excluded from the Class are those who purchased or otherwise acquired Primero securities on foreign exchanges or purchased or otherwise acquired Primero securities outside of the United States, in accordance with the United States Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010) ("[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.").

288. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Primero securities were actively traded, including on the NYSE. While the exact number of Class members cannot be determined at this early stage, Plaintiffs believe that thousands of people purchased Primero securities during the Class Period. Record owners and other members of the Class may be identified from records maintained by Primero or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

289.   Plaintiffs' claims are typical of the claims of the other members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

290.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

291.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, *inter alia*:

a)  Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)   Whether statements made by Primero and the Officer Defendants during the Class Period continued untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)  Whether and to what extent Primero and the Officer Defendants' material untrue statements and/or omissions of material fact caused the market price of Primero's securities to be artificially inflated during the Class Period;

d)  Whether Primero and the Officer Defendants acted with the requisite level of scienter in issuing false and misleading financial statements;

e)  Whether the Individual Defendants were controlling persons of Primero;

f)  Whether reliance may be presumed pursuant to the *Affiliated Ute* presumption or the fraud-on-the-market presumption; and

g)  Whether the Class members have sustained damages, and if so, the proper measure of damages.

**FIRST AMENDED CLASS ACTION COMPLAINT 2:16-cv-01034 BRO(RAOx)**

292.   Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

293.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## XIV.  LOSS CAUSATION

294.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Primero's stock price and operated as a fraud or deceit on those who purchased or otherwise acquired Primero securities during the Class Period by misrepresenting the Company's business and prospects.  During the Class Period, Primero and the Officer Defendants misrepresented and concealed the true facts regarding the circumstances surrounding the APA application, the APA Ruling, and the ruling's likelihood of renewal.  Later, as Primero and the Officer Defendants' prior misrepresentations, omissions, and scheme were disclosed and became apparent to the market, the price of Primero securities fell precipitously.  As a result of their purchases or acquisitions of Primero securities during the Class Period at artificially inflated prices, Plaintiffs and other Class members suffered damages as the truth was revealed.

295.   The respective Defendant's wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.  Primero's and the Officer Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period directly caused losses

to Plaintiffs and the Class.  On the strength of these statements, the Company's stock price was artificially inflated to a Class Period high of $8.47 per share on July 10, 2014.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Primero's business, operations, performance, and prospects. The allegations herein suffice under both a corrective disclosure theory and a materialization of the risk theory of loss causation.

296.   "A corrective disclosure reveals the fraud, or at least some aspect of the fraud to the market." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266-67 (S.D. Cal. 2010).  Under a corrective disclosure theory, the disclosure of the *juicio* corrected misrepresentations concerning the Primero's payment of taxes at the SW Purchase price, and its ability to continue to pay that lower tax amount, and consequently removed a portion of the artificial inflation in the price of Primero's stock and directly and proximately caused Plaintiffs and other Class members to suffer damages.  For example, on February 3, 2016, when Primero announced *inter alia* that the SAT filed a legal claim seeking to nullify the Company's APA Ruling, Primero stock declined $0.74 per share to close at $1.89 per share on February 4, 2016, a one-day decline of 28% on unusually high volume of shares.

297.   Subsequent disclosures confirmed Primero's misrepresentations and revealed material omissions relating to the APA's vulnerability.  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (finding subsequent press release that company mischaracterized loans confirmed investors' suspicions regarding subpoena announced one month prior constituted corrective disclosure).  On February 18, 2016, for example, Primero filed a form 6-K with the SEC revealing that the SAT was unlikely to renew the APA Ruling, correcting Primero's past statements about the APA Ruling's impact.  ¶178.  In response, Primero's stock declined $0.06 per share to

close at $1.45 per share on February 18, 2016, a one-day decline of 4% on unusually high volume of shares.  ¶179.  Subsequently published *Reforma* articles and court decisions revealed Luis Natera's failure to recuse himself given his brother's, Christian Natera's, involvement in the APA Ruling ¶¶205, 165-75.  Lastly, court decisions  (¶¶165-75, 177), and the Defendants' filing of the APA Ruling in this Court's docket (ECF No. 75-2), revealed that (i) Luis Natera improperly failed to recuse himself from Primero's APA given that his brother, Christian Natera, was an authorized representative of the Company as set forth in ¶¶124-29; (ii) the APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero as set forth in ¶¶130-35, 138-40; (iii) the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a transaction complies with the ALP as explained in ¶¶136-37, 139, 141; and (iv) Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its ***comparable independent*** transaction (*i.e.*, the External SPA 2004 between Wheaton River and Silver Wheaton) was actually a ***related party transaction*** and was therefore an inappropriate comparison transaction as explained in ¶¶142-48 above.

298.   Under the materialization of the risk theory, a fraud is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the fraud.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)*.*  Stated otherwise, loss causation allegations under this theory suffice where "defendants' misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of the security."  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546-48 (N.D. Cal. 2009).  Primero's and the Officer Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period concealed the risks underlying the APA Ruling's specific vulnerability— that (i) Luis

85

Natera improperly failed to recuse himself from Primero's APA given that his brother, Christian Natera, was an authorized representative of the Company as set forth in ¶¶124-29; (ii) the APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero as set forth in ¶¶130-35; (iii) the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a transaction complies with the ALP as explained in ¶¶136-37, 139, 141; and (iv) Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its ***comparable independent*** transaction (*i.e.*, the External SPA 2004 between Wheaton River and Silver Wheaton) was actually a ***related party transaction*** and was therefore an inappropriate comparison transaction as explained in ¶¶142-48 above— which would have spared all or some of Plaintiffs' loss as a result of the disclosure of the SAT's legal claim and that the APA Ruling was unlikely to be renewed.

299.   Until shortly before Plaintiffs filed this Complaint, they were unaware of the facts alleged herein and could not have reasonably discovered the alleged misrepresentations and omissions by the exercise of reasonable diligence.

## XV.  CONTROL PERSON LIABILITY

300.   The Individual Defendants, because of their positions with Primero, possessed the power and authority to control the contents of Primero's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, as well as the power to compel Primero to disclose material information before transacting in Primero's securities, or to otherwise abstain from such transactions until it did so.  Each of the Individual Defendants had a duty to (1) promptly disseminate complete, accurate, and truthful information with respect to the APA Ruling, its impact, renewability, and the

Company's financial statements and operations; (2) correct any previously issued statements that were materially misleading or untrue when made so that the market could accurately price the Company's securities based upon truthful, accurate, and complete information; (3) update any previously-issued forward-looking statements that became materially misleading or untrue so that the market could accurately price the Company's securities based upon truthful, accurate, and complete information; and (4) a duty to ensure that the Company abstain from conducting the Brigus acquisition or disclose adverse facts before doing so.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## XVI.  THE FRAUD ON THE MARKET PRESUMPTION

301.   At all relevant times, the market for Primero's securities was an efficient market for the following reasons, among others:

     a.     Primero's common stock was listed and actively traded on the NYSE (symbol PPP), a highly efficient market;

     b.     As a registered and regulated issuer of securities, Primero filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c.   Primero regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.   The market reacted to public information disseminated by Primero;

e.   Approximately 14 analysts[18] followed Primero's business and wrote reports which were publicly available and affected the public marketplace;

f.   The material misrepresentation and omissions alleged herein would tend to induce a reasonable investor to overvalue Primero's stock; and

g.   Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired Primero securities between the time that the Defendants made the material misrepresentations and omissions the time that the truth was revealed, during which time the price of Primero securities was artificially inflated by Defendants' misrepresentations and omissions.

302.   As a result of the above, the market for Primero securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' prices.  The historical daily trading prices and volumes of Primero securities are incorporated herein by reference.

---

[18]   Primero, Analyst Coverage, http://www.primeromining.com/English/investors/analyst-coverage/default.aspx (last visited Feb. 27, 2017).

Under these circumstances, all those who purchased or otherwise acquired Primero
securities during the Class Period suffered similar injuries through their purchases or
acquisitions of securities at prices which were artificially inflated by Defendants'
misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XVII.  THE AFFILIATED UTE PRESUMPTION

303.   At all relevant times, Plaintiffs and the Class reasonably relied upon
Defendants to disclose material information as required by law and in the Company's
SEC filings.  Plaintiffs and the Class would not have purchased or otherwise acquired
Primero securities at artificially inflated prices if Defendants had disclosed all material
information as required.  Thus, to the extent Defendants wrongfully failed to disclose
material facts and information concerning the circumstances surrounding the APA
application and the APA Ruling, or otherwise omitted material facts and information,
Plaintiffs and the Class are presumed to rely on Defendants' omissions as established
by the Supreme Court in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972).

## XVIII.  NO STATUTORY SAFE HARBOR

304.   The safe harbor provisions for forward-looking statements under the
Private Securities Litigation Reform Act of 1995 are applicable only under certain
circumstances that do not apply to any of the materially false and misleading
statements and omissions alleged in this Complaint.

305.   First, many of the identified false and misleading statements and
omissions herein are not forward-looking statements, but instead are statements of
current or historic fact.

306.   Second, to the extent there were any forward-looking statements that
were identified as such at the time made, there were no meaningfully cautionary

statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

307.   Third, such false and misleading statements were not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings class, or other public statement described herein were general, "boilerplate" statements of risk that would affect any mining company, and misleadingly contained no factual disclosure of any of the specific details concerning the vulnerability of the APA Ruling, or similar important factors that would give investors adequate notice of such risks.

308.   Fourth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Primero who actually knew that each such statement was false or misleading when made.

## XIX.  THE ACT OF STATE DOCTRINE IS INAPPLICABLE

309.   As explained by the Supreme Court in *W.S. Kirkpatrick, Co. v. Environmental Tectonics Corp., Int'l.*, 493 U.S. 400, 401-410 (1990) ("*Kirkpatrick*"), the act of state doctrine does not bar "a court in the United States from entertaining a cause of action ***that does not rest upon the asserted invalidity of an official act of a foreign sovereign***, ***but that does require imputing to foreign officials an unlawful motivation (the obtaining of bribes in the performance of such an act***." "The act of

90

state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id.* at 409.

310.   "Act of state issues only arise when a court ***must*** decide – that is, when the outcome of the case turns upon – the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine." *Id*. at 406.  Thus in *Kirkpatrick*, the Supreme Court held the act of state doctrine was not implicated because, "Regardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the rule of decision that the act of state doctrine requires." *Id.*

311.   In other words, when the Supreme Court uses the term "valid" it means valid in the sense that the act of state should be deemed legally operative—not lawfulness in any other legal sense such as whether the act of state violated international law or the internal laws of the sovereign.  *Compare Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 415, 439 (1964) (applying the act of state doctrine even though the act of state was alleged to have violated international law because the court would have been ***required to invalidate*** a Cuban act of state) *with Kirkpatrick*, 493 U.S. at 402-405 (declining to apply the act of state doctrine even though the facts to be determined in the U.S. proceeding would have established that the sovereign's acts were illegal under "Nigerian law [which] prohibits both the payment and the receipt of bribes in connection with the award of a government contract").

312.   Plaintiffs are not asking the Court to invalidate the APA Ruling by declaring it legally inoperative or ineffective.  Findings in this action that Primero violated U.S. securities laws by engaging in illegal insider trading, that certain defendants intentionally misled investors by failing to disclose known adverse facts,

and that certain defendants who, as control persons, could have prevented Primero's wrongdoing in no way would require the Court to nullify or invalidate the APA Ruling.  Indeed the Court could assume the APA Ruling legally operative yet nonetheless adjudicate Plaintiffs' claims in Plaintiffs' favor.  Although Plaintiffs' claims may require adjudication of facts which would support a finding that the APA Ruling was improperly issued under Mexican tax law, that would in no way implicate the act of state doctrine per the Supreme Court's *Kirkpatrick* precedent.  *Kirkpatrick*, 493 U.S. at 405-06.

313.   Even if the act of state doctrine were implicated, the Ninth Circuit has articulated four factors that courts are required to evaluate in deciding whether to apply the doctrine given the public policy reasons underlying the doctrine:  (1) the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it; (2) the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches; (3) the balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence; and (4) whether the foreign state was acting in the public interest.  *John Doe I v. Unocal Corp.*, 395 F.3d 932, 959 (9th Cir. 2002).  These factors taken together militate against application of the act of state doctrine.

314.   The first factor—the degree of codification or consensus concerning a particular area of international law—makes it more appropriate to render decisions touching on the APA Ruling.  The arms-length principle outlined in the Guidelines "is the approach which nearly every country seeking to address [transfer pricing] issues has decided to take."  United Nations, *Practical Manual on Transfer Pricing for Developing Countries*, at iii (N.Y. 2013).  The 34 OECD member countries comprising 78% of the world GDP, and non-OECD member countries such as China,

92

India and Russia, have all adopted the Guidelines on transfer pricing.  Office of the United States Trade Representative, *Organization for Economic Co-Operation and Development (OECD)*, https://ustr.gov/trade-agreements/wto-multilateral-affairs/oecd (last visited Feb. 8, 2017); OECD, *Transfer Pricing Country Profiles*, http://www.oecd.org/ctp/transfer-pricing/transferpricingcountryprofiles.htm (last visited Feb. 8, 2017).  Accordingly, there is a high degree of consensus concerning transfer pricing and the arms-length principle.

315.   The second factor—the implications of the issue for our foreign relations—weighs against application of the act of state doctrine.  Mexico has repudiated the APA Ruling and is actively seeking to nullify it via the *juicio de lesividad*.  Additionally, the Mexican government has removed Luis Natera from the SAT and suspended him from public service because of his conduct involving Primero's APA Ruling.  ¶¶165-71.  Accordingly, any finding of impropriety connected to the APA Ruling "would more likely be consonant, than at odds, with the present position of the [Mexican] government."  *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2000).

316.   The third factor—whether the government which perpetrated the act is no longer in existence—also militates against application of the doctrine in this case.  The government that approved the APA Ruling has since been replaced by the Enrique Peña Nieto's government.  ¶163.  Not long after Nieto took power, his government suspended Luis Natera from the SAT.  ¶165-71.  The General Administration of Major Taxpayers is now led by Oscar Molina Chie.  ¶164.  That the current government now seeks to overturn the APA Ruling granted by the former government, demonstrates that the act of state doctrine "shift[s] the balance of considerations[,]" showing that the doctrine "has little or no applicability" to Plaintiffs' claims.  *Republic of Phillipines v. Marcos*, 862 F.2d 1355, 1359-61 (9th Cir. 1988).

93

317.    The fourth and final factor—whether the act of state was in the public interest—further weighs against the application of the doctrine.  The APA Ruling bars Mexico's government from obtaining legitimate tax revenue that it can use to finance development for its citizens.  As noted by the United Nations, "[t]here is a risk, without an effective response to transfer pricing issues, that profits might appear to be earned in low or no tax jurisdictions . . . and losses might appear to be incurred in high-tax jurisdictions. . . . This may have the net effect of minimizing taxes and, in so doing, may impact on the legitimate tax revenues of countries where economic activity of the MNE takes place, and therefore the ability of such countries to finance development."  United Nations, *Practical Manual on Transfer Pricing for Developing Countries*, at iii (N.Y. 2013).  As evidenced by Mexico's suspension of Luis Natera, and its filing of the *juicio* seeking to nullify the APA Ruling, the APA Ruling minimized Primero's taxes to the detriment of Mexico's public interest in collecting legitimate taxes to finance development for its citizens.

## XX.  CAUSES OF ACTION

### COUNT I

#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Primero and the Officer Defendants

318.    Plaintiffs re-allege each allegation above as if fully set forth herein.

319.    This Count is brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against Primero and the Officer Defendants.

320.    During the Class Period, Primero and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press release, conference calls, and analyst reports

concerning the APA Ruling, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

321.   Primero and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the APA Ruling and the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

322.   Primero and the Officer Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

323.   As a result of Primero and the Officer Defendants' dissemination of materially false and misleading information ant their failure to disclose material facts, Plaintiffs and the Class Members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

324.   Primero is liable for the acts of the Officer Defendants and other Company agents and personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Primero in taking the actions alleged herein.

325.   Plaintiffs and Class Members purchased or otherwise acquired Primero securities, without knowing that Primero and the Officer Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Plaintiffs and Class members relied directly or indirectly on false and misleading statements by Primero and the Officer Defendants, and/or an

95

absence of material adverse information that was known to Primero and the Officer Defendants or recklessly disregarded by them but not disclosed in Primero and the Officer Defendants' public statements.  Plaintiffs and Class Members were damaged as a result of their reliance on Primero's and the Officer Defendants' false statements and misrepresentations and omissions of material facts.

326.   At the time of each of Primero's and the Officer Defendants' false statements, misrepresentations and omissions, Plaintiff and Class members were unware of their falsity and believed them to be true.  Plaintiff and the Class would not otherwise have purchased or acquired Primero securities at the prevailing prices had they known the truth about the matters discussed above.

327.   Plaintiffs are filing this action within two years after discovery of the facts constitution the violation, including facts establishing scienter and other elements of Plaintiffs' claims, and within five years after the violations with respect to Plaintiffs' investments.

328.   By virtue of the foregoing, Primero and the Officer Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

329.   As a direct and proximate result of Primero's and the Officer Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchases or acquisitions of Primero securities.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Officer Defendants

330.   Plaintiffs reallege each allegation above as if fully set forth herein.

331.   This Count is asserted against the Officer Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

332.   As set forth above, Primero committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period concerning the vulnerability of the APA Ruling to the filing of a *juicio de lesividad* or nonrenewal.

333.   Each of the Officer Defendants, by reason of their status as senior executive officers and/or directors of Primero, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of § 20(a) of the Exchange Act.  The Officer Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class's investments in Primero securities within the meaning of § 20(a) of the Exchange Act.  Therefore, the Officer Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

334.   The Officer Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Officer Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

335.   The Officer Defendants knew or recklessly disregarded the fact that Primero's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Officer Defendants did not act in good faith.  By virtue of their high-level positions and their participation in and awareness of Primero's operations and public statements, the Officer Defendants were able to and did influence and control Primero's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend

contained materially false and misleading information and on which Plaintiff and the Class relied.

336.   The Officer Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

337.   As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases or acquisitions of Primero securities.

## COUNT III

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Primero

338.   Plaintiffs reallege each allegation above as if fully set forth herein.

339.   This Count is brought against Primero for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and other members of the Class.

340.   On or around March 5, 2017, Primero sold 41,340,664 shares of Primero common stock to Plaintiffs and Class members in connection with Primero's Brigus acquisition.  ¶162.

341.   The knowledge of Primero's officers, directors, and agents may be attributed to Primero itself.  *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

342.   Thus, in connection with Primero's Brigus acquisition, Primero sold or otherwise disposed of Primero common stock to Brigus shareholders while in possession of the following material nonpublic information: (i) Luis Natera improperly failed to recuse himself from Primero's APA given that his brother, Christian Natera, was an authorized representative of the Company as set forth in ¶¶124-29; (ii) the APA Ruling approved a transfer pricing methodology other than the

CUP methodologies that were proposed by Primero as set forth in ¶¶130-35, 138-40; (iii) the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a transaction complies with the ALP as explained in ¶¶136-37, 139, 141; and (iv) Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its **_comparable independent_** transaction (*i.e.*, the External SPA 2004 between Wheaton River and Silver Wheaton) was actually a **_related party transaction_** and was therefore an inappropriate comparison transaction as explained in ¶¶142-48 above.

343.   In conducting the transaction, Primero did not disclose the material non-public information to shareholders of Brigus, such as Plaintiffs.

344.   Plaintiffs and other members of the Class acquired Primero shares as a direct result of Primero's acquisition of Brigus, *i.e.*, contemporaneously with Primero's sales.

345.   Plaintiffs and other members of the Class suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Primero common stock.  Plaintiffs and other members of the Class would not have acquired Primero common stock at the consideration they paid, or at all, if they had been aware that the market prices had been artificially inflated by Primero's failure to disclose material non-public information, or if they had been aware of the material non-public information Primero failed to disclose.

## COUNT IV
## Violations of Section 20A of the Exchange Act Against Primero

346.   Plaintiffs reallege each allegation above as if fully set forth herein.

347.   This Count is brought against Primero by Plaintiffs for violation of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.  Plaintiffs and other Class members purchased or otherwise acquired Primero stock contemporaneously with the

sales and/or disposal of Primero stock by Primero in connection with Primero's acquisition of Brigus.

348.    Section 20A(a) of the Exchange Act provides that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."

349.    As set forth in Count III, Primero violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in fraudulent, deceptive or manipulative practices and trading in Primero securities while in possession of material, nonpublic information relating to the APA Ruling.

350.    As detailed above (¶162), Plaintiffs acquired Primero common stock as a direct result of Primero's acquisition of Brigus.  *See* ECF No. 13-4.  As a result, Plaintiffs and other Class members: (i) suffered substantial damages in that they purchased Primero common stock without knowledge of the following material facts: (a) Luis Natera improperly failed to recuse himself from Primero's APA given that his brother, Christian Natera, was an authorized representative of the Company as set forth in ¶¶124-29; (b) the APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero as set forth in ¶¶130-35, 138-40; (c) the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of the MITL that are used to determine whether a transaction complies with the ALP as explained in ¶¶136-37, 139, 141; and (d) Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its ***comparable independent*** transaction (*i.e.*, the External

100

SPA 2004 between Wheaton River and Silver Wheaton) was actually a ***related party transaction*** and was therefore an inappropriate comparison transaction as explained in ¶¶142-48 above; and (ii) would not have purchased Primero common stock at the prices Plaintiffs and the Class paid, or at all, if they had been aware that the market prices had been artificially inflated by Primero's and the Officer Defendants' false and misleading statements and/or omissions.

351.   Primero is required to account for all such stock sales and to disgorge their profits or losses avoided.

## COUNT V

### Violations of Section 20(a) of the Exchange Act Against The Director Defendants And Conway

352.   Plaintiffs reallege each allegation above as if fully set forth herein.

353.   The Director Defendants were each directors of Primero, and Conway was CEO of Primero at the time of Primero's acquisition of Brigus.  By reason of their respective statuses as directors and CEO of Primero, the Director Defendants and Conway directly or indirectly, controlled the conduct of Primero in the sale of Primero common stock, within the meaning of §20(a) of the Exchange Act.  Therefore, the Director Defendants and Conway are jointly and severally liable for Primero's violations of Section 20A, as alleged in Counts III and IV.

354.   By virtue of their high-level positions and their participation in and awareness of Primero's operations and public statements, Conway and the Director Defendants were able to and did influence and control Primero's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and other Class members contend contained materially false and misleading information and omissions and on which Plaintiffs and the Class relied.

355.   Conway and the Director Defendants had the power to control or influence the transactions, statements, and omissions giving rise to the securities violations alleged herein, set forth more fully above in Counts III and IV.

356.   As set forth in Counts III and IV, Defendant Primero violated §§ 10(b) and 20A of the Exchange Act and Rule 10b-5, thereunder, by the acts and omissions as alleged herein.  By virtue of their positions as controlling persons, Conway and the Director Defendants are also liable pursuant to §20(a) of the Exchange Act.

357.   As a direct and proximate result of the Director Defendants', Conway's, and Primero's wrongful conduct, Plaintiffs and other Class Members suffered damages in connection with their acquisition of Primero common stock.

## XXI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and statements alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.   Awarding rescissory damages and/or disgorgement in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

E.     Awarding such other and further relief as this Court may deem just and proper.

## XXII.  JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:  February 27, 2017          Respectfully submitted,

By: /s/ *Richard W. Gonnello*
          Richard W. Gonnello

Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice*)
Megan M. Sullivan (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: rgonnello@faruqilaw.com
          klenahan@faruqilaw.com
          msullivan@faruqilaw.com

Barbara A. Rohr
SBN 273353
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimilie: 424-256-2885
Email: brohr@faruqilaw.com

*Attorneys for Lead Plaintiffs Royal Wulff Ventures LLC and Robert E. Cook, as Trustee for the Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988 and Lead Counsel for the Class*